Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | District Case No. 08-CV-01194-W-CAB<br><br>Bankruptcy Court No. 04-00769-PB11<br><br>Appeal No. 2 |
| DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,<br><br>APPELLANTS,<br><br>v.<br><br>CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,<br><br>APPELLEE. | **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**<br><br>[Filed concurrently with Application for Order Shortening Time; Notice of Motion and Motion For Stay Pending Appeal; Memorandum of Points and Authorities; Declaration of Michael G. Fletcher]<br><br>DATE: To Be Set<br>TIME: To Be Set<br>COURTROOM: Seven<br><br>The Honorable Thomas J. Whelan, Judge Presiding |

Appellants/Movants Dynamic Finance Corporation and Angela C. Sabella hereby request the Court take judicial notice of the following papers and pleadings, true and complete copies of which are attached hereto at the Exhibit tabs referenced below and incorporated herein:

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

1. 2/27/04 Order For Relief Signed On 2/27/2004. **BK Docket No.** 12[1]
2. 9/8/05 Memorandum Of Points And Authorities In Opposition Re Motion For Order: (1) Approving Settlements With Secured Creditors [including Dynamic and Sabella] Filed By John L. Hosack On Behalf Of Dorene Mae Bree, James Bree, South Temecula Gateway, LLC. **BK Docket No.** 320
3. 4/17/06 Order On Motion To Approve Settlement [Of Dynamic's Secured Claims And Sabella's Secured Claims] Signed On 4/17/2006. NOT FOR PUBLICATION **BK Docket No.** 456
4. 6/6/06 Order Granting Application for Appointment of Chapter 11 Trustee Richard M Kipperman Trustee signed on 6/6/2006. **BK Docket No.** 484
5. 5/2/07 Notice Of Motion Of Richard M Kipperman, Chapter 11 Trustee (i) To Compel Responses To Subpoenas For Documents And Testimony To Isaac Lei, The Alcon Group And Custodian Of Records Of The Alcon Group etc. **BK Docket No.** 541
6. 5/2/07 Richard M Kipperman, Chapter 11 Trustee's Motion To Compel Responses To Subpoenas For Documents And Testimony To Isaac Lei, The Alcon Group And Custodian Of Records Of The Alcon Group etc.; Memorandum of Points and Authorities in Support **EXCLUDING ALL EXHIBITS FOR BREVITY AND CONVENIENCE. BK Docket No.** 542
7. 5/29/07 Opposition Of Isaac Lei And The Alcon Group, And Angela C. Sabella And Dynamic Finance Corporation To The Motion Of Richard M. Kipperman, Chapter 11 Trustee (i) To Compel Responses To Subpoenas For Documents And Testimony Of Isaac Lei, The Alcon Group And Custodian Of Records Of The Alcon Group etc.; Request For Judicial Notice And Memorandum Of Points And Authorities In Support Thereof **BK Docket No.** 563

---

[1] "BK Docket" refers to the Docket of the U.S. Bankruptcy Court Southern District of California (San Diego) Bankruptcy Petition #: 04-00769-PB11 for *In Re: North Plaza, LLC.*

8. 5/29/07  Declaration Of Isaac Lei In Support Of Opposition Of Isaac Lei And The Alcon Group To The Motion Of Richard M. Kipperman, Chapter 11 Trustee (i) To Compel Responses To Subpoenas For Documents And Testimony Of Isaac Lei, The Alcon Group And Custodian Of Records Of The Alcon Group etc. **EXCLUDING ALL EXHIBITS FOR BREVITY AND CONVENIENCE BK Docket No.** 564

9. 5/29/07  Declaration Of Angela C. Sabella In Support Of Opposition Of Isaac Lei And The Alcon Group To The Motion Of Richard M. Kipperman, Chapter 11 Trustee (i) To Compel Responses To Subpoenas For Documents And Testimony Of Isaac Lei, The Alcon Group And Custodian Of Records Of The Alcon Group  **BK Docket No.** 565

10. 7/24/07  Supplemental Opposition To Motion To Compel Responses To Subpoenas For Documents And Testimony Of Isaac Lei, The Alcon Group And Custodian Of Records Of The Alcon Group, etc. **BK Docket No.** 640

11. 3/7/08  Hearing Brief Of Privilege Holders Dynamic Finance Corporation And Angela C. Sabella Filed By Michael Gerard Fletcher On Behalf Of Dynamic Finance Corporation & Angela C. Sabella. **BK Docket No.** 704

12. 4/8/08  Closing Brief Of Privilege Holders Dynamic Corporation And Angela C. Sabella **BK Docket No.** 734

13. 6/2/08  Written Decision. Order Granting Motion To Compel Discovery From Isaac Lei/Alcon Group; (Related Documents 542 Motion To Compel ) Signed On 5/30/2008. Not For Publication  **BK Docket No.** 772

14. 6/9/08  Notice Of Appeal. BK Appeal No. 2 (Related Documents 772 Order) Filed By Michael Gerard Fletcher On Behalf Of Dynamic Finance Corporation & Angela C. Sabella.  **BK Docket No.** 773

15. 6/12/08  Dynamic Finance Corporation's And Angela Sabella's Notice Of Motion And Motion For Stay Pending Appeal. BK Appeal No. 2 Of Order On The Trustee's Motion To Compel Discovery From Isaac Lei/The Alcon Group; Declaration Of Michael Fletcher In Support Thereof; Memorandum Of Points And Authorities In Support Thereof (Related Documents 772 Order, 773 Notice Of Appeal) **BK Docket No.** 775

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

16. 6/12/08 Declaration Of Michael Gerard Fletcher In Support Of Dynamic Finance Corporation's And Angela Sabella's Motion For Stay Pending Appeal On The Trustee's Motion To Compel (Related Documents 775 Motion For Stay Pending Appeal) **BK Docket No.** 776

17. 6/25/08- Opposition of Chapter 11 Trustee, Richard M. Kipperman to Motion of Dynamic Finance Corporation and Angela C. Sabella for Stay Pending Appeal [FRBP 8005] **BK Docket No.** 788.

18. 6/25/08 Election For Appeal To Be Heard By District Court. BK Appeal 2 **BK Docket No.** 786

19. 6/30/08 Reply To Opposition Of Trustee To Dynamic Finance Corporation And Angela Sabella's Motion For Stay Pending Appeal Of Order On The Trustee's Motion To Compel Discovery From Isaac Lei/The Alcon Group (Related Documents 788) **BK Docket No.** 792

20. 7/2/08 Minute Order. Hearing Date: 07/02/2008, Matter: Dynamic Finance Corporation And Angela Sabella's Motion For Stay Pending Appeal Of Order On Trustee's Motion To Compel Discovery From Isaac Lei/The Alcon Group (On Shortened Time). Disposition: Denied. See Attached PDF Document For Details. (Related Documents 777 Motion For Ex Parte Relief) **BK Docket No.** 796

21. 7/2/08 Transcript of Hearing Date: 07/02/2008, Matter: Dynamic Finance Corporation And Angela Sabella's Motion For Stay Pending Appeal Of Order On Trustee's Motion To Compel Discovery From Isaac Lei/The Alcon Group (On Shortened Time) (not on BK Docket)

22. *Grubbs v. K Mart Corp.*, 411 N.W.2d 477, 480 (Mich.Ct.App. 1987) cited by Bankruptcy Court in Order (see Exhibit 13, above).

23. *Gerheise v. Stephens*, 712 So.2d 1252, 1254 (Fl.App. 1998) cited by Bankruptcy Court in Order (see Exhibit 13, above).

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

24. Memorandum and Order Re: [Denying] Motions to Stay and for Reconsideration, *In re Napster, Inc. Copyright Litigation*, US District Court for the Northern District of California Case No. C MDL-0001369 MHP filed May 17, 2006

25. Minute Order Re: [Granting] Motion for Stay on Appeal, *In re Napster, Inc. Copyright Litigation*, Ninth Circuit Court of Appeals Case No. 06-15886 filed May 19, 2006  **Ninth Circuit Court of Appeals Docket No.** 16.

26. Minute Order Re: [Granting] Plaintiff and Counter-Defendant's Motion to Dismiss Trustee Defendant's Counterclaims, United States Bankruptcy Court Southern District (San Diego), *Dynamic Finance Corporation v. Kipperman, et al.,* Case No. 08-90035-PB filed 1/28/98.

DATED: July 11, 2008             FRANDZEL ROBINS BLOOM & CSATO, L.C.
                                 MICHAEL GERARD FLETCHER
                                 TRICIA L. LEGITTINO


                                 By:  /s/ Michael Gerard Fletcher
                                      MICHAEL GERARD FLETCHER
                                      Attorneys for Movants/Appellants
                                      Dynamic Finance Corporation and
                                      Angela C. Sabella

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re

NORTH PLAZA, LLC,

Debtor.

DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,

APPELLANTS,

v.

CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,

APPELLEE

District Case No. 08-CV-01194-W-CAB

Bankruptcy Court No. 04-00769-PB11

Appeal No. 2

**EXHIBITS 1 THROUGH 3 TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**

DATE: To Be Set
TIME: To Be Set
COURTROOM: Seven

The Honorable Thomas J. Whelan, Judge Presiding

**EXHIBIT 1**

EXHIBIT 1
PAGE 1

CSD 1127 [07/01/96]

ENTERED 2/27/04
FILED
FEB 27 2004
CLERK U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re

NORTH PLAZA, LLC

Debtor.

BANKRUPTCY NO. 04-00769-B11

**ORDER FOR RELIEF AND ORDER DIRECTING DEBTOR TO FILE SCHEDULES AND STATEMENT OF FINANCIAL AFFAIRS**

On consideration of the involuntary petition filed by PHILLIPS, HASKETT & INGWALSON on JANUARY 28, 2004, and the summons issued thereon having been served on FEBRUARY 5, 2004, and no answer or other pleading in response thereto having been timely filed, an ORDER FOR RELIEF under Chapter 11 of Title 11 of the United State Code is GRANTED.

IT IS ORDERED that the Debtor file with the Court, WITHIN 15 DAYS of the entry of this order, the schedules and statements required by Federal Rule of Bankruptcy Procedure 1007(b) and (c).

DATED: FEB 27 2004

Judge, United States Bankruptcy Court

**CERTIFICATE OF MAILING**

I hereby certify that on this date a copy of the within order was mailed to the following parties in interest, namely:

NORTH PLAZA, LLC, 29400 Rancho California Rd., Temecula, CA 92591
Terry D. Phillips, Phillips, Haskett & Ingwalson, 701 "B" St., Ste. 1190, San Diego, CA 92101-8108
Martin T. McGuinn, Kirby & McGuinn, APC, 600 "B" St., Ste. 1950, San Diego, CA 92101-4515
Edward G. Schloss, 11300 West Olympic Blvd., Suite 620, Los Angeles, CA 90064
Milford W. Dahl, Jr., Rutan & Tucker, LLP, 611 Anton Blvd., 14th Floor, Costa Mesa, CA 92626-1931
Sonali S. Jandial, Richards, Watson & Gershon, 355 South Grand Ave., 40th Floor, Los Angeles, CA 90071-3101
United States Trustee, Dept. of Justice, 402 W. Broadway, Ste. 600, San Diego, CA 92101

DATED: FEB 27 2004

Barry K. Lander, Clerk

By: N. Wilkerson, Deputy Clerk

CSD 1015

# EXHIBIT 2

EXHIBIT 2
PAGE 3

JEFFER, MANGELS, BUTLER & MARMARO LLP
JOHN L. HOSACK, ESQ. (State Bar No. 42876)
DAVID M. POITRAS, P.C., ESQ. (State Bar No. 141309)
THOMAS M. GEHER, ESQ. (State Bar No. 130588)
1900 Avenue of the Stars, Seventh Floor
Los Angeles, California 90067-4308
Telephone: (310) 203-8080
Facsimile: (310) 203-0567

Attorneys for Secured Creditors JAMES BREE, DORENE MAE BREE and SOUTH TEMECULA GATEWAY, LLC

ORIGINAL

FILED KD
05 SEP -8 AM 10:45
CLERK
U.S. BANKRUPTCY CT.
SO. DIST OF CALIF

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In Re

NORTH PLAZA, LLC,

Debtor.

CASE NO. 04-00769-PB11

Chapter 11

**SECURED CREDITORS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO NORTH PLAZA, LLC's MOTION FOR ORDER: (1) APPROVING SETTLEMENTS WITH SECURED CREDITORS; AND (2) AUTHORIZING PAYMENT OF SECURED CLAIMS**

Date: September 21, 2005
Time: 10:30 a.m.
Courtroom: Four
Judge: Honorable Peter W. Bowie

PRINTED ON RECYCLED PAPER

3675202v1

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2
PAGE 4

Secured Creditors James Bree, Dorene Mae Bree and South Temecula Gateway, LLC, a California limited liability company ("Secured Creditors"), respectfully submit this Memorandum of Points and Authorities in Support of their Opposition to the Debtor/Debtor in Possession, North Plaza, LLC's ("Debtor") Motion for An Order: (1) Approving Settlements with Secured Creditors; and (2) Authorizing Payment of Secured Claims.

## I.

## THE DEBTOR, THROUGH ITS MANAGER WILLIAM P. JOHNSON, HAS DENIED UNDER OATH IN THE SUPERIOR COURT LITIGATION THAT IT IS INDEBTED TO DYNAMIC AND SABELLA AND HAS ALLEGED THAT DYNAMIC AND SABELLA OWE MONEY TO THE DEBTOR

### A. Introduction

The Debtor seeks Court approval for purported "settlements" with Dynamic and Sabella, but they have failed to disclose to this Court that there are currently pending in the Superior Court of the State of California, County of Riverside, at least six separate actions which clearly demonstrate that the purported "settlements" with Dynamic and Sabella are not warranted by the law or the facts. [See, Secured Creditors' Request for Judicial Notice, Exhibit Nos. 1, 4, 13, 14, 16 and 18.]

The Debtor, Sabella and Dynamic have also failed to disclose to this Court that it is the position of Dynamic and Sabella in the said Superior Court litigation that Sabella is William P. Johnson's ". . . partner on the Vail Lake development projects, not just the lender." [See, Secured Creditors' Request for Judicial Notice, Exhibit No. 13, p. 279, ls. 6-7.]

The Debtor, Dynamic and Sabella also failed to disclose to this Court that in the Superior Court litigation, Rancho California Country Club, LLC, the maker of the purported $18,000,000 promissory note which is the subject of Dynamic's Claim No. 15, is seeking, among other relief, cancellation of the deed of trust which the Debtor seeks to "settle" by its Motion. [See, Secured Creditors' Request for Judicial Notice, Exhibit No. 11, pp. 255-257, and Exhibit No. 12, pp. 261-262].

The Debtor, Dynamic and Sabella also failed to disclose to this Court that the purported $18,000,000 Rancho California County Club, LLC promissory note is cross-collateralized by a deed

PRINTED ON RECYCLED PAPER

3675202v1

- 2 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2
PAGE 5

of trust on additional real property owned by Vail Lake Village & Resort, LLC, which raises the issue of marshalling of assets which issue is not addressed by the Debtor. [See, Secured Creditors' Request for Judicial Notice, Exhibit No. 4, pp. 123, ll 4-23.]

The Debtor also seeks this Court's approval of a purported "settlement" of Sabella's Claim No. 14 based upon a purported promissory note which she purportedly obtained from Robert R. Chambers ("Chambers") by a series of alleged assignments. However, the Debtor and Sabella failed to disclose to this Court that Chambers and William P. Johnson (the Manager of the Debtor) and Shining City, Inc. (the 55% Member of the Debtor), are currently engaged in litigation in the Superior Court of the State of California, with regard to the purported obligations owed to Chambers which are the subject of Sabella's Claim No. 14 [See, Secured Creditors' Request for Judicial Notice, Exhibit Nos. 14 and 15]. According to the Debtor's Motion, the purported Chambers note was executed on January 28, 1998. However, in the Declaration of Robert R. Chambers in Support of Application for Right to Attach Order and Order for Issuance of Right to Attach Order, Chambers states: "I have made no other commercial loans in the 12-month period surrounding March 4, 1999." [See, Secured Creditors' Request For Judicial Notice Exhibit No. 14, p. 375, ll 14-15] The three promissory notes in favor of Chambers were all signed by William P. Johnson and reference North Plaza, LLC [See, Secured Creditors' Request for Judicial Notice, Exhibit No. 14, pp. 373, 378 and 379].

The Debtor and Sabella failed to advise this Court that in the Superior Court litigation William P. Johnson (the manager of North Plaza, LLC) has <u>denied</u> that any money is owed to Chambers and has alleged fourteen affirmative defenses, including that "A substantial portion of the damages claimed due by plaintiff [Chambers] in his complaint were discharged in a bankruptcy proceeding of defendant William P. Johnson pursuant to 11 U.S.C. Section 727. [See, Secured Creditors' Request for Judicial Notice, Exhibit No. 15, p. 282, ls. 18-23.]

**B. <u>The Debtor Has Shown Insufficient Legal or Factual Grounds for this Court to Approve The Purported "Settlement" of Dynamic's Claim No. 15</u>**

The Debtor, Dynamic and Sabella have failed to disclose to this Court that it is the position of Sabella in the Superior Court litigation that she is Johnson's ". . . partner on the Vail Lake

PRINTED ON RECYCLED PAPER

3675202v1

- 3 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2
PAGE 6

development projects, not just the lender." [See, Secured Creditors' Request for Judicial Notice, No. 13, p. 279, ls. 6-7.]

The Debtor, Dynamic and Sabella have failed to disclose to this Court the roles of Johnson [the President and sole shareholder of Shining City, Inc.], Shining City, Inc. (the 55% Member of North Plaza, LLC), Dynamic and Sabella in "squeezing out" Secured Creditor James Bree from Vail Lake USA, LLC, obtaining the reconveyance of Bree's deed of trust on real property owned by Vail Lake USA, LLC and their inducing of Bree into accepting a deed of trust executed by Johnson on behalf of North Plaza, LLC [See, Secured Creditors' Request for Judicial Notice, Exhibit No. 1, Exh. A, p. 34, para 3.3].

The Debtor acknowledges that one of the "issues" with respect to Dynamic's Claim No. 16 is whether the purported Dynamic "loan" was arranged by a broker. In this regard, the Debtor relies exclusively upon the Lei Declaration [See, Debtor's Memorandum of Points and Authorities, p. 8, ln. 27]. However, the Debtor failed to disclose to this Court that in the Superior Court litigation Johnson [the Manager of the Debtor] has stated under oath that ". . . Lei is essentially an employee of Ms. Sabella or DYNAMIC." [See, Secured Creditors' Request for Judicial Notice, Exhibit No. 8, p. 299, para. 6, ls. 7-26.] Indeed, Johnson takes a dramatically different position in the Superior Court litigation with respect to the purported role of Lei then he takes in the instant motion. In the Declaration Of William P. Johnson In Opposition To Ex Parte Application By Plaintiff For Appointment Of Receiver, TRO, And Order to Show Cause [See, Secured Creditors' Request For Judicial Notice Exhibit No. 8, pg. 299, ll. 7-26], Johnson described Lee's conduct with respect to the $18,000,000 loan (which is the subject of Dynamic Claim No. 15) as follows:

> "6. Isaac Lei did not "arrange" the July 2000 $18 Million loan from DYNAMIC to Rancho California Country Club, LLC. At that time, I was and still am an authorized agent and officer of Rancho California Country Club, LLC. Isaac Lei acted in a clerical and messenger capacity with respect to the loan. Isaac Lei did not "set the interest rate and points" for the loan. The loan documents were all prepared by Kathryn Robertson, Esq. of Gibson, Dunn & Crutcher in Los Angeles, who was legal counsel to DYNAMIC FINANCE CORPORATION. Mr. Lei did not negotiate anything between DYNAMIC and Rancho California Country Club, LLC. I met directly with Ms. Robertson regarding the loan, and the interest rate and points had already been included in the loan documents by her client, DYNAMIC FINANCE CORPORATION. When meeting with Ms.

PRINTED ON RECYCLED PAPER

3675202v1

- 4 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2

PAGE 7

> Robertson, I clearly understood that the teens of the note and deed of trust were not negotiable, and there were no revisions to the documents to my knowledge. Accordingly, <u>Mr. Lei did not "revise the loan documentation," as he states, or "negotiate terms between the parties," Mr. Lei was not an "intermediary" between DYNAMIC and Rancho California Country Club, LLC. He has an office at DYNAMIC's place of business and can be reached by telephone there during business hours, I believe he works on an exclusive basis for Angela Sabella and the business entities she owns or controls, including DYNAMIC. I believe Mr. Lei is essentially an employee of Ms. Sabella or DYNAMIC. He is with her constantly and even travels with her</u>. At no time did Mr. Lei make any disclosures to me regarding the terms of the loan and my rights under the law. I am unaware of any certificate signed. . Lei at the time of the loan attesting to his 'arrangement' thereof as a real estate broker." (Emphasis added.)

If, as Johnson declares under oath in the Superior Court litigation, Lei is determined by this Court to be ". . . essentially an employee of Ms. Sabella or DYNAMIC," then the Dynamic loan, which is the subject of Claim No. 15, was <u>not</u> arranged by a broker and that Dynamic is not entitled to charge interest (and extension fees and other charges) at a rate in excess of the rate otherwise permitted under California law.

**C. <u>Dynamic Has Failed to Demonstrate Sufficient Legal Or Factual Reason for This Court to Approve The Purported "Settlement" Of Dynamic's Claim No. 16</u>**

There are a number of issues with respect to the purported loan in the original principal amount of $4,400,000.00 allegedly made in July of 1998 by Dynamic to the Debtor. Indeed, this Court previously held an extensive hearing on the Debtor's Motion for a payment to Dynamic and Dynamic's secured claim has been allowed only conditionally and the partial payment is subject to disgorgement in the event that Dynamic's secured claim is not allowed at least in the amount of $10,500,000.00. While the Debtor admits that it has identified "five primary issues with respect to Dynamic's Claim No. 16, the Debtor ignores the sworn declaration of its Manager, William P. Johnson, that Lei is ". . . essentially an employee of Ms. Sabella or DYNAMIC." Assuming that Johnson's characterization of Lei is accurate, then Dynamic's loan which is the subject of Claim No. 15, was not arranged by a broker and Dynamic is not entitled to charge interest (and extension fees and other charges) at a rate in excess of the rate otherwise permitted under California law.

PRINTED ON RECYCLED PAPER

3675202v1

- 5 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2

PAGE 8

It should be apparent to this Court from the Superior Court litigation [See, Secured Creditors' Request for Judicial Notice Exhibits Nos. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12 and 13] that the relationship among the Debtor, Johnson, Sabella, and Dynamic is anything other than a Debtor-Creditor relationship. Indeed, as Dynamic and Sabella have stated in the Superior Court litigation that Johnson had continuously and repeatedly assured ". . .Sabella that she was his partner . . . not just the lender." [Secured Creditors' Request for Judicial Notice Exhibit No. 1, pg.14, lls. 6-7].

## II.

## THE DEBTOR, THROUGH ITS MANAGER WILLIAM P. JOHNSON, HAS DENIED UNDER OATH IN THE SUPERIOR COURT LITIGATION THAT IT IS INDEBTED TO SUPRUNUKS AND HAS ALLEGED THAT SUPRUNUKS OWE TO THE DEBTOR ITS ATTORNEYS' FEES INCURRED IN THE SUPERIOR COURT LITIGATION

### A. Introduction

The Debtor requests that this Court approve a proposed "settlement" with the Suprunuks based upon purported loans allegedly made by the Suprunuks to William P. Johnson ("Johnson") for the Walker Basin Property (which is not owned by the Debtor) in the total amount of $1,421,800.00. However, the Debtor and the Suprunuks have failed to support this Motion with respect to a proposed "settlement" with the Suprunuks based upon competent evidence. [See, Secured Creditors' Evidentiary Objections to the Johnson Declaration.] Indeed, in view of the facts alleged under oath by the Suprunuks in the Superior Court litigation, the conclusion is obvious that the Suprunuks realized that the position which they have taken in the Superior Court litigation is irreconcilable with the position taken by the Debtor and them in the instant Motion. [See, Secured Creditors' Request for Judicial Notice Exhibits No. 16, 17, 18, 19 and 20.]

The Debtor admits in its Motion that it did not receive anything from the Suprunuks in consideration for the Deed of Trust which Johnson, as Manager of the Debtor, executed in favor of the Suprunuks. However, the Debtor and the Suprunuks have failed to disclose to this Court that these identical purported loans of $1,421,800.00, allegedly made to Johnson for the Walker Basin Property, are currently the subject of an action pending in the Superior Court of the State of California, County of Riverside, Case No. RIC391087 [See, Secured Creditors' Request for Judicial

PRINTED ON RECYCLED PAPER

3675202v1 - 6 - P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2
PAGE 9

Notice No. 16. Since Case No. RIC391087 includes a Verified First Amended Complaint [See, Secured Creditors' Request for Judicial Notice No. 16] and a verified Answer To Verified First Amended Complaint which was verified by William P. Johnson, Manager of the Debtor [See, Secured Creditors' Request for Judicial Notice Exhibit No. 17], this Court can readily see that it is the position of Johnson [the Manager of the Debtor], under oath, in the Superior Court, that no debt is owed to the Suprunuks, and the Suprunuks are obligated to pay the Debtor its attorneys fees which it incurred in the said Superior Court litigation.

**B. <u>The Suprunuks Have Admitted Under Oath In The Superior Court Litigation That Their Proposed Loans Of $1,421,800.00 Were Made To Johnson, As An Individual, For The "Walker Basin Property" (A Property Not Owned By The Debtor)</u>**

The Suprunuks' Verified First Amended Complaint [See, Secured Creditors' Request for Judicial Notice Exhibit No. 16] alleges under oath that the borrower was William P. Johnson [see, Secured Creditors' Request for Judicial Notice No. 16, p. 389, ls. 13-26]. In addition, the loan documents attached to the Suprunuks' Verified First Amended Complaint reflect that the borrower was William P. Johnson, not the Debtor. [See, Secured Creditors' Request for Judicial Notice, Exhibit No. 16, Exhs. "3," "4" and "5", pp. 410-425.]

**C. <u>Johnson, The Manager Of The Debtor, Has Denied Under Oath in the Superior Court Litigation That Any Money Is Owed To The Suprunuks.</u>**

The Debtor's and the Suprunuks' failure to disclose to this Court the existence of pending action between the Suprunuks and the Debtor in the Superior Court of the State of California relative to the same loans of $1,421,800.00 [See, Secured Creditors' Request for Judicial Notice Exhibits Nos. 16 and 17]. The Debtor and the Suprunuks also failed to disclose to this Court that in the verified Answer to Verified First Amended Complaint which the Debtor filed in the Superior Court, it is the position of the Debtor, that no money is owed to the Suprunuks and that the Suprunuks owe the Debtor the attorneys' fees which it incurred in the Superior Court litigation [See, Secured Creditors' Request for Judicial Notice Exhibit No. 17].

The Debtor's Motion acknowledges only the potential of two defenses with respect to the Suprunuks' claim for their loans made to Johnson for the Walker Basin Property (i.e., ". . . whether

PRINTED ON RECYCLED PAPER

3675202v1

- 7 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2

PAGE 10

the Suprunuks' lien is avoidable as a fraudulent transfer; and (2) whether the Suprunuks' claim otherwise is subject to reduction because it includes interest in excess of what California law permits."). However, the Debtor fails to raise the most obvious defense to the Suprunuks' claim which is the total lack of consideration to the Debtor for the deed of trust which Johnson, as Manager of the Debtor, executed in favor of the Suprunuks. A written instrument, such as the Deed of Trust at issue, which is obtained without consideration may be cancelled pursuant to California Civil Code § 3412. Wigard v. Brown (1881) 59 Cal. 194, 197.

The Debtor also failed to advise this Court that in the Superior Court action in its verified Answer the Debtor had raised thirteen additional affirmative defenses to the Suprunuks' claim including, but not limited to, usury [Eleventh Affirmative Defense], estoppel [Fourth Affirmative Defense], waiver [Tenth Affirmative Defense], accord and satisfaction [Twelfth Affirmative Defense], etc. [See, Secured Creditors' Request For Judicial Notice Exhibit No. 17, pp. 441-443]

In seeking to apply the factors from In re A&C Property, the Debtor purports to discuss the "... complexity of the litigation involved ...", but failed to advise this Court that said litigation is currently pending in the Superior Court wherein the Debtor is represented by Fredrick C. Phillips, Esq. of the law firm of Phillips, Haskett & Ingwalson ("Phillips"), which is the very party which instigated the Debtor's current bankruptcy when it filed the purported "involuntary" petition against the Debtor and the Suprunuks are represented in the Superior Court litigation by Milford W. Dahl, Jr., Esq., the same attorney who represents the Suprunuks in this bankruptcy.

**D. Conclusion**

While the Suprunuks may be owed money by Johnson, based upon the Debtors' Motion, it is obvious that the Suprunuks are not owed any money by the Debtor and is equally obvious that the Suprunuks are not entitled to a lien on the Debtor's property. Of course, since the Suprunuks paid $6,000.00 to Phillips to finance the Debtor's bankruptcy, it may be that the Debtor and the Suprunuks feel that the Suprunuks are entitled to be paid from the Debtor's assets in derogation of the rights of the other creditors of the Debtor. [See, Bree Declaration, Exh. "7," para. 6.] Undoubtedly, Johnson anticipates that the Suprunuks will continue to lend money to him and to his ventures for additional projects and Johnson apparently views a "settlement" (using the Debtor's

PRINTED ON RECYCLED PAPER

3675202v1

- 8 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2
PAGE 11



assets) with the Suprunuks as a prudent business decision for Johnson. However, the Debtor should file a complaint for fraudulent conveyance, among other claims, against the Suprunuks, as the Debtor has done against the Secured Creditors, and force the Suprunuks to look for their recovery to Johnson as the person to whom they made the $1,421,800.00 of loans in issue.

**III.**

**THE DEBTOR HAS FAILED TO DEMONSTRATE BY COMPETENT AND ADMISSIBLE EVIDENCE THAT THERE WAS ANY CONSIDERATION RECEIVED BY VAIL LAKE VILLAGE AND RESORT, LLC FOR THE PURPORTED ASSIGNMENT OF THE DEED OF TRUST TO DOUGLAS/CFFAI**

**A. Introduction**

The Debtor seeks this Court's approval of a purported "settlement" with Douglas/CFFAI with respect to Claim No. 2, but fails to provide any competent and admissible evidence to support the request for this Court's approval of the purported "settlement."

The Debtor does not provide any competent and admissible evidence that it received any consideration or value from Douglas/CFFAI with respect to the Deed of Trust at issue.

Douglas/CFFAI purports to be the assignee of a deed of trust signed by Johnson as Manager of the Debtor, dated September 17, 2002, which was acknowledged on September 23, 2003. [See, Debtor's Request for Judicial Notice, Exhibit 19] However, the Debtor does not provide any competent and admissible evidence that Douglas/CFFAI provided any consideration to Vail Lake Village & Resort, LLC for the purported assignment of the alleged Deed of Trust. The most glaring deficiency with respect to the Debtor's proposed "settlement" with Douglas/CFFAI is that there is no declaration or other competent evidence from Vail Lake Village and Resort, LLC, Clifford Douglas as Trustee of the Clifford Douglas Profit Sharing Plan ("Douglas") or Corporate Funding Financial of America, Inc. ("CFFAI") with respect to the transaction whereby the Deed of Trust was assigned to Douglas/CFFAI.

A close examination of the Debtor's Motion leads to the conclusion that the reason that there are no declarations in support of the Motion from Vail Lake Village and Resort, LLC, Douglas or

PRINTED ON RECYCLED PAPER

3675202v1

- 9 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2

PAGE 12

CFFAI is that there is nothing which could truthfully be declared under oath which would support the Debtor's Motion.

**B. The Debtor Has Submitted No Competent and Admissible Evidence That It Received Any Consideration From Vail Lake Village & Resort for the Deed of Trust In Issue**

The premise of the Debtor's purported "settlement" with Douglas/CFFAI is based solely upon inadmissible statements contained in the Declaration of William P. Johnson ("I am informed and believe . . ."). [See, Secured Creditors' Evidentiary Objection to the Johnson Declaration] The Debtor has failed to submit any competent and admissible evidence on behalf of Vail Lake Village & Resort, LLC with respect to the purported loan to the Debtor. In addition, the Debtor has failed to submit any competent and admissible evidence by Douglas or CFFAI with respect to the purported assignment on October 29, 2002, of the alleged Declaration of Trust to Douglas and CFFAI. [See, Debtor's Request for Judicial Notice No. 20] The Declaration of Johnson, ¶ 17-21, is incompetent and inadmissible and is objected to by the Secured Creditors to the extent that it purports to state that the Debtor received a loan of $1,000,000.00 in or around September of 2002, from Vail Lake Village & Resort, LLC. The Declaration of William P. Johnson is similarly incompetent and inadmissible because it fails to provide admissible evidence that Vail Lake Village & Resort, LLC, made a loan to the Debtor in the sum of $1,000,000.00 in September of 2002. Therefore, even before the purported assignment of the Deed of Trust to Douglas/CFFAI is examined, it is clear that there is no competent evidence before this Court to show that the Debtor received any consideration for the Deed of Trust in issue. Since there is no competent evidence to show that the Debtor received consideration for the Deed of Trust in issue, that Deed of Trust may be cancelled under California Civil Code Section 3412. Wiard v. Brown (1881) 59 Cal. 194, 197.

**C. The Debtor Has Submitted No Competent and Admissible Evidence that Vail Lake Village & Resort, LLC Received Any Consideration From Douglas/CFFAI For the Purported Assignment of the Alleged Deed of Trust In Issue**

Douglas/CFFAI, in an apparent recognition that there are no factual or legal grounds to support the Debtor's purported "settlement" with them, failed to submit any declarations in support of the Debtor's Motion. Similarly, Vail Lake Village & Resort, LLC also failed to submit a

PRINTED ON RECYCLED PAPER

3675202v1 - 10 - P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2
PAGE 13

declaration in support of the Debtor's Motion for this Court to approve the purported "settlement" with Douglas/CFFAI.

While the Debtor, in its purported evaluation of the Douglas/CFFAI claim, acknowledges two primary issues concerning that claim, the Debtor fails to recognize the principal issue with respect to that claim is that there is not a scintilla of competent and admissible evidence before this Court to show that Vail Lake Village & Resort, LLC, ever received any consideration for the purported assignment of the alleged Deed of Trust in issue. Therefore, the purported assignment of the alleged Deed of Trust in favor of Douglas/CFFAI [see, Debtor's Request for Judicial Notice, Exhibit 20] is subject to cancellation under California Civil Code Section 3412. Wiard v. Brown (1881) 59 Cal. 194, 197.

**D. The Deed of Trust Executed by Johnson as Manager of North Plaza, LLC, Which Was Purportedly Assigned to Douglas/CFFAI Is Subject To The Prior Deed of Trust Executed By Johnson As Manager of North Plaza, LLC, In Favor Of Bree**

The Deed of Trust executed by Johnson in favor of Vail Lake Village and Resort, LLC is dated September 17, 2002, and acknowledged September 23, 2002 [See, Debtor's Request for Judicial Notice, Exhibit 19]. However, the Deed of Trust executed by Johnson, as Manager of North Plaza, LLC, in favor of Bree, is dated September 10, 2002, and acknowledged September 12, 2002. [See, Bree's Declaration, Ex. 6, pp. 173-175.]

Both Deeds of Trust were recorded on September 23, 2003, at the Request of First American Title Company. The Deed of Trust in favor of Vail Lake Village & Resort, LLC, is recorded one document number ahead of the Deed of Trust in favor of Bree. However, California law is well-settled that there is no difference in priority between deeds of trust recorded on the same day. In addition, since Johnson as Manager of North Plaza, LLC, had executed the Deed of Trust in favor of Bree seven days before Johnson, as the Manager of North Plaza, executed the Deed of Trust in favor of Vail Lake Village & Resort, LLC [of which Johnson is the Manager], it is obvious that both Johnson, North Plaza, LLC, and Vail Lake Village & Resort, LLC, all had actual knowledge of the existence of the prior Deed of Trust in favor of Bree. Accordingly, the fact of recordation is irrelevant to the purported rights of Douglas/CFFAI because Johnson, who was the Manager of Vail

PRINTED ON RECYCLED PAPER

3675202v1

- 11 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2
PAGE 14

Lake & Resort, LLC [see, Debtor's Request for Judicial Notice, Ex. 20, and Bree's Declaration, para. 14, pg. 5-6] had actual knowledge that Johnson, as Manager of North Plaza, LLC, had executed the Deed of Trust in favor of Bree one week before Johnson, as Manager of North Plaza, LLC, executed the Deed of Trust in favor of Vail Lake Village & Resort, LLC, of which he was also the Manager.

**E. Conclusion**

Since Douglas/CFAAI paid a total of $6,000.00 to Phillips to finance the Debtor's bankruptcy, it may be that the Debtor and Douglas/CFAAI feel that Douglas/CFFAI were entitled to be paid from the Debtor's assets in derogation of the rights of the other creditors. [See, Bree Declaration, Exhibit 7, para. 6] Undoubtedly, Johnson anticipates that Douglas/CFFAI will in the future continue to loan money to him and to his ventures for additional projects and Johnson apparently views a "settlement" (using the Debtor's assets) with Douglas/CFFAI as a prudent business decision for Johnson, but not for the Debtor.

**IV.**

**CONCLUSION**

The Debtor proposes only to settle with four "insiders" of the Debtor. All of the four "insiders" with whom the Debtor seeks this Court's approval of the purported "settlements" are the same persons who funded the Debtor's bankruptcy and who have ongoing business relationships with William P. Johnson, the Debtor's Manager, Shining City, Inc. (the 55% member of the Debtor), and the Debtor's alter egos (i.e., Vail Lake USA, LLC, Vail Lake Village & Resort, LLC and Vail Lake Rancho California, LLC). The Debtor (through its Manager William P. Johnson) has alleged in the Superior Court litigation that it does not owe any money to the four "insiders" with whom it seeks this Court's approval of the purported "settlement" agreements. Indeed, the Superior Court litigation, the Debtor has taken the position (through its Manager William P. Johnson) that the "insiders" are not owed any money, but instead owe money to the Debtor and its alter egos. The Secured Creditors are owed in excess of $5,257,000.00 and if it is determined by this Court that the Secured Creditors have valid claims, there would be insufficient money left to pay those claims if the Debtor retains only the sum of $1,027,581.00, as is proposed in the Debtor's Motion.

PRINTED ON RECYCLED PAPER

3675202v1

- 12 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2

PAGE 15

Accordingly, the Secured Creditors respectfully request that this Court deny the Debtor's purported "settlements" with the "insiders." In the alternative, should this Court approve the purported "settlements" with the Debtor's "insiders" (which it should not) then Secured Creditor request that the Debtor be required to retain at a minimum $7,000,000.00 for the benefit of the Debtor's bankruptcy estate so that it will be financially able to pay the Secured Creditors' claims.

DATED: September 7, 2005

JEFFER, MANGELS, BUTLER & MARMARO LLP
JOHN L. HOSACK, ESQ.
DAVID M. POITRAS, ESQ.
THOMAS M. GEHER, ESQ.

By: [signature]
JOHN L. HOSACK, ESQ.
Attorneys for Secured Creditors JAMES BREE, DORENE MAE BREE and SOUTH TEMECULA GATEWAY, LLC

PRINTED ON RECYCLED PAPER

3675202v1

- 13 -

P&As IN OPP. TO DEBTOR/ DEBTOR IN POSSESSION's MOTION FOR ORDER

EXHIBIT 2
PAGE 16

# PROOF OF SERVICE

**STATE OF CALIFORNIA, CITY AND COUNTY OF LOS ANGELES**

I am employed in the City and County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is: 1900 Avenue of the Stars, 7th Floor, Los Angeles, California 90067.

On September 7 , 2005 I served the document(s) described as **SECURED CREDITORS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO NORTH PLAZA, LLC's MOTION FOR ORDER: (1) APPROVING SETTLEMENTS WITH SECURED CREDITORS; AND (2) AUTHORIZING PAYMENT OF SECURED CLAIMS** in this action by placing the true copies thereof enclosed in sealed envelopes addressed as follows:

**SEE ATTACHED LIST**

☒ (BY MAIL) I am "readily familiar" with the firm's practice for collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ (BY FAX) At , I transmitted, pursuant to Rules 2001 et seq., the above-described document by facsimile machine (which complied with Rule 2003(3)), to the above-listed fax number(s). The transmission originated from facsimile phone number (310) 203-0567 and was reported as complete and without error. The facsimile machine properly issued a transmission report, a copy of which is attached hereto.

☐ (BY E-MAIL) I delivered such via email transmission to the addresses listed.

☐ (BY PERSONAL SERVICE) I delivered such envelope by hand to the offices of the addressee.

☐ (BY OVERNIGHT DELIVERY) I caused said envelope(s) to be delivered overnight via an overnight delivery service in lieu of delivery by mail to the addressee(s).

Executed on September 7, 2005 at Los Angeles, California.

☐ (STATE) I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

☒ (FEDERAL) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

BILLIE TERRY

3349240v1

**In re: North Plaza, LLC**
United States Bankruptcy Court, Southern District of California, San Diego Division
Case No.: 04-00769-PB11

NORTH PLAZA, LLC
Attn: William Johnson
P.O. Box 1955
Rancho Santa Fe, CA 92067

Tiffany Carroll, Esq.
Office of the United States Trustee
402 W. Broadway, Suite 600
San Diego, CA 92101

K. Todd Curry, Esq.
Nugent Weinman Abbene Alcock & Wolfe APC
1010 Second Avenue, Suite 2200
San Diego, CA 92101

Frederick C. Phillips, Esq.
Terry D. Phillips, Esq.
Phillips, Haskett & Ingwalson, APC
701 B Street, Suite 1190
San Diego, CA 92101-3540

Edmund L. Regalia, Esq.
Heidi A. Timken, Esq.
Miller, Starr & Regalia, APC
1331 N. California Blvd., Fifth Floor
P.O. Box 8177
Walnut Creek, CA 94596

Edward G. Schloss, Esq.
11300 West Olympic Blvd.
Suite 620
Los Angeles, CA 90064

Steven R. Orr, Esq.
Peter M. Thorson, Esq.
Sonali S. Jandial, Esq.
Richards, Watson & Gershon, APC
355 South Grand Avenue, 40th Floor
Los Angeles, CA 90071-3101

Milford W. Dahl, Jr., Esq.
Rutan & Tucker, LLP
611 Anton Blvd., 14th Floor
Costa Mesa, CA 92626

Angela Sabella
853 E. Valley Blvd.
Suite 200
San Gabriel, CA 91776

Richard M. Pachulski, Esq.
Stanley E. Goldich, Esq.
Pachulski, Stang, Ziehl, Young, Jones & Weintraub, P.C.
10100 Santa Monica Blvd., 11th Floor
Los Angeles, CA 90067-4100

James Bree & Dorene Bree
1754 Laguna Drive
Vista, CA 92084

Dynamic Finance Corp.
853 E. Valley Blvd., Suite 200
San Gabriel, CA 91776

Peter & Dorothy Suprunuk
159 Spinks Canyon
Duarte, CA 91010

Clifford Douglas
P.O. Box 2729
Rancho Santa Fe, CA 92067

KIP, Inc.
25740 Washington Avenue
Murrieta, CA 92562

Tom Tahara
1101 Via Mil Cumbres
Solana Beach, CA 92075

South Temecula, LLC
c/o James Bree
1754 Laguna Drive
Vista, CA 92084

Robert E. Chambers
11439 Laurel Crest Drive
Studio City, CA 91604

Gregson M. Perry, Esq.
Law Offices of Gregson M. Perry
12304 Santa Monica Blvd., #300 2FL
Los Angeles, CA 90025

Paul McDonnell, Treasurer
Riverside County
4080 Lemon Street, 1st Floor
PO Box 12005
Riverside, CA 92502-2205

Roger Alford, CPA
Hausmaninger Benoe Lang Alford & Geselowitz
19600 Fairchild, Suite 320
Irvine, CA 92612-2584

Chief, Special Procedures Section – Insolvency
Internal Revenue Service
P.O. Box 30213
Laguna Niguel, CA 92607-0213

Butsko Utility Design, Inc.
17065 Via Del Campo, Suite 200
San Diego, CA 92127

Burkett & Wong
3434 Fourth Avenue
San Diego, CA 92103

Neil B. Katz, Esq.
Robillard & Katz
2377 Crenshaw Blvd., Suite 310
Torrance, CA 90501

Petra Geotechnical Inc.
3185-A Airway Avenue
Costa Mesa, CA 92626

Shining City, Inc.
William P. Johnson, President
29400 Rancho California Rd.
Temecula, CA 92591

3676961v1

RBF Consulting
27555 Ynez Road, Suite 400
Temecula, CA 92591-4679

Martha E. Romero, Esq.
Romero Law Firm
7743 South Painter Ave., Suite E
Whittier, CA 90602

Laura S. Taylor, Esq.
Linda D. Fox, Esq.
Sheppard, Mullin, Richter & Hampton, LLP
501 W. Broadway, 19th Floor
San Diego, CA 92101

Gerald N. Sims, Esq.
Michael Y. MacKinnon, Esq.
Pyle Sims Duncan & Stevenson, APC
401 B Street, Suite 1500
San Diego, CA 92101

Martha A. Mansell, Esq.
Law Offices of Martha A. Mansell
1522 So. Saltair Ave., Suite 302
Los Angeles, CA 90025

Michael K. Kuhn, Esq.
Jackson Walker LLP
1401 McKinney, Suite 1900
Houston, TX 77010

Scott A. Smylie, Esq.
Smylie & Van Dusen
550 W. "C" Street, Suite 1600
San Diego, CA 92101

Martin T. McGuinn, Esq.
Jana Logan, Esq.
Kirby & McGuinn, APC
600 B Street, Suite 1950
San Diego, CA 92101

3676961v1

**EXHIBIT 3**

EXHIBIT 3
PAGE 20

# NOT FOR PUBLICATION

ENTERED 4/17/06
FILED
APR 17 2006
CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | Case No. 04-00769-B11<br><br>ORDER ON MOTION TO APPROVE SETTLEMENT |

This matter came on for evidentiary hearing on the debtor's motion to approve a settlement debtor reached with two creditors who asserted the first and second secured positions on the debtor's real property. Those creditors are Dynamic Finance Corporation and Angela C. Sabella, respectively. Angela Sabella is president of Dynamic Finance, as well as its parent, Dynamic Holdings, and of its affiliates.

The debtor is a limited liability company which owned a piece of land in Temecula, California, which was over 40 acres in size. The debtor's manager is William Johnson, who holds his interest in the debtor through his and his wife's wholly owned

///

company, Shining city, Inc. Shining City holds 55% of the debtor.

This case was commenced as an involuntary bankruptcy, and the filing was not contested. The avowed purpose was to prevent the foreclosure on the land for the benefit of the petitioning secured creditor. The land was subsequently sold, yielding net proceeds in excess of $17 million. Subsequently, debtor brought a motion to settle with four levels of secured creditors, which was opposed. By written order, the court determined there were several issues which required an evidentiary hearing. Discovery was undertaken, and the hearing has been held.

The Court has subject matter jurisdiction over the proceeding pursuant to 28 U.S.C. § 1334 and General Order No. 312-D of the United States District Court for the Southern District of California. This is a core proceeding under 28 U.S.C. 157(b)(2)(B), (O).

The standard for assessing whether to approve a settlement agreement was set in a case called <u>In re A & C Properties</u>, 784 F.2d 1377 (9th Cir. 1986). There, the court wrote:

> It is clear that there must be more than a mere good faith negotiation of a settlement by the trustee in order for the bankruptcy court to affirm a compromise agreement. The court must also find that the compromise is fair and equitable [Citation omitted.]
>
> In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the court must consider:
>
> (a) The probability of success in the

EXHIBIT 3
PAGE 22

> litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.
>
> [Citation omitted.] . . .
>
> The trustee, as the party proposing the compromise, has the burden of persuading the bankruptcy court that the compromise is fair and equitable and should be approved.

In In re JMS Automotive Rebuilders, Inc., 2002 WL 32817517 (C.D. CA. 202), the court elaborated on each of the elements of the A & C Properties test. In explaining "the probability of success" prong, the court wrote:

> [T]he court must ascertain whether the bankruptcy estate would be likely to succeed on the merits of the subject controversy. [Citation omitted.] The court is responsible for determining the estate's litigation risk, and then determining whether the amount tendered in settlement is commensurate to that litigation risk. Id. However, the court's ultimate obligation is to "canvass" the above-mentioned issues and see whether the settlement falls below the lowest point in the range of reasonableness. [Citation omitted.] The court should not conduct a minitrial as to the merits of the compromised claims and defenses absent a showing of necessity.

Turning to another prong of the test, the court stated:

> For purposes of determining the complexity of litigation, the court is required to determine whether pursuing the controversy on its merits would produce a sufficient net benefit to the estate.

> [Citation omitted.] Items to consider in determining the complexity of the case are: (1) likely burden on the trial court and the parties; (2) likely amount of administrative - expense claims; (3) and other factors which would reduce the real value of any collected judgment in comparison to the in-hand present value of the settlement.

Background

There are at least seven trust deeds securing creditors' interests against the net sale proceeds from the real estate. They are Dynamic's claim number 16, Ms. Sabella's claim number 14, the Suprunuks claim, the Clifford Douglas claim, and the claim of the Brees and South Temecula Gateway (STG). In addition, there is Dynamic's claim number 15. In the original settlement motion, the debtor sought to compromise all the above claims except that of the Brees and STG, who objected. Following the court's order on the first motion, a second settlement motion was filed, addressing only Dynamic's claim 16 and Sabella's claim 14. That is the motion which was the subject of the evidentiary hearing.

The gist of the settlement is that Dynamic has agreed to settle for about $1.3 million less than the full face amount of its claim. The debtor is candid in pointing out that approximately $800,000 of that $1.3 million is default-rate interest, which could be avoided in a confirmed plan. The Dynamic claim, including default interest, exceeds $15 million. In compromise, Dynamic would agree to a first priority secured claim of $14,297,500, plus interest at 10% on the unpaid

principal balance of $3,797,500 (the court previously allowed a paydown of $10.5 million to slow the interest added to the debt).

The Sabella claim is asserted to be in excess of $1.7 million. She would agree to a second priority secured claim in the amount of $1,315,000 plus 10% interest on that amount after February 1, 2006.

The net sale proceeds from the real property were $17,659,100.31. Debtor's Schedule D listed total secured claims against the property as $21,400,000, only $2,000,000 of which was disputed (that is the claim of the Brees, objecting parties here). Not listed was what has become known as Dynamic's claim 15. So, not all undisputed secured creditors would get paid in full if the debtor's schedules are accurate, unless the senior secured creditors are willing to leave something on the table for them.

When the first settlement motion was filed, the debtor calculated that the settlement agreements reached with Dynamic, Sabella, the Suprunuks, and Clifford Douglas would leave $1,027,581 to pay junior secured creditors (not including the Brees) and unsecured creditors. That number has since been eroded by intervening interest and attorney fee accruals, as reflected by the revised settlement figures. Under the current proposal, Dynamic's unpaid principal balance increased almost $700,000, from $3,100,000 to $3,797,500, presumably for nine months of interest on the unpaid balance, plus attorneys fees. The proposed unpaid compromised balance on the Sabella loan

increased from $1,200,000 to $1,315,000 over the same nine months. A ballpark subtraction of those amounts from the remaining net proceeds would leave approximately $2,000,000 to address the scheduled $2,000,000 claim of the Brees (to which the debtor has objected), the $1,200,000 claim of Clifford Douglas, the $2,000,000 claim of the Suprunuks, and $300,000 of junior secured claims, as well as $467,000 of scheduled unsecured creditors. Ahead of them are the administrative claims of the debtor's bankruptcy professionals.

Very much related to the question of what will be gained for creditors is the question of why the debtor would agree to this compromise, and why Dynamic and Sabella would agree to compromise their claims in favor of junior secured and unsecured creditors. Are the probability of success and litigation risk the only factors, or at least the predominant ones? The objecting parties argue they are not.

As noted, the manager of the debtor is William Johnson. Mr. Johnson has had multiple business dealings with Dr. Chambers, the Suprunuks, Dynamic Finance, Angela Sabella, and Isaac Lei. He testified he or entities he is involved with have borrowed "tens of millions of dollars" from Dynamic over a period of years. He also testified he and his wife have millions of dollars of personal guarantees outstanding on loans made by Dynamic. The objecting parties have characterized him as "an economic captive" of Dynamic and Ms. Sabella. At the same time, there are multiple state court lawsuits among the parties

concerning their respective interests in various projects, or obligations issued by those projects.

One example of the foregoing brought out by the objecting parties is the debtor's apparent settlement of the $50,000 claim of Isaac Lei. Apparently, the proof of claim was reviewed and submitted by counsel for Dynamic and Sabella. However, it was filed about two months after the claims bar date. The debtor's initial position was to not allow the claim at all. Evidence adduced at the hearing indicated the debtor agreed to allow the late-filed claim at $45,000. Then it was brought out that the original claim had failed to credit $7,500 Mr. Lei had received, so the claim was overstated from the outset.

In the context of a motion to approve a proposed compromise, it is not the Court's function to make findings of fact, or conclusions of law. But the Court is charged with determining whether the proponent of the settlement has met its burden of showing the settlement is fair and equitable, as A & C Properties directs. The objecting parties have argued the settlement cannot meet the test because the person making the decisions for the debtor, William Johnson, has so many other obligations involving the same parties, as to whom he should be at arm's length. The Court has been sensitive to that concern for some time, as reflected in its November, 2005 written order. The circumstances and interrelations clearly call for heightened scrutiny, but they do not mean that a legitimate settlement could not be reached

///

that benefits junior creditors. The question remains whether the proposed settlement is in the zone of reasonableness.

Discussion

Again, in the context of the instant motion, it is not the Court's role to make findings of facts and conclusions of law, notwithstanding that a lengthy evidentiary hearing has been held. And the Court will not do so. As a separate matter, counsel for Dynamic and Ms. Sabella have advised the Court that the settlement is a package, and if either part fails to meet the A & C Properties test, the whole settlement fails.

Sabella's Claim 14

The Sabella claim has a lot of convoluted history. The central issue, however, will be whether Ms. Sabella acquired the promissory note on which it is based as a holder in due course pursuant to California Commercial Code § 3302. In order to answer that question for purposes of the instant motion, the Court will review its understanding of the history of the obligation on which Ms. Sabella relies.

According to Dr. Chambers, Chambers Family Trust loaned the debtor $600,000 to aid in acquiring the real estate. Dr. Chambers was the managing member of the debtor, and Shining City and the Suprunuks were the other members. In return for the loan, the Chambers Family Trust received a promissory note for $600,000 and collateral in the form of a trust deed on the property. Dr. Chambers testified he did not know if the note provided for interest or what the due date was, although he

probably signed the note on behalf of North Plaza at the time. The whereabouts of that note are unknown.

Dr. Chambers testified that Mr. Johnson wanted to borrow money against North Plaza's land. Dr. Chambers did not want to subordinate to a new lender, so it appears an agreement was reached. In November, 1997 Dr. Chambers executed a full reconveyance of the Family Trust's interest in the 1996 trust deed securing the $600,000 loan. Then, on or about January 28, 1998 Dr. Chambers, as manager of North Plaza, executed a promissory note to the Chambers Family Trust for $739,064.07. The note was to be secured by a deed of trust. This note is at the center of the Sabella claim.

A Short Form Deed of Trust was prepared at some point, and dated January 28, 1998 - the same date as the date of making of the note. However, the signature of Dr. Chambers as manager of North Plaza was not notarized until October 21, 1998, and the trust deed was not recorded until October 23, 1998, almost ten months after the making of the note. It is quite relevant that in between January and October, 1998 Dynamic made its loan to North Plaza of $4,400,000 and acquired its first position deed of trust. Testimony indicated that Dynamic would only loan money on real estate if it received a first position trust deed as collateral.

On the same date, October 23, 1998 there was also recorded an assignment of the January 28, 1998 deed of trust to an entity named B C Lake Villas, LLC, managed by Mr. Johnson. The

assignment indicated that while the North Plaza trust deed was dated January 28, 1998 it was recorded "concurrently herewith". Because it was not recorded until October 23, it was junior in priority to Dynamic's first position. The Court does not know if Dynamic was informed of North Plaza's obligation under the note, but no title report would have shown it at the time because nothing concerning it was recorded.

Dr. Chambers wrote a memo he signed, and Mr. Johnson countersigned, dated October 21, 1998 in which he states:

> I am hereby, as manager of North Plaza LLC, executing a note for $739,064.97 to myself as trustee of Chambers Family Trust dated 3/3/92. Further as trustee I am assigning this note to BC Lake Villas LLC and delivering it to you as manager. This is in exchange for a note in similar amount from BC Lake Villas LLC to me as trustee which is expected to be paid on November 15, 1998.

With the effect of confusing the reader, the memo continued:

> There is still outstanding a 1996 note for $600,000 from North Plaza, LLC to me as trustee which is to provide protection until BC Lake Villas LLC makes the expected payment in November. Until that event that 1996 note is to be paid instead of the current $739,064.97 note by North Plaza LLC, and is to be covered by the latter's deed of trust. Upon receipt of the expected payment from BC Lake Villas LLC I am to cancel the $600,000 note.

The memo referenced that its contents were in accordance with an assignment Dr. Chambers had prepared, and the Suprunuks had signed. That assignment explained in much greater detail the claimed origins of the $739.064.07 note. It stated that the original $600,000 note bore interest at 14%, and was due January

16, 1998. Thereafter, the assignment recites, the note principal was increased by $25,681.07 for additional loans by the Chambers Family Trust. Then it recites that the interest on the adjusted note, when added to the outstanding principal, brought the total to $739,064.07 as of November 5, 1997. Then, the Agreement portion of the document recited:

> A Chambers Family Trust 3/3/92 hereby assigns to BC Lake Villas, LP any and all interest and property rights in the note to it from North Plaza, LLC originally dated July 16, 1996 except to the extent that the principal and interest on the BC Lake Villas note to Chambers Family Trust dated November 5, 1997 remains unpaid.

Still on October 23, 1998, BC Lake Villas recorded the assignment of the North Plaza January 28, 1998 deed of trust to Iraj Ameri, dba Corporate Funding. The assignment was executed by William Johnson as manager of BC Lake Villas. Then, on December 10, 1998 Ameri reassigned the January 28, 1998 North Plaza trust deed back to BC Lake Villas, LLC. Then the trust deed was assigned by BC Lake Villas to the Goldbergs and Ameri as collateral. That assignment was also recorded December 10. Mr. Johnson testified that BC Villas held the North Plaza-to-Chambers note and needed to get money out of it. So they borrowed from the Goldbergs and assigned them the North Plaza note and trust deed.

According to the testimony, the BC Lake Villas property sold in March, 1999, although there were not enough proceeds to pay all secured creditors in full. Dr. Chambers received $450,000 in

cash, and a promissory note from Shining City, Inc. for $385,000. The theory appears to be that the $600,000 North Plaza-to-Chambers note of 1996 was extinguished by BC Lake Villas' payment to Dr. Chambers, and that the January 28, 1998 note for $739,064.07 became the property of BC Lake Villas in exchange for its own note and trust deed, although when that might have happened is confusing in light of the Assignment and Agreement referenced in Dr. Chamber's memo.

The evidence at the hearing indicated that Ms. Sabella was interested in acquiring the second trust deed position, and note, from BC Lake Villas as early as February, 1999. Memos were introduced indicating the note now reflected a loan of $833,000, had an 8% interest rate and a June 30, 1999 due date, and that Mr. Johnson held the note. Subsequently, the transaction was structured as a loan from Ms. Sabella to the Johnsons, individually, in the amount of $617,256.79. That loan was reflected in a note dated May 26, 1999. The security offered by Mr. Johnson was the "Chambers note" and trust deed. Notwithstanding that the $617,256 note was made by the Johnsons, individually, the last page (p. 6) purports to be signed by Mr. Johnson for BC Lake Villas, LLC, as well as separately by he and his wife. BC Lake Villas is nowhere identified as a borrower on the note.

The proceeds of the Sabella loan to the Johnsons were disbursed on behalf of Sabella to the Goldbergs and Ameri, who were the senior assignees on the "Chambers note", presumably to

buy them out. In addition, $75,000 was disbursed to Peter Suprunuk, and over $26,000 to the Johnsons. Actual disbursements totalled $518,353.70 on a loan for $617,256.79, which apparently included prepaid interest and a reserve of $30,000 for an RV park project. For that, Ms. Sabella became the assignee of the "Chambers note" for $739,064.07 plus accrued interest, and received an assignment of the second trust deed as collateral. At least one way of looking at the transaction is that Mr. Johnson bought out the obligations to the Goldbergs and Ameri with the proceeds of his loan from Ms. Sabella, and assigned his successor position to her, although the actual assignments came directly from the Goldbergs and Ameri to her.

When Ms. Sabella received the assignments from the Goldbergs and Ameri, all she could obtain is what they held, which was the right to repayment of the debts owed to them by BC Lake Villas, secured by the "Chambers note" and trust deed. It appears that BC Lake Villas was the owner of the "Chambers note", having exchanged its own obligation for it, and had pledged it, and the supporting trust deed, as collateral for repayment of the loans made by the Goldbergs. When and how Ms. Sabella became the owner of the "Chambers note", or other circumstances which would authorize her to enforce its terms, was not made clear during the hearing. So far as appears from the record, the note and trust deed remain as collateral for the Johnsons' performance under the terms of the $617,256.79 loan.

///

Assuming, without deciding, that Ms. Sabella somehow does have the right to enforce against the North Plaza estate the terms of the "Chambers note", it is of concern that it will be because of some ostensible default by the Johnsons under their loan, for which the note is collateral. If North Plaza pays the obligation, it may relieve the Johnsons of their obligation on that loan, or put North Plaza in the position of having to pursue its own manager if it somehow may become subrogated. More troubling is that Mr. Johnson is the manager of the debtor asking this Court to approve the settlement. It is also troubling that the terms of the settlements also include releases. The debtor has not explained how, if at all, it can recover for the benefit of the estate any such obligation to which it may become subrogated, much less whether the releases would or would not impact its ability to recover.

Based on the foregoing, the Court concludes that the debtor has not carried its burden of demonstrating that the proposed settlement is within the zone of reasonableness, and should therefore be denied, without prejudice, at least in part because it has not been shown that Ms. Sabella "owns" the "Chambers note" such that she can enforce it against the North Plaza estate.

Assuming she crossed that threshold, then the Court would get to the issue raised at the outset - whether she is a holder in due course. Section 3302 of the California Commercial Code provides in relevant part:

      > (a) . . . "holder in due course" means the holder of an instrument if both of the following apply:
>
> (1) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity.
>
> (2) The holder took the instrument (A) for value, (B) in good faith, (C) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (D) without notice that the instrument contains an unauthorized signature or has been altered, (E) without notice of any claim to the instrument described in Section 3306, and (F) without notice that any party has a defense or claim in recoupment described in subdivision (a) of Section 3305.

Ms. Sabella testified that she relied on her broker, Isaac Lei, for all the work and due diligence on this transaction because she was focused on resolving a matter in Utah. It appears by her testimony that Mr. Lei was acting as her agent in the transaction, and she is chargeable with his knowledge. It does not appear she can insulate herself as a holder in due course by delegating.

According to a February 25, 1999 memo from Mr. Lei to Ms. Sabella, it seems they understood the second trust deed on North Plaza secured an $833,000 obligation. By a similar memo dated April 28, 1999 Mr. Lei still thinks it is an $833,000 obligation, and that Mr. Johnson holds the note. He also

understood the loan was due June 30, and that Johnson was asking Dr. Chambers, as a manager of North Plaza, for a 90 day extension. Importantly, Mr. Lei understood the note had an 8% interest rate. The same memo reflects that Mr. Lei understood the Goldbergs held the $833,000 note and trust deed as collateral for a loan that was past due as of March 19, 1999.

The real issue arose when Mr. Lei received a copy of the "Chambers note" because virtually nothing about it resembled what he had understood it to be. The face amount of the note was $739,064.07, not $833,000. The second line of the note had typed in: "On or before January 12, 1999," followed by the preprinted words "after date, for value received, I/we promise to pay . . ." That language indicates a one year due date because interest was to commence January 12, 1998. The rate of interest provided was 13%. Then, typed in after the preprinted words "interest payable" were the words "and principal payable on June 12, 1999." The word "June" had been altered by someone putting white-out or correcting tape over whatever was under it, and then writing the word "June". So Mr. Lei was faced with information that showed the note was at variance with what he had understood its interest rate to be, and it had at least two possible due dates neither of which were what he expected. Moreover, the later one, June 12, was clearly an alteration, and was for an unusual period of time, 17 months, as distinct from the one year set out elsewhere in the note. Interestingly, Dr. Chambers testified

///

those are his initials near the correction to "June", and he assumes he must have put them there when the correction was made.

There were other changes on the note, such as the change to one digit of the year of the date of the Chambers Family Trust. In addition, the date then did not match the date of the Chambers Family Trust in the assignment of the note to BC Lake Villas. The Court is not persuaded the latter changes were ones Mr. Lei should necessarily have observed. However, the former give rise to much greater concern. Section 3103 of the California Commercial Code defines "Good Faith" to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing." Mr. Lei is an experienced broker. He had been communicating with others, including Ms. Sabella, about his understanding of the contents of the note. Then he saw the note, and little, if anything, resembled what he understood and expected - not the amount, not the due date, and most notably, not the interest rate. There is an irony of sorts involved because Ms. Sabella testified she likely would not have been interested in the note if it carried only an 8% interest rate. Yet that is what Mr. Lei told her in a memo. Instead, the rate of interest on the face of the note was 13% which, under the circumstances, should have been a red flag for Mr. Lei 1) if he thought it was supposed to be 8%; and 2) because he knew the rate was usurious unless the note was somehow exempted from the usury provisions. Notwithstanding those facts, there was no testimony of any effort to ascertain whether the note was exempt. With

facts like that staring him in the face, he cannot play ostrich. Almost nothing about the note was what he expected, and the Court is inclined to think that "reasonable commercial standards" would require some effort to reconcile the due date and the interest rate, and whether the note was exempt from the usury law.

In sum, because of the tangle of interrelations, the Court is unable to ascertain whether the proposed settlement package was the product of good faith negotiation. The Court is persuaded that no sufficient showing has been made that Ms. Sabella would succeed in establishing a right to receive the face amount of the Chambers note plus interest accrued at 13% because there is no sufficient showing that she took the note as a holder in due course, assuming she owns it as distinct from holding it as an assignment of collateral on an obligation. The Court recognizes that litigation of the Sabella claim will delay distribution and, if she does prevail, will cost the estate accrued interest, which would further erode what was left for junior creditors, not to mention administrative claims.

In the last analysis, at least for purposes of the present motion, the debtor as the proponent, has the burden of persuading the Court that the proposed settlement is fair and equitable, and should be approved. It has not done so.

Because Dynamic and Ms. Sabella have stated that the settlement proposal is a package, denial of the motion as to Ms. Sabella's claim effectively constitutes a denial of the motion as to Dynamic, as well. Therefore, the Court need not

separately address the objections to settlement of Dynamic's claim.

Accordingly, and for the foregoing reasons, the debtor's motion to improve its settlement with Dynamic and Ms. Sabella shall be, and hereby is, denied.

IT IS SO ORDERED.

DATED: APR 17 2006

PETER W. BOWIE, Chief Judge
United States Bankruptcy Court

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re Case No. 04-00769-B11

**CERTIFICATE OF MAILING**

The undersigned, a regularly appointed and qualified clerk in the office of the United States Bankruptcy Court for the Southern District of California, at San Diego, hereby certifies that a true copy of the attached document, to wit:

**ORDER ON MOTION TO APPROVE SETTLEMENT**

was enclosed in a sealed envelope bearing the lawful frank of the Bankruptcy Judges and mailed to each of the parties at their respective address listed below:

**Attorney for Debtor:**

K. Todd Curry, Esq.
Nugent, Weinman, Abbene, Alcock & Wolf, APC
1010 Second Avenue, Suite 2200
San Diego, CA 92101

**Attorney for Creditors Dynamic Finance and Angela Sabella:**

Stanley E. Goldich, Esq.
Pachulski, Stang, Ziehl, Young, Jones & Weintraub PC
10100 Santa Monica Boulevard, 11th Floor
Los Angeles, CA 90067-4100

**Attorney for Creditors James and Dorene Mae Bree, and South Temecula Gateway, LLC:**

John A. Graham, Esq.
Jeffer, Mangels, Butler & Marmaro LLP
1900 Avenue of the Stars, Seventh Floor
Los Angeles, CA 90067

Said envelope(s) containing such document were deposited by me in a regular United States mail box in the City of San Diego, in said district on April 17, 2006.

Barbara J. Kelly
Barbara J. Kelly, Deputy Clerk

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re

NORTH PLAZA, LLC,

Debtor.

DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,

APPELLANTS,

v.

CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,

APPELLEE

District Case No. 08-CV-01194-W-CAB

Bankruptcy Court No. 04-00769-PB11

Appeal No. 2

**EXHIBITS 4 THROUGH 6 TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**

DATE: To Be Set
TIME: To Be Set
COURTROOM: Seven

The Honorable Thomas J. Whelan, Judge Presiding

**EXHIBIT 4**

EXHIBIT 4
PAGE 41

CSD 1001A [08/22/03]
Name, Address, Telephone No. & I.D. No.

TIFFANY L. CARROLL, ATTORNEY #157054
ASSISTANT UNITED STATES TRUSTEE
OFFICE OF THE UNITED STATES TRUSTEE
402 WEST BROADWAY, SUITE 600
SAN DIEGO, CA 92101-8511
619-557-5013

Order Entered on
June 06, 2006
by Clerk U.S. Bankruptcy Court
Southern District of California

**UNITED STATES BANKRUPTCY COURT**

SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re

NORTH PLAZA, LLC,

Debtor.

BANKRUPTCY NO. 04-00769-PB11

Date of Hearing: May 23, 2006
Time of Hearing: 10:00 a.m.
Name of Judge: Peter W. Bowie

## ORDER APPROVING APPOINTMENT OF A CHAPTER 11 TRUSTEE

IT IS ORDERED THAT the relief sought as set forth on the continuation pages attached and numbered two (2) through 2 with exhibits, if any, for a total of 2 pages, is granted. Motion/Application Docket Entry No. 483.

//

//

//

//

//

//

DATED: June 06, 2006

Judge, United States Bankruptcy Court

Signature by the attorney constitutes a certification under Fed. R. of Bankr. P. 9011 that the relief in the order is the relief granted by the court.

Submitted by:

OFFICE OF THE UNITED STATES TRUSTEE
(Firm name)

By:/s/ Tiffany L. Carroll
Assistant United States Trustee

CSD 1001A [08/22/03] (Page 2)
ORDER APPROVING APPOINTMENT OF A CHAPTER 11 TRUSTEE
DEBTOR: NORTH PLAZA, LLC CASE NO: 04-00769-PB11

This matter came before the Court on the Ex Parte Application for Approval of Appointment of Chapter 11 Trustee by United States Trustee ("Application"), and based upon the Application and Declarations filed in support thereof,

IT IS HEREBY ORDERED that the appointment of Richard M. Kipperman as Chapter 11 Trustee is approved.

CSD 1001A

*Signed by Judge James W. [illegible]*

EXHIBIT 4
PAGE 43

**EXHIBIT 5**

EXHIBIT 5
PAGE 44

Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
**BAKER & McKENZIE LLP**
101 West Broadway, Twelfth Floor
San Diego, CA 92101-3890
Telephone: +1 619 236 1441
Facsimile: +1 619 236 0429

Counsel for Chapter 11 Trustee,
Richard M Kipperman

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

In re:

NORTH PLAZA, LLC,
a California Limited Liability Company,

Debtor

Case No.04-00769 PB11

Chapter 11

**NOTICE OF MOTION OF RICHARD M KIPPERMAN, CHAPTER 11 TRUSTEE (i) TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY TO ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP UNDER FRCP 45 AND FRBP 9016.**

DATE: TBD
TIME: TBD
DEPT: 2
JUDGE: Chief Judge, Hon. Peter W. Bowie

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on a date and time yet to be determined Richard M Kipperman, Chapter 11 Trustee for the estate of North Plaza, LLC ("Trustee"), pursuant to Federal Rule of Civil Procedure 45, made applicable to this action by Federal Rule of Bankruptcy Procedure Bankruptcy 9016, will move for an order: (i) compelling Mr. Isaac Lei ("Lei") to produce those documents requested in the Trustee's Subpoena issued on February 15, 2007 pursuant to Fed. R.

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
NOTICE OF MOTION TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY TO ISAAC LEI, THE ALCON GROUP
SDODMS1/675531.1

EXHIBIT 5
PAGE 45

Bankr. Proc. 2004 ("Lei Subpoena") at a date and time to be set by the Court after hearing on this Motion; (ii) compelling the Custodian of Records of The Alcon Group, Inc., a California Corporation ("Alcon") to produce those documents requested in the Trustee's Subpoena issued on February 15, 2007 pursuant to Fed. R. Bankr. Proc. 2004 ("Alcon COR Subpoena") at a date and time to be set by the Court after hearing on this Motion; (iii) commanding Lei and the custodian of records and person most knowledgeable of Alcon to appear for deposition seven (7) calendar days following the date set by this Court for their document production, respectively; and (iv) such other relief as this Court deems just and proper under the circumstances (the "Motion").

This Motion is made on the grounds that Lei and Alcon seek to withhold a substantial portion of the information in his and its possession, making vague assertions under the broad rubrics of "privilege" and "relevance." Should Lei and/or Alcon be successful in withholding documents on these purported grounds, the Trustee will be impeded and/or prevented from carrying out his statutory duties, which include accounting for and maximizing all property of the estate, investigating the debtor's financial affairs, objecting to claims, and recovering fraudulent and other avoidable transfers. As such, the Trustee respectfully requests this Court grant the Trustee's Motion, thereby permitting the Trustee to obtain the information necessary for him to fulfill his statutory duties to the bankruptcy estate.

The Motion is based on this Notice, Memorandum of Points and Authorities, and the Declaration Janet D. Gertz in support of the Motion, filed concurrently herewith.

Dated: May 2, 2007

BAKER & McKENZIE LLP

By: /s/ Ali M.M. Mojdehi
Ali M.M. Mojdehi
Janet D. Gertz

Counsel for Chapter 11 Trustee,
Richard M Kipperman

2

CASE NO 04-00769 PB11
NOTICE OF MOTION TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY TO ISAAC LEI, THE ALCON GROUP

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

SDODMS1/675531.1

EXHIBIT 5
PAGE 46

EXHIBIT 5
PAGE 47

**EXHIBIT 6**

EXHIBIT 6
PAGE 48

Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
**BAKER & McKENZIE LLP**
101 West Broadway, Twelfth Floor
San Diego, CA 92101-3890
Telephone: +1 619 236 1441
Facsimile: +1 619 236 0429

Counsel for Chapter 11 Trustee,
Richard M Kipperman

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

In re:

NORTH PLAZA, LLC,
a California Limited Liability Company,

Debtor

Case No.04-00769 PB11

Chapter 11

**MOTION OF RICHARD M KIPPERMAN, CHAPTER 11 TRUSTEE (i) TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY TO ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP UNDER FRCP 45 AND FRBP 9016; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

DATE: TBD
TIME: TBD
DEPT: 2
JUDGE: Chief Judge, Hon. Peter W. Bowie

TO: THE HONORABLE PETER W. BOWIE, CHIEF UNITED STATES BANKRUPTCY JUDGE:

Richard M Kipperman, Chapter 11 Trustee for the estate of North Plaza, LLC ("Trustee") hereby submits this Motion, pursuant to Federal Rule of Civil Procedure 45, made applicable to this action by Federal Rule of Bankruptcy Procedure Bankruptcy 9016 , for an order: (i) compelling Mr.

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 49

Isaac Lei ("Lei") to produce those documents requested in the Trustee's Subpoena issued on February 15, 2007 pursuant to Fed. R. Bankr. Proc. 2004 ("Lei Subpoena") at a date and time to be set by the Court after hearing on this Motion; (ii) compelling the Custodian of Records of The Alcon Group, Inc., a California Corporation ("Alcon") to produce those documents requested in the Trustee's Subpoena issued on February 15, 2007 pursuant to Fed. R. Bankr. Proc. 2004 ("Alcon COR Subpoena") at a date and time to be set by the Court after hearing on this Motion; (iii) commanding Lei and the custodian of records and person most knowledgeable of Alcon to appear for deposition seven (7) calendar days following the date set by this Court for their document production, respectively; and (iv) such other relief as this Court deems just and proper under the circumstances (the "Motion").

This Motion is based on the Memorandum of Points and Authorities, the Declaration Janet Gertz in support of the Motion, and the Notice of Motion filed concurrently herewith.

In support of the Motion, the Trustee states as follows:

**I.**

**INTRODUCTION**

As with most discovery disputes, the key issue of contention between the Trustee and the examinees Lei and Alcon Group (collectively, "Lei") is the proper scope and breadth of discovery. This is a determination, however, that is distinctly rooted in the facts and circumstances of the specific case. As is revealed by even a cursory review of the docket in this case, the facts and circumstances of the North Plaza, LLC bankruptcy, as well as the history of the entity known as North Plaza, LLC, are unique in many respects.

The Trustee contends that the scope of discovery and ambit of relevancy that should be applicable to the Trustee's Rule 2004 Examinations of Lei must be determined with respect to three specific overriding issues that have bedeviled this case from its inception. Those issues are as follows:

(i) The unique and inseparable relationship of North Plaza, LLC with the larger real estate development empire of William P. Johnson and Angela Chen Sabella;

2

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 50

(ii) The historical and currently existing conflicts of interest by and between the bankruptcy estate of North Plaza, LLC and the entity's manager, William P. Johnson; and

(iii) the unique role played by Lei within the larger real estate development empire of William P. Johnson and Angela Chen Sabella, including with respect North Plaza, LLC and its eventual demise.

In light of these overriding issues, the Trustee believes that a bare discussion of the law of privilege and relevance as they relate to Subpoenas would be inadequate to comprehensively analyze the present discovery dispute between the Trustee and Lei. To properly address the very complex issues that are inextricably intertwined with this discovery dispute, it is first necessary to provide the Court with a brief discussion of the facts and history of the case, as such are presently known to the Trustee. That discussion follows in Section II below.

As set forth below, Lei is not a mere disinterested third party in this case: Lei possesses extensive personal knowledge of the interrelationships of the Johnson/Sabella Affiliated Entities in the larger Johnson/Sabella business empire, particularly as it relates to North Plaza. Lei appears to have acted for Ms. Sabella in most, if not all, of the transactions involving North Plaza and is therefore likely to possesses documents that reveal the true characterization and nature of the interrelated transactions between North Plaza and the Johnson/Sabella Affiliated Entities. The Trustee is informed and believes that Lei holds key information pertinent to the true extent of the property of the estate—which may include recapture of substantial, highly valuable real and other tangible property interests. Information and documents in Lei's possession may otherwise be relevant to potential claims by the estate against insiders of the Debtor and such persons' agents. The Trustee is informed and believes that, in many respects, Examinees may be the *only* reliable source for certain key documents and information.

As discussed in more detail in the legal analysis of the discovery disputes contained in Section III below, Lei seeks to withhold a substantial portion of the information in his possession, making vague assertions under the broad rubrics of "privilege" and "relevance." Should Lei be successful in withholding documents on these purported grounds, the Trustee will be impeded and/or prevented from carrying out his statutory duties, which include accounting for and maximizing all

3

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 51

property of the estate, investigating the debtor's financial affairs, objecting to claims, and recovering fraudulent and other avoidable transfers. *See, e.g.*, 11 U.S.C. §§ 323, 502, 541, 11 U.S.C. §§ 547(b), 704, 721, 704(1) & (2), 1106(a), 1106(a). As such, the Trustee respectfully requests this Court grant the Trustee's Motion, thereby permitting the Trustee to obtain the information necessary for him to fulfill his statutory duties to the bankruptcy estate.

## II.

## THE FACTUAL FRAMEWORK

### A. THE EXTRAORDINARY INTERCONNECTIONS OF NORTH PLAZA, LLC WITH JOHNSON/SABELLA

North Plaza was not an island unto itself. In order to properly understand the convoluted financial history of North Plaza, therefore, the analytical aperture must be focused on the larger family of real estate investment entities owned or controlled, directly or indirectly, by William P. Johnson and/or William Johnson's alter ego, Shining City, Inc., a Wyoming Corporation ("Shining City") along with Angela Chen Sabella ("Sabella").

Each of the entities that form the larger dynasty of the Johnson/Sabella affiliated entities are structurally similar and have a unity of purpose. Each of the entities is primarily involved in real estate investment activity in the city of Temecula, California. Each of these entities holds real property assets heavily leveraged by "hard money," high interest, balloon-payment loans from Dynamic Finance Corporation and/or Sabella. Each of these entities is somehow interconnected with William Johnson's alter ego, Shining City, Inc., a Wyoming Corporation. Each of these entities is either managed, owned, and/or controlled by William P. Johnson or Shining City. Most of these entities were formed with seed money obtained from a small cadre of well-heeled retirees, with little to no capital actually contributed by William P. Johnson. These entities include Vail Lake, U.S.A., LLC; Vail Lake Village and Resort, LLC; Vail Lake Rancho California, LLC; Rancho California Highlands, LLC (I and II); Rancho California Gateway, LLC; Bear Creek Villas, LLC (collectively, along with Shining City, Inc., the "Johnson/Sabella Affiliated Entities"). Most importantly, each of these entities is connected in some fashion to one or more of the claims that have been filed against North Plaza, and each of these entities appear to receive the regular scrutiny of Lei with respect to

4

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 52

every minutia of their financial affairs.

The Trustee's initial investigation has revealed that, from approximately 1998 to the Petition Date, North Plaza, LLC continuously engaged in a tangled web of business transactions with the Johnson/Sabella Affiliated Entities. Many of these transactions appear to have been marred by serious improprieties. An initial investigation indicates that contracts were violated; operating agreements were disregarded, statutory requirements were flaunted, and fiduciary duties were regularly breached. Real and personal property assets were treated as fungible and moved freely among the Johnson/Sabella Affiliated Entities, often for little or no consideration. Debts incurred by one entity often disappear, only to appear, as if by magic, on another entity's books. The North Plaza business records reveal an array of poorly documented, likely self-dealing insider transactions among the Johnson/Sabella controlled entities. Mr. Lei, for one reason or another, appears to have kept detailed records all of these interconnected transactions.

These interconnections dictate the proper scope of relevance with respect to the Trustee's Rule 2004 Examinations of Lei. First, in light of the dubious nature of the interconnections between North Plaza, LLC and the Johnson/Sabella controlled entities, the Trustee should be permitted to obtain *full* discovery from Lei as to all matters relevant to North Plaza, LLC, which necessarily extends to the entire breadth and subject matter of the interconnections between the Johnson/Sabella Affiliated Entities and the reasons therefore. *Second*, because the Trustee's initial investigation has revealed that certain assets of North Plaza may have been converted by other Johnson/Sabella Affiliated Entities, documents relating to the current disposition of those assets are now relevant to the determination of the property of the estate. *Third*, as is discussed more fully below, Mr. Johnson's own personal financial dealings and interconnections with the Johnson/Sabella Affiliated Entities are directly relevant to the insidious conflicts of interest on the part of both the debtor in possession and its manager—conflicts that have troubled this case from its inception.

## B. THE EXTRAORDINARY CONFLICTS OF INTEREST INFLUENCING THIS CASE

### 1. The Period of the Debtor in Possession

The ever present backdrop to the bankruptcy estate of North Plaza, LLC has been the conflicted position of the manager of North Plaza, LLC, William P. Johnson. As was noted by this

5

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 53

Court in its Order on Motion to Approve Settlement dated April 17, 2006,

> Mr. Johnson . . . testified he and his wife have millions of dollars of personal guarantees outstanding on loans made by Dynamic. The objecting parties have characterized him as an "economic captive" of Dynamic and Ms. Sabella. At the same time, there are multiple state court lawsuits among the parties concerning their respective interests in various projects, or obligations issued by those projects.

Indeed, the Trustee's initial discovery has revealed that Mr. Johnson's economic captivity to Dynamic and Ms. Sabella ran—and still runs—very deep. Not only has Johnson given millions of dollars of personal guarantees to Dynamic and/or Sabella, but the shares of Johnson's corporation, Shining City, is pledged to Dynamic and/or Sabella. Sabella has for some time been embroiled in a dispute with Johnson, alleging Johnson's various breaches in repayment of loans, etc., entitle her to exercise options for significant equity interests in several of the most valuable Johnson/Sabella Affiliated Entities. Moreover, Johnson and Sabella appear to have been de facto, if not actual, partners and co-owners in respect to the larger business enterprise that is encompassed by the Johnson/Sabella Affiliated Entities. The Trustee's discovery has also revealed a receivable from Johnson to North Plaza, LLC in the amount of $1,227,298.39, as of the period ending December 31, 2003. The Trustee is informed and believes that this receivable is otherwise indirectly connected to a personal obligation of Johnson to Sabella. These sort of interrelationships—and resulting pernicious conflicts—appear to have greatly influenced the history of this case.

Even the initiation of the Debtor's petition in bankruptcy was somewhat extraordinary. This case was commenced by an involuntary petition filed on January 28, 2004 under Chapter 11 of Title 11 of the United States Code.[1] The involuntary petition was filed by a certain Mr. Terry Phillips, esq., of Phillips Haskett & Ingwalson, APC, avowedly to prevent foreclosure on the real property held by North Plaza, LLC for the protection of his firm, a creditor. Mr. Fred Phillips, esq., also of Phillips Haskett & Ingwalson, APC ("Phillips") had long served as counsel to North Plaza, as well as counsel to the Johnson/Sabella Affiliated Entities and counsel to William P. Johnson personally.[2]

The Trustee is informed and believes that Phillips was in close communication with both Lei

[1] Title 11 of the United States Code is referred to hereinafter as the "Bankruptcy Code."
[2] Upon information and belief, the filing fees for the petition, paid on February 3, 2004, was billed by Phillips to North Plaza.

6

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 54

and Mr. Johnson during the period immediately preceding and immediately following the Petition Date. The Trustee is informed and believes that Mr. Phillips' standing to file an involuntary petition against North Plaza under Section 303 of the Bankruptcy Code was subject to substantial infirmities and disabling conflicts of interest.

/ / /

The Order for Relief was entered on February 27, 2004. According to declarations filed on the docket in this case, Phillips contacted Mr. K. Todd Curry of Nugent & Newham, APC on or about March 25, 2004 to request that Mr. Curry serve as General Counsel for the Debtor in Possession (hereinafter, "DIP Counsel"). Mr. Curry appears to have been first retained by the Debtor on March 29, 2004, and his first appearance in the case was on March 30, 2004. (*See* Debtor's Response to Order to Show Cause Why a Chapter 11 Trustee Should Not be Appointed or Case Converted to A Chapter 7 (Docket Index 42). On April 21, DIP Counsel filed a Disclosure of Compensation of Attorney for Debtor, which represented that his initial retainer of $24,000 had been paid by Mr. Johnson, Ms. Sabella, and certain other lien holders of the Debtor.

On May 3, 2004, DIP Counsel filed an application for employment as General Counsel to the Debtor in Possession. (Docket Index 63). On May 3, 2004, the Office of the U.S. Trustee filed a statement of position expressing concerns with respect to potential conflicts of interest in respect to Curry's employment, in light of, *inter alia*,

> whether an impermissible conflict of interest exists disqualifying [Curry, as he] received a retainer through . . .insiders . . . , and [Curry's] future fees are guaranteed by William Johnson, an insider of the Debtor.

On July 8, 2004, after notice and a hearing, DIP Counsel's application for employment was approved, based upon his prior representations to the Court that he was aware of no "facts that would create a potential for conflict of interest in this case." (*See* Declaration of K. Todd Curry in Support of Debtor's Motion for Order Authorizing it to Employ Nugent & Newham, APC as General Bankruptcy Counsel dated June 2, 2004 (Docket Index 93)). DIP Counsel otherwise represented that he would not act on behalf of the lienholders paying his retainer[3] and that he would immediately

[3] The docket reveals that, during the course of the case, Curry regularly filed pleadings on behalf of

7

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 55

withdraw if a conflict of interest became apparent. (*Id.*).

The Trustee is informed and believes that the first meeting of creditors under Section 341 of the Bankruptcy Code was held on April 1, 2004. No transcript of this meeting appears to have been obtained by DIP Counsel, and no other record appears to have been preserved by DIP Counsel.

On August 10, 2004, creditor South Temecula Gateway, LLC filed a Motion for Appointment of a Trustee in a Chapter 11 Case, based on perceived irregularities in the administration of the case. The Motion complained of the Debtor's failure to file operating reports, improper use of cash collateral without court approval, failure to market the real property, and indicated concern over irresolvable conflicts of interest. (*See* Docket Index 111). On September 1, 2004, DIP Counsel filed a response to the Motion of South Temecula Gateway, LLC, asserting that "appointment of a Chapter 11 Trustee would not be in the best interest of creditors." (*See* DIP Counsel's Response to Motion to Appoint Chapter 11 Trustee, and Status Report Re Motion for Order Authorizing Sale of Nonresidential Real Property Free and Clear Of Liens and Interests, Including Overbid Procedure, Docket Index 129).

Files the Trustee has recently gathered from the Debtor's books and records reveal that at or about this same time, Curry became aware that (i) certain funds of the Debtor had been improperly transferred by Johnson to third parties without Court approval; and (ii) $7,500.00 had been improperly transferred in March 2004 from the North Plaza checking account to Johnson's spouse.[4] No mention was made of these issues to the Court. On December 13, 2004, with the sale of the real property pending, South Temecula Gateway, LLC withdrew its Motion without prejudice. (Docket Index 210).

On February 3, 2005, this Court entered an Order Authorizing Sale of Nonresidential Real Property Free and Clear of Liens, Claims, and Interests. (Docket Index 243). On March 2, 2005, the sale of the real property closed, leaving the Debtor with cash on hand in the amount of

---

Examinees and/or Dynamic.

[4] The Trustee is investigating whether these improperly converted funds were used to pay a portion of DIP Counsel's retainer. Documents obtained by the Trustee reveal that Patricia Johnson paid the funds for the retainer in March 2004, *not* William Johnson, as is stated in DIP Counsel's declaration. The Trustee can find no evidence that these funds were ever recovered for the estate or that this conversion of funds was brought to the attention of the Court.

8

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 56

$17,659,100.31. On March 25, 2005, DIP Counsel filed the Debtor's Motion For Order Allowing and Authorizing Immediate Payment of a Portion of Dynamic Finance's Secured Claim (Docket Index 249), along with supporting declarations by Isaac Lei (Docket Index 250) and DIP Counsel (Docket Index 251.) In his declaration, DIP Counsel represented to this Court that partial payment should be made on Dynamic Claim No. 16. DIP Counsel stated in his declaration that this recommendation had been based upon: (i) review of Dynamic loan documents, *i.e.*, for accuracy and completeness; (ii) review of loan disbursements and "detailed supporting documents"; (iii) legal analysis of usury issues; and (iv) legal analysis and confirmation of entitlement to default interest.[5] On April 22, 2005, this Court entered an Order Conditionally Allowing A Portion of Claim No. 16 and Authorizing Interim Payment to Dynamic Finance Corp., subject to disgorgement. (Docket Index 285.)

More than a year and a half after the involuntary petition was filed, on August 24, 2005, DIP Counsel filed a Notice of Motion and Motion For Order: (1) Approving Settlements With Secured Creditors; and (2) Authorizing Payment of Secured Claims on behalf of the Debtor ("First Motion for Order on Settlements" (Docket Index 307)). The proposed settlement provoked a long and bitter dispute among the secured creditors and elicited extensive debate concerning the propriety of the settlement, including without limitation, the amount of the Sabella and Dynamic Claims.

On November 10, 2005, the Court issued a ruling disapproving the First Motion for Order on Settlements, finding cases cited by DIP Counsel as to relative priorities to be inapposite, and stating as follows:

> The Court also has concerns about the Debtor's interest in championing the proposed settlements. As pointed out by Debtor in its moving papers, the determination by a debtor in possession to settle a particular dispute is generally afforded "considerable deference." However, the Court wonders whether that general rule should apply in a case such as this where the debtor in possession is not a going concern—having sold essentially all of its assets—and has not expectation of a residual interest in the estate, particularly when the proposed settlements are opposed by a secured creditor whose potential distribution is severely impacted by the proposed settlements.

---

[5] As discussed more particularly below, the Trustee's initial review indicates that DIP Counsel's review of these issues may have been merely perfunctory. As such, DIP Counsel's representations to this Court may have been overly sanguine with respect to the accuracy and validity of certain aspects of Dynamic's Claim No. 16.

9

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 57

(Order Setting Status Conference re Notice of Motion and Motion For Order: (1) Approving Settlements With Secured Creditors; and (2) Authorizing Payment of Secured Claim (Docket Index 353)).

On January 5, 2005, DIP Counsel filed a second settlement motion on behalf of the Debtor (Notice of Motion and Motion--Amended Motion For Order (1) Approving Settlements With Secured Creditors; and (2) Authorizing Payment of Secured Claims (Docket Index, 362), ("Second Motion for Order on Settlements")). Unlike the First Motion for Order on Settlements, the Second Motion addressed only Dynamic's Claim 16 and Sabella's Claim 14.[6] This second proposed settlement again elicited bitter argument among secured creditors and renewed concerns over the proposed settlement of the Sabella/Dynamic claims in light of , *inter alia*, issues of usury law and holder in due course. Mr. Lei's role as an alleged "broker" of the Dynamic/Sabella loans was central to this dispute.

Extensive discovery was conducted with respect to the Second Motion for Order on Settlements by the Bree Creditors. On April 17, 2006, this Court issued a ruling after a lengthy evidentiary hearing on the Second Motion for Order on Settlements. In its Order, the Court again disapproved of the settlement proposed by the Debtor. In this ruling, the Court noted:

> The objecting parties have argued the settlement cannot meet the test because the person making the decision for the debtor, William Johnson, has so many other obligations involving the same parties, as to whom he should be at arm's length. The court has been sensitive to that concern for some time, as reflected in its November, 2005 written order. The circumstances and interrelations clearly call for heightened scrutiny . . . .

(*See* April 17, 2006 Ruling, Docket Index 456.) The Court also expressed its concern with the very broad releases of liability that were proposed in the settlement and the related potential for conflicts of interest, indicating that "more troubling is that Mr. Johnson is the manager of the debtor asking this Court to approve the settlement." (*Id.*).

On April 24, 2004, after the proposed settlement had failed for a second time, DIP Counsel filed a Notice of Motion and Motion For Order Authorizing Debtor to Engage Douglas P. Wilson and Douglas Wilson Companies As Manager of Debtor In Possession, Including Use of Cash

[6] An attempt was also made to settle a claim of Lei that had been filed after the bar date.

10

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 58

Collateral to Pay Post-Petition Retainer (Docket Index 461). On May 11, 2006, the Office of the U.S. Trustee filed a Response, stating that "due to the status of the case and Mr. Johnson's conflicts of interest . . . a chapter 11 trustee [should] be appointed rather than a new manager" stating that, unlike a manager "[a] chapter 11 trustee's powers and duties to the estate are clear." (Docket Index 468). On June 5, 2006, the Court entered Order Directing the Appointment of Chapter 11 Trustee. (Docket Index 479). On June 6, 2006, the Court entered an order appointing Richard M Kipperman as the Trustee. (Docket Index 484).

**2. The Events Following the Appointment of Richard M Kipperman As Chapter 11 Trustee**

On June 16, 2006, an order was entered appointing Baker & McKenzie LLP as the Trustee's general counsel. On August 30, 2006, LECG, LLC was appointed as accountants and consultants to the Trustee in this case.

Upon assuming his position and retaining the necessary professionals, the Trustee soon discovered a surprising dearth of information and analysis concerning the Debtor. Despite the fact that the case had been filed more than two and one half years earlier, and despite the fact that hundreds of thousands of dollars had been expended on legal and professional fees, there was no evidence that the professionals for the Debtor in Possession had ever engaged in a meaningful review of the books and records of North Plaza. There was also no evidence that any discovery and/or more than perfunctory legal analysis had been done by DIP Counsel with respect to the validity of claims asserted against the estate and/or potential claims of the estate against third parties. Candidly, this dearth of information and analysis is not particularly surprising where it appears that Mr. Johnson's conflicting loyalties and ongoing financial entanglements with the rest of the Johnson/Sabella Affiliated Entities would have made this sort of probing investigation extremely inconvenient, both for Mr. Johnson and his affiliates.

Aware of these overriding issues, counsel for the Trustee immediately set about to assemble all available information regarding the Debtor. To his surprise, the Trustee encountered a general resistance to providing this critical information to the Trustee from persons in possession of these materials.

11

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 59

First, the Trustee endeavored to obtain a complete set of the corporate books and records of North Plaza. The Trustee's counsel contacted Ms. Jean Shetler, the office administrator for North Plaza, to request delivery of the books and records of the debtor, including general ledger, P&L statements, balance sheets, check ledgers, annual audits or compilation reports. The Trustee's counsel made several initial calls to Ms. Shetler requesting these records. The calls were not returned. (*See* Declaration of Janet D. Gertz ¶ 2 attached hereto as Exhibit "A", (hereinafter, "Gertz Decl.").

On September 19, 2006, this Court granted the Trustee's request for an Order Directing Examination and Production of Documents Pursuant to Rule 2004 (Docket Index 512), compelling certain named persons with information to submit to examinations and authorizing the Trustee to issue subpoenas "to additional persons possessing knowledge of the debtor's acts, conduct, or financial affairs so far as it related to the Debtor's proceeding in this bankruptcy case and/or as may be necessary to show the condition of the estate and to enable discovery of its extent and whereabouts." Only after this order was entered, specifically naming individuals affiliated with the Debtor, on September 21, 2006, counsel for the Trustee finally received a call from Phillips, indicating that Ms. Shetler would cooperate to provide the books and records of North Plaza to counsel for the Trustee. On or about September 27, 2006, the Trustee finally obtained possession of the books and records of North Plaza, LLC and immediately commenced a review. (*See id.*).

Upon the Trustee's taking possession of the books and records of North Plaza, a review of these documents revealed general disarray. (*See id.* ¶3). Few originals of material agreements and other important documents had been maintained, making forensic analysis more difficult. Promissory notes and deeds of trust mentioned in the debtor's tax returns were missing and their location unaccounted for. Key loan documents remained unsigned. Corporate formalities had been routinely disregarded and unauthorized acts by the entity permitted. Tax returns for North Plaza had been filed years after the fact and contained conflicting information, inadequate documentation, and were riddled with errors. Under the Operating Agreement, the permitted duration of North Plaza, LLC had expired years earlier, on December 31, 2001. The entity had no manager in place from the date of Robert Chambers' resignation on or about August 15, 2001 until approximately June 23,

12

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 60

2004[7] when an amendment to the Operating Agreement was finally executed appointing William Johnson as the new manager, with the applicable amendment being backdated to August 15, 2001.

///

Most troubling with respect to any analysis and review of the validity of the claims filed against the estate is the extremely convoluted history of each of the obligations of the Debtor.[8] Upon investigation, each claim filed against the estate comes with its own history, usually involving one or more of the other Johnson/Sabella Affiliated Entities. It is not an exaggeration to say that each claim filed against the estate requires a flowchart to fully understand its genesis, history, and relationship to other entities. Furthermore, in most cases, the transaction documents belie the facts of what actually happened from an accounting perspective. The general disarray in the Debtor's financial affairs is reflected in the claims that have been filed against the estate in this bankruptcy case: material documentation is missing from these claims, attachments are unsigned, and the provenance of certain liens is questionable. Former DIP Counsel appears to have overlooked or ignored many of these glaring deficiencies.

In light of the troubled history of this case and concern over conflicts of interest, the Trustee was also particularly desirous of obtaining a full set of original client files from the former DIP Counsel. Unfortunately, obtaining this information from the former DIP Counsel has also been unnecessarily difficult, which has impeded the Trustee's progress. The Trustee has made repeated written and oral requests to former DIP Counsel for turnover of "*all* client files," to no avail. Initially, on July 11, 2006, Trustee's counsel requested that former DIP Counsel would submit a document index of his client files to enable the Trustee to obtain an understanding of the content and extent of these materials. (*See id.* ¶4.). Former DIP Counsel responded that he did not keep a formal index, and instead indicated generally that he had possession of files containing "correspondence, pleadings, documents pertaining to the sale of real property, documents relating to claims, and client documents." (*See id.* ¶4.)

---

[7] It appears as though the debtor in possession executed this amendment because they could not open a DIP bank account absent a proper manager for the entity.

[8] The so-called "Chambers Note," chronicled to this Court in extensive testimony during the evidentiary hearing, is typical of the very convoluted nature of each of the transactions entered into by the Debtor

13

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 61

Undeterred, on August 7, 2006, counsel for the Trustee again requested that former DIP Counsel provide "the originals of all of the North Plaza client files that are in your possession." (*See id.* ¶5.) On August 21, 2006, after several follow-up requests, former DIP Counsel provided some files to the Trustee's counsel, representing that he was delivering "everything," except for "documents related to the closing of the sale of the real property which are in storage." Former DIP Counsel otherwise represented in this same communication that "we will get these to you." (*See id.* ¶5.) These files received on August 21, 2006 from former DIP Counsel consisted in total of only three bankers' boxes, despite the fact that the case had been pending over 2 ½ years. (*See id.* ¶5.)

Upon review, the client files provided by former DIP Counsel appeared to Trustee' counsel to be incomplete. They proved to be substantially comprised of: (i) copies of discovery propounded by the Bree creditors in respect to the evidentiary hearing on the settlement, including tax returns attached to the Bree's deposition of Roger Alford; (ii) copies of exhibits Dynamic had submitted at the evidentiary hearing in support of Claims No. 14 and 16, which were otherwise available to the Trustee on the docket; and (iii) copies of the Debtor's operating reports, which were otherwise available to the Trustee's counsel on the docket, along with some related correspondence. Reasonably, the files belonging to the Debtor should have been expected to be more extensive, where the former DIP Counsel had overseen the case for approximately 2 years and where the case had included a significant number of contested motions, along with an extensive evidentiary hearing.

Specifically, the files delivered by former DIP Counsel to counsel to the Trustee—which former DIP Counsel had represented included "everything"—: (i) contained less than 20 e-mail communications concerning the estate; (ii) included no legal analysis and/or legal memoranda, which would necessarily have been prepared in light of declarations former DIP Counsel had made to this Court concerning his analysis of issues relating to the proposed settlement; (iii) contained no trace of the signed tolling agreements that the docket indicates the Debtor had entered into with potential defendants; and (iv) included none of the written discovery that had been conducted by former DIP Counsel with respect to the evidentiary hearing, including interrogatories, requests for admission, and document discovery propounded among the parties related to the Second Motion to Approve Settlement.

14

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 62

When questioned by Trustee's counsel regarding whether he still retained any other files, specifically, "discovery" or "pleading" files, former DIP Counsel belatedly indicated, in October, 2006, that he had in fact withheld certain "pleading" files. (*See id.* ¶6). Former DIP Counsel offered to allow the Trustee to copy these files, but would not agree to provide the original client files to the Trustee. (*See id.* ¶6.) Former DIP Counsel has simply ignored the Trustee's repeated request for a response as to any "discovery" files in former DIP Counsel's possession. In light of former DIP Counsel's intransigence on this matter and because materials described merely as "pleadings" could more economically be copied from the docket, counsel for the Trustee determined it was not cost effective to accept former DIP Counsel's proposal to copy these files. (*See id.* ¶6.) On or about January 3, 2007, after being substituted out as counsel for the Debtor in certain state court litigation, former DIP Counsel finally turned over his pleadings files in the state court litigation to counsel for the Trustee. No discovery, analysis, discovery, or work product related to the state court litigation was turned over to the Trustee. (*See id.* ¶7.) The Trustee is informed and believes that former DIP Counsel persists in improperly withholding estate property from the Trustee in the form of client files and documents, including, without limitation, all email communications related to North Plaza, LLC and all work product, each of which is property of the estate. *See American Metrocomm Corp. v. Duane Morris & Heckscher LLP (In re American Metrocomm Corp.)*, 274 B.R. 641 (Bankr. D. Del. 2002) (holding that attorney client privilege and work product of the debtor are property of the estate).

This is most unfortunate and prejudicial to the estate, particularly in light of the discovery disputes that are detailed herein. The Trustee is concurrently filing a Motion for Disqualification of Former DIP Counsel and a Motion for Turnover to address these, and other, serious issues. The Trustee is legitimately concerned that the insidious conflicts that plagued the debtor-in-possession and its manager may have also influenced DIP Counsel.

In addition to the very great difficulties incident to collecting the books and records and client files of North Plaza, the Trustee has also encountered great difficulty in obtaining deposition testimony and documents with respect to his Rule 2004 Examinations of persons with knowledge, pursuant to this Court's Order dated September 19, 2006 authorizing the same. Each of these

15

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 63

examinations has suffered undue delay due to difficulties with obtaining cooperation. First, there have been repeated attempts by various deponents to evade service. (*See id.* ¶8.) Second, even after being properly served, some examinees have failed to attend their depositions. (*See id.*). Third, deponents have claimed unavailability. (*See id.*) Fourth, deponents have on several occasions cancelled their depositions at the last minute, costing the estate needless expense. (*See id.*)

Notwithstanding these difficulties, on November 13, 2006 counsel for the Trustee commenced a deposition of Roger Alford, former tax accountant to the Debtor. On November 16, 2006 counsel for the Trustee commenced the deposition of Phillips. On January 15, 2007 counsel for the Trustee commenced a series of depositions of William P. Johnson, individually and as manager of North Plaza. On January 31, 2007 the Trustee commenced depositions of Johnson in his capacity as person most knowledgeable and custodian of records of Shining City, Inc. and Vail Lake, U.S.A., LLC, respectively.

The Trustee now desires to conduct a final examination—that of Lei. Unfortunately, the Trustee is encountering some very serious obstacles in obtaining the documents from Lei, the prior receipt of which is crucial to a thorough Rule 2004 Examination.

**C. THE UNUSUAL (AND OFTEN DISPUTED) ROLE OF LEI**

Lei's presence in this case is pervasive, and the record is replete with references to Lei with respect to disputed issues. This is not surprising when the relevant facts are considered: Lei was integral to the transactions North Plaza, LLC entered into with Dynamic and/or Sabella. Lei was integral to North Plaza, LLC's interrelated transactions with each of the other Johnson/Sabella Affiliated Entities. Lei was integral to Johnson's own financial relationship to and dependency upon Sabella and/or Dynamic. Furthermore, Lei's role as an employee of Dynamic/Sabella or as an "independent broker" who "arranged" the Dynamic/Sabella loans is extraordinarily relevant to this case: According to the Trustee's preliminary calculations, determination that Lei did not "arrange" the loan for another as an independent "broker" would decrease the value of the Dynamic Claim No. 16 alone by a minimum of $8 million.

As, stated above, the Debtor's proposed settlements of the claims of Dynamic and Sabella provoked a long and bitter dispute among the secured creditors and elicited extensive debate

16

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 64

concerning, *inter alia*, the propriety of the settlement amount of Dynamic Claims 14 and 16 in light of issues related to usury law and whether Sabella/Dynamic was each a holder in due course. As set forth in the pleadings filed in respect to the two settlements and as is confirmed by the transcript of the evidentiary hearing on the Debtor's Second Motion for Order on Settlements, the role of Lei figured prominently in the debate over the propriety of the two proposed settlements.

As discussed above, the Court disapproved both the Debtor's First Motion for Order on Settlements and the Debtor's Second Motion for Order on Settlements. In its Order disapproving the Debtor's Second Motion for Order on Settlements, the Court cited in particular the troubling issues with conflicts of interest. As evidence of these disabling conflicts, the Court cited to several factors, including (i) the questionable nature of the Debtor's settlement of Lei's claim; (ii) the problematic nature of the releases granted by the Debtor; and (iii) questions incident to the Debtor's ability to propose the settlements at arms' length, in light of conflicts incident to Mr. Johnson's own financial entanglements with Dynamic and Sabella and the potential pressure that might be exerted by Dynamic and/or Sabella on Mr. Johnson related to these entanglements. (*See* Order on Motion to Approve Settlement dated April 17, 2006 (Docket Index 456)). The Trustee's review of the Legacy Production indicates that the facts will fully substantiate the concerns articulated as to each of these issues. The facts also appear to demonstrate that Lei figured prominently in serious issues of conflict of interest with respect to each of these general subjects of the Court's concern.

In light of the above, and in light of the Trustee's statutory duty to account for and maximize all property of the estate, investigate the debtor's financial affairs, and to recover fraudulent and avoidable transfers, *all* documents and communications by Lei relating to North Plaza, LLC and/or the interconnected Johnson/Sabella Affiliated Entities are decidedly relevant to the proper scope of the Trustee's Rule 2004 Examination. As discussed in more detail below, the Trustee does not believe that these documents are otherwise subject to any valid form of privilege.

17

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 65

## III.

## THE DISCOVERY DISPUTE WITH LEI

### A. The Background of the Examination and Related Document Discovery

#### 1. The Subpoenas

Pursuant to Rule 2004 of the Bankruptcy Code and this Court's Order dated September 19, 2006, the Trustee properly served Subpoenas to Alcon Group, Inc., Custodian of Records of Alcon Group, Inc. and Isaac Lei (collectively, "Lei") on February 16, 2007 (attached to Gertz Decl. as Exhibits H-1, H-2, and H-3 (collectively, "Subpoenas")). Under the Subpoenas, Isaac Lei and Alcon Group, Inc. were requested to appear and produce documents on March 2 and 5, 2007, respectively, with such examinations to be continued from day to day until completed. (*See* Gertz Decl. ¶9.).

#### 2. Assertions of Relevance and Scope

On February 26, 2007, Lei served the Trustee with an Objection to the Subpoenas, (attached to Gertz Decl. as Exhibit I), asserting the following specific objections to the Subpoenas:

1. In response to the Trustee's request under Category 9, for "*Information and documents that refer or relate to any office where Your real estate license is displayed and where personal consultations with clients are held*," Lei objected on the basis that this request was "vague, ambiguous, and unintelligible."

In response to this objection, the Trustee explained that this language contained in each of the Trustee's Subpoenas is a direct quote from Division 4, Part 1, Chapter 3, Article 2 of the Cal. Bus. & Prof. Code, regulating the conduct of licensed real estate brokers. This language should not therefore be in any way vague, ambiguous, and unintelligible to Lei, who has held himself out as a licensed California real estate broker.

2. In response to the Trustee's request under Category 35 for, "*Information and documents that refer or relate to Your employment by or on behalf of Dynamic*" and Category 36 for, "*Information and documents that refer or relate to Your employment by or on behalf of Sabella*," Lei objected to the use of the word "employment", in each of the Subpoenas, asserting that the word was "ambiguous." Lei also objected on grounds that the request was "overbroad, burdensome, and oppressive."

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

On March 28, 2007, after having had an opportunity to review the voluminous privilege logs Lei produced and the basis for Lei's assertions of privilege contained therein, counsel for the Trustee responded that "employment" should be construed in the usual sense of the word and also to include all activities where Mr. Lei and/or Alcon acted as the "functional equivalent" of an employee. As noted below, the term, "functional employee" is a direct quote from the applicable case law construing the "client representative" theory, which Lei has asserted in support of a substantial portion of his claims of attorney-client privilege. As such, the Trustee is informed and believes that the reference should not be either ambiguous or incomprehensible to Lei. Nor is the request overbroad, burdensome, or oppressive. Indeed, proof of Mr. Lei's status as a de facto employee of Dynamic or the "functional equivalent" is key to the sustainability of the majority of Lei's privilege claims, which are based on the theory that he was a "client representative" or de facto employee of Dynamic and/or Sabella.

Lei's relevance objections essentially amount to the contention that the issue of the scope of Lei's services to Dynamic and/or Sabella and the character and nature of Lei's relationship to Dynamic and Sabella is an improper inquiry under the Trustee's Rule 2004 Examination. As asserted by Lei in his Objections:

> None of Examinees were employees of Dynamic and would therefore have nothing to produce in response to the request. However, to the extent the Trustee is using a broader definition of the term "employment" so as to include any an all actions ever undertaken by or on behalf of Dyamic beyond those actions subject to the categories of the remaining requests in the subpoena[s] as they relate to North Plaza or the Real Property, Examinees object to the request on the grounds that the same is overbroad, burdensome and oppressive and not reasonably calculated to lead to the discovery of matter relevant to an inquiry under Federal Rule of Bankruptcy Procedure 2004 . . .

Miscellaneous other relevance objections not asserted in Lei's Objections are untimely under Fed. R. Civ. Proc. 45(c)(1)(B).

**3. Assertions of Privilege**

On February 26, 2007, Lei served the Trustee with Amended Privilege Log (Vol. 1) and Privilege Log (Vol II), asserting privilege as to approximately 18,000 pages of documents. Subsequently, on April 19, 2006, Lei served the Trustee with a Privilege Log (Vol III) and (Vol. IV),

19

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 67

which were later amended to correct errors on April 23, 2007. Privilege Log Vol. I-IV are collectively referred to herein as the "Privilege Logs." Privilege has been claimed for a substantial amount of documents. All in all, the Trustee estimates that Lei has claimed privilege for nearly 10,000 documents on the Privilege Logs, to date. (*See* Gertz Decl.¶11.)

As is noted below, quality issues with the Legacy Production and the Supplemental Production prevent the Trustee from reconciling the Privilege Log (Vol. II) and Privilege (Vol. IV) with the documents. As such, the Trustee is unable to provide detailed responses to Privilege Log (Vol. II) and Privilege Log (Vol. IV) at this time. While reserving all rights, therefore, the Trustee provides initial responses to Privilege Log (Vol. I) Privilege Log (Vol. III) (attached hereto as Exhibit ("B") ("Trustee's Initial Responses to Privilege Logs") and intends to supplement the Trustee's Initial Responses to Privilege Logs as soon as possible following receipt from Lei of the corrected and amended versions of Privilege Log (Vol. II) and Privilege (Vol. IV) in a form that permits the Trustee to properly reconcile the privilege logs to the documents. (*See* Gertz Decl. ¶12.)

**4. The Mechanics of the Production and Attempts to Meet and Confer to Resolve the Dispute with Lei' Counsel**

Counsel for the Trustee has agreed with counsel for Lei[9] to accept an initial production from Lei in response to the Subpoenas, consisting of the documents that had been produced by Dynamic/Sabella to the Bree Creditors in the discovery incident to the evidentiary hearing ("Legacy Production"). The Trustee agreed to the production of these materials in response to the Subpoenas issued to Lei solely as an accommodation to enable Lei's initial and partial response, in order to help alleviate some burden on Lei in reassembling these same materials and in order to move the Trustee's review of documents along more quickly. The Legacy Production was not deemed to satisfy Lei's response to the Trustee's Subpoena with respect to any particular time period and/or requests under the Subpoenas, including without limitation the time period covered by the Legacy Production. It is understood that Lei is to produce additional documents in his possession or control as may be responsive to the Subpoenas ("Supplemental Production"). In agreeing to receive the

---

[9] Counsel for Lei is Pachulski, Stang, et al., the same counsel as has previously appeared on behalf of Dynamic and Sabella in this case.

20

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 68

Legacy Production, the Trustee reserved all rights to contest the accuracy and sufficiency of the Legacy Production and any accompanying privilege logs as to errors and omissions, etc.

More than two months after issuance of the Subpoenas, the Trustee has essentially received only a verbatim copy of the Legacy Production that was produced to the Bree Creditors, along with the accompanying privilege logs.[10] The privilege logs accompanying the Legacy Production were only partially updated to reflect only some of the documents that were produced at that time pursuant to Court order. Beyond that, the Trustee has received only a minimal amount of documents in respect to the Supplemental Production. Perhaps prompted by the Trustee's specific request for discovery of all EDI data, Counsel for Lei has recently discovered approximately 40,000 e-mails that reside on Lei's computer. Lei has therefore promised to provide a "rolling" production of these materials, as the review of such is completed.

The Trustee's counsel has attempted to meet and confer with counsel for Lei to resolve this discovery dispute without Court intervention. On March 28, counsel for the Trustee made a response to counsel for Lei after conducting a high level review of the Legacy Production and accompanying Privilege Logs. (*See* letter from Janet Gertz to Steven Kahn dated March 28, 2007, attached as Exhibit "K" to Gertz Decl.). On April 2, counsel for Lei responded. (*See* letter from Steven Kahn to Janet Gertz dated April 2, 2007, attached as Exhibit "L" to Gertz Decl.) On April 13, 2007, counsel for the Trustee responded to counsel for Lei, attempting to resolve the disagreements. (*See* letter from Janet Gertz to Steven Kahn dated April 13, 2007, attached as Exhibit "M" to Gertz Decl.). On April 17, 2007, counsel for Lei responded to the letter from the Trustee's counsel, indicating very broad disagreement on the key issues of privilege and relevance pertaining to the Subpoena. (*See* letter from Steven Kahn to Janet Gertz dated April 17, 2007, attached as Exhibit "N" to Gertz Decl.) Unable to resolve the dispute, counsel spoke by telephone on April 20, 2007 to attempt to resolve their disagreements but were unable to reach a consensus. (*See* Gertz Decl. ¶14.)

As is noted in the e-mail correspondence between counsel concerning their efforts to meet

[10] Some supplemental materials have been produced, but these are flawed and error filled and they will have to be re-produced by Lei.

21

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 69

and confer, the Supplemental Production has reflected serious problems with quality, with the documents being produced to the Trustee in a manner that makes them generally unusable and renders the privilege log incompatible with the numbering scheme for the documents actually produced. Lei's counsel have promised to correct these errors. (*See* Gertz Decl. ¶15.) As such, while reserving all rights to otherwise contest the sufficiency, accuracy, timeliness, and completeness of Lei's production, the Trustee will not burden the Court with these issues now, but will file a supplement to this Motion should Lei not address and correct these issues completely and within a reasonable period of time. (*See* Gertz Decl. ¶16.)

/ / /

As noted above, the Trustee will not burden the Court now, but will file a supplement to this Motion should Lei not address the deficiencies and correct the errors in the Privilege Logs within a reasonable period of time. (*See id.*) The following discussion will concern itself with the threshold substantive issues incident to the discovery dispute: relevance and privilege.

## B. <u>THE LEGAL FRAMEWORK FOR THE DISCOVERY DISPUTES</u>

### 1. The Legal Framework Pertaining to Disputed Issues of Relevance

The scope of a Rule 2004 Examination is very broad. Examinations under Rule 2004 go beyond the scope of discovery under the Federal Rules of Civil Procedure, are allowed for the "purpose of discovering assets and unearthing frauds" and have even been compared to "a fishing expedition." *In re GHR Energy Corp.*, 33 B.R. 451, 453 (Bankr. D. Mass. 1983) (citing *In re Foerst*, 93 F. 190, 191 (S.D.N.Y. 1999)). Although certainly not without limits, here the scope of the examination clearly is concerned solely with matters relevant to the basic inquiry.

First, Lei seeks to cordon off from the Trustee's inquiry the nature of Mr. Lei's general business/employment relationship with Dynamic and Sabella. Lei asserts that the Trustee's request for documents relating to "services with respect to other loans and business transactions of Dynamic/Sabella," including those involving other Johnson entities, is inappropriate as not relevant. This Court has, however, already decided that this issue is decidedly relevant, even when determining the question under the much narrower subject matter of the evidentiary hearing.

The Court previously determined this issue in overruling Dynamic/Sabella's motions for

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

protective order and sustaining the Bree Parties' document requests concerning other services performed by Lei for Dynamic or Sabella, which requests were propounded as follows:

> *[Amended] RFP No. 2: All documents, writings or other communications between Dynamic and/or Sabella, on the one hand, and Lei, on the other hand, relating to the negotiation of the terms of any loan made by Dynamic and/or Sabella since 01/01/90.*
>
> *RFP No. 33: All documents, writings or other communications which refer or relate to Lei's representation of Dynamic or Sabella since 01/01/90.*

In its January 28, 2006 ruling on Dynamic/Sabella's motion for a protective order relating to the above requests, the Court stated:

> One of my major areas of concern . . . is the relationship with Mr. Lei. And that's a factual issue in terms of his role in Claim 16... [I]t's relevant to examine his role in relation to Dynamic and/or Sabella with respect to broker or not brokering other loans . . . so we can say look here's a pattern and practice.... [I]t's a legitimate inquiry....
>
> [I]t's relevant to have discovery of [Lei's] role in other loans involving Dynamic and Sabella so that we get to look factually at those and see if they are different, whether they are the same, how that was viewed at that time in terms of whether he really was a broker or he was an employee....
>
> If I was [counsel], there's no way I would take Mr. Lei's deposition before I get your document production request responses . . . .

(01/27/06 Transcript, pp. 18, 27, 28-29. (emphasis added)).

Because the Court has already made a determination of this issue *i.e.*, that the Examinees' services with respect to other loans and business transactions of Dynamic/Sabella are indeed relevant, it constitutes the law of the case. Guided by the Court's previous assessment of this matter, the Trustee is unwilling to proceed with the deposition of Lei until these documents are produced in their entirety.

Second, the framework for the scope of relevance under this Rule 2004 Examination must be founded in whether the information could lead to discovery of admissible evidence. Under Rule 2004, the ambit of relevance extends to "the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate, or to the debtor's right to a discharge" as well as to the "operation of any business and the

23

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 71

desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan . . . and any other matter relevant to the case or to the formulation of a plan." Fed. R. Bankr. Proc. 2004.

As set forth above, in light of the interrelationships and inextricably linked nature of the affairs, assets, liabilities, and property of each of the Johnson/Sabella Affiliated Entities, each of the documents requested from Examinees—*including* those relating to the Johnson/Saballa Affiiliated Entities, which are each inextricably linked with North Plaza, LLC—directly serves the purposes of discovery of admissible evidence under Federal Rule of Bankruptcy Procedure 2004. As noted below, Lei has otherwise put the entire subject matter of his business and/or employment relationship with Dynamic/Sabella at issue by attempting to claim status as a Dynamic/Sabella "client representative." The issue of Lei's business and/or employment relationship with Dynamic/Sabella is also most relevant to the determination of the usury safe harbor as it affects the Dynamic/Sabella claims against the estate.

Lei's Objections to the Subpoenas should be denied, and Lei should be compelled to produce *all* relevant documents forthwith.

**C. The Legal Framework for Examinees' Assertion of Privileges**

Under Federal Rule of Evidence 501, the applicable law governing privileges is determined with reference to the substantive law that provides the rule of decision. As such, the federal common law of privilege, as interpreted by the courts of the United States in light of reason and experience, will apply to these Rule 2004 Examinations, which are brought pursuant to federal law.

Privileges are narrowly construed under Federal law. The initial burden of establishing that a privilege exists is on the party claiming the privilege. *Davis v. Fendler*, 650 F.2d 1154, 1160 (9th Cir. 1981). As such, Rule 26(b)(5) provides that when a party withholds information otherwise discoverable by claiming that it is privileged, the party must "make the claim expressly," and must "describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection."

Here, Lei has asserted three types of privileges on the Privilege Logs: (i) the attorney client

24

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 72

privilege, (ii) the work product doctrine, and (iii) "confidential settlement communications." Viewed under federal common law, Examinees have not met their burden of establishing that any valid claim of privilege exists. First, the descriptions on the Privilege Log are seriously inadequate, hampering the Trustee from making any meaningful determination of whether Examinees' claims of privilege can be substantiated. At a minimum, in light of the deficiencies of the Privilege Logs, Lei has not met his burden of establishing any privilege exists. Under the law of the Ninth Circuit, moreover, failure to timely and properly assert claims of privilege on a privilege log may also, in some circumstances, constitute a waiver, particularly where the delay and/or vagueness is due to gamesmanship. *Burlington Northern & Santa Fe Ry. v. United States Dist. Court*, 408 F.3d 1142 (9th Cir.. 2005).

Notwithstanding the ambiguous descriptions on the Privilege Logs, no applicable claim of privilege appears to be even remotely applicable to a substantial portion of the documents claimed by Examinees as privileged on the Privilege Logs. Based on Lei's descriptions, the Trustee's specific contentions with respect to what appear to be Lei's improper assertions of privilege, listed by Bates No. (where available), are set forth in Trustee's Initial Responses to Privilege Logs.[11]

**1. Attorney-Client Privilege**

Under federal common law, in order to claim the attorney-client privilege there must be eight essential elements to a protected communication: 1) where legal advice of any kind is sought; 2) from a legal adviser in his capacity as such; 3) the communications relating to that purpose; 4) made in confidence; 5) by the client; 6) are at his instance permanently protected; 7) from disclosure by himself or by the legal adviser; 8) unless the protection be waived. *See United States v. Chevron Corp.*, 1996 U.S. Dist. LEXIS 4154 (N.D. Cal. 1996).

As such, not every communication between an attorney and a client is *per se* privileged. First, communications that occur in the presence of a third party lack the required element of confidentiality and are not within the privilege, *Lovell v. Evergreen Res., Inc.*, No. C-88-3467, 1990 US Dist LEXIS 11223, at *17 (N.D. Cal. Apr 19, 1990), and any waiver by disclosure to a third

[11] As stated above, Privilege Log (Vol. II) and Privilege Log (Vol. III) are not addressed at this time, as they are indecipherable.

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

EXHIBIT 6
PAGE 73

party generally will extend to the entire subject matter. *Verizon Cal., Inc. v. Ronald A. Katz Tech. Licensing, L.P.*, 266 F. Supp. 2d 1h 144, 1148-1150 (C.D. Cal. 2003). Second, a client cannot create privilege by merely forwarding non-privileged documents to counsel. *Guzzino v. Felterman*, 174 FRD 59, 61 (WD La 1997). Third, because the attorney-client privilege pertains only to legal advice (*i.e.*, advice with respect to litigation), it does not extend to business-related documents prepared by the attorney for a client, such as drafts of corporate documents, contracts, and notes and minutes from business meetings. *Christman v. Brauvin Realty Advisors, Inc.*, 185 F.R.D. 251, 256 (N.D. Ill. 1999). Finally, The "crime-fraud exception" to the privilege protects against abuse of the attorney-client relationship. As the Supreme Court wrote in *Clark v. United States*, 289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933), "The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Id.* at 15. The planned crime or fraud need not have succeeded for the exception to apply. The client's abuse of the attorney-client relationship, not his or her successful criminal or fraudulent act, vitiates the privilege. *In re Grand Jury Proceedings*, 87 F.3d 377, 380 (9th Cir. 1996)..

Notwithstanding the inadequacy of the descriptions on the Privilege Logs, the Trustee is still able to discern serious deficiencies with Examinees' bare assertions of attorney-client privilege. As is set forth in detail in the Trustee's Initial Responses to Privilege Logs, attached hereto, the Trustee's review of the Volumes I through IV of Examinees' Privilege Logs reveals that the "client" in question was Dynamic and/or Sabella, and that third parties, such as Mr. Lei and/or Alcon Group, were included on a substantial portion of the communications, automatically defeating any claim of privilege. As such, the privilege has been waived as to the entire subject matter covered by these communications. Furthermore, in many cases the description of the communication (such as facsimile cover sheets) suggests that they were non-privileged documents that were simply forwarded to an attorney in an attempt to cloak the document with privilege. Additionally, a substantial portion of the documents appear to relate to contracts, deeds, loan transactions, and the like, and thus are not legal advice covered by the attorney-client privilege. In light of these deficiencies, very few—if *any*—of the documents listed on the Privilege Logs can be accorded the

26

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 74

shelter of the attorney-client privilege, as is more specifically detailed in the Trustee's Initial Responses to Privilege Logs attached hereto.

Indeed, this determination has already been made with respect to Privilege Log (Vol. 1) and Privilege Log (Vol. II). After a full *in camera* review of these documents, the Court found that it was "unable to determine from the face of most of the documents whether the claim of privilege for each document is sustainable." (*See* Order re Documents Produced in Camera Review dated March 30, 2006 (Docket Index 444)). The documents were thus ordered produced, not based upon determination of privilege but based solely upon the Court's determination of their relevance to the limited scope of the evidentiary hearing (*i.e.*, limited to Claims 14 and 16). The Court otherwise invited Dynamic/Sabella to attempt to later substantiate their claims of privilege as to those documents prior to the evidentiary hearing. It would be unfortunate to subject the Court to a further in camera review on this issue, and the Trustee respectfully suggests that the Court's determination that there was no claim of privilege determinable on the face of most of the documents contained in Privilege Log (Vol. 1) and Privilege Log (Vol. II) is the law of the case.

**2. Attorney-Client "Representative" Privilege**

Fundamental to Lei's assertion of attorney-client privilege in general is the novel theory that Lei can claim status as a "client representative" of Dynamic and/or Sabella. The Trustee respectfully suggests that Lei's invocation of the "client representative" construct appears to have been previously been negated (rather, estopped) by Lei's prior repeated declarations under oath filed with this Court that he "is not an employee" of Dynamic or Sabella and that he is an "*independent* real estate broker." (*See, e.g.,* Declaration of Isaac Lei In Support of Motion For Order Allowing and Authorizing Immediate Payment of a Portion of Dynamic Finance's Secured Claim dated March 25, 2006 (Docket Index No. 250) (emphasis added)). Lei simply cannot have his cake (*i.e.*, characterizing himself as an "independent broker" when it benefits Dynamic to claim protection of the usury safe harbor) and eat it too (*i.e.*, characterizing himself as an insider member of Dynamic's control group when it is otherwise beneficial to claim protection of the attorney-client privilege).

The "client representative" concept is contained in Supreme Court Rule of Evidence 503, which was not adopted by Congress as part of the Federal Rules of Evidence. In the opinion of the

27

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 75

Advisory Committee, in light of the fact that the term, "client representative," is not defined, the matter is better left to resolution by decision on a case-by-case basis. *See* Advisory Comm. Note to Proposed Standard 503. As such, the concept must be determined with respect to the governing law as it is construed by the courts of the Ninth Circuit.

The "client representative" construct has been developed in a limited number of cases, with disagreement among the circuits. The line of cases adopted by the courts of the Ninth Circuit follow the "functional equivalent" or "de facto employee" doctrine, *i.e.*, that the corporate attorney-client privilege narrowly extends to communications between a corporation's attorney and outside agents or consultants to the corporation who act as the "functional equivalent of a corporate employee." Chief among the cases following this principle is *In re Bieter Co*., 16 F.3d 929, 937 (8th Cir. 1994). In *Bieter*, the Eighth Circuit extended the attorney-client privilege to an independent consultant who acted as the de facto principal of a limited purpose corporation in its quest to develop real property, and in the litigation stemming from that project's failure. 16 F.3d at 939-40. In doing so, the court recognized that the consultant often acted as the "sole representative" of the client corporation. *Bieter*, 16 F.3d at 934. Considering the consultant's central role, the court found that "there [was] no principled basis to distinguish [the consultant's] role from that of an employee . . . ." *Bieter*, 16 F.3d at 938. The courts of the Ninth Circuit have recently adopted the functional employee standard set forth in *Bieter*; *accord Memry Corp. v. Ky. Oil Tech., N.V.*, 2007 U.S. Dist. LEXIS 3094 (N.D. Cal. Jan. 4, 2007).

Furthermore, federal courts have held that "a detailed factual showing" is required of the proponent. *See Memry Corp.,* 2007 U.S. Dist. LEXIS 3094. For example, in this case specific evidence must be presented demonstrating (i) Lei's exact duties in this capacity; (ii) Lei's integration into the Dynamic corporate structure or his possession of information not known by other persons at Dynamic; (iii) a "significant" amount, *i.e.*, over 85 percent or more, of Lei's time devoted to consulting activities for Dynamic; (iv) Lei's physical location when performing his alleged duties; and (v) the salary paid to Lei for his services or other financial interest in Dynamic held by Lei. *See id.*

Lei has not met his evidentiary burden of proof as to each of these factual questions so as to

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

establish that he operated as a functional employee of Dynamic/Sabella. To the contrary, Lei seeks to otherwise *withhold* this same information under the cloak of his claim of privilege. This he cannot do. The Trustee also respectfully suggests that, in light of Lei's present attempt to claim the benefit of the attorney-client privilege on the basis of his claimed status as a de facto employee of Dynamic/Sabella, Lei should be estopped from making future assertions in this case that he otherwise could have functioned at any point in time as an "independent" loan broker.[12]

**3. Attorney Work Product Doctrine**

To be eligible for protection as attorney work product, materials must be "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). Materials produced in the ordinary course of business do not enjoy work product protection merely because they prove to be of value in subsequent litigation. *Miller v. Pancucci*, 141 FRD 292, 303, (C.D. Cal.1992). More importantly, these documents and tangible materials must also have been prepared by or for *a party*, or by or for a *party's* representative." *Id.* Accordingly, a document prepared by or for a nonparty to an action cannot be work product in that action, even if the nonparty admittedly prepared the document for other related litigation. *See In re Cal. Public Util. Comm'n*, 892 F.2d 778, 781 (9th Cir 1989) (nonparty governmental agency could not assert work product protection for documents it prepared for separate administrative action). Moreover, even if a document or tangible thing is work product, the facts contained in the work product are not protected from discovery. *See Powell v. United States Dep't of Justice*, 584 F Supp 1508, 1520 (N.D. Cal 1984).

Examinees have attempted to claim work product protection for a substantial portion of documents listed on the Privilege Logs. Examinees are not a party to any existing or contemplated action in this case. As such, the work product doctrine is inapplicable.

Furthermore, assuming *arguendo* that the work product doctrine could possibly be viewed as applicable here, the Privilege Logs reveal that these communications are either unprotected facts, were shared with third parties, and/or otherwise involved mundane business tasks and do not appear

---

[12] Under the governing law, a functional employee of Dynamic and/or Sabella could not possibly have "arranged" loans for Dynamic and/or Sabella while under their direction and control. *See Park Terrace Ltd v. Teasdale*, 100 Cal. App. 4th 802 (2002) (usury exemption is inapplicable where broker acts on own behalf).

29

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 77

to have been "prepared in anticipation of litigation or for trial." Work product is otherwise a limited doctrine, which should be refused under these circumstances where the Trustee clearly has a "substantial need" for these documents that cannot be obtained from any other source than Lei. *See* FRCP 26(b)(3).

**4. Confidential Settlement Communications**

Lei otherwise seeks to claim a privilege for "confidential settlement communications" as to communications with Phillips.[13] A privilege for confidential settlement communications does not exist under federal common law. Fed. R. Evid. 408 is not otherwise applicable, as Rule 408 bars only admissibility to prove liability on a claim. We believe the law of the case otherwise precludes Lei's continued assertion of privilege as to documents shared with third parties concerning out of court settlements. This is supported by the following statements by the Court made at the March 24, 2006 hearing:

- "There is not . . . a privilege for settlement communications." Transcript at 25.
- The joint defense privilege "does not exist" in the context of a settlement. Transcript at 25-6.

Accordingly, all documents shared with third parties related to out of court settlements must be produced. In light of the Court's comments on this matter, the Trustee finds it quite surprising that Lei continues to assert this basis to attempt to withhold a substantial portion of documents on Privilege Log (Vol. I) and Privilege Log (Vol. II).

With respect to Privilege Log (Vol. III), although Lei no longer asserts any privilege for "confidential settlement communications," he otherwise attempts to cleverly "repackage" this same objection under a new label, *i.e.* "attorney client and work product (joint representation)." This objection is equally meritless where Lei has not met his burden of proof that the common interest doctrine is applicable. Under the governing law, absent specific proof that no waiver has occurred, all documents relating to communications shared with third parties, including, without limitation, other counsel, must be produced to the Trustee.

[13] Although communications with Curry are still listed as withheld by Lei on the privilege log, the majority of these documents appear to have been produced, with some exceptions. The Trustee believes this was due to a clerical error.

30

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 78

## IV.

## CONCLUSION

The Trustee has been appointed by this Court to get to the root of the issues that have been troubling this case from its inception. As explained above, the Trustee requires immediate, full, and complete discovery from Lei in order to accomplish that task and to ultimately prescribe a cure.

///

///

///

///

In light of the foregoing, and in light of counsel for the Trustee's certification under L. Bankr. R. 7026-3, the Trustee respectfully requests that this Court grant the Trustee's Motion, compelling Lei to make full responses to the Subpoena. This Court's grant of the Trustee's motion will facilitate the Trustee's fulfillment of his statutory duties, including without limitation, the accounting for and maximizing all property of the estate, investigating the Debtor's financial affairs, avoiding and recovering fraudulent and avoidable transfers, objecting to claims, and otherwise addressing the issues incident to the relative equities of this very troubled and conflict-ridden case.

Dated: May 2, 2007

BAKER & McKENZIE LLP

By: /s/ Ali M.M. Mojdehi
Ali M.M. Mojdehi
Janet D. Gertz

Counsel for Chapter 11 Trustee,
Richard M Kipperman

31

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

CASE NO 04-00769 PB11
MOTION AND POINTS AND AUTHORITIES IN SUPPORT OF TRUSTEE'S MOTION TO COMPEL LEI AND ALCON
SDODMS1/675395.5

EXHIBIT 6
PAGE 79

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 2

II. THE FACTUAL FRAMEWORK .......... 4

A. THE EXTRAORDINARY INTERCONNECTIONS OF NORTH PLAZA, LLC WITH JOHNSON/SABELLA .......... 4

B. THE EXTRAORDINARY CONFLICTS OF INTEREST INFLUENCING THIS CASE .......... 5

1. The Period of the Debtor in Possession .......... 5

2. The Events Following the Appointment of Richard M Kipperman As Chapter 11 Trustee .......... 11

C. THE UNUSUAL (AND OFTEN DISPUTED) ROLE OF LEI .......... 16

III. THE DISCOVERY DISPUTE WITH LEI .......... 17

A. The Background of the Examination and Related Document Discovery .......... 17

1. The Subpoenas .......... 17

2. Assertions of Relevance and Scope .......... 18

3. Assertions of Privilege .......... 19

4. The Mechanics of the Production and Attempts to Meet and Confer to Resolve the Dispute with Lei' Counsel .......... 20

B. THE LEGAL FRAMEWORK FOR THE DISCOVERY DISPUTES .......... 22

1. The Legal Framework Pertaining to Disputed Issues of Relevance .......... 22

C. The Legal Framework for Examinees' Assertion of Privileges .......... 24

1. Attorney-Client Privilege .......... 25

2. Attorney-Client "Representative" Privilege .......... 27

3. Attorney Work Product Doctrine .......... 29

4. Confidential Settlement Communications .......... 29

IV. CONCLUSION .......... 30

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

## TABLE OF AUTHORITIES

### FEDERAL CASES

*American Metrocomm Corp. v. Duane Morris & Heckscher LLP (In re American Metrocomm Corp.)*,
274 B.R. 641 (Bankr. D. Del. 2002) ....... 15

*In re Bieter Co.*,
16 F.3d 929 (8th Cir. 1994) ....... 28

*Burlington Northern & Santa Fe Ry. v. United States Dist. Court*,
408 F.3d 1142 (9th Cir. 2005) ....... 24

*Christman v. Brauvin Realty Advisors, Inc.*,
185 F.R.D. 251 (N.D. Ill. 1999) ....... 25

*Clark v. United States*,
289 U.S. 1, 53 S. Ct. 465, 77 L. Ed. 993 (1933) ....... 25, 26

*Davis v. Fendler*,
650 F.2d 1154 (9th Cir. 1981) ....... 24

*In re Foerst*,
93 F. 190 (S.D.N.Y. 1999) ....... 22

*In re GHR Energy Corp.* ,
33 B.R. 451 (Bankr. D. Mass. 1983) ....... 22

*In re Grand Jury Proceedings*,
87 F.3d 377 (9th Cir. 1996) ....... 26

*Guzzino v. Felterman*,
174 FRD 59 (WD La 1997) ....... 25

*Lovell v. Evergreen Res., Inc.*,
No. C-88-3467, 1990 US Dist LEXIS 11223 (N.D. Cal. Apr 19, 1990) ....... 25

*Memry Corp. v. Ky. Oil Tech., N.V.*,
2007 U.S. Dist. LEXIS 3094 (N.D. Cal. Jan. 4, 2007) ....... 28

*Miller v. Pancucci*,
141 FRD 292 (C.D. Cal.1992) ....... 29

*United States v. Chevron Corp.*,
1996 U.S. Dist. LEXIS 4154 (N.D. Cal. 1996) ....... 25

*Verizon Cal., Inc. v. Ronald A. Katz Tech. Licensing, L.P.*,
266 F. Supp. 2d 1h (C.D. Cal. 2003) ....... 25

Baker & McKenzie LLP
101 West Broadway,
Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

## STATE CASES

*Park Terrace Ltd v. Teasdale*, 100 Cal. App. 4th 802 (2002) .......... 28

## FEDERAL STATUTES AND RULES

11 U.S.C. § 323 .......... 3

11 U.S.C. § 502 .......... 3

11 U.S.C. § 541 .......... 3

11 U.S.C. § 547(b) .......... 3

11 U.S.C. § 704 .......... 3

11 U.S.C. § 704(1) & (2) .......... 3

11 U.S.C. § 721 .......... 3

11 U.S.C. § 1106(a) .......... 3

Fed. R. Civ. P. 26(b)(3) .......... 29

Fed. R. Evid. 408 .......... 30

Fed. R. Bankr. Proc. 2004 .......... Passim

Fed. R. Civ. Proc. 45(c)(1)(B) .......... 19

Fed. R. Bankr. Proc. 9016 .......... 1

Fed. R. Civ. Proc. 45 .......... 1

Fed. R. Civ. P. 26(b)(5) .......... 24

*L.* Bankr. R. 7026-3 .......... 31

Supreme Court Standard 503 .......... 27

Baker & McKenzie LLP
101 West Broadway, Twelfth Floor
San Diego, CA 92101
+1 619 236 1441

SDODMS1/675395.TOA

EXHIBIT 6
PAGE 83

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | District Case No. 08-CV-01194-W-CAB<br><br>Bankruptcy Court No. 04-00769-PB11<br><br>Appeal No. 2 |
| DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,<br><br>APPELLANTS,<br>v.<br><br>CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,<br><br>APPELLEE | **EXHIBITS 7 THROUGH 10 TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**<br><br>DATE: To Be Set<br>TIME: To Be Set<br>COURTROOM: Seven<br><br>The Honorable Thomas J. Whelan, Judge Presiding |

**EXHIBIT 7**

EXHIBIT 7

PAGE 84

Richard M. Pachulski, Esq. (CA Bar No. 90073)
Stanley E. Goldich (CA Bar No. 92659)
Steven J. Kahn (CA Bar No. 76933)
Pachulski Stang Ziehl Young Jones
& Weintraub LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Fax: 310/201-0760

Attorneys for Examinees Isaac Lei and The Alcon Group, and Privilege Holders Angela C. Sabella and Dynamic Finance Corporation

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re: | Case No.: 04-00769-PB11 |
| NORTH PLAZA LLC, | Chapter 11 |
| Debtor. | **OPPOSITION OF ISAAC LEI AND THE ALCON GROUP, AND ANGELA C. SABELLA AND DYNAMIC FINANCE CORPORATION TO THE MOTION OF RICHARD M. KIPPERMAN, CHAPTER 11 TRUSTEE (i) TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY OF ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP UNDER FRCP 45 AND FRBP 9016; REQUEST FOR JUDICIAL NOTICE AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br>Date: June 15, 2007<br>Time: 9:00 a.m.<br>Place: Dept. 2<br>Judge: Chief Judge, Peter W. Bowie |

**TO THE HONORABLE PETER W. BOWIE, CHIEF UNITED STATES BANKRUPTCY JUDGE:**

## Table of Contents

Page

I. SUMMARY OF ARGUMENT ..... 2

II. THE DISCOVERY DISPUTE ..... 4

A. The Subpoenas ..... 4

B. Objections as to Scope ..... 5

1. Documents Relating to the Vail Lake Entities After January 31, 2001 ..... 5

2. Breadth as to Lei/Alcon Activities ..... 6

C. Communications Between Lei/Alcon and Counsel for Dynamic/Sabella are Privileged ..... 8

1. The Recognition of the Attorney/Client Privilege in this Case ..... 8

2. Application of Law of Privilege as to Client Representatives. ..... 10

3. Confidential Settlement Negotiations and Work Product ..... 14

D. The Production Process and Privilege Logs ..... 15

III. CONCLUSION ..... 17

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

20298-005\DOCS_LA:167586.1

1

EXHIBIT 7
PAGE 86

## TABLE OF AUTHORITIES

### Cases

*In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994) .......... 10, 11, 12

*In re CV Therapeutics, Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 41568 (N. D. Cal. June 16, 2006) .......... 10, 12

*In re Mortgage & Realty Trust*, 212 B.R. 649 (Bkrtcy.C.D. Cal. 1997) .......... 13

*Memry Corp. v. Ky. Oil Tech., Nv.*, 2007 U.S. Dist. LEXIS 3094 (N.D. Cal. Jan. 4, 2007) .......... 10, 11, 12

*Park Terrace Limited v. Teasdale* (2002) 100 Cal.App. 4th 802 .......... 6

*Sadalcek v. Morgan Whitney Trading Group, Inc.*, 795 F.Supp. 329 (C.D.Cal. 1992) .......... 13

*Stickel v. Harris* (1987) 196 Cal.App. 3d 575 .......... 6

*Trammel v. United States*, 445 U.S. 40, 101 S. Ct. 906, 63 L.Ed.2d 186 (1980) .......... 12

*United States v. (Under Seal)*, 748 F.2d 871 (4th Cir. 1984) .......... 10

*United States v. Spector*, 793 F.2d 932 (8th Cir. 1986) .......... 10

*Waller v. Fin. Corp. of Am.*, 828 F.2d 579 (9th Cir. 1987) .......... 13

### Other Authorities

2 J. Weinstein, *Evidence* ¶ 503[02] at 503-17 (1975) .......... 10

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Isaac Lei and The Alcon Group ("Lei," "Alcon" and collectively "Lei/Alcon" or the "Examinees"), on behalf of themselves, and ,as to issues of privilege, also Angela C. Sabella ("Sabella") and Dynamic Finance Corporation ("Dynamic") (collectively "Sabella/Dynamic" or "Privilege Holders") herein oppose the Motion of Richard M. Kipperman, Chapter 11 Trustee (i) to Compel Responses to Subpoenas for Documents and Testimony to Isaac Lei, The Alcon Group and Custodian of Records of The Alcon Group Under FRCP 45 and FRBP 9016.

This opposition is based upon the Memorandum of Points and Authorities attached hereto and the Declarations of Isaac Lei, Angela Sabella and Steven J. Kahn filed concurrently herewith. Examinees also request that the Court take judicial notice of the *Opposition of Dynamic Finance Corporation and Angela C. Sabella to Motion to Compel Production of Documents and attached Declarations of Angela C. Sabella, Isaac Lei and Steven J. Kahn* filed March 22, 2006 (Docket No. 434) and the *Response of Dynamic Finance Corporation and Angela C. Sabella to Court Order Re: In Camera Review Dated March 30, 2006 and Declaration of Richard J. Gruber in Support Thereof* filed April 2, 2006 (Docket No. 447).

In support of this opposition, Examinees and Privilege Holders represent as follows:

## I.

## SUMMARY OF ARGUMENT

In an obvious effort to taint Lei/Alcon and their counsel with the purported sins of others, the Trustee endeavors to paint a picture through innuendo, half truths and scurrilous statements, of obstruction, guile and duplicity relating to the Examinees' efforts to respond to the Trustee's excessively broad subpoenas.

It cannot go without noting that the actual dispute relating to the pending discovery is not addressed by the Trustee until page 18 of the Motion. Rather than directly address what are, in fact, discrete issues of breadth and privilege, the Trustee, without any stated factual basis, undertakes to construct an "evil empire" into which he casts Lei/Alcon as holding a "unique role… within a larger real estate empire of William P. Johnson and Angela Chen Sabella, including with respect to North Plaza, LLC and its eventual demise," in which "contracts were violated, operating agreements were disregarded, statutory requirements were flaunted, and fiduciary duties were regularly breached,"

culminating in the baseless contention that "certain assets of North Plaza may have been converted by other Johnson/Sabella affiliated entities."

The purpose of the Trustee's tactics is clear: Knowing that the document requests are overbroad and that the assertion that *no communications* between Alcon/Lei on behalf of Dynamic/Sabella and counsel are privileged is without merit and in direct conflict with this Court's prior withholding of production of documents reviewed *in camera*, the Trustee, in the tradition of yellow journalists of a prior age, finds it necessary to baselessly besmirch Examinees and counsel to mask the weaknesses of his positions.

To date, hundreds of hours and well in excess of $100,000 has been incurred in legal expense in efforts to comply with the document production requests contained in the subpoenas within the realm of reason and relevance. However, the Trustee appears hell-bent to obtain over a decade's worth of documents reflecting any possible piece of paper or electronic communication ever viewed or generated by the Examinees no matter how unrelated to any potential issue, and regardless of relevance, privilege or expense. This is despite the fact that as late as early February of this year, nearly eight months after his appointment, counsel for the Trustee stated that he did not know whether any document production by Lei would be necessary at all.

The issues actually before the Court are discrete and can be simply stated: (1) as to scope, (a) is the Trustee entitled to documents relating to Vail Lake USA, LLC, Vail Lake Rancho California, LLC, Vail Lake Village and Resort, LLC (the "Vail Lake Entities") *after* the Debtor ceased holding a beneficial interest in Vail Lake USA in the year 2000, and (b) is the Trustee entitled to documents relating to Lei's unrelated activities in the past year; and (2) as to privilege, is the Trustee entitled to all documents reflecting Lei/Alcon's participation in communications with counsel on behalf of Dynamic/Sabella.

As set forth below, the Examinees and counsel have acted in good faith throughout in responding to the subpoenas, and are complying, and will continue to comply, with legitimate document requests.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The issues before the Court should be determined on the facts, which the Trustee chooses to ignore or obscure, not baseless insinuation and accusations.

## II.

## THE DISCOVERY DISPUTE

### A. The Subpoenas

The subpoenas at issue were served by the Trustee on February 16, 2007, unrealistically demanding production on March 2 and March 5, 2007.

Shortly thereafter, it was agreed between counsel for the Trustee and Examinees that compliance with the subpoenas could, in part, be fulfilled through a production of the documents previously produced to James Bree and his related entities (the "Bree Parties") in the context of the objection by the Bree Parties to the proposed settlement of the Dynamic's and Sabella's proofs of claim (the "Bree Production"). The Bree Production included voluminous documentation in the possession, custody and control of Examinees and documents within the possession, custody and control of Dynamic/Sabella not technically subject to the present subpoenas. The scope of the documentation reflected all matters relating to the Debtor and, as ordered by the Court on March 24, 2006, communications involving Alcon/Lei and counsel and Todd Curry, counsel for the Debtor, and documents reflecting Alcon/Lei's activities both in relation to Dynamic and other Alcon/Lei clients from 1997 through the date of production in March, 2006. Examinees produced those documents, including the documents not withheld after the Court's in camera review, along with the associated privilege logs, interlineated to remove those documents the Court ordered to be produced on March 30, 2006.[1] Subsequently, and through this date, the Examinees have produced additional documentation to the extent the subpoenas exceed the scope of the Bree production, and have generated additional privilege logs relating to the further productions.

[1] Although Examinees produced to Bree and the Trustee the communications with Todd Curry, as ordered by the Court, through inadvertence the privilege log initially delivered to the Trustee neglected to remove those documents as having been subject to that objection or as confidential settlement negotiations. This error has since been corrected.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Given the broad scope of the subpoenas, the costs attendant to accumulation, review and production of a decade's worth of documents have been extreme, totaling well over $100,000 to date.

**B. <u>Objections as to Scope</u>**

1. <u>Documents Relating to the Vail Lake Entities After January 31, 2001</u>

The subpoenas provide under "Definitions and Instructions" that, "*Unless otherwise specified*, this subpoena covers the period from November 1, 1997 through the present."

There are 66 categories of documents identified in the subpoenas, and most are unlimited as to time. Certainly, as to documents relating to North Plaza and those which are the subject of the Dynamic/Sabella claims, in the context of a 2004 Examination, Examinees have proffered no objection to same.

However, as to the first "breadth" dispute, pertaining to categories of documents relating to the Vail Lake Entities, the categories are, on their face, limited in time, and appropriately so. The subject requests, catetgories 26 and 27 state as follows:

> 26. Documents that refer or relate to any transfers of real property from Vail Lake USA to Vail Lake Village and Resort, LLC, *during the time North Plaza was a member of Vail Lake USA*, including without limitation, any valuations or estimated valuations of such transferred real property.
>
> 27. Documents that refer or relate to any transfer of any right, title or interest from Vail Lake USA to any other person or entity *during the time North Plaza was a member of Vail Lake USA,* including without limitation, any transfers of contract rights to or on behalf of Vail Lake Rancho California.

This inquiry is, of course, wholly appropriate. All documentary evidence and depositions on the issue reflect that on or about September, 1996, North Plaza obtained a twenty percent (20%) membership interest in Vail Lake USA for $500,000 and then sold that interest through a contract dated April 4, 2000 for $1.1 million, and the then members of the Debtor (the Suprunuks, Robert Chambers and his Family Trust, and Shining City, LLC) elected to distribute the proceeds thereof to themselves or to pay down Dynamic, the last payment being made January 31, 2001. (See Declarations of Steven J. Kahn and Isaac Lei, attached hereto.) Based

upon the stated time parameters, Examinees did not object to these requests and have produced all non-privileged documents in their possession, custody or control responsive to same.

Despite the clear and unequivocal language in the requests, on April 13, 2007, nearly *two months* after service of the subpoenas, counsel for the Trustee for the *first time* advised counsel for Examinees that it is the Trustee's position that the Debtor continues to hold an interest in Vail Lake USA *to this date*, thereby changing the clearly stated limitations of the requests. When asked for the factual basis for this new contention, Trustee's counsel either would not, or could not, respond.

Based upon the clear time limitations on the face of these requests, Examinees have not produced documents relating to the Vail Lake Entities subsequent to calendar year 2000. Those documents are voluminous in nature and contain extensive communications between Examinees, Dynamic/Sabella and their counsel, on the one hand, and counsel for Johnson and the Vail Lake Entities, on the other hand, pertaining to unfinalized negotiations relating to loan extensions and other long standing disputes relating to those entities and which have *no bearing or relevance to* the Debtor and its assets.

Rather than proffer any factual basis to justify the late redefining of the literal appropriately limited scope of the actual requests, Trustee's counsel merely falls back on the baseless innuendo and accusations which riddle the Motion.[2]

Without even the barest showing of relevance as to the documents post-dating the termination of North Plaza's interest in Vail Lake USA, Examinees have not produced same. Additionally, because of the volume of documents involved, the expense of review for production, redaction and privilege may well exceed an additional $30,000.

2. <u>Breadth as to Lei/Alcon Activities</u>

In the Motion, the Trustee appears to assert that the Examinees have refused to produce any documentation reflecting Lei/Alcon's arranging of loans by Dynamic and/or Sabella other than the

[2] By reason of same, and in an effort to assist Examinees in responding to the Motion, Examinees served the Trustee and his counsel with document requests which, in part, seek the factual basis for the contention that North Plaza either possesses or should possess a beneficial interest in or claim against any of the Vail Lake Entities. Unfortunately, Examinees are without the benefit of responses to those requests at this time.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

loans relating to North Plaza and Lei/Alcon's representation of Dynamic or Sabella unrelated to the North Plaza loans. This is simply not true.

As a threshold matter, the "employment" status of Alcon/Lei is nothing more than the assertion of the same red herring argument advanced by the Bree Parties in their argument that the "employment" of Lei/Alcon by Dynamic/Sabella somehow precludes loans arranged by Lei/Alcon as a licensed real estate broker from the protections afforded under the California Constitution and applicable usury law. However, putting aside that Lei/Alcon were not employees of Dynamic/Sabella and unquestionably conducted their own business as a licensed broker and had a number of other clients at the time the subject loans were arranged, no statute or case law holds or even implies that a licensed real estate broker who also happens to be an employee of his or her principal divests any loan arranged by him of the constitutional and statutory protections from usury law. Indeed, the only decisions even approaching the issue hold that a licensed real estate broker who is a general partner of a limited partnership or a member of a joint venture while arranging a loan, performs within his licensed capacity and affords no basis for excluding the loan transactions from the usury exception. See, *Stickel v. Harris* (1987) 196 Cal.App. 3d 575, 582, and *Park Terrace Limited v. Teasdale* (2002) 100 Cal.App. 4th 802. Hence, if Lei/Alcon's "employment" status with Dynamic/Sabella is irrelevant to a determination as to whether the Dynamic loan is subject to the usury law, an inquiry into his decade long activities on behalf of Dynamic/Sabella is equally irrelevant as to the assets, property or claims of North Plaza.

Even if the employee issue is not considered a red herring, the Examinees have objected only to incurring the expense of accumulating, reviewing and redacting similar documents *from the date of the last production to the present*, a time period over three years after the last loan extension. Such a production is particularly expensive in light of the need to redact on a line by line basis confidential information relating to wholly unrelated third-party borrowers of Dynamic and Sabella. Such activities are also extremely remote in time and unrelated to the transactions at issue. Significantly, the date of the last loan extension was in October 2003.

In response to the Court's order on January 28, 2006, and as part of the Bree Production, Dynamic/Sabella and Lei/Alcon produced all documents reflecting Lei/Alcon's activities on behalf

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

of Dynamic/Sabella from the beginning of their relationship through the date of production in March, 2006. *Those same documents have been produced to the Trustee.* The Trustee also has the benefit of Lei's testimony on these issues in a prior deposition and over the course of a five day evidentiary hearing during which he was subjected to vigorous cross-examination relating to his activities. Hence, Lei's services for Dynamic/Sabella with respect to the Dynamic and Sabella loans, including the arranging of the loans, assisting in the monitoring and servicing of the loans and acting as the representative of Dynamic/Sabella are already a matter of public record in this case.

In addition, in an effort to obviate the time and expense in "updating" the prior production, Examinees offered on April 2, 2007 to stipulate that Lei/Alcon provided the same or similar services with respect to other loan and business transactions of Dynamic/Sabella as he had done previously.

However, the Trustee refused to accept the offered stipulation and continues to insist that the documents be produced.

Because there is absolutely no case or statutory law which holds or even implies that a licensed real estate broker cannot arrange a loan for his or her employer exempt from usury, and in light of the fact that substantial evidence documenting Lei/Alcon's activities on behalf of Dynamic/Sabella over a course of eight (8) years has been produced and was the subject of extensive testimony, and the Examinees offered to stipulate that the same activities were performed in the ninth year, the Trustee's insistence of the production of additional later and more remote documentation four years after the last loan extension is unjustified and punitive. Examinees should not be subjected to the burden and expense of the additional production.

**C. <u>Communications Between Lei/Alcon and Counsel for Dynamic/Sabella are Privileged</u>**

1. <u>The Recognition of the Attorney/Client Privilege in this Case</u>

Remarkably, the Trustee asserts that the participation of Lei/Alcon in communications with counsel for Dynamic/Sabella "breaks" the attorney/client privilege unless Lei/Alcon "admit" that they are actual employees of Dynamic/Sabella such that any loans arranged by them on behalf of Dynamic/Sabella are not exempt from usury. Such a contention is founded neither in fact nor law, and demonstrates the refusal of Trustee to conduct his inquiry within the scope of reason.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

During discovery conducted in relation to the Bree Parties' objection to the proposed settlements of the Dynamic and Sabella claims, the Bree Parties asserted a like position and identified 591 documents reflecting communications between counsel for Dynamic/Sabella, on the one hand, and Lei/Alcon, on the other hand, or as to which Lei/Alcon were copied. Dynamic/Sabella submitted declarations from counsel, Sabella and Lei evidencing that Dynamic/Sabella directed Lei/Alcon to communicate with counsel on their behalf in securing legal services and advice from Dynamic's and Sabella's legal counsel. (*See*Request for Judicial Notice of Docket Nos. 434 and 447). In furtherance of that direction, Dynamic/Sabella and Lei/Alcon established that Lei/Alcon communicated with Dynamic's and Sabella's counsel regarding documenting loans, providing information from Dynamic and Sabella to counsel, to advise and assist counsel in rendering of legal services and relaying information and advice back from counsel to Dynamic and Sabella, including participation and various settlement discussions in which Alcon/Lei would provide information and documents necessary for those negotiations, relay Dynamic's and Sabella's settlement positions, and relay back to Dynamic and Sabella the positions of other parties. Dynamic/Sabella and Lei/Alcon, as well as their counsel, understood and expected that any such communications with counsel and with Dynamic and Sabella which contained information and legal advice obtained from such counsel, would be confidential and not subject to disclosure as within the attorney/client privilege. (*See* Docket Nos. 434 and 447 and Declarations of Isaac Lei, Angela Sabella and Steven J. Kahn filed concurrently herewith).

The 591 documents identified by the Bree Parties were submitted to the Court for in *camera* review on or about March 28, 2006. On March 30, 2006, the Court issued its Order Re Documents Produced In Camera Review and *withheld* from production 462 of the 591 documents submitted for review. Although some of the documents withheld by the Court appeared to have been beyond the scope of the discovery permitted in the context of that litigation, a large number of the documents withheld from production directly related to North Plaza and the claims of Dynamic and Sabella against the North Plaza Estate.

As to the remaining 129 documents not preliminarily withheld, noting that the Court was "unable to determine from the face of most of the documents whether the claim of privilege for each

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

document is sustainable," the Court invited Dynamic/Sabella to submit additional information to substantiate a claim of privilege as to any of the 129 documents. In light of the impending evidentiary hearing (4 days later), through a Response filed April 2, 2006, Dynamic/Sabella objected to the production of 4 pages of the documents not preliminarily withheld and, without waiving, and specifically preserving, its claim of privilege as to the remainder, acceded to the production of same to the Bree Parties.

Subsequently, and in response to the Trustee's subpoena, Examinees reviewed anew the 462 documents withheld by the Court and determined that 88 of them involved relevancy as to the more limited scope of the Bree objection, and not privilege, *and produced those additional documents to the Trustee.*

The clear law of the case in these proceedings is that qualified communications between Lei/Alcon and counsel for Dynamic/Sabella, communications containing information and advice as a result thereof from Alcon/Lei to Dynamic/Sabella, and qualified communications between Dynamic/Sabella and counsel as to which Lei/Alcon was copied, are subject to the attorney/client privilege.

Despite this fact, and is as reflected in the Trustee's response to Privilege Logs I and III (attached to the Declaration of Janet Gertz), each and every document as to which the attorney/client privilege has been asserted has been challenged by the Trustee, *including interoffice communications solely between counsel* working on various Dynamic/Sabella matters as well as the documents withheld from production by the Court.

2. Application of Law of Privilege as to Client Representatives.

Dynamic/Sabella's assertion of the attorney/client privilege in the course of the litigation with the Bree Parties was based on California law. In that any objection by the Trustee to the Dynamic and Sabella claims would still have to be determined under California law, and in that the period to initiate avoidance actions under the Bankruptcy Code has expired, it would appear that any claims for turnover would also have to be based on California law. Nevertheless, if federal common law of privilege is to be applied, the qualified communications of Lei/Alcon on behalf of Dynamic/Sabella remain privileged.

There is no statutory definition of the attorney/client privilege in the Federal Rules of Evidence or other federal statute. However, proposed Federal Rule of Evidence 503, also referred to as Supreme Court Standard 503 provides guidance which has been utilized by various courts in defining the privilege. "Although not enacted by Congress, 'courts have relied upon it as an accurate definition of the federal common law of attorney-client privilege....consequently, despite the failure of Congress to enact a detailed article on privileges, Standard 503 should be referred to by the Courts.'" 2 J. Weinstein, *Evidence* ¶ 503[02] at 503-17 (1975). *United States v. Spector*, 793 F.2d 932, 938 (8th Cir. 1986), *United States v. (Under Seal)*, 748 F.2d 871, 874 n.5 (4th Cir. 1984). As pertinent here, Supreme Court Standard 503 provides:

> "The privilege extends to communications (1) between client *or his representative* and lawyer or his representative, (2) between lawyer and lawyer's representative, (3) by client or his lawyer to a lawyer representing another in a matter of common interest, (4) between *representatives* of the client or the client and *a representative* of the client, and (5) between lawyers representing the client." (Emphasis added)

Supreme Court Standard 503 does not define "representative," but Uniform Evidence Rule 502(a)(4) is, "a clear statement of the scope of privilege as now generally accepted." McCormick on Evidence, (6th Ed. 2006). Uniform Rule of Evidence 502 protects the communications between an attorney and a client and a client's representative. A client's representative is defined in Uniform Rule of Evidence 502(a)(4) as follows:

> "'Representative of the client' means a person having authority to obtain professional legal services, or to act on legal advice rendered, on behalf of the client **or** a person who, for the purpose of effectuating legal representation for the client, makes or receives a confidential communication while acting in the scope of employment for the client." (Emphasis added)

As to law within the Ninth Circuit, Examinees agree with the Trustee that the case of *Memry Corp. v. Ky. Oil Tech., Nv.*, 2007 U.S. Dist. LEXIS 3094 (N.D. Cal. Jan. 4, 2007), adopting the Eighth Circuit decision of *In re Bieter Co.*, 16 F.3d 929, 937 (8th Cir. 1994), best elucidates the inclusion of "client representatives" within the attorney/client privilege. However, as opposed to the Trustee's characterization of the inclusion of such representatives as being a "narrow extension," the

court in *In re CV Therapeutics, Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 41568 (N. D. Cal. June 16, 2006) states, "The courts have taken an expansive view of protected communications between independent contractors and counsel where the outside consultant functions like an employee in providing information which facilitates the obtaining of legal advice. *See In re Bieter Co.*, 16 F.3d 929, 936 (8th Cir. 1994)." (Emphasis added)

The *Memry* case cited by the Trustee as representative of the law in the Ninth Circuit on this issue in turn cites *Bieter*, which favors and supports a finding that Lei/Alcon is a "client representative" such that qualified communications between them and counsel for Dynamic/Sabella are within the attorney/client privilege.

In *Bieter*, a Dennis S. Klohs ("Klohs") was an individual who worked closely with Bieter in that entity's attempt to develop commercial property and in subsequent litigation related to those development efforts. At the pertinent times, Klohs was an independent contractor to Bieter who provided advice and guidance regarding the proposed commercial development, and his agreement with Bieter made clear that he was an independent contractor and expressly not an agent, employee or partner of Bieter.

In rendering services to Bieter, Klohs' involvement with Bieter's counsel, "was rather extensive." Klohs often attended meetings with counsel, either alone or with Bieter and received many communications from those attorneys, both sent directly to him and as to which he was copied. He also worked with architects and consultants and appeared at public hearings before the local city council and planning commissions and was viewed and dealt with by the City, potential tenants and the defendants in the lawsuit as a representative of Bieter.

The Court found that Klohs' relationship to Bieter was of the sort that justifies application of the attorney/client privilege stating, "There is no principled basis to distinguish Klohs' rule from that of an employee, and his involvement in the subject of the litigation makes him precisely the sort of person with whom a lawyer would wish to confer confidentiality in order to understand Bieter's reasons for seeking representation. *See Upjohn*, 449 U.S. at 389, 101 S. Ct. at 682; Sexton, *supra*, 498."

The rationale for this conclusion, as stated by the *Bieter* court, is clear:

> "'The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client....the lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.' *Upjohn*, 449 U.S. at 389, 101 S. Ct. at 682 (quoting *Trammel v. United States*, 445 U.S. 40, 51, 101 S. Ct. 906, 913, 63 L.Ed.2d 186 (1980)). Such information will, in the vast majority of cases, be available from the client or the client's employees, but there are undoubtedly situations such as the one described by Dean Sexton, in which too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentiality with non-employees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing thus freely. '[I]t is only natural that,' just as '[M]idle-level-and indeed lower-level-employees...would have the relevant information needed by corporate counsel to adequately advise the client with respect to ... actual or potential difficulties,' *id.* at 391, so too would non-employees who possess a 'significant relationship to the [client] and the [client's] involvement in the transaction that is the subject of legal services.' Sexton, *supra*, at 487." (Emphasis added)

The two cases in the Ninth Circuit adopting *Bieter*, i.e. *Memry*, *supra*, and *CV Therapeutics*, *supra*, came to similar conclusions on analogous facts, upholding the privilege as to non-employee consultants and representatives. *Memry*, in particular, calls for a viewing of the "totality of the relationship" between the representative and the client and notes a number of non-inclusive and disjunctive factors which gravitate toward a finding of privilege, including the length of the relationship, involvement in transactions and litigation, direct communications with the client's counsel, representation by the client that the agent is an authorized representative of the client and counsel's treatment of the agent as a client representative, as well as where the work was performed and remuneration for services. No one of this list of non-exclusive factors is definitive, and, despite counsel's baseless assertion in the Motion that the cases require a showing of "a 'significant' amount, i.e., over 85% or more, of Lei's time devoted to consulting activities for Dynamic" for the assertion of the privilege, neither case provides 85% or any other percentage of time as a prerequisite for the assertion of privilege.[3]

[3] If there were, in fact, an 85% of time threshold, and Lei devoted 60% of his time to Dynamic/Sabella matters, one wonders if the Trustee would then cease asserting his position that the Dynamic loan was usurious.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

The declarations previously submitted by Lei and Sabella relating to Lei's activities, reiterated and supplemented by the declarations submitted concurrently herewith necessitate a reaffirmation by the Court that Lei/Alcon is and was an authorized representative of Dynamic/Sabella in their relationship with counsel.

Qualified communications involving Alcon/Lei are as subject to privilege under federal law as they were under California law. Alcon/Lei's involvement in such communications simply does not "break" the privilege.

3. Confidential Settlement Negotiations and Work Product

As noted above, the initial version of the Privilege Log (Vols. I and II) contained reference to the withholding of communications with Todd Curry and Fred Phillips as being "confidential settlement negotiations." Examinees are well aware that the Court overruled such designations. Examinees produced the communications with Mr. Curry, but inadvertently failed to remove the "confidential settlement negotiations" from the Privilege Logs.

As to the assertion of that objection as to communications with Fred Phillips, Examinees again acknowledge the Court's overruling of that designation. However, and as stated above, the communications with Fred Phillips which were subject to that designation involve negotiations between Dynamic/Sabella, on the one hand, and the various Vail Lake Entities and their principals, on the other hand, relating to the resolution of outstanding disputes between those entities *years after* North Plaza ceased holding any interest in Vail Lake USA. As such, the communications are outside the scope of the subpoenas and have not been produced.

The Trustee's assertion that Examinees attempt to "cleverly repackage this same objection under a new label, *i.e.* 'attorney client and work product (joint representation)'" is just untrue. The communications so designated are separate from those previously designated as confidential settlement negotiations, and relate to communications in matters as to which Mr. Phillips represented the interests of Dynamic/Sabella as well as various of the Vail Lake Entities, as revealed to the Trustee by Mr. Phillips during his 2004 Examination. The common interest privilege is well established. See *In re Mortgage & Realty Trust*, 212 B.R. 649 (Bkrtcy.C.D.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Cal. 1997), *Waller v. Fin. Corp. of Am.*, 828 F.2d 579 (9th Cir. 1987), *Sadalcek v. Morgan Whitney Trading Group, Inc.*, 795 F.Supp. 329 (C.D.Cal. 1992).

As to the assertion of the work product exception to discovery, the Trustee remarkably asserts that the work product doctrine is inapplicable because "Examinees are not a party to any existing or contemplated action in this case." Clearly, Examinees were involved in extensive litigation with the Bree Parties in this case and the Trustee has stated that he intends to attack the Dynamic claim on the basis of usury and has intimated similar attacks on the Sabella claim, as well as other unspecified actions based on claims and theories the Trustee refuses to reveal.

To the extent any specific documents are asserted to be within the attorney/client privilege and work product exception to discovery, a determination in favor of the attorney/client privilege obviates the need to determine whether the work product exception applies. Unless such an initial determination is made, a document-by-document review for work product would not appear to be appropriate at this conjuncture.

**D. The Production Process and Privilege Logs**

Although the production of documents in response to the subpoenas was not without some substantial technical problems and incumbent delays, subject to the disputes set forth above, responses to the subpoenas and related privilege logs shall have been served on counsel for the Trustee.

Delays resulting from various technical problems arising from the Trustee's request for electronic production and the required review of voluminous documents are not uncommon in large document productions from numerous data bases and hardcopy files. Timing problems were exacerbated by the required use of an outside vendor to upload and organize the tens of thousands of documents for review, coding and production, and preparation of related privilege logs, as well as an effort (as requested by the Trustee) to eliminate duplicate documents, a task which cannot be accomplished without a detailed review of all documents deemed responsive to the subpoenas.

Substantial delay and expense were also incurred as the result of the Trustee demanding that any partially redacted documents also be listed on a "Redaction Log," despite the clear "to" and "from" designations of the redacted matter evidencing communications between client and counsel,

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

and the insistence that the subject matter descriptions generated by an industry standard production software was "insufficient," and requiring a line by line reading of each communication to augment the descriptions without sacrificing confidentiality, lest the Trustee claim waiver of the privilege for a failure to meet his demands.

Therefore, to construe any delays as indicative of some nefarious ploy is unwarranted and distasteful. For example, counsel for the Trustee states, "Perhaps prompted by the Trustee's specific requests for discovery of all EDI data, counsel for Lei has recently discovered approximately 40,000 emails that reside on Lei's computer," implying in a letter dated April 13, 2007 (but not the Motion) that a "vast number of potentially responsive documents have never been produced in the past." The Trustee's baseless insinuation was immediately refuted on April 17, 2007: a large majority of the documents *had* previously been produced to the Bree Parties, and the computer also contained years of Mr. Lei's personal records as well as an extreme number of copies of documents, sometimes six to ten copies of the same document. The Trustee's counsel simply chooses to reassert the accusation as part of an inappropriate attack upon the integrity of Examinees and counsel.

As to the Trustee's Responses to Privilege Logs (I and III), it should be noted that amended privilege logs have been provided the Trustee which both remove, as much as possible, duplicates of documents and expand descriptions of the documents where possible without revealing the content of the communications sought to be protected. Examinees even provided the Trustee with "Courtesy Logs" to assist the tracking of all changes in the updated and revised logs.

Attached to the Declaration of Steven J. Kahn, filed concurrently herewith, are the "Courtesy Logs" provided to the Trustee relating to Privilege Logs I and III. The logs chart the removal of items produced pursuant to Court order and upon the Examinee's father review of documents previously withheld by the Court. The Logs also set forth as to each document, the claim of privilege, the Trustee's Response, prior Court rulings (if applicable), and the Examinees' position. As can be seen, the Trustee has demanded production of all listed documents, including 364 documents ordered protected by the Court, 11 documents reflecting

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

direct communications between counsel and Dynamic/Sabella, 12 documents reflecting communications solely between counsel or from counsel to file. This *blitzkrieg* approach of the Trustee's counsel in demanding the production of documents protected by the Court and not involving anybody other than counsel or Dynamic/Sabella is indicative of the Trustee's overall imperious pursuit of discovery in this matter, and should not be countenanced. Examinees and counsel have endeavored, and continue to endeavor to comply with the subpoenas and address the concerns and questions of the Trustee at every juncture. The Trustee and his counsel simply fail to act reasonably and in good faith.

**III.**

**CONCLUSION**

For the reasons set forth hereinabove, the relief requested by the Trustee should be denied. Examinees shall have produced all non-privileged documentation to the Trustee responsive to the requests set forth in the subpoenas. The Trustee did not request, nor is he otherwise entitled to any documentation relating to the Vail Lake Entities after the relinquishment of North Plaza's membership interest in Vail Lake USA, LLC during calendar year 2000. Qualified communications between Mr. Lei and counsel for Dynamic/Sabella, and communications between Lei, Dynamic and Sabella containing confidential information obtained from counsel remain privileged under federal common law, just as they were under California law.

In the event the Court reaffirms, or determines anew, the existence of the attorney/client privilege with regard to communications in which Mr. Lei participated or to which he was made privy, the blanket assertion that *no documents* are subject to privilege (which forms the basis of the Trustee's Motion and his Initial Response to the Privilege Logs I and III) will be mooted. To the extent that the Trustee then contends, in good faith, that any *specific documents* may not subject to privilege, the parties should be ordered to promptly meet and confer in an effort to resolve any disputes as to those specific documents, and thereby either eliminate the need for further Court

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

intervention, or at least appropriately narrow the scope and burden which might be occasioned by any *in camera* review thereafter.

Respectfully submitted,

Dated: May ___, 2007

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP

By */s/ Stanley E. Goldich*

Richard M. Pachulski, Esq. (CA Bar No. 90073)
Stanley E. Goldich (CA Bar No. 92659)
Steven J. Kahn (CA Bar No. 76933)
Attorneys for Isaac Lei, TheAlcon Group, Dynamic Finance Corporation and Angela Sabella

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

20298-005\DOCS_LA:167586.1 18

EXHIBIT 7
PAGE 104

# PROOF OF SERVICE

STATE OF CALIFORNIA )
)
CITY OF LOS ANGELES )

I, Myra Kulick, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067-4100.

On May 29, 2007, I caused to be served the **OPPOSITION OF ISAAC LEI AND THE ALCON GROUP TO THE MOTION OF RICHARD M. KIPPERMAN, CHAPTER 11 TRUSTEE (i) TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY OF ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP UNDER FRCP 45 AND FRBP 9016; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

*Please see attached Service List*

☐ (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑ (BY NOTICE OF ELECTRONIC FILING) I caused to be served the above-described document by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

☐ (BY FAX) I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

☐ (BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s).

☑ (BY OVERNIGHT DELIVERY) By sending by Federal Express to the addressee(s) as indicated on the attached list.

I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

Executed on May 29, 2007, at Los Angeles, California.

[signature]
Myra Kulick

**SERVICE LIST**

Tiffany L. Carroll
Office of the United States Trustee
402 West Broadway, Suite 600
San Diego, CA 92101

Counsel for Debtor
K. Todd Curry
Nugent Weinman, et al.
1010 Second Avenue #2200
San Diego, CA 92101

Counsel for Richard Kipperman
Ali M.M. Mojdehi
Baker & McKenzie LLP
101 West Broadway, 12th Floor
San Diego, CA 92101

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**EXHIBIT 8**

EXHIBIT 8
PAGE 106

Richard M. Pachulski, Esq. (CA Bar No. 90073)
Stanley E. Goldich (CA Bar No. 92659)
Steven J. Kahn (CA Bar No. 76933)
Pachulski Stang Ziehl Young Jones
& Weintraub LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Fax: 310/201-0760

Attorneys for Examinees Isaac Lei and
The Alcon Group and Privilege Holders Angela C. Sabella
and Dynamic Finance Corporation

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:<br><br>NORTH PLAZA LLC,<br><br>Debtor. | Case No.: 04-00769-PB11<br><br>Chapter 11<br><br>**DECLARATION OF ISAAC LEI IN SUPPORT OF OPPOSITION OF ISAAC LEI AND THE ALCON GROUP TO THE MOTION OF RICHARD M. KIPPERMAN, CHAPTER 11 TRUSTEE (i) TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY OF ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP**<br><br>Date: June 15, 2007<br>Time: 9:00 a.m.<br>Place: Dept. 2<br>Judge: Chief Judge, Peter W. Bowie |

# DECLARATION OF ISAAC LEI

I, Isaac Lei, declare:

1. I am a licensed real estate broker in the state of California and I am the president of The Alcon Group ("Alcon"). The facts stated herein are of my own personal knowledge, and if called upon as a witness, I could and would competently testify thereto.

**Re: Representation of Dynamic and Sabella**

2. Since 1997, as a licensed real estate broker, I, through Alcon, arranged a number of loans for Dynamic Finance Corporation ("Dynamic") and Angela C. Sabella ("Sabella"), and assisted Dynamic and Sabella in negotiations arising from those loans and other transactions.

3. Dynamic and Sabella, as the case may be, have directed me to communicate with their counsel on their behalf in securing legal service and advice from Dynamic's and Sabella's legal counsel. In that capacity, I have communicated with Dynamic's and Sabella's counsel regarding documenting loans, providing information from Dynamic and Sabella to counsel to advise and assist counsel in the rendering of legal services and relaying information and advice back from counsel to Dynamic and Sabella. At Dynamic's and Sabella's direction, I also participated in various settlement discussions in which I would provide information and documents necessary for those negotiations and relay Dynamic's and Sabella's settlement positions and relay back to Dynamic and Sabella the positions of other parties. In addition, at Dynamic's and Sabella's direction, I have communicated with counsel in relation to litigation involving Dynamic and/or Sabella, who have relied on me to provide documents and information to counsel to assist counsel in providing legal services, as well as relaying advice and information, back and forth relating to litigation. Communications are often forwarded to me by counsel for transmission to Ms. Sabella.

4. At all times in rendering these services as Dynamic's and Sabella's representative, I understood and expected that my communications with Dynamic's and Sabella's counsel and my communications with Dynamic and Sabella which contained information and legal advice obtained from such counsel would be confidential and not subject to disclosure.

5. Dynamic provides me with a desk at its offices which I use when working on Dynamic/Sabella matters. I do not receive a salary or other form of compensation from Dynamic or Sabella, but The Alcon Group receives broker's commissions for loans it arranges for Dynamic and Sabella. As I have testified previously, I perform a number of services in relation to loans arranged by Alcon for Dynamic and Sabella so as to retain a "presence" in an effort to have future loans referred to Alcon to arrange as a broker.

**Re: Sale of North Plaza's Interest in Vail Lake USA, LLC**

6. I understand that the Trustee has taken the position that the debtor still holds in equity the interest in Vail Lake USA, LLC.

7. I have obtained from Dynamic the following documents reflecting the sale of the debtor's membership interest in Vail Lake USA to Shining City, Inc.:

a. Agreement for Purchase and Sale of Membership Interest by and between North Plaza, LLC and Shining City, Inc., a true and correct copy which is attached hereto as Exhibit "A".

b. Membership Interest Transfer Agreement dated April 4, 2000, a true and correct copy of which is attached hereto and incorporated herein by reference as Exhibit "B".

c. Assignment and Assumption of Membership Interest dated April 4, 2000, a true and correct copy of which is attached hereto and incorporated herein by reference as Exhibit "C".

8. It is my understanding that the monies to fund the purchase of North Plaza, LLC's membership interests in Vail Lake USA was funded through a loan made by Angela Sabella to Shining City, Inc. executed as of April 3, 2000, a true and correct copy which is attached hereto and incorporated herein by reference as Exhibit "D".

9. At the apparent direction of the members of North Plaza, LLC, the purchase price for the Membership Transfer was paid out of that loan through a check payable to Peter Suprunuk in the sum of $300,000, a check payable to Robert Chambers in a sum of $225,000 and a check payable to Robert Chambers/North Plaza, LLC/Dynamic Finance Corporation for $175,000, which check was designated to pay down the loan which funded the sale of North Plaza's membership interests in Vail

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Lake USA, LLC. True and correct copies of the cancelled checks and disbursement instructions are attached hereto collectively as Exhibit "E".

10. I understand that the balance of the purchase price, $400,000, was "paid" to Shining City, Inc. through the cancellation of an indebtedness owed to that entity. I am unaware that Shining City, Inc. has made any claim against Vail Lake USA or any other entity for any funds relating to the sale.

I declare under penalty of perjury pursuant to the laws of California and United States that the foregoing is true and correct.

Executed this 27th day of May, 2007, at Los Angeles, California.

Isaac Lei

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**EXHIBIT 9**

EXHIBIT 9
PAGE 111

Richard M. Pachulski, Esq. (CA Bar No. 90073)
Stanley E. Goldich (CA Bar No. 92659)
Steven J. Kahn (CA Bar No. 76933)
Pachulski Stang Ziehl Young Jones
& Weintraub LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Fax: 310/201-0760

Attorneys for Examinees Isaac Lei and
The Alcon Group and Privilege Holders Angela C. Sabella
and Dynamic Finance Corporation

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In Re:<br><br>NORTH PLAZA LLC,<br><br>Debtor. | Case No.: 04-00769-PB11<br><br>Chapter 11<br><br>**DECLARATION OF ANGELA C. SABELLA IN SUPPORT OF OPPOSITION OF ISAAC LEI AND THE ALCON GROUP TO THE MOTION OF RICHARD M. KIPPERMAN, CHAPTER 11 TRUSTEE (i) TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY OF ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP**<br><br>Date: June 15, 2007<br>Time: 9:00 a.m.<br>Place: Dept. 2<br>Judge: Chief Judge, Peter W. Bowie |

**DECLARATION OF ANGELA C. SABELLA**

I, Angela C. Sabella, declare:

1. I am an individual over 18 years of age and I am the president of Dynamic Finance Corporation ("Dynamic"), and was so at all times relevant hereto. The facts stated herein are of my own personal knowledge, and if called upon to testify, I could and would competently testify thereto.

2. In negotiating loans on behalf of Dynamic and myself, including monitoring of the loans and negotiating and documenting extensions thereto, as well as in negotiating and representing Dynamic's and my interests relating to litigation and other disputes, I authorized, and continue to authorize, Isaac Lei of The Alcon Group to represent Dynamic and me in the securing of legal services and advice from Dynamic's and my counsel, including the transmission of information and advice back and forth between Dynamic and me, on the one hand, and Dynamic's and my attorneys. Dynamic and I rely on Mr. Lei to provide information to counsel in the course of negotiations and litigation, and relay instructions and advice between counsel, Dynamic and Sabella.

3. I made this authorization with the understanding and expectation that communications between Mr. Lei on behalf of Dynamic and myself with Dynamic's and my counsel would be afforded the same confidentiality as if I, either on my own behalf or on behalf of Dynamic, directly communicated with Dynamic's or my counsel.

4. This authorization to Mr. Lei was and is operative at all times, and the authorizing of Mr. Lei to act as the representative of Dynamic and me in communications with counsel is particularly important in that I spend a substantial amount of time in Hong Kong, China, which is in a time zone relative to California such that transactions and discussions during ordinary business hours in California is at a time during which I cannot participate.

4. Mr. Lei has been acting as my representative with counsel from 1997 through the present. In furtherance of Mr. Lei's activities in the representation of Dynamic and me, Dynamic provides Mr. Lei a desk at Dynamic's offices, which I know he uses. Aside from myself, Mr. Lei possesses the most intimate and extensive knowledge as to Dynamic's and my transactions which involve communications with counsel, both as to the transactions themselves, the properties securing

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

29-MAY-2007 12:20 FROM: TO:KAR FUNG CO. P:2/2

the transactions, and any disputes or litigation arising therefrom, which information is generally not known to Dynamic's staff.

I declare under penalty of perjury pursuant to the laws of California and the United States that the foregoing is true and correct.

Executed this 29th day of May, 2007, at Hong Kong, PRC.

Angela C. Sabella

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

20298-005\DOCS_LA:167677.1

2

EXHIBIT 9
PAGE 114

**PROOF OF SERVICE**

STATE OF CALIFORNIA )
)
CITY OF LOS ANGELES )

I, Myra Kulick, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067-4100.

On May 29, 2007, I caused to be served the **DECLARATION OF ANGELA C. SABELLA IN SUPPORT OF OPPOSITION OF ISAAC LEI AND THE ALCON GROUP TO THE MOTION OF RICHARD M. KIPPERMAN, CHAPTER 11 TRUSTEE (i) TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY OF ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP** in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

*Please see attached Service List*

☐ (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ (BY FAX) I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

☐ (BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s).

☑ (BY OVERNIGHT DELIVERY) By sending by Federal Express to the addressee(s) as indicated on the attached list.

I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

Executed on May 29, 2007, at Los Angeles, California.

Myra Kulick

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**EXHIBIT 10**

EXHIBIT 10

PAGE 116

FILED SD 07 JUL 24 PM 2:27 U.S. BANKRUPTCY CT SO. DIST. OF CALIF

Richard M. Pachulski, Esq. (CA Bar No. 90073)
Stanley E. Goldich (CA Bar No. 92659)
Steven J. Kahn (CA Bar No. 76933)
Pachulski Stang Ziehl Young Jones
& Weintraub LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067-4100
Telephone: 310/277-6910
Fax: 310/201-0760

Attorneys for Examinees Isaac Lei and
The Alcon Group, and Privilege Holders Angela C. Sabella
and Dynamic Finance Corporation

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP ATTORNEYS AT LAW LOS ANGELES, CALIFORNIA

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

FILED BY FAX

In Re:

NORTH PLAZA LLC,

Debtor.

Case No.: 04-00769-PB11

Chapter 11

**SUPPLEMENTAL OPPOSITION OF ISAAC LEI AND THE ALCON GROUP, AND ANGELA C. SABELLA AND DYNAMIC FINANCE CORPORATION TO THE MOTION OF RICHARD M. KIPPERMAN, CHAPTER 11 TRUSTEE TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY OF ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP UNDER FRCP 45 AND FRBP 9016; DECLARATION OF STEVEN J. KAHN**

Date: July 25, 2007
Time: 9:30 a.m.
Place: Dept. 2
Judge: Chief Judge, Peter W. Bowie

**TO THE HONORABLE PETER W. BOWIE, CHIEF UNITED STATES BANKRUPTCY JUDGE:**

By reason of additional developments in this matter occurring since the Scheduling Conference held on July 6, 2007, Isaac Lei and The Alcon Group ("Lei," "Alcon" and collectively

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

"Lei/Alcon" or the "Examinees"), on behalf of themselves, and as to issues of privilege also Angela C. Sabella ("Sabella") and Dynamic Finance Corporation ("Dynamic") (collectively "Sabella/Dynamic" or "Privilege Holders") herein supplement their Opposition to the Motion of Richard M. Kipperman, Chapter 11 Trustee to Compel Responses For Subpoenas For Documents and Testimony to Isaac Lei, The Alcon Group and Custodian of Records of The Alcon Group Under FRCP 45 and FRBP 9016, and represent as follows:

I.

## SUMMARY OF CURRENT EVENTS

At the Scheduling Conference for the within contested matter held on July 6, 2007, counsel for Lei/Alcon and Sabella/Dynamic stated that they believed that they could reach a resolution as to a large number of documents subject to the pending dispute between them and the Trustee upon the conducting of a "meet and confer" session with counsel for the Trustee.

In furtherance thereof, on Monday, July 9, 2007 counsel for Lei/Alcon and Sabella/Dynamic attempted to reach Trustee's counsel by telephone, but was unsuccessful and left a message.

On the following day, Tuesday, July 10, 2007, counsel for Lei/Alcon and Sabella/Dynamic sent an e-mail to Trustee's counsel again requesting contact with counsel to schedule a telephonic "meet and confer." A true and correct copy of said e-mail attached to the Declaration of Steven J. Kahn, attached hereto as Exhibit "A."

Having not heard from counsel for the Trustee by July 16, 2007, counsel sent another e-mail requesting contact from him.[1] A true and correct copy of the email is attached to the Declaration of Steven J. Kahn as Exhibit "B."

Having still not received contact from Trustee's counsel as of Thursday, July 19, 2007, ten days after the initial efforts at contact, counsel for Lei/Alcon and Sabella/Dynamic sent an additional e-mail requesting contact lest counsel's nonresponse be brought to the Court's attention, a true and correct copy of which is attached hereto and incorporated herein by reference as Exhibit "C."

Counsel for the Trustee finally responded to this last effort to arrange a meet and confer and

[1] The July 16, 2007 e-mail was addressed to Ali.M.Mojdehi@bakernet.com instead of Ali.M.M.Mojdehi@bakernet.com. Mr. Mojdehi denies receipt of the e-mail, but same was not "bounced back" as undeliverable on counsel's e-mail system.

a telephonic discussion was held in the morning of July 19, 2007.

During the discussion, counsel for Lei/Alcon and Sabella/Dynamic stated that while they believed that all of the documents contained on the current privilege logs were validly subject to the attorney/client privilege, the vast majority of those documents were of no consequence to any of the issues relating to the Sabella/Dynamic claims and other issues raised by the Trustee in support of his present motion. Counsel for Lei/Alcon and Sabella/Dynamic offered to produce all of those documents to the Trustee on the sole condition that the Trustee would not assert that the production of those documents constituted a waiver of the attorney/client privilege beyond the specific documents produced, so that there would be no argument of a "subject matter" waiver as to any remaining documents withheld as privileged. The effect of such a production and agreement would both (1) provide the Trustee a large number of the documents sought through his motion and (2) substantially narrow the number of documents which may remain in dispute so that any judicial review as to privilege, if necessary, would be manageable.

Counsel for the Trustee stated that he would have to think about the proposal and would respond on the following Monday, July 23, 2007.

No response was received from Trustee's counsel on Monday until an email sent at 6:25 p.m. requesting a call back, after counsel for Examinees had already left the office.

At approximately 11:00 a.m. this morning, counsel for the Trustee finally contacted Examines's counsel to address the proposal. Noting that a "gambling person" would weigh the offer against the possibility of obtaining all of the documents, Ms. Gertz, with Mr. Mojdehi present, stated that she would rather "roll the dice and try to get all of them," despite the fact that the right to seek to obtain the remaining non-produced documents would still be available to the Trustee under the terms of the proposal.

Counsel stated that they wanted to think about the proposal further and would not respond until Thursday or Friday of this week.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

II.

ARGUMENT

Trustee counsel's refusal to "meet and confer" in good faith and to have produced to him a substantial number of documents which he seeks through the present motion is indicative of his conduct during the entire course of the 2004 proceedings against Examinees. Simply put, if Trustee counsel's motivation was to obtain as much information as possible from Examinees, he would have promptly responded to counsel's efforts at contact in less than ten (10) days and would have promptly responded to Examinee's counsel's offer in an affirmative fashion. He did neither, raising again the spectre that the discovery process is being used for improper purposes.

This is not simply a matter of a lack of professional behavior or courtesy.

As of this date, responding to the voluminous document requests and Trustee's counsel's incessant demands that documents be produced and identified in a manner most convenient to him, and beyond that which is required under the law,[2] has resulted in extraordinary expense which could have been avoided if Trustee's counsel acted in a cooperative as opposed to combative manner.

Through the end of June, 2007, over *$300,000* has been required to be incurred for attorneys' fees, costs and outside vendor fees in efforts to comply with the subpoenas and the Trustee's demands. This amount *excludes* both the time spent in responding to the present motion and time relating to inadvertent productions of documents.[3]

Although discovery rules are liberal, a party must show more than just a speculative theory that information might be relevant to a claim or defense. *Morden v. Intermec Technologies Corp.*, 77 Fed. App. 424, 427 (9th Cir. 2003).

Similarly, the burden imposed by subpoenas directed to non-parties is a factor entitled to special weight in evaluating the balance of competitive needs. *Heidelberg Americas, Inc. v. Tokoyo Kikai Seisakusho, Ltd.*, 333 F. 3d 38 (1st Cir. 2003), quashing a subpoena as unduly burdensome in seeking a decade's worth of materials including "any and all documents received, reviewed or

[2] A list of the demands asserted by Trustee's counsel over the course of the production and Examinee's actions in response thereto is attached to the Declaration of Steven J. Kahn as Exhibit "D."

[3] This amount is in addition to the in excess of $250,000 in attorneys' fees and costs incurred in responding to the discovery requests served by the Bree Parties in early 2006.

generated... relating to any type of business affiliation" between the plaintiff and the non-party.

The same factors are present here and the demands far outweigh any potential benefit to be derived therefrom.

Indeed, the Trustee's continued demands and refusal to meet and confer in good faith push his efforts beyond burden and oppression. They are now simply puntitive and should not be countenanced by the Court.

Respectfully submitted,

Dated: July 24, 2007

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP

By

Richard M. Pachulski, Esq. (CA Bar No. 90073)
Stanley E. Goldich (CA Bar No. 92659)
Steven J. Kahn (CA Bar No. 76933)
Attorneys for Isaac Lei, The Alcon Group, Dynamic Finance Corporation and Angela Sabella

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

FILED BY FAX

DECLARATION OF STEVEN J. KAHN

I, STEVEN J. KAHN, declare:

1. I am an attorney at law suly licensed to practice before all courts in the State of California and in this District. I am of counsel to the law firm of Pachulski Stang Ziehl Young Jones & Weintraub LLP, attorneys of record for Examinees and Sabella/Dynamic in this bankruptcy case. The facts stated herein are of my own personal knowledge, and if called upon as a witness, I could and would competently testify thereto.

2. At the Scheduling Conference for the within contested matter held on July 6, 2007, I stated that I believed that we could reach a resolution as to a large number of documents subject to the pending dispute between Examinees and the Trustee upon the conducting of a "meet and confer" session with counsel for the Trustee.

3. In furtherance thereof, on Monday, July 9, 2007 Gina Brandt of my office and I attempted to reach Trustee's counsel by telephone, but were unsuccessful and left a message.

4. On the following day, Tuesday, July 10, 2007, Ms. Brandt of our office sent an e-mail to Trustee's counsel again requesting contact with counsel to schedule a telephonic "meet and confer." A true and correct copy of said e-mail is attached hereto as Exhibit "A."

5. Having not heard from counsel for the Trustee by July 16, 2007, I sent another e-mail requesting contact from him.[4] A true and correct copy of the email is attached hereto as Exhibit "B."

6. Having still not received contact from Trustee's counsel as of Thursday, July 19, 2007, ten days after the initial efforts at contact, I sent an additional e-mail requesting contact lest counsel's nonresponse be brought to the Court's attention. A true and correct copy of this email is attached hereto and incorporated herein by reference as Exhibit "C."

7. Counsel for the Trustee finally responded to this last effort to arrange a meet and confer and a telephonic discussion was held in the morning of July 19, 2007.

8. During the discussion, I stated that while we believed that all of the documents contained on the current privilege logs were validly subject to the attorney/client privilege, the vast

[4] The July 16, 2007 e-mail was addressed to Ali.M.Mojdehi@bakernet.com instead of Ali.M.M.Mojdehi@bakernet.com. Mr. Mojdehi denies receipt of the e-mail, but same was not "bounced back" as undeliverable on counsel's e-mail system.

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP ATTORNEYS AT LAW LOS ANGELES, CALIFORNIA

majority of those documents were of no consequence to any of the issues relating to the Sabella/Dynamic claims and other issues raised by the Trustee in support of his present motion. I offered to produce all of those documents to the Trustee on the sole condition that the Trustee would not assert that the production of those documents constituted a waiver of the attorney/client privilege beyond the specific documents produced, so that there would be no argument of a "subject matter" waiver as to any remaining documents withheld as privileged. The effect of such a production and agreement would both (1) provide the Trustee a large number of the documents sought through his motion and (2) substantially narrow the number of documents which may remain in dispute so that any judicial review, if necessary, would be manageable.

9. Counsel for the Trustee stated that he would have to think about the proposal and would respond to me on the following Monday, July 23, 2007.

10. No response was received from Trustee's counsel on Monday until an email sent at 6:25 p.m. requesting a call back, after I had already left the office. I attempted to contact Trustee's counsel at approximately 7:45 p.m., stating that I would be available until 8:00 p.m. that evening. Having not heard from Trustee's counsel, I sent another email at 8:44 a.m. this morning.

11. At approximately 11:00 a.m. this morning, counsel for the Trustee finally contacted me to address the proposal. Noting that a "gambling person" would weigh the offer against the possibility of obtaining all of the documents, Ms. Gertz, with Mr. Mojdehi present, stated that she would rather "roll the dice and try to get all of them," despite the fact that the right to seek to obtain the remaining non-produced documents would still be available to the Trustee under the terms of the proposal.

12. Counsel stated that they wanted to think about the proposal further and would not respond until Thursday or Friday of this week.

13. A true and correct list of the Trustee's demands during this discovery process and our responses thereto are attached there as Exhibit "D."

///

///

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 24th day of July, 2007, at Los Angeles, California.

Steven J. Kahn

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## Steven J. Kahn

**From:** Gina Brandt
**Sent:** Tuesday, July 10, 2007 4:02 PM
**To:** 'ali.m.m.mojdehl@bakernet.com'
**Cc:** Steven J. Kahn; Stan Goldich
**Subject:** Dynamic: Document Production Sequestration Log

Hello Ali:

Attached is the drafted Sequestration Log in connection with the PSZY-E production. As you know, we requested that the PSZY-E CD be sequestered in its entirety following your firm's complaints about the entire production set, and our subsequent determination that the CD we produced to you was technically flawed. We have since provided you with a replacement CD which corrected the errors about which your firm complained and which does not have the technical problems or inadvertent production of non-responsive or privileged communications.

As discussed at the hearing, we are available to meet with you to resolve any issues on this sequestration log so that we do not burden the Court with matters that we should be able to resolve in a reasoned meet and confer. Since we have not heard from you following Steve Kahn's telephone call to you yesterday, we thought we would propose a telephonic meet and confer early next week. Please let us know what days are good for you.

Thanks,

Gina Brandt
Pachulski Stang Ziehl Young Jones & Weintraub LLP
(310) 277-6910

Sequestration
.og re PL 4_v3.p..

EXHIBIT
A

## Steven J. Kahn

**From:** Steven J. Kahn
**Sent:** Monday, July 16, 2007 8:42 AM
**To:** 'ali.m.mojdehi@bakernet.com'
**Cc:** Stan Goldich; Gina Brandt
**Subject:** FW: Dynamic: Document Production Sequestration Log

Ali,

I have left a message for you to call, and Gina requested the same below. We have not heard back from you.

I am in the Delaware office today and tomorrow. You can call the LA number and ask to be transferred to DE. I am at extension 6462. If not at my desk, I can be paged.

Thanks.

-----Original Message-----
**From:** Gina Brandt
**Sent:** Tuesday, July 10, 2007 7:02 PM
**To:** 'ali.m.m.mojdehi@bakernet.com'
**Cc:** Steven J. Kahn; Stan Goldich
**Subject:** Dynamic: Document Production Sequestration Log

Hello Ali:

Attached is the drafted Sequestration Log in connection with the PSZY-E production. As you know, we requested that the PSZY-E CD be sequestered in its entirety following your firm's complaints about the entire production set, and our subsequent determination that the CD we produced to you was technically flawed. We have since provided you with a replacement CD which corrected the errors about which your firm complained and which does not have the technical problems or inadvertent production of non-responsive or privileged communications.

As discussed at the hearing, we are available to meet with you to resolve any issues on this sequestration log so that we do not burden the Court with matters that we should be able to resolve in a reasoned meet and confer. Since we have not heard from you following Steve Kahn's telephone call to you yesterday, we thought we would propose a telephonic meet and confer early next week. Please let us know what days are good for you.

Thanks,

Gina Brandt
Pachulski Stang Ziehl Young Jones & Weintraub LLP
(310) 277-6910



Sequestration
og re PL 4_v3.p..

EXHIBIT
B

## Steven J. Kahn

**From:** Steven J. Kahn
**Sent:** Thursday, July 19, 2007 9:35 AM
**To:** 'ali.m.m.mojdehi@bakernet.com'
**Cc:** Stan Goldich
**Subject:** Dynamic/North Plaza

We have attempted to contact you several times since the scheduling conference to discuss resolution of various of the discovery issues but you have not responded to our call or emails. In light of the rapidly approaching hearing date, if I do not hear from you by the close of business today we will have no choice but to bring this matter to the court's attention.

Steven J. Kahn
Pachulski Stang Ziehl Young Jones & Weintraub LLP
10100 Santa Monica Blvd., 11th Floor
Los Angeles, California 90067
Tel: 310.277.6910 | Fax: 310.201.0760
SKahn@PSZYJW.COM
www.pszyjw.com

Los Angeles | San Francisco | Wilmington, DE | New York

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the addressee(s) named herein and may contain legally privileged and/or confidential information. If you are not the intended recipient of this e-mail message, you are hereby notified that any dissemination, distribution or copying of this e-mail message, and any attachments thereto is strictly prohibited. If you have received this e-mail message in error, please immediately notify me by telephone and permanently delete the original and any copies of this email and any prints thereof.

NOT INTENDED AS A SUBSTITUTE FOR A WRITING
Notwithstanding the Uniform Electronic Transactions Act or the applicability of any other law of similar substance and affect, absent an express statement to the contrary hereinabove, this e-mail message, its contents, and any attachments hereto are not intended to represent an offer or acceptance to enter into a contract and are not otherwise intended to bind the sender, Pachulski Stang Ziehl Young Jones & Weintraub LLP, any of its clients, or any other person or entity.

EXHIBIT
C

# ALCON/EI DOCUMENT PRODUCTION ISSUES AND RESPONSES

| | | |
|---|---|---|
| **VOLUME I**<br>DYN0001-DYN02332<br>PSYJW000 1-PSYJW2670<br>ALC0001-ALC3410 | **(1) Privilege Logs I-IV: Insufficient Descriptions**<br><br>The descriptions of documents withheld on the basis of privilege do not provide a sufficient basis for the Trustee (or the Court) to determine the specific nature of the privilege asserted as to that document. Because Rule 26(b)(5) was intended to help reduce the need for an in camera examination of documents, the persistent failure of Examinees to supply the relevant information may result in a waiver of the privilege. | Examinees dispute the Trustee's claim that the subject matter of the privileged document was insufficient. The subject matter description is intended to be sufficiently unspecific so as to protect the communication but not so general that a reasoned determination cannot be made as to whether the privilege is properly asserted.<br><br>In order to accommodate the Trustee, the Examinees have undertaken to re-review all of the privileged documents and provide additional description of the subject matter. Thus the examinees have provided the Trustee with replaced privilege logs for Vols. 1 through 4. |
| **VOLUME II:**<br>Production to Eire used Summation Document IDs<br>Replacement production to Trustee uses both Summation DocIDs and production identifier: "D-PST-" | | |
| **VOLUME III:**<br>DYN2233-DYN3344<br>PSYJW2865-PSYJW7912<br>ALC3411-ALC4552 | **(2) Privilege Logs I-IV: Outdated and Inaccurate**<br><br>Examinees must update, correct, and amend privilege Logs I-IV to identify all documents removed from or added to each Privilege Log to date. (See 04/02/07 Kahn letter, 04/17/07 Kahn letter, 04/24/07 Smoogen email, 04/25/07 Brandt email, 05/10/07 Brandt email) | While Examinees dispute that they are under obligation to update the Privilege Logs, to accommodate the Trustee, the Privilege Logs have been updated. Following a statutory Meet and Confer, Examinees may produce additional documents and may further update their privilege logs as appropriate. |
| **VOLUME IV:**<br>PSZY-E00001 -PSZY-E04<br>102<br><br>PSZY-REDACTED-00001-<br>PSZY-REDACTED-00180<br>Initial production used Summation Document IDs and separate production identifier (see above)<br>Replacement production to Trustee uses both Summation DocIDs and production identifier: "D-PSZY-" | **(3) Privilege Logs I-IV: Redacted Documents Missing**<br><br>Examinees must amend Privilege Logs I-IV to add all "redacted" documents and specific privilege claim(s) asserted as to each redaction. (See 04/24/07 Smoogen email, 04/25/07 Kahn email, 04/25/07 Brandt email, 05/10/07 Kahn email)<br><br>Examinees must provide specific descriptions of privilege claimed for each document redaction. Examinees make boilerplate reference that all "redactions [or redacted documents] have been made on the grounds of the attorney-client privilege and/or work product doctrine or in limited, obvious circumstances to remove from disclosure private matters such as bank routing numbers or bank account numbers." (See 04/24/07 Smoogen email, 04/25/07 Kahn email, 04/28/07 Brandt email) | Again, Examinees dispute that they are under obligation to amend their Privilege Logs, this time to "add all redacted documents and specific privilege claim(s) asserted as to each redaction." However, to accommodate the Trustee, Examinees have provided the Trustee with a separate "Redaction Log" and in addition, as to Replacement Privilege Logs II, IV, V, and the Supplemental Privilege Log, the redacted documents have been identified therein with the privilege asserted. Following a statutory Meet and Confer, Examinees may produce certain of the redacted documents as unredacted document(s) as appropriate. |

DOCS_LA:11607.5.2

1

EXHIBIT
D

EXHIBIT 10<br>PAGE 128

## ALCON/LEI DOCUMENT PRODUCTION ISSUES AND RESPONSES

| | | |
|---|---|---|
| | Kahn email, 04/23/07 Privilege Log III and 04/23/07 Privilege Log IV.) General, boilerplate assertion of privilege claim(s) do not comply with the express provisions of FRCP Rule 26(b)(5)(A). *See* Green v. Baca, 219 F.R.D. 485, 491 (C.D. Cal. 2003) | |
| | **(4) Privilege Logs II-IV: Irreconcilable with Documents**<br><br>Bates label schemes on documents withheld from production and identified on Privilege Logs II and IV are not consistent with production sets of documents. Accordingly, it is impossible to determine, for example, whether Examinees withheld an email but produced its attachment or withheld both, or where in the production set such documents were maintained, etc. This is substantial and significant. Privilege Log II alone is 488 pages long, and the Trustee is at a disadvantage having to "piece together" these withheld communications and their attachments.<br>(*See* 04/24/07 Smoogen email, 04/25/07 Brandt email; 04/25/07 Kahn email, 04/28/07 Brandt email.) | Examinees dispute that they are under obligation to provide the bates label scheme specified by the Trustee, nor are they required to account for "all Bates numbers omitted from the production set...". Indeed, it is common for attorneys to provide bates labels for produced documents only, with privileged documents numerically listed on the privilege log or to bate label all documents and withhold certain documents as either privileged or non-responsive.<br><br>Examinees have endeavored to accommodate the Trustee's increasingly costly demands by providing replacement privilege logs and replacement documents which would allow the Trustee to "link" produced documents to the privilege log.<br><br>Note: Privilege Log II originally consisted of 488 pages due to the significant number of duplicates contained therein. Examinees have undertaken remove duplicates from both the production and the Privilege Log, which has resulted in a Replacement Privilege Log of 166 pages. In addition, Examinees have produced documents responsive to the broader request of the Trustee's 2004 Document Subpoena. |
| | **(5) Production Sets are Not Bates Labeled**<br><br>Examinees must provide a document labeling scheme that enables reconciliation between the production set and a corrected privilege log. Examinees have promised to replace CD-2 with revised CD-2 containing the identical | Examinees use the Summation document identifiers on the Privilege Log for convenience which identify a document by a document single number rather than by page numbers. Examinees have agreed to provide a dual numbering system |

DOCS_LA:167675.2

## ALCON/LEI DOCUMENT PRODUCTION ISSUES AND RESPONSES

| | | |
|---|---|---|
| | documents branded as follows: (a) with a Bates label, and (b) with a visible, original, electronic branding number that will enable reconciliation between the production set and a corrected Privilege Log II, as noted above. (*See* 04/17/07 Kahn letter, 04/24/07 Smoogen email, 04/25/07 Brandt email, 04/25/07 Kahn email, 04/29/07 Brandt email.) | which will allow for page numbers as well as document numbers. Examinees have provided the Trustee with a replacement CD and a replacement Privilege Log Vol. 4. |
| | **(6) Bates Numbering Gaps, Indicating Improperly Withheld Documents**<br><br>This production set reveals significant gaps in the Bates Numbering scheme of documents. Examinees must account for all Bates numbers omitted from the production set falling within the following Bates ranges and must either assert a proper basis for not producing them or produce them immediately:<br>DYN2333-DYN3344<br>PSYJW267 1-PSYJW2907<br>ALC341 1-ALC4552 | See above. Examinees will respond to any questions from the Trustee as to a missing bates number and have provided the Trustee with a previously made list of "void numbers". |
| | **(7) Privilege Logs II-IV: Improper Withholding Rather than Redaction.**<br><br>The Trustee's review of the privilege log indicates that Examinees have been improperly withholding documents that should, at most, be redacted. To the extent a portion of a document, such as email contains privileged material, the writing and all attachments must be produced, with redactions rather than withheld completely. | Examinees dispute Trustee's contention that documents have been improperly withheld. Where the underlying non-privileged email is produced in its original form, redacting each subsequent privileged portion so that the Trustee will have multiple copies of the same email but with the privileged portion redacted is extremely burdensome and oppressive. This case involves literally thousands of emails. The cost and burden of the redacting of each email is excessive in light of the fact that the underlying non-privileged email *has been produced* to the Trustee.<br><br>To the extent that any particular email is significant to the Trustee, Examinees will meet and confer with the Trustee to |

## ALCON/LEI DOCUMENT PRODUCTION ISSUES AND RESPONSES

| | | |
|---|---|---|
| | | resolve any dispute. |
| | **(8) Privilege Log I: Sequestered Documents**<br><br>Examinees advised the Trustee on 05/14/07 that certain "DYN" documents listed on Privilege Log I were inadvertently included in the DYN 03/08/07 production set revised 03/09/07. Examinees have requested Trustee to sequester such documents pending in camera review. The Trustee has complied with Examinees' request by segregating and sequestering documents expressly identified by Examinees' counsel. Examinees have promised to produce certain documents contained therein based on "the list" provided to them by the Trustee (*See* 05/14/07 Brandt email and 05/14/07 Gertz' email, 05/14/07 Brandt email response, 04/14/07 Brandt email response, 05/15/07 Gertz email reply, 05/16/07 Brandt email.)<br><br>Examinees have requested the Trustee on 5/14/07 to sequester a privileged document not contained on Privilege Log I. The Trustee has complied with Examinees' request by segregating and sequestering documents expressly identified by Examinees' counsel pending in camera review by the Court. Examinees must correct Privilege Log I to reflect these additional assertions of privilege (*See* 05/14/07 Brandt email and 05/14/07 Gertz's email reply.) | Privilege Log I, as revised, has been provided to the Trustee. |
| | **(9) Sequestered Documents on Privilege Log IV**<br><br>Examinees have demanded sequester of documents identified as PSZY-Redacted-00001– PSZY-Redacted-00 180, but have failed to list any of these redacted documents on Privilege Log IV. (*See* 04/28/07 Brandt email, 05/02/07 Gertz email, 05/10/07 Kahn email, 05/11/07 Gertz email, 05/14/07 Brandt email, 04/23/07 Privilege Log IV.) The Trustee is therefore denied information | In light of the complaints made by the Trustee as to the difficult Bates numbering scheme on the documents produced as the PSZY-E production, Examinees determined that the production was technically or mechanically flawed as certain "redactions" did not properly attach when printed from the electronic version, and certain withheld documents were inadvertently included in the production set. Thus, Examinees |

## ALCON/LEI DOCUMENT PRODUCTION ISSUES AND RESPONSES

| [illegible] | [illegible] | [illegible] |
|---|---|---|
| | about these writings in violation of FRCP Rule 26(b)(5)(A) | promptly demanded, on 4/28/2007, and again on 5/2/2007, the return or destruction of the entire CD with the representation that a corrected replacement CD would be provided to the Trustee. The Trustee refused and opted for sequestration. A replacement CD *has been given to the Trustee*. Examinees' demand that the first CD be destroyed or returned remains in force. The Trustee may sequester it, but its continued use is in violation of the Examinees' invocation of "clawback" procedures. The Trustee has represented that the production set has been sequestered. |
| | **(10) Additional Sequestered Documents** Examinees advised Trustee on 4/23/2007, that they inadvertently produced ALC3452, which is listed on Privilege Log III. Pending in camera review, Trustee has sequestered this document as requested by Examinees' counsel. (*See* 04/23/07 Kahn letter.) | Mr. Kahn's letter of 4/23/2007 requests that the unredacted version of ALC3540 be withdrawn. Examinees produced the redacted version to the Trustee on 4/23/2007.<br><br>Examinees demanded that ALC3770-78 [draft of Sabella Declaration]; and ALC 3752-59 [draft redlined agreement] be destroyed or returned since the Trustee states that such documents were previously produced by Alcon. See email from Gina Brandt on 5/10/2007. |
| | **(11) Illegible or Cutoff Documents** Examinees must produce replacements for all illegible or cutoff documents identified by the Trustee. (*See* 04/24/07 Smoogen email, 04/25/07 Kahn email.) | None have been identified by the Trustee to date, although Examinees have located and replaced one such document. |
| | **(12) Privilege Log III: Improper Assertion of Privilege for Documents Ordered Produced** Examinees acknowledge that, "through oversight," they withheld and listed on Privilege Log III duplicate copies of documents previously produced pursuant to 03/30/06 Court Order. Examinees must amend Privilege Log III to correct this error. (*See* 04/23/07 Privilege Log III, 05/10/07 Brandt email.) | Privilege Log III has been so revised to correct the inadvertent listings, and the revised privilege log has been provided to the Trustee. |

## PROOF OF SERVICE

FILED BY FAX

STATE OF CALIFORNIA )
)
CITY OF LOS ANGELES )

I, Sherry Ploussard, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067-4100.

On July 24, 2007, I caused to be served the **SUPPLEMENTAL OPPOSITION OF ISAAC LEI AND THE ALCON GROUP TO THE MOTION OF RICHARD M. KIPPERMAN, CHAPTER 11 TRUSTEE (i) TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY OF ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP UNDER FRCP 45 AND FRBP 9016; DECLARATION OF STEPHEN J. KAHN** in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

*Please see attached Service List*

☐ (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑ (BY NOTICE OF ELECTRONIC FILING) I caused to be served the above-described document by means of electronic transmission.

☑ (BY FAX) I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

☐ (BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s).

☑ (BY OVERNIGHT DELIVERY) By sending by Federal Express to the addressee(s) as indicated on the attached list.

I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

Executed on July 24, 2007, at Los Angeles, California.

[signature]
Sherry Ploussard

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

**SERVICE LIST**

Via Facsimile and FedEx

Tiffany L. Carroll
Office of the United States Trustee
402 West Broadway, Suite 600
San Diego, CA 92101
Tel. (619) 557-5013
Fax: (619) 557-5339

Via Email, FedEx and Facsimile

Counsel for Debtor
K. Todd Curry
Curry & Associates
525 B Street, Suite 1500
San Diego, CA 92101
tcurry@currylaw.com
Tel: (619) 238-0004
Fax: (619) 238-0006

Counsel for Richard Kipperman
Ali M.M. Mojdehi
Baker & McKenzie LLP
101 West Broadway, 12th Floor
San Diego, CA 92101
Ali.m.m.mojdehi@bakernet.com
Tel.: (619) 235-7780
Fax: (619) 236-0429

PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | District Case No. 08-CV-01194-W-CAB<br><br>Bankruptcy Court No. 04-00769-PB11<br><br>Appeal No. 2 |
| DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,<br><br>APPELLANTS,<br><br>v.<br><br>CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,<br><br>APPELLEE | **EXHIBIT 11 TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**<br><br>DATE: To Be Set<br>TIME: To Be Set<br>COURTROOM: Seven<br><br>The Honorable Thomas J. Whelan, Judge Presiding |

**EXHIBIT 11**

EXHIBIT 1(
PAGE 135

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Secured Creditors Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In Re:

NORTH PLAZA LLC,

Debtor.

CASE NO. 04-00769-PB11

Chapter 11

**HEARING BRIEF OF PRIVILEGE HOLDERS DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA**

Hearing Date: March 19, 2008
Time: 9:00 a.m.
Place: Courtroom 2

EXHIBIT I(
PAGE 136

# TABLE OF CONTENTS

PAGE

I. INTRODUCTION....................1

II. APPLICATION OF THE FEDERAL LAW OF PRIVILEGE AS TO CLIENT REPRESENTATIVES....................2

A. Overview of the Federal Common Law of Privilege....................2

B. The "Bieter" Factors to Determine Non-Employee Client Representative Status....................3

C. Adoption and Interpretation of the "Beiter Factors" in the Ninth Circuit....................7

III. THE APPLICATION OF CALIFORNIA LAW OF PRIVILEGE AS TO CLIENT REPRESENTATIVES....................9

IV. CONCLUSION....................14

518733.3 i 33360-036

HEARING BRIEF OF PRIVILEGE HOLDERS DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA

EXHIBIT 11

PAGE 137

# TABLE OF AUTHORITIES

## FEDERAL CASES

Atmel Corp. v. St. Paul Fire & Marine Insurance Co., 409 F. Supp. 2d 1180 (2005) .......... 10

In re Bieter Co., 16 F.3d 929 (8th Cir. 1994) .......... 3, 4, 5, 6, 7

In re CV Therapeutics, Inc. Securities Litigation, 2006 U.S. Dist. LEXIS 41568 (N. D. Cal. June 16, 2006) .......... 3

Diversified Industries, Inc. v. Meredith, 572 F.2d 596 (8th Cir 1978) .......... 4, 5, 6

Truckstop.Net, L.L.C. v. Sprint Communs. Co., L.P., 2007 U.S. Dist. LEXIS 63907 .......... 11

Memry Corp. v. Ky. Oil Tech., Nv., 2007 U.S. Dist. LEXIS 3094 (N.D. Cal. 2007) .......... 3, 7, 10

United States v. Spector, 793 F.2d 932,938 (8th Cir. 1986) .......... 2

United States v. (Under Seal), 748 F.2d 871,874 n.5 (4th Cir. 1984) .......... 2

In re Asia Global Crossing, Ltd., 322 B.R. 247 (2005) .......... 13

Trammel v. United States, 445 U.S. 40, 101 S. Ct. 906, 63 L. Ed. 2d 186 (1980) .......... 4

Upjohn Co. v. U.S., 449 U.S. 383, 101 S. Ct. 677 .......... 4

## FEDERAL STATUES

Supreme Court Standard 503 .......... 2

Uniform Evidence Rule 502(a)(4) .......... 2

## STATE CASES

Insurance Company of North America v. Superior Court of Los Angeles County, 108 Cal. App. 3d 758 (1980) .......... 9

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

In re Jordan,
7 Cal. 3d 930 (1972)........................................................................................ 9

**OTHER STATE CASES**

Crenshaw v. Crenshaw,
646 So. 2d 661.............................................................................................. 11

Langdon v. Champion,
752 P.2d 999 (1988)...................................................................................... 11

State v. Sucharew,
205 Ariz. 16 (2003)...................................................................................... 11

Branch v. Greene County Board of Education,
533 So. 2d 248 (Ala. Civ. App. 1988)........................................................... 11

Barnes/Science Associates Limited Partnership, et al v. Barnes Engineering Co., et al.,
1990 Conn. Super. LEXIS 464 (1990)........................................................... 11

Chandler v. Denton,
1987 OK 38 (1987)....................................................................................... 13

Corll v. Edward D. Jones & Co.,
646 N.E.2d 721 (1995).................................................................................. 12

Haney v. Yates,
40 S.W.3d 352 (2000)................................................................................... 12

Hofmann v. Conder,
712 P.2d 216 (1985)...................................................................................... 14

Kratzer v. Kratzer,
595 S.W.2d 453 (Mo. App. 1980)................................................................. 12

Lessard v. Metropolitan Life Ins. Co.,
1986 Me. Super. LEXIS 135 (1986).............................................................. 12

In re Marriage of Johnson,
237 Ill. App. 3d 381 (1992)........................................................................... 12

McCaffrey v. Estate of Brennan,
533 S.W.2d 264 (Mo. App. 1976)................................................................. 12

Mobley v. State,
409 So. 2d 1031 (1982)................................................................................. 11

Ryan v. Gifford,
2007 Del. Ch. LEXIS 168 (2007).................................................................. 11

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Santa Fe Pac. Gold Corp. v. United Nuclear Corp., 2007 NMCA 1 .......... 13

State v. Stickney, 148 N.H. 232 (2002) .......... 12

State v. Soto, 84 Haw. 229 (1997) .......... 11

State v. Van Landingham, 283 N.C. 589 (1973) .......... 13

State v. Copeland, 448 N.W.2d 611 (1989) .......... 13

State v. Driscoll, 116 R.I. 749 (1976) .......... 13

State v. Rickabaugh, 361 N.W.2d 623 (1985) .......... 13

State ex rel. Richards v. Records Custodian, 180 Wis. 2d 468 (1993) .......... 14

TJN, Inc. v. Superior Container Corp. (In re TJN, Inc.), 1997 Bankr. LEXIS 2423 (1997) .......... 13

United States v. Spector, 793 F.2d 932 (1986) .......... 12

Wardleigh v. Second Judicial District Court, 111 Nev. 345 (1995) .......... 12

**STATE STATUTES**

California Evidence Code Section 951 .......... 9

Evidence Code Section 952 .......... 9, 10

**OTHER STATE STATUTES**

Fla. Stat. Ann. § 90.502(1) .......... 11

Or. Rev. Stat. § 40.225 (1), (2) .......... 13

Alaska R. Evid. 503(a) .......... 11

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Ark. R. Evid. 502(b) .......... 11
Haw. R. Evid. 503(a) .......... 11
Ky. R. Evid. 503(a)(5) .......... 12
N.H. R. Evid. 502(a)(5) .......... 12
Rule 11-503(A)(4) .......... 13
Id. R. Evid. 502 .......... 11
N.D.R.Ev. Rule 502 .......... 13
S.D. Codified Laws § 19-13-2(5) .......... 14
Tex. Evid. R. 503 .......... 14

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

518733.3 v 33360-036
HEARING BRIEF OF PRIVILEGE HOLDERS DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA
EXHIBIT 11
PAGE 141

**TO THE HONORABLE PETER W. BOWIE, CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Dynamic Finance Corporation and Angela C. Sabella ("Dynamic," "Sabella," and collectively "Dynamic/Sabella" or the "Privilege Holders"), on behalf of themselves, herein submit their Hearing Brief pursuant to Local Bankruptcy Rule 7016-12.

## I.

## INTRODUCTION

The present evidentiary hearing has been scheduled to determine a narrow and discreet issue. As a threshold matter, are the communications between legal and among counsel for Sabella/Dynamic, Sabella and Dynamic, and/or Lei/Alcon, and communications between Lei/Alcon and Dynamic/Sabella, containing or referencing those communications with counsel, subject to the attorney-client privilege. Conversely, does the mere participation of Lei/Alcon in those communications "break" the attorney-client privilege such that same are subject to disclosure to the Trustee.

Despite the fact that in the context of an objection by James Bree and his related entities (the "Bree Parties") to the proposed settlement of Dynamic's and Sabella's proofs of claim the Court reviewed a number of written communications involving Lei/Alcon and counsel for Sabella/Dynamic specifically relating to the Debtor and found same to be privileged, the Trustee insists that the issue be revisited in the context of his pending 2004 Examination of Lei/Alcon.[1]

Sabella/Dynamic's assertion of the attorney-client privilege in the course of the litigation with the Bree Parties was based on California law. In that any objection by the Trustee to the Dynamic and Sabella claims would still have to be determined under California law, and in that the period to initiate avoidance actions under the Bankruptcy Code has expired, it would appear that any claims that could be asserted by the Trustee would also have to be based on California law. Nevertheless, if federal common law of privilege is to be applied, the result is the same

---

[1] It should be noted that the Trustee also baselessly asserts that communications directly between counsel and Sabella/Dynamic or solely between counsel for Sabella/Dynamic, as to which Lei/Alcon was not a party, are similarly not privileged.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

because federal common law is not more restrictive or narrow than California law: it is merely less succinctly defined. As such, this brief will examine the issues under both federal and California law.

As will be seen below, although they arrive at their conclusions in different ways, the prevailing cases in California and among federal courts is clear. Under the circumstances present in this case, Lei/Alcon's communication with Sabella/Dynamic's counsel are absolutely privileged pursuant to the attorney-client privilege to the same extent as if the communications were solely between Sabella/Dynamic and their counsel. Further, both bodies of jurisprudence also protect any subsequent communications between Lei/Alcon and Sabella/Dynamic regarding the communications with and information obtained from the attorneys.

## II.

## APPLICATION OF THE FEDERAL LAW OF PRIVILEGE AS TO CLIENT REPRESENTATIVES

### A. Overview of the Federal Common Law of Privilege

There is no statutory definition of the attorney-client privilege in the Federal Rules of Evidence or other federal statute. However, proposed Federal Rule of Evidence 503, also referred to as Supreme Court Standard 503 provides the guidance which has been utilized by various courts in defining the privilege. "Although not enacted by Congress, 'courts have relied upon it as an accurate definition of the federal common law of attorney-client privilege .... consequently, despite the failure of Congress to enact a detailed article on privileges, Standard 503 should be referred to by the Courts.'" 2 J. Weinstein, *Evidence* ¶ 503[02] at 503-17 (1975). *United States v. Spector*, 793 F.2d 932,938 (8th Cir. 1986), *United States v. (Under Seal)*, 748 F.2d 871,874 n.5 (4th Cir. 1984). As pertinent here, Supreme Court Standard 503 provides:

> The privilege extends to communications (1) between client *or his representative* and lawyer or his representative, (2) between lawyer and lawyer's representative, (3) by client or his lawyer to a lawyer representing another in a matter of common interest, (4) between representatives of the client or the client and a representative of the client, and (5) between lawyers representing the client. (Emphasis added.)

Supreme Court Standard 503 does not define "representative," but Uniform Evidence Rule

502(a) (4) is, "a clear statement of the scope of privilege as now generally accepted." Broun, *McCormick on Evidence*, (6th Ed. 2006). Uniform Rule of Evidence 502 protects the communications between an attorney and a client and a client's representative. A client's representative is defined in Uniform Rule of Evidence 502(a)(4) as follows:

> Representative of the client' means a person having authority to obtain professional legal services, or to act on legal advice rendered, on behalf of the client **or** a person who, for the purpose of effectuating legal representation for the client, makes or receives a confidential communication while acting in the scope of employment for the client. (Emphasis added.)

**B. The "*Bieter*" Factors to Determine Non-Employee Client Representative Status**

As to law within the Ninth Circuit, Dynamic and Sabella agree with the Trustee that the case of *Memry Corp. v. Ky. Oil Tech.*, Nv., 2007 U.S. Dist. LEXIS 3094 (N.D. Cal. 2007), adopting the Eighth Circuit decision of *In re Bieter Co.*, 16 F.3d 929, 937 (8th Cir. 1994), best elucidates the inclusion of "client representatives" within the attorney-client privilege. However, as opposed to the Trustee's characterization of the inclusion of such representatives as being a "narrow extension," the court in *In re CV Therapeutics, Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 41568 (N. D. Cal. June 16, 2006) states, "The courts have taken an expansive view of protected communications between independent contractors and counsel where the outside consultant functions like an employee in providing information which facilitates the obtaining of legal advice. *See In re Bieter Co.*, 16 F.3d 929, 936 (8th Cir. 1994)." (Emphasis added.)

The *Memry* case cited by the Trustee as representative of the law in the Ninth Circuit on this issue in turn cites *Bieter*, which favors and supports a finding that Lei/Alcon is a "client representative" such that qualified communications between them and counsel for Sabella/Dynamic are within the attorney-client privilege.

In *Bieter*, Dennis S. Klohs ("Klohs") was an individual who worked closely with Bieter in that entity's attempt to develop commercial property and in subsequent litigation related to those development efforts. At the pertinent times, Klohs was an independent contractor to Bieter who provided advice and guidance regarding the proposed commercial development, and his agreement with Bieter made clear that he was an independent contractor and expressly not an agent,

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

employee, or partner of Bieter.

In rendering services to Bieter, Klohs' involvement with Bieter's counsel, "was rather extensive." Klohs often attended meetings with counsel, either alone or with Bieter and received many communications from those attorneys, both sent directly to him and as to which he was copied. He also worked with architects and consultants and appeared at public hearings before the local city council and planning commissions and was viewed and dealt with by the City, potential tenants, and the defendants in the lawsuit as a representative of Bieter.

The Court found that Klohs' relationship to Bieter was of the sort that justifies application of the attorney-client privilege stating, "There is no principled basis to distinguish Klohs' role from that of an employee, and his involvement in the subject of the litigation makes him precisely the sort of person with whom a lawyer would wish to confer confidentiality in order to understand Bieter's reasons for seeking representation. *See, Upjohn Co. v. U.S.*, 449 U.S. 383, 101 S. Ct. 677; Sexton, *supra*, 498."

The rationale for this conclusion, as stated by the *Bieter* court, is clear:

> The privilege recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer being fully informed by the client .... the lawyer-client privilege rests on the need for the advocate and counselor to know all that relates to the client's reasons for seeking representation if the professional mission is to be carried out.' *Upjohn*, 449 U.S. at 389, 101 S. Ct. at 682 (quoting *Trammel v. United States*, 445 U.S. 40, 51, 101 S. Ct. 906, 913, 63 L.Ed.2d 186 (1980). Such information will, in the vast majority of cases, be available from the client or the client's employees, but there are undoubtedly situations such as the one described by Dean Sexton, in which too narrow a definition of 'representative of the client' will lead to attorneys not being able to confer confidentiality with non-employees who, due to their relationship to the client, possess the very sort of information that the privilege envisions flowing thus freely. '[I]t is only natural that,' just as '[M]iddle-Level-and indeed lower-level-employees ... would have the relevant information needed by corporate counsel to adequately advise the client with respect to ... actual or potential difficulties,' id. at 391, so too would non-employees who possess a 'significant relationship to the [client] and the [client's] involvement in the transaction that is the subject of legal services.' Sexton, supra, at 487. (Emphasis added.)

The *Bieter* Court, citing its prior decision in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir 1978), enumerates five factors to be considered in determining whether an

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

individual can qualify as a client representative for the purposes of assertion of the attorney-client privilege: Whether the communication was made for the purpose of seeking legal advice, whether the person making the communication did so at the direction of his superior, ...... whether the superior requested that the communication be made so that the client could secure legal advice, whether the subject matter of the communication was within the scope of the representative's duties, and whether the communication was not disseminated beyond those persons who, because of the structure of the client's operations, need to know its contents."

The evidence will show that Lei/Alcon meets each of the factors set forth in *Bieter*:

**1. The Subject Communications Were Made for the Purpose of Seeking Legal Advice**[2]

As noted in *Bieter*, "In applying this requirement in Diversified, we noted that when a matter is committed to a professional legal advisor, it is '*prima facie* committed for the sake of legal advice and [is], therefore within the privilege absent *a clear showing to the contrary*.'" (Emphasis added.)

The evidence will show that Lei/Alcon's communications with counsel for Sabella/Dynamic as to which the privilege is asserted were made for the purpose of seeking legal services and advice in connection with the structuring and documentation of loans, extensions and workouts, monitoring the progress of the loans and the real estate developments secured by them, negotiations relating to disputes arising in relation to the transactions in which Mr. Lei was involved, and litigation arising therefrom. The Trustee has not and cannot make a "clear showing to the contrary."

**2. Lei/Alcon's Communications with Counsel Were at the Direction of Sabella/Dynamic**

The evidence will show that as to all engagements of counsel relevant here, Sabella/Dynamic directed Lei and counsel to communicate with each other in the rendition of

[2] *Diversified*, supra, also notes, "In order for the privilege to be applicable, the parties to the communication in question must bear the relationship of attorney and client. Moreover, the attorney must have been engaged or consulted by the client for the purpose of obtaining legal services or advice services *or* advice that a lawyer may perform or give in its capacity as a lawyer, not in some other capacity." (Emphasis added.)

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

obtaining legal advice and services from counsel for Sabella/Dynamic and for the transmission of information and advice between counsel and Sabella/Dynamic both in terms of structuring and documenting transactions on behalf of Sabella/Dynamic, the progress of the loans, negotiations relating to disputes arising from those transactions, and litigation arising therefrom. There can be no evidence to the contrary.

**3. <u>Sabella/Dynamic Requested that the Communications be Made so That They Could Secure Legal Services and Advice</u>**

As to this requirement, the Court in *Bieter* notes:

> No amplification of this requirement appears in *Diversified*, but that is not particularly surprising in that it adds little to the first two requirements. If the communication was made for the purpose of seeking legal advice and it was done at the direction of a superior, it is reasonable to infer that, *absent evidence to the contrary*, the superior directed that the communication be made for the purpose of securing legal advice. (Emphasis added.)

The evidence will show that Sabella/Dynamic directed that their counsel and Lei/Alcon communicate with each other for the purpose of structuring and documenting transactions, issues relating to the loans arising thereafter, negotiating disputes, and litigation arising therefrom. The Trustee can have no evidence to present to the contrary, and the requirements of this factor are met.

**4. <u>The Subject Matter of the Communications Were Within the Scope of Lei/Alcon's Duties</u>**

The evidence will show that Lei/Alcon undertook to arrange loans under their licenses as real estate brokers for Sabella/Dynamic for cooperation and with the expectation of cooperation. The evidence will also show that Lei/Alcon, in an effort to retain a "presence" before Sabella/Dynamic in order to obtain additional loan brokering assignments, undertook additional duties with relation to transactions in which it was involved, including monitoring the loans and the progress of entitlement and development of the real property secured thereby, including representing Sabella/Dynamic's interests in the properties at meetings with governmental bodies and regulatory agencies, and consulting with counsel for Sabella/Dynamic regarding the progress of development of the properties, and communicating any pertinent advice from counsel to

Sabella/Dynamic. Lei/Alcon, at Sabella/Dynamic's instruction, became intimately involved in negotiations of disputes relating to borrowers and assisted Sabella/Dynamic's counsel in litigation. There is no evidence to the contrary.

**5. <u>The Communications Were Not Disseminated Beyond Those Persons Who, Because of the Structure of the Client's Operations, Needed to Know Its Contents</u>**

The evidence will show that communications between counsel for Sabella/Dynamic and Lei/Alcon and communications between Sabella/Dynamic and Lei/Alcon were not disseminated to anyone beyond counsel and Sabella/Dynamic, as it was the intent of all parties that the communications were intended and understood to be confidential.

Thus, the five factors set forth in *Bieter* will be shown to have been met and the communications between Lei/Alcon and Sabella/Dynamic's counsel and the imparting of information and advice received from counsel to Sabella/Dynamic are within the attorney-client privilege.

**C. <u>Adoption and Interpretation of the "Beiter Factors" in the Ninth Circuit</u>**

The two cases in the Ninth Circuit adopting *Bieter*, *i.e. Memry*, *supra,* and *CV Therapeutics*, *supra*, came to similar conclusions on analogous facts, upholding the privilege as to non-employee consultants and representatives. *Memry*, in particular, calls for a viewing of the "totality of the relationship" between the representative and the client and notes a number of non-inclusive and disjunctive factors which gravitate toward a finding of privilege, including (1) the length of the relationship; (2) level of involvement in transactions and litigation; (3) communications with the client's counsel directly and through copies of correspondence; (4) representation by the client that the agent is an authorized representative of the client; (5) counsel's treatment of the agent as a client representative; as well as (6) where the work was performed; (7) remuneration for services; and (8) possession of information not known to other employees of the client.

No one item on this list of non-exclusive factors is definitive in looking at the "totality of the relationship" between the representative and client. Indeed, the Court in *Memry* upheld the privilege on five of the eight considerations. In the present case, Lei/Alcon meets all of the

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

considerations.

The evidence will show that (1) Lei/Alcon began their involvement with Sabella/Dynamic in 1997 and continued that involvement through all relevant periods thereafter; (2) Lei/Alcon was intimately involved in the making, arranging, structuring, and documenting of the numerous loans and loan extensions for Sabella/Dynamic and actively monitored both the loans and the progress of the development of the properties securing the loans, as well as negotiations and litigation arising therefrom; (3) Sabella/Dynamic's counsel communicated with Lei/Alcon relating to the structuring and documentation of the loans, developments arising thereafter and litigation arising therefrom both directly and as a "cc" to such communications; (4) Sabella/Dynamic represented that Lei/Alcon was its authorized representative for the purpose of attorney-client purposes; (5) Sabella/Dynamic's counsel treated Lei/Alcon as Sabella/Dynamic's representative and understood its communications to be confidential and privileged; (6) although Lei/Alcon rendered services to Sabella/Dynamic at a number of locations, Lei/Alcon was provided a desk to work on Sabella/Dynamic projects at Dynamic's offices and did perform services there; (7) although Lei/Alcon was not separately compensated for the services it performed for Sabella/Dynamic beyond commissions (actually payable by the borrowers as is customary in the industry), the services rendered by Lei/Alcon for Sabella/Dynamic were performed for the purpose of obtaining engagements to arrange additional loans and extensions which would produce income to Lei/Alcon; and (8) other than possibly Sabella, nobody at Dynamic possessed the intimate knowledge of the facts underlying transactions in which Mr. Lei was involved, the status of the properties secured thereby, and the litigation arising therefrom.

Hence, under any applicable test, Lei/Alcon acted as a client representative for Sabella/Dynamic in its communications with its counsel. And, as is set forth below, the result would be no different under California law.

///

///

///

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

III.

**THE APPLICATION OF CALIFORNIA LAW OF PRIVILEGE AS TO CLIENT REPRESENTATIVES**

In California, the attorney-client privilege is codified in Evidence Code section 952 which states:

> As used in this article, "confidential communication between client and lawyer" means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons *other than those who are present to further the interest of the client* in the consultation *or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted*, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship. (Emphasis added.)

Moreover, California Evidence Code Section 951 defines "client" as:

> A person who, directly *or through an authorized representative*, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity, and includes an incompetent (a) who himself so consults the lawyer or (b) whose guardian or conservator so consults the lawyer in behalf of the incompetent. (Emphasis added).

As interpreted by California case law, "the privilege extends to communications which are intended to be confidential, if they are made to attorneys, family members, business associates, or agents of the party or his attorneys on matters of joint concern, when disclosure of the communication is reasonably necessary to further the interest of the litigant." *Insurance Company of North America v. Superior Court of Los Angeles County*, 108 Cal.App.3d 758, 766-67 (1980) (holding that that attorney-client communications in the presence of, or disclosed to, clerks, secretaries, interpreters, physicians, spouses, parents, business associates, or joint clients, when made to further the interest of the client or when reasonably necessary for transmission or accomplishment of the purpose of the consultation, remain privileged.) In essence, if the communication is disclosed to a third party whose presence is required to advance the client's interest, or if the third party is an agent of the client or the attorney, then the communication is covered by the attorney-client privilege. *In re Jordan*, 7 Cal.3d 930 (1972). The same facts set

forth above that render Lei/Alcon's communications privileged with Sabella/Dynamic's lawyers under the *Memry* and *Beiter* cases would also render them privileged under the California Evidence Code.

Further, California federal cases applying California state law also interpret Evidence Code section 952 as applying the privilege to third party agents or brokers. The case of *Atmel Corp. v. St. Paul Fire & Marine Ins. Co.*, 409 F.Supp.2d 1180 (2005) is directly on point to this case. In *Atmel*, the Defendant filed a motion to compel the production of approximately 80 documents that were in the possession of third-party independent insurance broker, ABD. *Atmel Corp.*, 409 F.Supp.2d at p. 1181. Plaintiff Atmel Corporation (the insured) had asked ABD (Atmel's insurance broker) not to produce the documents on the grounds of attorney-client privilege. The Defendant argued that any privilege was waived when the documents were produced to the broker ABD. The Court disagreed and held that the communications between an insured and its insurance broker were entitled to protection under the attorney-client privilege of Evidence Code section 952 because the broker served as a necessary advisor for coverage and claim questions, the broker was present to further the insured's interests, and disclosure to the broker was reasonably necessary to provide information to the insurer. *Id.* at p. 1182. The Court based its ruling on the facts that ABD negotiated insurance policies on behalf of Atmel, and *after the policies were purchased*, ABD served as a necessary advisor for both general coverage questions and regarding specific claims tendered to carriers. *Id.* at p. 1181. (Emphasis added). Moreover, Atmel and ABD worked together to provide relevant information about litigation or claims to the insurers. Due to the foregoing, the Court found that ABD was present to further Atmel's interests, thus the attorney-client privilege was not waived. *Id.*

The facts in this case are strikingly similar. Here, not only did Lei/Alcon negotiate and arrange the loans on behalf of Sabella/Dynamic but it also served as a "necessary advisor" after the loans were closed with regard to the status of the properties securing the loans and the extensions of the loans. Also, Lei/Alcon and Sabella/Dynamic worked together to provide counsel with relevant information concerning the North Plaza Bankruptcy. Thus, it cannot be refuted that Lei/Alcon's communications with the attorneys were solely to further Sabella/Dynamic's interests.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

As such, the attorney-client privilege has not been waived and these communications should receive all the protections afforded by California Evidence Code 952.

What's more, virtually every jurisdiction in the country follows the same rule as California. (*See, e.g.,* **Alabama**--*Crenshaw v. Crenshaw*, 646 So. 2d 661, 662 (1994 citing *Branch v. Greene County Bd. of Educ.*, 533 So. 2d 248, 255 (Ala. Civ. App. 1988) [attorney-client privilege applies to client-attorney communications made in the presence of a third party whose presence is necessary for the successful communication between the attorney and the client]; **Alaska**--*Langdon v. Champion*, 752 P.2d 999 (1988); Alaska R. Evid. 503(a) [privilege applies to third party representatives]; **Arizona**--*State v. Sucharew*, 205 Ariz. 16 (2003) [where the third party's presence does not indicate a lack of intent to keep the communication confidential, privilege will apply]; **Arkansas**--Ark. R. Evid. 502(b) [A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication]; **Connecticut**--*Barnes/Science Associates Limited Partnership, et al v. Barnes Engineering Company, et al.*, 1990 Conn. Super. LEXIS 464 (1990) [Communications made in the presence of a third person are usually not considered confidential unless (1) the person's presence is necessary or convenient for the consultation, and (2) there is a reasonable expectation of confidentiality]; **Delaware**--*Ryan v. Gifford*, 2007 Del. Ch. LEXIS 168 (2007) [Communications made in the presence of third persons for the purpose of seeking legal advice are protected under privilege]; **Florida**--*Mobley v. State*, 409 So. 2d 1031 (1982); Fla. Stat. Ann. § 90.502(1) (c) (1979) [privilege applies to third parties who are furthering the rendition of legal services]; **Hawaii**--*State v. Soto*, 84 Haw. 229 (1997); Haw. R. Evid. 503(a) [A "representative of the client" is one having authority to obtain professional legal services, or to act on advice rendered pursuant thereto, on behalf of the client. A communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure would be in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication]; **Idaho**--*Truckstop.Net, L.L.C. v. Sprint Communs. Co., L.P.*, 2007 U.S. Dist. LEXIS 63907; Rule 502 of the Idaho Rules of Evidence [A

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication]; **Illinois**--*In re Marriage of Johnson*, 237 Ill. App. 3d 381 (1992) [Communications made to agent of client or attorney privileged]; **Indiana**--*Corll v. Edward D. Jones & Co.*, 646 N.E.2d 721 (1995) [Communications made within the presence or hearing of an interested third person are privileged]; **Kentucky**--*Haney v. Yates*, 40 S.W.3d 352 (2000); Ky. R. Evid. 503(a)(5) [a communication is confidential if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication]; **Maine**--*Lessard v. Metropolitan Life Ins. Co.*, 1986 Me. Super. LEXIS 135 (1986); M.R. Ev. 502(a)(3) [to be within the scope of the privilege, the communication must be confidential, that is "not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication"]; **Minnesota**--*United States v. Spector*, 793 F.2d 932 (1986) [the attorney-client-privilege protects "communications not intended to be disclosed to third persons other than in the course of rendering legal service to the client"]; **Missouri**--*McCaffrey v. Estate of Brennan*, 533 S.W.2d 264 (Mo. App. 1976); *Kratzer v. Kratzer*, 595 S.W.2d 453 (Mo. App. 1980) [the attorney-client privilege as recognized in Missouri applies to information transmitted by a voluntary act of disclosure between the client and his lawyer in confidence and through a means which as far as the client is aware, discloses the information to no third persons other than those reasonably necessary for the transmission of the information or the accomplishment of the purpose for which it was transmitted. The third person-reasonably necessary exception to waiver has been standardly recognized in Missouri]; **Nebraska**--*Wardleigh v. Second Judicial Dist. Court*, 111 Nev. 345 (1995); NRS 49.055 [communication is confidential if it is not intended to be disclosed to third persons other than those to whom disclosure is in the furtherance of the rendition of professional legal services to the client]; **New Hampshire**--*State v. Stickney*, 148 N.H. 232 (2002); N.H. R. Evid. 502(a)(5) [communication is confidential if not

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication]; **New Mexico**--*Santa Fe Pac. Gold Corp. v. United Nuclear Corp.*, 2007 NMCA 1, *See* Rule 11-503(A)(4) ["a communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client"]; **New York**--*In re Asia Global Crossing, Ltd.*, 322 B.R. 247 (2005) [communication is confidential when the circumstances indicate that it was not intended to be disclosed to third persons other than (1) those to whom disclosure is in furtherance of the rendition of legal services to the client, or (2) those reasonably necessary for the transmission of the communication. Confidentiality has both a subjective and objective component; the communication must be given in confidence, and the client must reasonably understand it to be so given]; **North Carolina**--*State v. Van Landingham*, 283 N.C. 589 (1973) [communications between attorney and client made in presence of agent of either party are privileged]; **North Dakota**--*State v. Copeland*, 448 N.W.2d 611 (1989); Rule 502, N.D.R.Ev. [communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication]; **Oklahoma**--*Chandler v. Denton*, 1987 OK 38 (1987) [privilege applies to third parties who are essential to the transmission of information or whose presence is reasonably necessary for the protection of the client's interests]; **Oregon**--Or. Rev. Stat. § 40.225 (1), (2), (b) ["Confidential communication" means a communication not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication]; **Rhode Island**--*State v. Driscoll*, 116 R.I. 749 (1976) [privilege applies to third party agent of client or attorney]; **South Carolina**--*TJN, Inc. v. Superior Container Corp.* (In re TJN, Inc.), 1997 Bankr. LEXIS 2423 (1997) [confidential communications are those "not intended to be disclosed to third persons other than in the course of rendering legal services to the client or transmitting the communications by reasonably necessary means"]; **South Dakota**--*State v. Rickabaugh*, 361

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

N.W.2d 623 (1985); S.D. Codified Laws § 19-13-2(5) [states that a communication is "confidential" if it is not intended to be disclosed to third persons other than those whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication]; **Texas**, Tex. Evid. R. 503 [communication is "confidential" if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication]; **Utah**--*Hofmann v. Conder*, 712 P.2d 216 (1985) [the proper standard of whether the attorney-client privilege applies is whether the third person's presence is reasonably necessary under the circumstances]; **Wisconsin**--*State ex rel. Richards v. Records Custodian*, 180 Wis. 2d 468 (1993) [the disclosure to a third person may strip a communication of its confidential character, but not when the third person is an agent of the client or the attorney]).

## IV.

## CONCLUSION

For the reasons set forth hereinabove, Sabella/Dynamic request the Court to determine that Lei/Alcon is and was at all applicable times a client representative of Sabella/Dynamic such that Lei's/Alcon's communications with Sabella/Dynamic's counsel and the relaying of the content of those communications from counsel to Sabella/Dynamic, as well as information provided to Lei/Alcon by Sabella/Dynamic to be relayed to their counsel in confidence are protected by the attorney-client privilege and need not be disclosed to counsel for the Trustee.

DATED: March 7, 2008

Respectfully submitted,

FRANDZEL ROBINS BLOOM & CSATO, L.C.
MICHAEL GERARD FLETCHER
TRICIA L. LEGITTINO

By: /s/Michael Gerard Fletcher
MICHAEL GERARD FLETCHER
Attorneys for Secured Creditors Dynamic Finance Corporation and Angela C. Sabella

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**PROOF OF SERVICE**

I, the undersigned, declare and certify as follows:

I am over the age of eighteen years, not a party to the within action and employed in the County of Los Angeles, State of California. I am employed in the office of FRANDZEL ROBINS BLOOM & CSATO, L.C., members of the Bar of the above-entitled Court, and I made the service referred to below at their direction. My business address is 6500 Wilshire Boulevard, Seventeenth Floor, Los Angeles, California 90048-4920.

On March 7, 2008, I served true copy(ies) of the **HEARING BRIEF OF PRIVILEGE HOLDERS DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA**, the original(s) of which is(are) affixed hereto, to the party(ies) listed on the attached service list.

☒ **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business. Such document(s) were placed in envelopes addressed to the person(s) served hereunder for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices.

☐ **BY FACSIMILE:** At approximately _____, I caused said document(s) to be transmitted by facsimile. The telephone number of the sending facsimile machine was (323) 651-2577. The name(s) and facsimile machine telephone number(s) of the person(s) served are set forth in the service list. The document was transmitted by facsimile transmission, and the sending facsimile machine properly issued a transmission report confirming that the transmission was complete and without error.

☐ **BY E-MAIL:** At approximately_____, I caused said document(s) to be transmitted by electronic mail. The name(s) and e-mail addresses of the person(s) served are set forth in the service list. The document was transmitted by electronic transmission and without error.

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I caused said document(s) to be served by means of this Court's electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, to the parties and/or counsel who are registered CM/ECF Users set forth in the service list obtained from this Court.

☐ **BY OVERNIGHT DELIVERY:** I deposited such document(s) in a box or other facility regularly maintained by the overnight service carrier, or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier with delivery fees paid or provided for, addressed to the person(s) served hereunder.

I certify under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on March 7, 2008, at Los Angeles, California.

/s/Tiffany Lok
TIFFANY LOK

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**SERVICE LIST**

**VIA U.S. MAIL**
Linda F. Cantor
Pachulski Stang Ziehl Young et.al.
10100 Santa Monica Blvd., Ste. 1100
Los Angeles, CA 90067

Tiffany L. Carroll
Office of the United States Trustee
402 West Broadway, Suite 600
San Diego, CA 92101
tiffany.l.carroll@usdoj.gov

Stacy Elledge Chiang
CPA, CIRA, Director LECG, LLC
655 W. Broadway, Ste. 1300
San Diego, CA 92101

Milford W. Dahl
Rutan & Tucker, LLP
611 Anton Blvd, 14th Floor
Costa Mesa, CA 92626-1931

Linda D. Fox
Shepard, Mullin , Richter & Hampton
501 West Broadway, Suite 1900
San Diego, CA 92101-3598

Sonali S. Jandial
Richards, Watson & Gershon
355 South Grand Ave 40th Floor
Los Angeles, CA 90071-3101

Neil B. Katz
Collins, Robillard & Katz
2377 Crenshaw Blvd., Suite 310
Torrance, CA 90501-3325

Martha A. Mansell
Law Offices of Martha A. Mansell
1522 So. Saltair Ave. Ste 302
Los Angeles, CA 90025

Steven R. Orr
355 S. Grand Ave, 40th Flr
Los Angeles, CA 90071-3101
Richard M. Pachulski
Pachulski, Stang,Ziehl,Young, et al
10100 Santa Monica Blvd. 11th Floor
Los Angeles, CA 90067-4100

Frederick C. Phillips
Phillips, Haskett & Ingwalson, A.P.C.
701 "B" Street, Suite 1190
San Diego, CA 92101-3540

Edmund L. Regalia
Miller Starr & Regalia
1331 N. California Blvd. Fifth Floor
PO Box 8177
Walnut Creek, CA 94596

Martha E. Romero
Romero Law Firm
6516 Bright Avenue
Whittier, CA 90601

Raymond D. Scott
Wheatley, Scott & Company
1835 W. Orangewood Avenue
Suite 255
Orange, CA 92868

K. Todd Curry, Esq.
Curry & Associates
525 B Street, Suite 1500
San Diego, CA 92101

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re

NORTH PLAZA, LLC,

Debtor.

---

DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,

APPELLANTS,

v.

CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,

APPELLEE

District Case No. 08-CV-01194-W-CAB

Bankruptcy Court No. 04-00769-PB11

Appeal No. 2

**EXHIBIT 12 TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**

DATE: To Be Set
TIME: To Be Set
COURTROOM: Seven

The Honorable Thomas J. Whelan, Judge Presiding

**EXHIBIT 12**

EXHIBIT 12

PAGE 159

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Secured Creditors Angela C. Sabella and Dynamic Finance Corporation

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>NORTH PLAZA LLC,<br><br>Debtor. | CASE NO. 04-00769-PB11<br><br>Assigned to the Honorable Peter W. Bowie<br><br>Chapter 11<br><br>**CLOSING BRIEF OF PRIVILEGE HOLDERS DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA**<br><br>Hearing Date: March 19-21, 2008 |

EXHIBIT 12
PAGE 160

## TABLE OF CONTENTS

PAGE

I. INTRODUCTION......................................................................1

II. APPLICATION OF THE EVIDENCE IN THIS CASE TO THE GOVERNING LAW ESTABLISHES THAT ALCON/LEI WERE THE "CLIENT REPRESENTATIVE" OF DYNAMIC/SABELLA ..........................3

A. The Communications Between The Attorneys and Dynamic/Sabella are Privileged Even if Lei Was Present for Them.

B. Lei May Serve as Sabella's Personal Client-Representative........................6

C. Lei May Serve as the Client Representative of Both Dynamic and Sabella.....10

D. The Evidence Shows That Alcon/Lei were Dynamic/Sabella's "Client Representative" Pursuant to the Bieter and Memry factors.........................12

E. The Trustee's Failure to Procure Testimony From Bill Johnson Refuting Lei's, Sabella's and Gruber's Testimony Creates an Inference that Johnson and the Trustee are Incapable of Doing So..............................................36

F. Alcon/Lei's Status as a Licensed California Real Estate Broker Has No Effect on the Confidentiality of his Communications with Dynamic/Sabella's Counsel......................................................................37

III. CONCLUSION......................................................................41

# TABLE OF AUTHORITIES

## FEDERAL CASES

Amco Insurance Company v. Madera Quality Nut LLC, 2006 U.S. Dist. LEXIS 21205 ........ 9

In re Bieter Co., 16 F.3d 929 (8th Cir. 1994) ........ 13, 14, 15, 17, 20

In re CV Therapeutics, Inc. Securities Litigation, 2006 U.S. Dist. LEXIS 41568 (N. D. Cal. June 16, 2006) ........ 13, 16

Carolina Power v. Levarex, 451 F. Supp. 1044 (U.S.D.C. N.D. CA 1977) ........ 36

Carrauza-Chaidez v. US, 414 F.2d 503 ........ 36

Clifton v. United States, 45 U.S. 242 (1846) ........ 36

In re: Grand Jury Subpoenas, 995 F. Supp. 332 (E.D.N.Y.1998) ........ 6, 7

In re Lara, 731 F.2d 1455 (9th Cir. 1984) ........ 19

Leone v. Fisher, 2006 U.S. Dist. LEXIS at 15 ........ 6, 7

Memry Corp. v. Ky. Oil Tech., Nv., 2007 U.S. Dist. LEXIS 3094 (N.D. Cal. 2007) ........ 12, 13, 14, 15, 16, 20, 23, 25, 42

Regents of the University of Cal. v. Micro Therapeutics Inc., 2007 U.S. Dist. LEXIS 43879 (N.D. Cal. June 6, 2007) ........ 13, 14

Segerstrom v. United States, 2001 U.S. Dist. LEXIS 2949 (N.D. Cal. Feb. 7, 2001) ........ 5

United States v. Tei Fu Chen et al., 99 F.3d 1495 (9th Cir. 2006) ........ 4, 16

United State v. Kovel, 296 F.2d 918 (2nd Cir, 1961) ........ 13, 14

United States v. Spector, 793 F.2d 932,938 (8th Cir. 1986) ........ 3

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

United States v. (Under Seal), 748 F.2d 871,874 n.5 (4th Cir. 1984) ... 3

**STATE CASES**

City and County of San Francisco v. The Superior Court of the City and County of San Francisco, 37 Cal. 2d 227 (1951) ... 6, 8

Montoya v. McLeod, 176 Cal. App. 3d 57 (1985) ... 37, 38

Oxy Resources California LLC v. The Superior Court of Solano County, 115 Cal. App. 4th 874 (2004) ... 9

**SECONDARY SOURCES**

Weinstein, *Evidence* ¶ 503[02] at 503-17 (1975) ... 3

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**TO THE HONORABLE PETER W. BOWIE, CHIEF UNITED STATES BANKRUPTCY JUDGE:**

Dynamic Finance Corporation and Angela C. Sabella ("Dynamic," "Sabella," and collectively "Dynamic/Sabella" or the "Privilege Holders"), on behalf of themselves, herein submit their Closing Brief pursuant to the Court's March 21, 2008 Order.

**I.**

**INTRODUCTION**

On March 19, 20, and 21, 2008 this Court conducted an evidentiary hearing on a narrow and discreet issue, whether the communications between legal counsel retained by Dynamic and Sabella and their broker Isaac Lei ("Lei") and/or his company The Alcon Group ("Alcon") (collectively "Alcon/Lei") are entitled to the protections afforded by the attorney-client privilege to the same extent as if Dynamic/Sabella communicated directly with counsel.[1] This analysis also takes into consideration whether the attorney-client privilege protection extends to the flow of communications between Alcon/Lei and Dynamic/Sabella regarding legal advice sought from or given by legal counsel.[2] Thus, as the Court stated during the first day of testimony, the purpose of the hearing was to "get a clearer picture of Mr. Lei's role in relationship to Ms. Sabella and transactions.... "Day 1 P. 162: 17-20.[3]

---

[1] The communications also include those where Lei and Alcon were included in otherwise privileged communications with counsel.

[2] As used in this Brief "communication" or "communications" means any oral conversation or written document. The flow of communications the Privilege Holders are seeking to protect are between Alcon/Lei and legal counsel as well as any communication between Alcon/Lei and Dynamic/Sabella in which requests for legal advice were made or discussions of legal opinions from the attorneys were discussed. So for example, if Sabella instructed Lei to speak with the attorneys regarding a legal questions she or Dynamic had on a particular transaction, Lei then asks counsel this legal question and reports the answer back to Sabella, each leg of the process should be covered by the attorney-client privilege as well as any documents which memorialize these conversations or their subject matter.

[3] The transcripts from the three days of hearing are not consecutively paginated nor are they consistently labeled with volume numbers. Therefore, for purposes of testimony citations throughout this Brief, "Day 1" means the transcript for the March 19, 2008, hearing, "Day 2" means transcript from the March 20, 2008, hearing and "Day 3" means the transcript from the March 21, 2008, hearing.

As can be seen from the discussion below, the evidence at the hearing clearly shows that Alcon/Lei's role with regard to the loan transactions he brokered on behalf Dynamic/Sabella was that of a "client representative." Lei was the proverbial hub of the wheel, all spokes radiating out from and back to him representing a separate line of communication he had with someone integral to the loan transactions being discussed or closed:

Bill Johnson, the borrower's own broker and principal representative;

North Plaza's manager Chambers;

Guarantors;

Sabella, individually and as Dynamic's president;

Vallas, the broker for North Plaza's then lien holders;

Various sellers of Vail Lake properties;

Title officers;

Escrow officers;

Appraisers;

And, yes, legal counsel for Sabella and Dynamic.

Thus, any communications regarding legal advice which took place between Alcon/Lei and the attorneys as well as Alcon/Lei and Dynamic/Sabella regarding the legal advice sought or received from counsel should be protected from disclosure by the attorney-client privilege. Not only does the evidence show that Alcon/Lei meet each factor to be a "client representative" but the Trustee has presented no evidence that would contradict even a single one of these factors.

///

///

///

///

///

///

///

///

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 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
(323) 852-1000

## II.

## APPLICATION OF THE EVIDENCE IN THIS CASE TO THE

## GOVERNING LAW ESTABLISHES THAT ALCON/LEI

## WERE THE "CLIENT REPRESENTATIVE" OF DYNAMIC/SABELLA

**A.**  **The Communications Between The Attorneys and Dynamic/Sabella are**

**Privileged Even if Lei Was Present for Them.**

There is no statutory definition of the attorney-client privilege in the Federal Rules of Evidence or other federal statute. However, proposed Federal Rule of Evidence 503, also referred to as Supreme Court Standard 503 provides the guidance which has been utilized by various courts in defining the privilege. "Although not enacted by Congress, 'courts have relied upon it as an accurate definition of the federal common law of attorney-client privilege .... consequently, despite the failure of Congress to enact a detailed article on privileges, Standard 503 should be referred to by the Courts.'" 2 J. Weinstein, *Evidence* ¶ 503[02] at 503-17 (1975). *United States v. Spector*, 793 F.2d 932,938 (8th Cir. 1986), *United States v. (Under Seal)*, 748 F.2d 871,874 n.5 (4th Cir. 1984). As pertinent here, Supreme Court Standard 503 provides:

> The privilege extends to communications (1) between client or his representative and lawyer or his representative, (2) between lawyer and lawyer's representative, (3) by client or his lawyer to a lawyer representing another in a matter of common interest, (4) between representatives of the client or the client and a representative of the client, and (5) between lawyers representing the client. (Emphasis added.)

Supreme Court standard 503 does not define "representative," but Uniform Evidence Rule 502(a) (4) is, "a clear statement of the scope of privilege as now generally accepted." Broun, *McCormick on Evidence*, (6th Ed. 2006). Uniform Rule of Evidence 502 protects the communications between an attorney and a client and a client's representative. A client's representative is defined in Uniform Rule of Evidence 502(a) (4) as follows:

> Representative of the client' means a person having authority to obtain professional legal services, or to act on legal advice rendered, on behalf of the client or a person who, for the purpose of effectuating legal representation for the client, makes or receives a confidential communication while acting in the scope of employment for the client. (Emphasis added.)

CLOSING BRIEF OF PRIVILEGE HOLDERS DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA

**EXHIBIT /2**

**PAGE 166**

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 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
(323) 852-1000

1    In determining what types of attorney-client engagements will be afforded the protection

2  of the attorney-client privilege, the Ninth Circuit in applying the above rules has consistently held

3  that simply because a client speaks with a lawyer does not automatically render that

4  communication privileged. Rather, the privilege applies only when legal advice is sought "from a

5  professional in his capacity as such." *United States v. Tei Fu Chen et al.*, 99 F. 3d 1495, 1501 (9th

6  Cir. 2006) (finding that communications between clients and their counsel whom they hired to

7  avoid litigation and bring them into compliance with Customs regulations were within the scope

8  of the attorney-client privilege). Accordingly, if a person hires a lawyer for advice, there is a

9  rebuttable presumption that the lawyer is hired to give legal advice whether the subject of the

10  advice is criminal or civil, business, tort, domestic relations, or anything else. *Id*. Therefore,

11  whether a particular communication with an attorney is privileged will hinge on whether the

12  lawyer was engaged with or without "reference to his knowledge and discretion in the law." *Id*.

13  Finally, where the <u>general purpose</u> for which a lawyer was hired was to obtain legal advice, a

14  particular incidental transaction would receive protection, even though it is commercial rather

15  than legal in nature. *Id.* at 1502. (Emphasis added).

16    In this case, it is undisputed that Dynamic/Sabella retained The Attorneys[4] to

17  render legal advice on the loan transactions between Dynamic/Sabella and the Johnson

18  related entities (including North Plaza). The following testimony from the hearing is

19  uncontroverted:

20    • Sabella considered Pachulski to be her attorney. Angela Sabella
        Testimony ("Sabella Test.") Day 3 P. 10: 1-5 ;
21
22    • Sabella retains attorneys "to do everything lawfully and make the
        contracts enforceable." Sabella Test. Day 3 P. 11:2-5;
23    • Sabella needs to consult attorneys on the lending transactions that
24      either she or Dynamic makes because they engage in "unconventional
        lending" such as bridge loans or because the borrower is not

25

26  [4] "The Attorneys" refers to the legal counsel employed by Dynamic/Sabella at the law firm of Pachulski,
    Stang, Ziehl & Young ("Pachulksi Firm") including Richard Pachulski, Richard Gruber ("Gruber"), Stanley
27  Goldich and Steven Kahn and the legal counsel employed by Dynamic/Sabella at the law firm of Gibson,
    Dunn & Crutcher, LLP ("Gibson Dunn") including Nick Thomas and Kristine Robertson.

28

**EXHIBIT 12**

**PAGE 167**

"bankable" meaning that the collateral is raw land (unentitled) or the history of the borrower is not credible. Sabella Test. Day 3 P. 19:1-21;

- Lei consulted with Gruber on North Plaza to get legal advice with respect to the transaction and documents. Isaac Lei Testimony ("Lei Test.") Day 2 P. 94-95;
- Lei would use Gruber's "legal advice to get the deal done". Lei Test. Day 2 P. 222: 15-19;
- Sabella hired Gibson and Dunn for legal services. Lei Test. Day 3 P. 181: 3-11 and 21-23; and
- Gruber worked on loan transactions for either Sabella or Dynamic and Bill Johnson entities in or around December 1997. Richard Gruber Testimony ("Gruber Test.") Day 3 P. 240: 18-22.

There is no dispute that Dynamic/Sabella engaged The Attorneys for the general purpose of seeking legal advice. Thus, any and all communications between Dynamic/Sabella and The Attorneys are privileged.

Further, any communications between Dynamic/Sabella and The Attorney in which Isaac Lei took part are still covered by the privilege. *See*, *Segerstrom v. United States*, 2001 U.S. Dist. LEXIS 2949, *8 (N.D. Cal. Feb. 7, 2001) (finding that the attorney-client privilege was not waived when the client and the attorney had a meeting in the presence of the client's agent since the client's agent was there to assist the client in obtaining legal advice). Specifically, Angela Sabella testified that she intended all communications with The Attorneys, even if Isaac Lei was present, to be confidential. *See*, Sabella Test. Day 3 P. 56: 19-25 (Isaac Lei was not permitted to disclose to anyone other than her his discussion with The Attorneys). The following testimony of Angela Sabella solidly establishes that Isaac Lei's role as a participant in any meeting with her and The Attorneys was solely to assist her (or Dynamic) in obtaining and implementing legal advice:

- When Sabella feels there is a need to consult The Attorneys she does so herself or thorough people who can help her. Sabella Test. Day 3 P. 11:11-16;
- As part of his brokerage duties on her behalf or on behalf of Dynamic, Sabella expected Lei to be involved in the process of obtaining legal advice. Sabella Test. Day 3 P. 11:21-25 ;

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- Sabella told Lei that in working with The Attorneys she expected him to see the loan documents perfected and report to her if there were major problems. Sabella Test. Day 3 P. 11:19-21; and

- In subsequent deals with the Johnson related entities in which Lei acted as the Broker for either Dynamic or Sabella, Sabella's instructions to him were the same and she expected him to interact with her lawyers on her behalf. Sabella Test. Day 3 P. 12:17-23.

The unrefuted testimony in this case is that Lei's participation in communications with The Attorneys and Dynamic/Sabella was solely to assist them in obtaining and implementing legal advice. Therefore, any meeting Lei took part in with Dynamic/Sabella and The Attorneys or any correspondence from The Attorneys to Dynamic/Sabella in which he is copied is privileged.

**B. Lei May Serve as Sabella's Personal Client-Representative.**

Further, the Trustee's argument that Lei cannot be Sabella's personal client-representative because the doctrine only applies to corporations is simply wrong. While the Trustee represents that this is black letter law, he fails to provide the purported black letter law upon which he relies. Instead, in support of his argument, the Trustee cites to *Leone v. Fisher*, No. 3:05-CV-521, 2006 U.S. Dist LEXIS 75571 (D.Ct. Oct. 18, 2006) and *In re Grand Jury Subpoenas*, 995 F. Supp 332, 340 (E.D.N.Y.1998), each of which are either factually distinguishable or are not based on law which is controlling in this case.

In *Leone*, the court readily admits that the "authority cited herein is not federal and, thus not binding." *Leone* at * 15. The Court then goes on to rely on Connecticut state law to render its decision. Since *Leone* neither applies federal nor California law, it is simply not applicable to this case. It should also be noted that Connecticut law adds a component to the client- representative inquiry that California does not. Connecticut mandates that a client-representative's presence be necessary in order for communications to be privileged (*i.e.* because of some incapacity the client is physically unable to communicate with the attorney) *Id.* California has no such requirement. As is set forth below, in California a client may elect to communicate to her attorney through an agent whether or not she is capable of communicating to the attorney herself. *See*, *City and County of San Francisco v. The Superior Court of the City and County of San Francisco,* 37 Cal.2d 227, 236 (1951).

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Similarly, *In re Grand Jury Subpoena* applies New York law and is equally inapplicable to this case. Moreover, the facts of that case have no application here. The Court addressed claims of union members that statements by them to their union representatives (not to their lawyers) should be privileged. The court declined to find such statements were privileged because to do so, it would have to create a new privilege (union member-union representative) which the Court did not find was warranted. *In re Grand Jury Subpoenas,* 995 F.Supp. at 334. Not so here. Sabella is not asking this Court to create a new privilege. She is simply requesting this Court apply the existing attorney-client privilege as is warranted by the facts of this case.

It is appropriate for this Court to consider the law of the jurisdiction in which it sits in considering whether Lei can serve as Dynamic's and Sabella's client-representative. Here, the Court should apply California law in this analysis for two reasons. First, since there is no direct federal case law on point, the Court should look to California law which clearly establishes that an individual may have a client representative. *Leone v. Fisher,* 2006 U.S. Dist LEXIS at *15. Second, the Federal Courts in the cases cited by the Trustee in support of this argument, *Leone* and *In Re Grand Jury*, both applied the law of the state in which they were located.

Under California law it is not even a close call. Lei can absolutely serve as Sabella's client-representative. In California, the attorney-client privilege is codified in Evidence Code section 952 which states:

> As used in this article, "confidential communication between client and lawyer" means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons *other than those who are present to further the interest of the client* in the consultation *or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted,* and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship. (Emphasis added.)

Moreover, California Evidence Code section 951 defines "client" as:

> A person who, directly *or through an authorized representative,* consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity, and includes an incompetent (a) who himself so consults the lawyer or (b)

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

> whose guardian or conservator so consults the lawyer in behalf of the incompetent. (Emphasis added).

The simple wording of the California statue alone makes clear that Sabella was well within her rights to employ Isaac Lei as her client representative while retaining the attorney-client privilege. The foregoing sections only qualify one's right to communicate to an attorney through an agent by indicating that such communications should assist the lawyer in providing services to his client. Here, there is no question that the communications to Sabella's attorneys through Isaac Lei were designed to assist The Attorneys in connection with the loans Sabella made to Johnson and his related entities.

Moreover, the California case law clearly holds that a client may speak to an attorney by way of a representative, and such communications will be privileged. For example, in *City and County of San Francisco v. The Superior Court of the City and County of San Francisco*, 37 Cal.2d 227 (1951), a personal injury claimant relayed information to a doctor, who subsequently conveyed the information to the claimant's attorney. Doctor–patient privilege was inapplicable, but the court held the communications to be covered by attorney-client privilege. The Court reasoned that the doctor was an "intermediate agent" for communication between the claimant and his attorney. The Court stated,

> It is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and it is immaterial whether the agent is the agent of the attorney, the client, or both. The client's freedom of communication requires a liberty of employing other means than his own personal action. The privilege of confidence would be a vain one unless its exercise could be thus delegated. A communication, then, by <u>any form of agency</u> employed or set in motion by the client is within the privilege.
>
> This of course includes communications through an <u>interpreter</u>, and also communications <u>through a messenger</u> or any other <u>agent of transmission</u>, as well as communications <u>originating with the client's agent</u> and made to the attorney. It follows, too, that the communications of the <u>attorney's agent</u> to the attorney are within the privilege, because the attorney's agent is also the client's sub-agent and is acting as such for the client.

*Id.* at 15 [Emphasis in original].

Similarly, in *Amco Insurance Company v. Madera Quality Nut LLC*, 2006 U.S. Dist. LEXIS 21205, the Court, interpreting California Evidence Code section 952, held that attorney-client privilege applies to communications made to business associates or agents of a party when disclosure is reasonably necessary to facilitate the client's legal interests. The Court went on to state that, " [a] client is a person who, directly or through an authorized representative, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity " *Id.* at 14 (Emphasis added). *See also*, *Oxy Resources California LLC v. The Superior Court of Solano County*, 115 Cal. App. 4th 874 (2004) (privilege extends to business associates and agents of the client). Since the evidence in this case has clearly shown that Lei's purpose in communicating with The Attorneys was to assist Sabella, under California law he is deemed to be her client-representative and any communications between Lei and The Attorneys and then Lei and Sabella regarding the legal advice is privileged.

Finally, the bifurcated rule espoused (without any support) by the Trustee is, and would be, impractical and unworkable in the real world in general, and in the context of this case and these real-life loans. Take for example the second loan transaction reviewed at the hearing in detail: the loan to enable a Johnson entity to buy Parcel C and certain lake rights at Vail Lake.

- The initial loan proposed by Johnson and discussed in the meeting at Dynamic's offices on March 21, 1998, was <u>for Dynamic to make the $3.25 million loan.</u> *See,* Exhibit 14, P. 2 thereof;

- That remained the case for the next two months. Lei faxed to Gruber a summary of the loan terms for the now $2 million loan to be made by "Dynamic Finance" on May 23, 1998. Exhibit 28;

- However, by May 31, 1998, Sabella had replaced Dynamic as the lender, and it was she, not Dynamic, that made the ultimate $1.45 million loan. *See*, Exhibit 32 (Lei letter to Johnson, regarding "Ms. Sabella's proposed loan ....");

- And, Gruber's June 9, 1998, letter to the title officer states, "...we anticipate being in a position to provide you with Ms. Sabella's closing instructions by mid-morning tomorrow." Exhibit 27;

- Finally, Gruber sent to the title officer and escrow officer his cover letter and attached lender's closing instructions, dated June 10, 1998, defining "Lender" to be Angela C. Sabella. Exhibit 36, P. 2.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Under the wholly unrealistic rule advanced by the Trustee -- that only a corporation can have a client representative -- the conversations would start out being privileged, and remain so for the better part of two months, only then to become unprivileged in the last several weeks because the structure of the deal changed at the last minute. What an unworkable and unwarranted exaltation of form over substance. How far could this possibly be from the underpinning rationale of the rule that lawyers at times need to work with representatives of their clients? Would Gruber's needs have been any less at the end, just because he started out working on a deal that would have had Dynamic be the lender, only to have the structure change so that Sabella made the loan? Hardly. The Court should reject the Trustee's position as legally, factually, and practically unsupported.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**C. <u>Lei May Serve as the Client Representative of Both Dynamic and Sabella.</u>**

Based on the above, the only real issue in this case then is whether Alcon/Lei's communications with counsel in which Sabella was not present (or was not included such as not being copied on a correspondence) and Lei's communications with Sabella regarding the legal advice are privileged.

Despite the Trustee's repeated attempts to establish that Lei "worked for" Dynamic, the following undisputed testimony firmly established that Alcon/Lei were never employed by either Dynamic or Sabella and at all times functioned as independent brokers:

- Lei never had a role or title at Dynamic. Lei Test. Day 1 P. 211:1-3;
- Lei was never an employee of Dynamic. Lei Test. Day 1 P. 211:4-6;
- Lei was never paid a salary by Dynamic. Lei Test. Day 1 P. 211:7-9;
- Lei never received a W-2 withholding statement from Dynamic. Lei Test. Day 1 P. 211:10-12;
- Lei was never an officer or director of Dynamic. Lei Test. Day 1 P. 211:13-17;
- Lei was never an employee of Sabella. Lei Test. Day 1 P. 211:18-19;
- Sabella never paid Lei a salary or issued him a W-2. Lei Test. Day 1 P. 211:20-24;

- Neither Dynamic nor Sabella paid Lei any form of compensation. Any commission Lei earned brokering the loans was paid by the borrower. Sabella Test. Day 3 P. 49: 19-25 and P. 50: 1-4;

- Neither Dynamic nor Sabella determined the amount of commission Lei would earn for brokering a loan. Lei negotiated that directly with the borrower. Sabella Test. Day 3. P. 44: 8-14; and

- As for the work he does at the Dynamic office, Sabella testified that Lei "comes and goes any time he wants to. And sometimes he comes in the weekend or late at night, after his other jobs or—I have no control over his time." Sabella Test. Day 3. P. 51: 4-6.

The following uncontroverted evidence proves that at all times Alcon/Lei were acting as an independent licensed California Real Estate Brokers who were arranging and negotiating the terms of the loans between Dynamic and or Sabella and Johnson and/or his related entities:

- The scope of Isaac Lei's duties on the $500,000 Vail Lake loan was to, "get all the information from the borrower and do the due diligence and discuss the whole process with the lender and do anything they required of me. Lei Test. Day 1 P. 46: 17-23;

- From the first transaction, Lei understood that Sabella was going to be the lender and they were going to rely on him to do the due diligence on the loans. Lei Test. Day 1 P. 46: 24-25 and P. 47:1-2;

- Lei defines due diligence as "gathering all the information with respect to a proposed loan and make assessment of it-to see if it is a good possibility of going forward with it and discussing it with the lender." Lei Test. Day 1 P. 152: 9-17;

- Because Sabella was so busy, Lei had to do everything on the loan and Lei would only inform her if something was critical. Lei Test. Day 1 P. 148:23-25 and P. 149: 1-8;

- Lei described the following as acts he understood Dynamic and Sabella expected him to do as part of his due diligence, without any assistance from Dynamic or Sabella, for the loans he brokered between Dynamic and/or Sabella and Johnson and/or Johnson's related entities:
    - Determining the type of development for the property ;
    - Pricing with regard to a purchase;

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- Ascertain the stage of development of a property;
- Determining existing liens on potential refinance loans;
- Determining the level of entitlements on a particular piece of property;
- Determine potential market support for a project;
- Obtaining and reviewing preliminary title reports;
- Keeping apprized of the status of other projects or similar projects;
- Gathering whatever information is necessary and making whatever assessments that may be needed to be made to determine the potential value and loan to value ratios;
- Obtaining and interacting with appraisers;
- Determining the viability of a project;
- Reviewing all information he has gathered and making an assessment as to whether the loan should be made;

Lei Test. Day 1 PP. 155-159; and

- Lei rendered the same services to Dynamic and or Sabella in every loan he brokered between them and Johnson and/or the Johnson related entities. Lei Test. Day 2 P. 173:19-25.

However, simply because Alcon/Lei were independent brokers and not employees of Dynamic/Sabella does not automatically render their communications with The Attorneys non-privileged. As can be seen from the discussion below these communications are absolutely privileged as well because at all times Alcon/ Lei were acting as Dynamic/Sabella's "client representative."

**D. <u>The Evidence Shows That Alcon/Lei were Dynamic/Sabella's "Client Representative" Pursuant to the *Bieter* and *Memry* factors.</u>**

The parties agree that as to law within the Ninth Circuit, the case of *Memry Corp. v. Ky. Oil Tech.*, Nv., 2007 U.S. Dist. LEXIS 3094 (N.D. Cal. 2007), adopting the Eighth Circuit

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

decision of *In re Bieter Co.*, 16 F.3d 929, 937 (8th Cir. 1994), best elucidates the inclusion of "client representatives" within the attorney-client privilege.[5] Both of these cases hold that generally disclosure to third parties of confidential attorney-client communications waives the attorney-client privilege. However, there is an exception for independent contractors who are the functional equivalent of employees. *See*, *Memry* at *7.

While the Trustee attempts to characterize inclusion of such representatives as being a "narrow extension," the court in *In re CV Therapeutics, Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 41568 (N. D. Cal. June 16, 2006) states, "The courts have taken an expansive view of protected communications between independent contractors and counsel where the outside consultant functions like an employee in providing information which facilitates the obtaining of legal advice." *CV Therapeutics* at *18 *citing In re Bieter Co.,* 16 F.3d 929, 936 (8th Cir. 1994). (Emphasis added.)

In an attempt to create a round peg not fitting into a square hole scenario, the Trustee argues that pursuant to the holdings in *United State v. Kovel*, 296 F2d 918 (2nd Cir, 1961) and *Regents of the Univ. of Cal. v. Micro Therapeutics Inc.*, 2007 U.S. Dist LEXIS 43879 (N.D. Cal. June 6, 2007) a client-representative's role is limited to that of a "translator" *i.e.*, where the individual is required to enable "counsel to understand aspects of the client's own communications that could not otherwise be appreciated in the rendering of legal advice." Therefore, Lei, the Trustee argues, cannot be Dynamic/Sabella's client representative unless he was acting as a "translator". Trustee's Opposition Brief at PP. 5-6. The Trustee is presenting this Court with a severely contorted analysis of these cases which does not represent their true holdings.

In *Kovel*, the Court, applying New York law, found communications between an attorney and an accountant (whether hired by the lawyer or the attorney) to be privileged where such accountant "is necessary or highly useful for, effective consultation between the client and the lawyer." *Kovel* at 922. The Court analogized that the role of the accountant to that of a foreign

---

[5] A detailed legal analysis of both *Bieter* and *Memry* is contained in the Privilege Holder's Hearing Brief. For efficiency purposes these legal analysis will not be repeated in this Brief.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

language translator, which certainly would not destroy the privilege, in that both provide context and assistance to an attorney's understanding. *Id.* In coming to this conclusion, the Court recognized that the complexities of today's world mandate that attorneys receive assistance from others in providing legal advice and therefore an attorney must be permitted to seek such assistance without breaking the attorney-client privilege. *Id.* at 921. The Court did not, however, as the Trustee suggests, limit the role of client representative to that of a translator. In fact, the Court specifically said that "communications by the client's agent to the attorney are privileged." *Id.* at 924.

The holding in *Regents* is entirely based on a fact pattern which is not applicable in this case. The *Regents* Court found communications between an Italian translator and plaintiff's attorney were not privileged because there was no evidence to indicate that the communications were to assist the attorney in advising the plaintiff, rather the translator was hired to make an independent evaluation. *Regents* at *13. The Court specifically stated that had the translator been hired to assist with the plaintiff's case, the facts would have been analogous to *Kovel* and the result different because the translator's "translation would have been in aid of Dawes representation of his client and related communications ... would likely have been privileged." *Id.* Thus, the emphasis in *Regents* is not on the function of the party as a translator, but his role with regard to the attorney and the client.

Rather than attempting to cram non-applicable fact patterns into a pre-set mold, the *Bieter* and *Memry* Courts provide various factors to be considered in determining whether an individual can qualify as a client-representative for purposes of the attorney-client privilege. In order for a non-employee to be deemed a client-representative, the privilege holder must make a "detailed factual showing" demonstrating that the third party truly functioned as a client-representative. *Memry* at *7-8. Further no one factor is more important than another and, in fact, the court is to look at the <u>totality of the relationship</u> between the third party and the client to determine whether the individual is the functional equivalent of an employee for purposes of extending the attorney-client privilege to communications between the third party and the client's counsel. *Id.* at *10.

Here, the Privilege Holders, Dynamic and Sabella have made the detailed factual showing

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

necessary for this Court to find that Alcon and Lei were their client representatives. When the evidence in this case is applied to the *Bieter* and *Memry* "client-representative factors" it is clear that based on the totality of the relationship between Dynamic/Sabella and Alcon/Lei, Alcon/Lei were the functional equivalent of an employee or insider for purposes of applying the attorney-client privilege. The following summarizes the *Bieter* and *Memry* client-representative factors and the evidence from the hearing that supports each of them.

**1. <u>Lei's Communications with The Attorneys were for the Purpose of Seeking Legal Advice *(Bieter)*.</u>**

As noted in *Bieter*, "In applying this requirement in *Diversified*, we noted that when a matter is committed to a professional legal advisor, it is '<u>prima facie</u> committed for the sake of legal advice and [is], therefore within the privilege absent <u>a clear showing to the contrary</u>." (Emphasis added.). *Bieter* at 938

Here, Dynamic and Sabella presented overwhelming evidence proving that Lei's communications with The Attorneys were for the purpose of seeking legal advice, some of which includes the following uncontested testimony:

- As to the $500,000 Vail Lake loan, Gruber was to complete all the loan documentation and make sure that all the liens got recorded. Lei Test. Day 1 P. 71:24-25 and P. 72:1-2;

- Lei gave the proposed commitment letter draft (Exhibits 34 and 34A) to Gruber because Sabella wanted legal counsel to review it. Lei Test. Day 2 p. 10: 2-5;

- One of the reasons Lei consulted with The Attorneys was to "ensure the proper creation of liens as part of the loan transaction." Lei Test. Day 2: P. 74: 1-13;

- Lei met with Nick Thomas to get legal advice regarding the operating agreement on Vail Lake Rancho California. Lei Test. Day 2: P. 77; 6-9 and 20-22;

- Lei met with Gruber to get his "legal input" about the liens on North Plaza. Lei Test. Day 2: P. 88:12-14;

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- Exhibit 52 was sent by Lei to Gruber to get Gruber's "legal opinion" on the Preliminary Title Report on North Plaza. Lei Test. Day 2: P. 88:20-25 and P. 90:2-3;

- Lei forwarded a copy of Exhibit 61 to Gruber so he could "see if there's [sic] any exceptions and any legal matters that have to be addressed." Lei Test. Day 2: P. 110:5-7;

- Lei discussed the terms of the extension to the $500,000 Vail Lake loan with Gruber so that Gruber could draft the extension of the loan. Lei Test. Day 2: P. 124:3-1188:12-14; and

- Gruber testified that he was providing "legal services" to Dynamic and Sabella through his interaction with Lei. Gruber Test. Day 2: P. 242:23-25.

- Lei testified that he continued in his representative role in various litigation matters after loans were made, including this bankruptcy and various cases involving Vail Lake. Lei Test. Day 3, P. 215: 5-11.

The Trustee's arguments that Lei's communications were made to The Attorneys regarding business not legal advice are contrary to both the evidence in this case and the law. The Trustee failed to refute any of the above testimony which clearly establishes that the communications between Lei and The Attorneys were for legal advice. Further, while as the testimony proves the primary purpose of Lei's communications with The Attorneys was to seek legal advice, even if non-legal issues were discussed the Court must determine whether the legal purpose of the communication so permeates any non-legal purpose that the two purposes cannot be discretely separated from the factual nexus as a whole. *CV Therapeutics* at *9. [6]

Since the unrefuted testimony at the hearing established that the primary purpose of Lei's

---

[6] In his pre-hearing brief the Trustee argues that the client representative theory "generally protects communications made to a consultant during the course of active litigation" thus implying that because the communications between Lei and The Attorneys relate to loan transactions they are somehow outside the scope of the attorney-client privilege. This argument is misguided. First, The Ninth Circuit in *United States v. Tei Fu Chen et al.*, 99 F. 3d 1495, 1501 (9th Cir. 2006) cited above holds that the attorney-client privilege applies whenever a client seeks legal advice whether the subject is criminal or civil, business, tort, domestic relations, or anything else. There is no reason to believe that courts would narrow the application of the doctrine in the client-representative realm to apply only if the client's agent communicated with the lawyer during the course of active litigation. Also, the facts of *Memry* do not concern client representative communications that are only in the throes of active litigation. In fact the *Memry* Court holds that the attorney-client privilege shields from discovery <u>any legal advice</u> related communication between the client-representative and counsel. *Memry* at *11. (Emphasis added).

communications with The Attorneys was to seek legal advice with regard to the loan transactions; these communications as well as any non-legal issues discussed during the course of these communications are protected by the attorney-client privilege.

**2. Lei's Communications with The Attorneys were at the Direction of Dynamic/Sabella (*Bieter*).**

At the hearing, Dynamic/Sabella presented the following uncontradicted evidence which proves that Dynamic/Sabella directed Alcon/Lei to communicate with The Attorneys:

- Sabella testified that she told Lei from the very first loan he brokered for her that he would "need to work with the attorneys" and that because of the nature of the types of loans she and Dynamic make she "needs a broker to work with my attorneys." Sabella Test. Day 3 P. 9: 19 and P. 10: 13-14;
- Sabella testified that in all subsequent loans that Lei brokered on behalf of either herself or Dynamic her instructions to him were the same: she expected him to interact with her lawyers on her behalf. Sabella Test. Day 3 P. 12: 17-23;
- Sabella directed Lei to work with Nick Thomas on the equity portion of the Parcel C transaction. Lei Test. Day 2 P. 19; and
- Lei sent Gruber a draft of the proposed commitment letter on North Plaza (Exhibits 34 and 34A) and discussed it with him because Sabella wanted legal counsel to review it. Lei Test. Day 2 P. 10:2-5.

Based on this uncontested testimony, the Privilege Holders have met their burden as to this client-representative factor.

**3. Sabella Requested that Lei Communicate with The Attorneys so that She and/or Dynamic Could Secure Legal Advice (*Bieter*).**

As to this requirement, the Court in *Bieter* notes:

> No amplification of this requirement appears in *Diversified*, but that is not particularly surprising in that it adds little to the first two requirements. If the communication was made for the purpose of seeking legal advice and it was done at the direction of a superior, it is reasonable to infer that, absent evidence to the contrary, the superior directed that the communication be made for the purpose of securing legal advice. (Emphasis added.)

*Bieter* at 939. Despite this, the Privilege Holders have presented evidence that Sabella did in fact

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

request that Lei communicate with The Attorneys so either she or Dynamic could obtain legal advice. As discussed above, Sabella/Dynamic need to consult with attorneys due to the nature of the "unconventional" loans they make and the inherent risks associated with this type of lending. Sabella Test. Day 3 P. 19:1-21 and P. 21:7-23. When Sabella is not able to consult the attorneys herself she relies on "people who can help her" to bring her legal questions to counsel and get them resolved. Sabella Test. Day 3 P. 11:11-16. As the Broker on these loan transaction (either on her behalf or on behalf of Dynamic), Sabella expected that Lei would communicate with The Attorneys. Sabella Test. Day 3 P. 11:21-25.

Based on this testimony, the Privilege Holders have met their burden as to this client-representative factor.

**4. <u>The Subject Matter of Lei's Communications with The Attorneys was within the Scope of his Duties *(Bieter)*.</u>**

The evidence in this case demonstrates that all of Lei's communications with The Attorneys were squarely within the scope of his brokerage duties to Dynamic/Sabella, which were to make and arrange the loans between Dynamic/Sabella and Bill Johnson or his related entities. In addition to the brokerage duties Lei testified that he engaged in which are outlined above, the following summarizes Lei's testimony regarding specific duties he performed while brokering the loans for Dynamic/Sabella:

- Lei created and sent Exhibit 38 to Sabella which recaps a prior conversation he had with Bill Johnson in which Johnson requested that Lei inquire as to whether Dynamic and/or Sabella would be interested in providing a refinance loan on North Plaza. Lei Test. Day 2 P. 27:1-15;

- Prior to drafting and sending Exhibit 38 to Sabella, Lei had done an analysis of Bill Johnson's request that Dynamic/Sabella refinance North Plaza by independently verifying the amount of the existing liens on the property. Lei Test. Day 2 P. 30:1-4;

- Part of Lei's duties was to take part in the closing of transactions and he took part in the closing of Parcel C. Lei Test. Day 2 P. 33:21-25;

- Exhibit 40 is a document Lei drafted which reflect the terms of the North Plaza loan Lei negotiated on Sabella's behalf with Bill Johnson

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

who was the broker on behalf of North Plaza, LLC. Lei Test. Day 2 PP. 36-38:1-9;[7]

- As part of his duties, Lei analyzed Bill Johnson's request to take the lien off of Bear Creek and put it on North Plaza. Lei discussed his analysis with Sabella and recommended that it not be done. Lei Test. Day 2 P. 48:21-25 and P. 49:1-22;

- Lei gathered information regarding Bill Johnson's second request for a $500,000 increase on the North Plaza loan. After his analysis of this information he discussed it with Sabella and recommended that it should be done. Sabella accepted Lei's recommendation. Lei Test. Day 2 P. 54:1-25; P. 55:1-25 and P. 56: 1-8;

- Lei did an evaluation of Bill Johnson's third request to increase the North Plaza loan by $500,000 and decided it was not a good idea. Lei subsequently gave his recommendation to Sabella who agreed and turned down Johnson's request. Lei Test. Day 2 P. 99: 14-17; P. 100:10-25; and P. 101: 1-19;

- Exhibit 60 outlines the concerns Lei developed after gathering information regarding Bill Johnson's request for Dynamic/Sabella to finance the purchase of Walker Basin. Lei Test. Day 2 P. 102: 3-10; P. 103: 6-25; P.104: 1-25; P. 105: 1-25; and P. 106: 1-25;

- Lei initially discussed the increase in the North Plaza loan from $4.1 million to $4.4 million with the lender, then legal counsel and then explained them to the borrower. Lei also was involved with changing the North Plaza draft loan documents to reflect this increase. Lei Test. Day 2 P. 126: 14-25; P. 127: 1-25;

- Exhibit 70 is an example of how Lei reviewed loan documents and marked them for the legal counsel to make changes. Specifically, Lei testified that, "Generally he focuses" on basic terms and relies on legal counsel for the rest of the documentation of a loan. Lei Test. Day 2 P. 137: 20-24 and P. 138: 1-11; and

---

[7] In addition to this testimony regarding Johnson acting as the broker on these transactions, Sabella testified that Bill Johnson was a licensed California Real Estate broker and he was negotiating the terms of the loan transactions with Lei . Sabella Test. Day 3 P. 54: 1-7. Sabella also testified that it was her understanding that Bill Johnson was negotiating the terms of the loans on behalf of his affiliated entities. Sabella Test. Day 3 P. 54: 22-25 and P. 55:1-10. The Trustee attempted to counter this testimony with a phantom declaration of Bill Johnson in which Johnson purportedly stated that he was not acting as a broker on behalf of his entities with regard to these loan transactions. However, Johnson's subjective perception of his role is not determinative of whether or not he was a "broker" on these transactions. *See*, *In re Lara*, 731 F. 2d 1455, 1463 (9th Cir. 1984) (for purposes of applying Section 1 Article XV of the California Constitution a broker need not be acting as an agent for either party, he must simply be engaging in an activity for which a license is required).

- Sabella does not analyze the loan. Lei provides her with all the information and an analysis of the viability of it then she decides whether or not to make the loan. Lei Test. Day 3 P. 99:12-16.

Thus, the scope of Lei's duties was to navigate these loans on behalf of Dynamic/Sabella from the initial negotiations with the borrower, through the due diligence process, and ultimately to closing. At any point during this process, Lei could have (and as the evidence has shown did) seek the legal advice of The Attorneys on issues that would have been "critical or of importance that would affect the decision making by the lender…." Lei Test. Day 3 P. 174: 6-8. Lei testified that these "critical" or "important" issues to the lender included exceptions on a preliminary title report (Lei Test. Day 2 P. 110:1-2), drafting legally sufficient loan documents (Lei Test Day 2 P. 94-94), or any "legal advice to get the deal done" (Lei Test. Day 2 P. 222:15-19). Based on this evidence, the Privilege Holders have made a detailed factual showing of this client-representative factor.

**4. Lei Kept His Communications with The Attorneys Confidential.**[8]

The Privilege Holders provided overwhelming evidence at the hearing that Lei kept his communications with The Attorneys confidential. Lei repeatedly testified that Sabella was the only person at Dynamic with whom he discussed his communications with The Attorneys. The following summarizes the exhibits and testimony presented at the hearing on this point:

- Lei testified that with regard to the $500,000 Vail Lake loan he understood his communications with The Attorneys were to be confidential. Lei Test. Day 1 P. 73: 8-13;

- Lei was only permitted to disclose his communications with The Attorneys on the $500,000 Vail Lake loan with Sabella. Lei Test. Day 1 P. 73: 14-19;

---

[8] This "client representative factor" is actually a hybrid of the *Bieter* factor which asks, "Whether the communication was not disseminated beyond those person who, because of the structure if the client's operations, need to know its content" *Bieter* at 939 and the *Memry* factor which looks to whether the independent contractor, "possessed information not known to other employees of the client." *Memry* at *9-10. This Brief will address both of these factors simultaneously since they both are ultimately driving at whether the client representative kept the communications with legal counsel confidential and the evidence from the hearing as to each factor is the same.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- Lei did not tell Bill Johnson what he and Gruber discussed regarding the $500,000 Vail Lake loan Day 1P. 73: 25-25 and P. 74:1-2;

- After Lei discussed Exhibit 34 with Gruber he talked to Sabella about what was said-and no one else. Lei Test. Day 2 P. 11: 2-4;

- Lei kept confidential the conversations he had with Gruber regarding the recording of liens on Parcel C. Lei Test. Day 2 P. 74: 21;

- Lei kept confidential (only told Sabella) about the discussion he had with Nick Thomas regarding the amendment of the Vail Lake Rancho California operating agreement. Lei Test. Day 2 P. 77: 10-19;

- As to the information Lei received from Nick Thomas regarding the equity piece of the transaction on Parcel C, Lei did not share this information with anyone at Dynamic other than Sabella. Lei Test. Day 2 P. 21:4-14;

- Lei only discussed with Sabella Gruber's "legal input" about the liens on the North Plaza Project. Lei Test. Day 2 P. 88: 8-17.

- Lei only disclosed to Sabella the discussions he had with Gruber regarding the legal sufficiency of the draft loan documents on North Plaza. Lei Test Day 2 P. 94: 1-25 and 95:1-9;

- Lei would generally discuss with The Attorneys, " anything that's critical or of importance that would affect the decision making by the lender, then I would need to discuss that with the lender and legal counsel. That was-- those are informations [sic] that would not be discussed with Mr. Johnson." Lei Test Day 3: P. 174: 6-10;

- Lei testified that legal counsel specifically told him that their conversations would be confidential. Lei Test Day 3 P. 206:4-15 and P. 207: 1-8;

- While Lei told Bill Johnson about the lis pendens on the property, he did not disclose to Johnson that he learned this fact from legal counsel because "he [Johnson] didn't need to know that I have discussions with Mr. Gruber. Lei Test Day 2 P. 213: 7-20;

- Lei described a situation in which Bill Johnson wanted to go to Kristine Robertson's office and Lei told him that he could not meet with the lawyer since she was Dynamic's lawyers. Lei Test Day 3: P. 218: 4-20;

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- Gruber testified that from time to time he had to take Lei aside and remind him that there were certain kinds of dialogue that shouldn't happen in front of other parties. Gruber Test Day 3: P. 251: 9-16; and

- Gruber testified that when he had meetings with both Lei and Bill Johnson, if "something sensitive" would come up he would take Lei aside and talk to him about that issue separately. Gruber Test. Day 3: P. 257: 13-24.

Perhaps the most striking testimony that proves Lei kept his communications with The Attorneys came from Angela Sabella when she testified that:

- She expected that Lei as her broker (and the broker for Dynamic) would speak with The Attorneys and her and no one else. Sabella Test. Day 3 P. 13: 13-23;

- If she thought that her brokers had fiduciary duties to the borrowers she would not hire them because that is not how her business works "because my attorney and I are totally private and that information is privileged." Sabella Test. Day 3 P. 44: 1-7; and

- Drawing on her interactions with and observations of Isaac Lei as a broker for the last ten years, Sabella testified that Lei, "knows that he is not Bill Johnson's broker and he know that he has to keep everything confidential." Sabella Test. Day 3 P. 41: 9-11.

Lei testified that generally speaking he had to disclose to the borrower any information that he (Lei) believed would be material information that would affect the transaction from the borrower's perspective (*e.g.* the terms of the loan) even though he may have had discussions with The Attorneys regarding the same issues. Lei Test. Day 3 PP 14-19. Similarly, Sabella testified that Lei has to disclose some information to Johnson that he learned from the attorneys otherwise he could not get his job done. Sabella Test. Day 3 P. 58: 17-21. Despite this, there is no doubt that Lei kept any issues discussed with The Attorneys that were "critical" or "important" solely to the lender completely confidential. In this regard, the Trustee has presented no evidence that Lei disclosed confidential information he either discussed with or learned from The Attorneys to

///

///

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

anyone other than Sabella.[9]

The Trustee attempted to impeach Lei's testimony by reading deposition testimony indicating that Lei did not recall being told by Sabella that the conversations with her lawyers were to be "confidential." However, Lei previously had also testified that he was told by The Attorneys themselves that the discussions were confidential, and that he understood that from the nature of the transactions and discussions. Lei Test. Day 3, P. 206: 4-5 and P. 207: 1-8. As noted above, Gruber testified, without contradiction, that he routinely cautioned Lei about the need to maintain information they discussed as confidential, including physically leaving meetings with Johnson to go to his office alone with Lei to discuss confidential issues. Gruber Test. Day 3, P. 211: 13-16 and P. 213: 7-10. Finally, the only evidence adduced at the hearing illustrated how Lei would discuss certain matters with legal counsel, and then discuss the substance of some point with Johnson, without divulging the conversation with legal counsel or what legal counsel had said.

- In that regard, Lei testified that he specially brought to Johnson's attention the recordation of *a lis pendens* on the North Plaza property around April 1998, without divulging that he learned of that fact from legal counsel, or any of the discussions that he had had with legal counsel about that occurrence or the significance of it. Lei Test. Day 3, P. 211: 13-16 and P. 213: 7-20 and Exhibit 18.

Based on this evidence and the Trustee's failure to refute it, the Privilege Holders have proved this client-representative factor.

**5. The Length of Lei's Relationship with Dynamic/Sabella Further Supports a Finding that He was Their Client Representative (*Memry*).**

One of the factors the *Memry* Court based its finding of client-representative on was the

---

[9] In an attempt to create an argument that Lei did not keep his communications with The Attorneys confidential, at the hearing the Trustee questioned Lei regarding the role Francine Paxon played in the Johnson loans. However, this argument falls flat because Lei testified that Ms. Paxon was brought in to do a post-review of loan documents after a loan had already closed. Lei Test. Day 3 P. 107:17-22. Thus, any documents Ms. Paxon reviewed were no longer confidential because they had already been disseminated to the borrower and recorded. Further, the Privilege Holders recognize that any conversation which may have taken place between Gruber, Lei and Ms. Paxon would not be subject to the attorney-client privilege just as communications between Gruber, Johnson and Lei are not covered by the privilege.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

fact that the independent contractor had worked with the client's company since its formation (approximately nine years). *Memry* at *9. The evidence in this case is similar. Lei first began to broker loans for Dynamic/Sabella in 1997. Lei Test. Day 1 P. 31: 2-8. Further, Lei testified that for the last ten years he has continuously brokered loans for Dynamic/Sabella. Lei Test. Day 3 P. 79: 24-25 and P. 80: 1-2. In fact, Lei testified that ninety-five percent of the loans he has brokered over the last ten years have been for Dynamic/Sabella. Lei Test. Day 2 P. 192: 16-19.

Lei is not simply some random independent contractor that brokered one or even two loans for Dynamic/Sabella. Rather, over the last ten years he has brokered at least twenty-four loans and various extensions for Dynamic/Sabella (and this is only for loans to the Johnson related entities). In that regard, in addition to the first three loan transactions that Lei testified about in detail at the hearing, he further testified that he worked on and brokered twenty-one more loans between Sabella/Dynamic and Johnson including:

Bear Creek;

Walker Basin (deposit transaction);

RV Park (note assumption);

Vail Lake USA;

Walker Basin;

RV Park (working capital transaction);

North Plaza (second deed of trust);

RV Park (note assumption);

RV Park (working capital);

Walker Basin (loan purchase);

Vail Lake USA (members buyout);

Walker Basin (transitional grading);

Walker Basin;

Vail Lake Rancho Calif.;

Vail Lake Village and Resort;

Vail Lake USA;

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Vail Lake USA;

Vail Lake-RV Park;

Fallbrook;

Orchard-Hansch; and

Orchard Barth.

Lei Test. Day 2 P. 165: 24-25; P. 166: 1-25; P. 167: 1-25; and P. 168: 1-16.

Thus, as it did in *Memry* the length of the relationship between Lei and Dynamic/Sabella supports a finding that he was their client representative.

**6. <u>Lei's Level of Involvement in the Loan Transactions Establishes that He was Dynamic/Sabella's Client Representative. (*Memry*)</u>**

After presenting three days of testimony and forty-seven exhibits, the Privilege Holders have proven that Lei played an integral role not only in the North Plaza transaction, but in all loans he brokered on behalf of Dynamic/Sabella with Johnson and his related entities. Lei repeatedly testified that when he was negotiating the loan between Dynamic/Sabella on the one hand and Johnson on the other, he alone spoke with the borrower regarding the terms and issues the borrower had and then he alone would discuss the borrower's position with the lender. In short, Lei was the glue that held all these different components of the loans together and without him the loans would not have closed. [10]

In addition to the testimony and exhibits which have been detailed in various sections of this Brief already, the following summary of testimony and exhibits further establish Lei's extensive level of involvement in these loan transactions:

- Because Angela Sabella is so busy Lei has to do everything on the loan. Lei only informs her of something if it is critical. Lei Test. Day 1 P: 148:23-25 and P. 149: 1-8;

---

[10] What's more, the evidence has shown that at various times Lei was working on multiple deals between Dynamic/Sabella and Johnson. For example, Lei and Johnson began negotiating the terms of the $500,000 Bear Creek loan before the North Plaza loan had closed. Lei Test. Day 2 P. 5-23. While multi-tasking Lei was responsible for keeping track of the progress of each loan and making sure that what needed to be done got done so that each deal could close.

- Sabella expects Lei to take care of things (regarding the loans) on his own. Lei Test. Day 1 P.150: 3-8;
- Sabella does not read the entire loan documents. She only reviews the material terms of the loan documents such as the interest rate, personal guarantees, loan to value, maturity and default clauses. She relies on Lei and The Attorneys to make sure that the remainder of the loan documents properly reflect the terms that lender has agreed to. Sabella Test. Day 3 P. 23: 13-23;
- Of the loans Sabella makes, which includes loans to borrowers not affiliated with Johnson, Lei brokers the vast majority of them. Lei Test. Day 2 P. 193:19-21, and Exhibit 22.
- Because of the length of their relationship and her level of trust in him, whenever a broker she does not know approaches Sabella regarding a new deal, Sabella tells that broker to "go convince Isaac…they need to work with Isaac" Sabella Test. Day 3 P. 24:22-25 and P. 25:1-3;
- Gruber testified that he and Lei "were the principal people involved in seeing through the various loan transactions, including the negotiations and documentation." Gruber Test. Day 3 P. 242: 4-6;
- As to the $500,000 Vail Lake loan, after the initial meeting with Johnson and Sabella at the Dynamic Office, Lei had several meetings in person and over the telephone with Bill Johnson. The only people involved in these meetings and telephone calls were Lei and Johnson. Lei Test. Day 1 P. 47:17-25; P. 48: 1-18; and P. 51: 17-21;
- When Bill Johnson requested an extension of the Vail Lake loan, Lei discussed this with Sabella who agreed to a ninety day extension. Lei then informed Johnson of Sabella's decision. Lei Test. Day 2 P. 123: 12-24;
- With regard to the $1.5 million Parcel C loan, Johnson contacted Lei directly to see if Dynamic/Sabella would be interested in loaning him the money so he could purchase the property. After his conversations with Johnson, Lei discussed the specifics of the deal with Sabella. Lei Test. Day 1 P. 93: 6-25 and P. 94: 1-18;
- After Johnson contacted Lei to request Dynamic/Sabella loan him $1.5 million so he could purchase Parcel C, Lei did the following:
    - Conducted an independent evaluation of the collateral for the $1.5 million Parcel C loan by doing a "rough estimate". Lei Test. Day 1 P. 96: 17-25 and P. 97: 1-3;
    - Completed a valuation of the licenses. Lei Test. Day 1 P. 100: 21-23;

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- Discussed his valuations with Sabella and made a recommendation to her regarding whether or not this would be a viable loan. Lei Test. Day P. 100:21-23;

- Worked with Nick Thomas of Gibson Dunn to modify the operating agreement for Vail Lake Rancho California to reflect the equity piece of the deal. Lei Test. Day 1 P. 111: 22-25 and P. 112: 1-3;

- After his discussions with Nick Thomas regarding the equity portion of the deal he conferred with Gruber who was going to draft the loan documentation. Lei Test. Day 1 P. 113: 18-25 and P. 114: 1-16;

- Lei testified that one of his duties as a broker for Dynamic/Sabella was to complete the "due diligence" on a loan which to him means, "gathering all the information with respects [sic] to proposed loan and make assessment of it, to see if it's a good possibility of going forward this loan proposal and bringing it to the lender to discuss all that." Lei Test. Day 1 P. 152: 9-17;

- Lei testified that he separately negotiated the $500,000 increase on the Parcel C loan first with Johnson and then with Sabella. The changes that Lei negotiated between Johnson and Sabella are documented in Exhibits 14 and 28. Lei Test. Day 1 P. 194: 1-25 and P. 195: 1-24;

- The following summarizes Lei's testimony regarding his role in the North Plaza loan:

    - Initially Johnson contacted Lei directly to inquire as to whether Dynamic/Sabella would be interested in providing a loan to refinance the North Plaza property. Lei Test. Day 1 P. 243: 14-18;

    - Lei also spoke with Ron Vallas who represented the existing lender on the North Plaza property to determine the amount of the liens currently on the property. Lei Test. Day 1 P. 253: 2-4;

    - After he got the information from Johnson and Vallas he then discussed the proposal with Sabella. Lei Test. Day 1 P. 246: 7-10;

    - Lei discussed with Sabella Bill Johnson's request to increase the North Plaza loan to $4.1 million to pay off all the existing lien holders. However, Sabella was willing to

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

only increase the loan amount to $3.7 million. Lei Test. Day 2 P. 113: 15-25 and P. 114: 1-16;

- Lei created Exhibit 63 and gave it to Sabella to summarize for her the payoff amounts and fees associated with the North Plaza loan. Lei Test. Day 2 P. 114: 21-25 and P. 115: 1-15;

- After gathering and reviewing the information contained on Exhibit 63, Lei came to the conclusion that if the North Plaza loan was not increased, the transaction would not be able to close. Lei discussed this evaluation with Sabella. Lei Test. Day 2 P. 115: 20-25 and P. 116: 1-4;

- Sabella eventually agreed to Lei's recommendation and the North Plaza loan closed at $4.1 million. Lei Test. Day 2 P. 116: 14-20 and P. 117: 4-6;

- When it was determined that the North Plaza loan would have to increase again this time from $4.1 million to $4.4 million, Lei discussed with Sabella that based on his evaluation of the value of the property, (which he believed would be supported by the appraisal report) the loan at $4.4 million would be within the fifty percent loan-to value criteria that Dynamic/Sabella required. Lei Test. Day 2 P. 143: 10-15 and P. 144: 1-13;

- Based on Lei's evaluation of the value of the North Plaza property he recommended that Sabella go forward with the transaction at $4.4 million. Lei Test. Day 2 P. 144: 14-25 and P. 145: 1-2;

- Lei "went around to gather" the signatures on Exhibit 72. Lei Test. Day 2 P. 146: 1-8;

- Lei prepared Exhibit 75A to "reflect all the costs with respect to the escrow closing statement" on the North Plaza loan. Lei Test. Day 2 P. 149: 18025 and P. 150: 1-5; and

- As to his role in causing the money to be disbursed from the lender into escrow on the North Plaza loan, Lei testified that, "After all documents were delivered to escrow in respect to communicating with legal counsel, and legal counsel felt comfortable that everything had been properly documented and that everything has been [sic] with the escrow company, then escrow would let me know that it's okay to fund—or wire transfer the funds, then I would in

turn talk to Ms. Sabella about the wire transfer. Lei Test. Day 2 P. 162: 17-25 and P. 163: 1-13.

- Exhibit 78 is a document Lei created and sent to Johnson to summarize their discussion regarding a new $500,000 loan for Bear Creek Johnson had proposed. Lei Test. Day 2 P. 156: 5-25;

- Lei testified that he brokered approximately twenty-one additional loans between Dynamic/Sabella and Johnson and/or his related entities between July 1998 and 2003. Lei testified that he engaged in the same duties and handled these transactions in the same manner as the $500,000 Vail Lake loan, the Parcel C loan and the North Plaza loan. Lei Test. Day 2 PP 165-173;

- Lei assisted Dynamic/Sabella in litigation matters involving these loans. Lei Test. Day 3 P. 215: 5-11.

Throughout the course of these proceedings the Trustee has attempted to diminish Lei's role in the loan transactions with Dynamic/Sabella by arguing that his duties were "largely clerical in nature" and even tried to demean him by suggesting he walked Sabella's dogs or was a flunky relegated to retrieving “flower pots.”[11] However, the evidence in this case shows that nothing could be further from the truth. In addition to the testimony and evidence which has already been highlighted to show Lei's integral role in these loans, the following testimony and exhibits further solidify this point:

- With regard to Exhibits 41, 41 A and 41 B (all of which Lei prepared and sent to the borrower), Lei testified that he alone discussed with the borrower and then the lender the changes in the lender's fees and interest rates which are detailed in these three exhibits. Lei Test. Day 2 P. 67:3-25, P. 68: 1-25 and 69:1-25. Specifically, Lei testified that the reason why the interest rate went up and the loan points went down was "just a matter of take between the lender's fees and interest rates in my discussion with the lender". Lei Test. Day 2 P. 69:24-25 and P. 70: 1-3; and

[11] Lei *debunked* the Trustee's attempted “flower pots” impeachment by noting that while some may view the issue as “trivial,” (See Exhibit "MG" and "MH"), it was potentially endangering a borrower/lender relationship that was important to him and his brokerage business and that he was attempting to defuse a situation that could have suspended his abilities to broker Johnson-related loans with Dynamic or Sabella. Lei Test. Day 2, P. 211: 19-25 and 212: 1-18.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- Although Sabella was the person who ultimately decided whether or not to go forward with a loan she based her decision on Lei's analysis of the situation and his "giving her a favorable or unfavorable opinion." And that Sabella relied not only on his valuation of the property, but on his analysis of "the overall scheme of the whole project, the risk associated with this, if a loan was made." Lei Test. Day 3 P. 98:25 and P. 99: 1-8.

However, Exhibit 50 and Lei's testimony regarding it truly illustrate the extent of Lei's involvement in brokering these loans. Exhibit 50 is a fax Lei prepared and sent to Bill Johnson on June 30, 1998 regarding North Plaza. Lei Test. Day 2 P. 80: 1-11. In this fax Lei tells Johnson, "after a long negotiation process these are the final terms that we have discussed and agreed to". With regard to this "long negotiation process" Lei testified that he did the following:

- Discovered that more money would be needed to pay off all the liens on the property. Lei Test. Day 2 P. 81: 4-25.
- Discussed the increase with Bill Johnson. Lei Test. Day 2 P. 82: 8-13;
- Evaluated the additional lien information he received and came to his own conclusion that the loan should be increased. Lei Test. Day 2 P. 82: 14-24;
- Discussed the need for the increase in the loan with Sabella. Lei Test. Day 2 P. 83: 11-24 and
- Recommended to Sabella that the loan be increased from $3.9 million to $4.1 million to pay off the additional liens. Sabella did not initially agree with his recommendation. Lei had to work to convince her. She initially wanted to reduce the loan amount from $3.9 million to $3.7 million. *See* Exhibit 63. Lei ultimately did convince Sabella, and Dynamic agreed to the increase the amount of the loan from $3.9 million to $4.1 million. Lei Test. Day 2 P. 84: 13-21.

To summarize the "long negotiation process" Lei testified that, "It was long and tedious with respect to getting information and getting to the point where we can agree to the terms, and specifically that amount that needs to be paid, paying off existing lenders on the property." Lei Test. Day 2 P. 85: 6-10. Lei further testified that the "we" that engaged in the "long negotiation process" was himself and "Mr. Johnson." Lei Test. Day 2 P. 85: 20-24.

Based on the evidence at the hearing, it is clear that Lei's level of involvement in these

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

loans was greater than any other person involved with them.[12] It was Lei alone who negotiated the terms of these loans with Johnson; Lei alone who gathered all the information during the due diligence process; and Lei alone who kept abreast of the progress of the work on the properties and there entitlements. Lei possessed information and contacts on these transactions that no one else did. Aside from Sabella, no one else at Dynamic or on Sabella's personal behalf participated in the loan negotiations or underwriting, and by and large only Lei interacted with the lawyers for Sabella and Dynamic. Based on this, there is no principled basis upon which to distinguish Lei's role from that of a Dynamic employee for purposes of the attorney-client privilege. [13]

**7. <u>The Attorneys Communicated Directly with Lei or Copied him on Correspondence to Dynamic/Sabella *(Memry)*.</u>**

Lei testified that he communicated directly with Gruber via face to face meetings, telephone calls, or correspondence and that neither Sabella nor anyone else was present for the majority of the meetings he had with Gruber (Lei Test Day 1 P. 117: 9-19). Lei also testified that he communicated directly with Nick Thomas to provide him information with regard the equity portion of the Parcel C loan so Thomas could render a legal opinion and re-draft the Vail Lake Rancho California operating agreement. Lei Test. Day 2 P. 19:5-25 and P. 20:1-24. Further, the following exhibits demonstrate that The Attorneys either corresponded directly with Lei or copied him on their correspondence to Dynamic/Sabella:

---

[12] The Trustee actually undercut his own argument when he questioned Lei about appearing at a deposition as the "Person with Most Knowledge ("PMK")" to testify about the Vail Lake loan Dynamic extended to a Johnson related entity. *See,* Lei Test. Day 3 P. 185:8-25; P. 186:1-25; and 187:1-6. California Code of Civil Procedure section 2025.230 states that a corporation can designate any officer or "agent" to testify on its behalf. Thus, the fact that Dynamic designated Lei as its agent with the most knowledge of this loan only emphasizes his integral role in these transactions and further proves that he was the company's client representative.

[13] Even if the Court were to ignore the mountain of evidence regarding Lei's level of involvement in these transactions and accept the Trustee's argument that his duties were "largely clerical", *United States v. Kovel* a cases relied upon and cited frequently by the Trustee, states that the attorney-client privilege covers communications to non-lawyer employees with 'a menial or ministerial responsibility that involves relating communications to an attorney. "*Kovel,* 296 F. 2d 918, 921. Thus, even if Lei's duties were "largely clerical" his communications with The Attorneys would still be privileged.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- Exhibits 18 is a correspondence from Gruber to Sabella regarding the Vail Lake loan in which Lei is copied. Lei Test. Day 1 P. 138;

- Exhibit 19 is a correspondence from Gruber to Sabella regarding the Vail Lake loan in which Lei is copied. Gruber begins the letter, "When I spoke to Isaac this morning..." Lei Test. Day 1 P. 142:5-15 and P. 143:1-2;

- Exhibit 28 is a fax sent by Lei directly to Gruber in which Lei was providing Gruber with information that enabled the attorney to provide legal services on the Parcel C loan. Lei Test. Day 1 P. 189:19-25;

- Exhibit 31 is a fax directly from Gruber to Lei in which Gruber requested Lei to get specific documents from Bill Johnson so that the loan on Parcel C could close. Lei Test. Day 1 P. 219: 16-18 and P. 220: 19-25;
- Exhibits 34 and 34A are documents Lei created and sent directly to Gruber so that per Sabella's direction an attorney could review the commitment letter for the North Plaza loan. Lei Test. Day 2 PP. 7-10;

- Exhibit 54 is a letter Gruber sent directly to Lei requesting that Lei review the drafts of the loan documents Gruber had prepared and make sure they were consistent with the terms of the loan Lei had negotiated. Neither Sabella nor any other person at Dynamic is copied on this letter. Le Test. Day 2 PP. 92-94;

- Exhibit 63 is a fax Lei sent directly to Gruber regarding the loan disbursement schedule for the North Plaza loan. Lei Test. Day 2 P. 111;

- Exhibit 65 is a fax Gruber sent directly to Lei discussing the documents for the North Plaza loan that Gruber had prepared. Neither Sabella nor any other person at Dynamic is copied on this fax. Lei Test. Day 2 P. 118: 17-25 and P. 119: 1-23; and

- Exhibit 66 is a fax sent from Lei directly to Gruber the purpose of which was so Lei could let Gruber know to prepare the extension of the $500,000 loan on Vail Lake. Lei Test. Day 2 P. 121:18-25 and P. 122: 1-19.

Based on the above, the Privilege Holders have presented the Court with ample evidence to find that Lei communicated directly with The Attorneys.

**8. Sabella Represented to The Attorneys and The Borrower that Lei was Her and Dynamic's Authorized Representative. *(Memry).***

The following testimony regarding this factor has not been disputed:

- In the first meeting with Bill Johnson in late 1997 to discuss the $500,000 loan on Vail Lake, Lei testified that Sabella introduced him to Johnson as "the broker in this transaction…I was to be the point person on the transaction". Lei Test Day 1 P. 45: 3-25; and P. 46:1;

- Following the initial meeting with Bill Johnson, Sabella and Lei went to the Pachulski Firm. Lei testified that in a meeting with Richard Pachulski, Sabella introduced him as the broker for the transaction and that he was going to be the "point person" to interact between the lender, borrower and counsel. Lei Test. Day 1 P. 61: 3-20 and P. 62: 15-19;

- After the meeting between Richard Pachulski, Sabella and Lei, Richard Pachulski then introduced Lei to Gruber whom Lei was told would be the attorney doing all the documentation on the loan. Sabella explained to Gruber that Lei was going to be the broker on these loans and that he would be the "point person" Gruber would work with on the loans. Lei Test. Day 1 P. 62: 15-25 and P. 63: 1-21; and

- Gruber testified that Lei was introduced to him "as the broker working on the transactions in connection with loans to be made by Angela Sabella and/or Dynamic Finance." Based on this, Gruber testified that, "…almost all of my dealings with Angela were through Isaac" and that was the way he understood it was supposed to be. Gruber Test. Day 3: P. 241: 17-19 and P. 242:18-22.

Based on the above, the Privilege Holders have proven this client-representative factor.

**9. The Attorneys Treated Lei as Dynamic/Sabella's Client Representative.**

The following testimony from Gruber establishes that he treated Lei as Dynamic/Sabella's client representative:[14]

[14] In addition to this testimony all of the faxes Gruber sent directly to Lei contain the following language, "The facsimile transmission is a confidential communication. Therefore, please see that the designated recipient noted above receives this correspondence such that its contents are not disclosed to any other person." (*See,* Exhibit 65). This language further proves the point that Gruber viewed Lei as the client-representative of his clients Dynamic/Sabella and sought to protect the confidentiality of the communications he sent to Lei just as he would in a communion sent directly to Dynamic/Sabella.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

- His understanding of client representative is that the person is not only designated to receive information and but can also convey confidential information from the client on the client's behalf. Gruber Test. Day 3 P. 254: 12-16;

- In his dealings with Lei, Gruber treated him as someone who spoke on behalf of Dynamic or Sabella. Gruber Test. Day 3 P. 254:12-25 and P. 255:1-6;

- Gruber worked with Lei quite a bit from time to time on the various loan transactions and when Lei gave him an instruction Gruber considered the instruction to be coming from Dynamic/Sabella. Gruber Test. Day 3 P. 241:20-23; P. 254: 23-25 and P. 255:1-6.

Since the Trustee has presented no evidence contrary to the above testimony, the Privilege Holders have met their burden on this client representative factor.

**10. <u>Lei Performed the Brokerage Work for Dynamic/Sabella either at the Dynamic Office or at his Home Office.</u>**

Although Lei testified that he was not and is not an employee of Dynamic Finance, he did testify that he has a desk at Dynamic's office. Lei Test. Day 1 P. 219:9-13. When working at his desk at Dynamic's office he was working exclusively on the loans he was brokering for Dynamic/Sabella. Lei Test. Day 2 P. 195: 14-19. Lei also testified that he had "desks" at the offices of other clients for whom he either performed brokerage or consulting services. Lei Test. Day 3 P. 224: 7-12.

Lei also testified that he sometimes worked on the Dynamic/Sabella loans from his home office. The Trustee's attempts to impeach Lei on his use of a home office with deposition testimony from September 2007 were unsuccessful when on re-direct Lei testified that in September 2007 he did not work out of his home office, but that he worked extensively from his home office in 1997, 1998, and 1999. Lei Test. Day 3 P. 223: 3-1.7.

Lei's testimony regarding where he performed his work is consistent with his status as an independent contractor. He essentially performs his work wherever it is most convenient for him to do so, and most advantageous for his client relationships. The most important point of this testimony is that Lei performed his brokerage duties for Dynamic/Sabella either at his home office

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

or at Dynamic's offices. Thus he was able to service Dynamic/Sabella in a manner that met their needs and maintained the confidentiality of their business.

**11. Lei Received or Has the Expectation of Receiving Commission on all of The Loans he Brokered between Dynamic/Sabella and Johnson.**

The testimony in this case has shown that Lei brokered the loans between Dynamic/Sabella and Johnson with the expectation of compensation in the form of commission or brokerage fees. Lei's commissions were not paid by Dynamic/Sabella but were negotiated between Lei and the borrower. Sabella Test. Day 3 P. 44: 12-14. Lei explained that beginning with the first loan he brokered between Dynamic/Sabella and Johnson (the $500,000 Vail Lake loan) he came to an arrangement with the borrower that his commission would be paid one half at the time of closing and the other half when the loan was paid off. Lei Test. Day 1 P. 79: 15-25. Lei explained that the reason for this was since the commission was to be paid by the borrower from the proceeds of the loan it would actually "help the borrower" if half of the commission was paid when the loan was paid off so that borrower would not be paying accruing interest on the broker's commission. Lei Test. Day 1 P. 80: 11-24.

Using this compensation arrangement Lei testified that he earned a following commission for his brokerage services:

- On the $500,000 Vail Lake loan his commission was three points of the loan. Lei Test. Day 1 P. 75:5-9. The broker fee Lei earned on this transaction is also reflected in Exhibit 12;
- When the loan on Parcel C closed he earned a commission on the loan transaction, but not on the equity portion of the deal. Lei Test. Day 1 P. 233: 13-19;
- Lei earned a commission on the $4.4 million North Plaza loan that closed in July 1998. Lei Test. Day 1 P. 164: 23-25 and P. 165: 1-4; and
- Lei earned a commission (or expects to earn a commission) on all the other loans he brokered between Dynamic/Sabella and Johnson between 1998 and 2003. Let Test. Day 2 P. 168: 14-16.

Since the Trustee has provided no evidence to refute the above testimony, the Privilege Holders have proven this client representative factor.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**E. The Trustee's Failure to Procure Testimony From Bill Johnson Refuting Lei's, Sabella's and Gruber's Testimony Creates an Inference that Johnson and the Trustee are Incapable of Doing So.**

The Trustee brought Bill Johnson into the courtroom. All without putting Johnson on the witness stand. The Trustee referred to a declaration that the Trustee's legal counsel had prepared and had Johnson sign, about Johnson's involvement in matters associated with loans that were the subject of this hearing. The Trustee then proceeded to cross examine Lei about Johnson's statements in the declaration concerning Johnson's involvement in the loan transactions. Lei Test. Day 3, P. 193: 18-25; 194: 1-25 and 195: 1-3.

The Trustee's failure to call Johnson, his failure to expose Johnson to cross-examination, and his use of Johnson's statements in this maneuver, creates an inference that this Court should draw that Johnson is incapable of challenging Lei's testimony on any point material to this hearing. This point has been an established rule of federal evidence law for over 160 years, since at least 1846. In that year, the United States Supreme Court decided *Clifton v. United States*, 45 U.S. 242 (1846) where the Court held:

> It is well observed by Mr. Evans (2 Evans's Pithier, 149), in substance, that if the weaker and less satisfactory evidence is given and relied on in support of a fact when it is apparent to the court and jury that proof of a more direct and explicit character was within the power of the party, the same caution which rejects the secondary evidence will awaken distrust and suspicion of the weaker and less satisfactory, and that it may well be presumed, if the more perfect exposition had been given it would have laid open deficiencies and objections which the more obscure and uncertain testimony was intended to conceal.

*Clifton* at 248. [Emphasis added.]

The Ninth Circuit applies this rule, both as a matter of federal evidence law and as an application of California state law in appropriate federal contexts. *See, Carrauza-Chaidez v. US*, 414 F.2d 503, 505 (9th Cir. 1969 (The hearing court instructed the jury that "If a party offers weaker and less satisfactory evidence, when stronger and more satisfactory evidence could have been produced, the evidence offered should be viewed with distrust."). *See also, Carolina Power v. Levarex*, 451 F. Supp. 1044, 1055 (U.S.D.C. N.D. CA 1977) (Citing California Evidence Code

section 412, the Court held that, "Uranex, which has the burden of proof on this issue, has submitted no documentary evidence which shows that the specific Homestake transaction in question was for the account of COGEMA. Common sense indicates that there would be some documentation of who owned uranium worth 85 million dollars.").[15]

Common sense dictates here that if Johnson could have contradicted Lei, Sabella, or Gruber, the Trustee would have called him as a witness, put him on the stand, and exposed him to cross-examination. The Trustee did not, opting instead to shield Johnson while still trying to "give him a voice" in the hearing. The Court is entitled to and should infer that Johnson is and was incapable of contradicting Lei, Sabella, or Gruber or the Court would have seen and heard from him, live and in person.

**F. <u>Alcon/Lei's Status as a Licensed California Real Estate Broker Has No Effect on the Confidentiality of his Communications with Dynamic/Sabella's Counsel.</u>**

In his Opposition to the Privilege Holders' Hearing Brief and at the hearing, the Trustee argued that Alcon/Lei's duties as a licensed California Real Estate Broker somehow override the attorney-client privilege. This argument is not only offensive to the long established federal and California body of law creating and preserving the attorney-client privilege, but it is also contrary to the evidence in this case.

The Trustee cites no authority to support his argument that a broker's duties of disclosure destroy the attorney-client privilege because, of course, none exist. The only support the Trustee can muster up for this argument comes from *Miller & Starr,* a treatise on California Real Estate law and the case of *Montoya v. McLeod,* 176 Cal. App. 3d 57 (1985) supposedly cited by *Miller & Starr*. Opposition Brief P. 16: 2-9. The Trustee's reliance on these sources is misplaced. As an initial matter, section 4:31 of *Miller & Starr* cited by the Trustee does not contain the quote which he has cited in his Opposition Brief. Putting that aside, the case of *Montoya v. McLeod* is factually dissimilar from this case and does not stand for the proposition that a broker's duties nullify the

---

[15] If weaker and less satisfactory evidence is offered when it was within the power of the party to produce stronger and more satisfactory evidence, the evidence offered should be viewed with distrust.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

attorney-client privilege.

In *Montoya* the lenders complained that a real estate sales person who worked for the borrower did not disclose all the material terms of the loan she solicited them to fund. *Montoya* at 61. Although the facts of the case are the exact opposite of the facts of the case at bar, the *Montoya* Court ultimately held that although the salesperson was employed by the borrower (who was a licensed California real estate broker) her conduct in this transaction created a dual agency. The Court found that this agency was "fiduciary in nature and imposes high standards of good faith". *Id.*

There is no dispute in this case that Lei owed duties to both the lender and the borrower when brokering the loans between Dynamic/Sabella and Johnson. In fact, the evidence in this case shows that Lei and Sabella agree with the following citation to § 4.32 of *Miller & Star* on page 15 of the Trustee's Opposition Brief:

> in most cases, a mortgage loan broker owes fiduciary duties to both the lender and the borrower. The use of a statutory disclosure form does not supercede the broker's fiduciary obligation to exercise the highest good faith to both parties and to disclose to each all such material facts concerning the transaction that may affect [either the borrower or lender's] decision to enter into the transaction.

The undisputed evidence in this case shows that Lei followed this duty while brokering the loans between Dynamic/Sabella and Johnson and his related entities. Specifically, in her testimony Sabella said:

- Lei knew that he had a duty to the borrower to disclose material terms to them. Sabella Test. Day 3 P. 41: 12-14;
- In order to do his job as a broker either on her behalf or on behalf of Dynamic, Lei would have to exchange information with Johnson. Otherwise, Lei cannot do his job. Sabella Test. Day 3 P. 58: 17-21 ;
- She expected Lei to deal honestly with Johnson in the loan transactions. Based on her experience with him and the lack of any complaints by Johnson, Lei did in fact deal honestly with Johnson while brokering the Dynamic/Sabella loans with him. Sabella Test. Day 3 P. 59: 9-20; and
- Sabella never instructed Lei to withhold any information from Bill Johnson on any loan Lei brokered. Sabella Test. Day 3 P. 58: 14-16.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

To the same point, Lei testified that he understood that he owed duties to both the borrower and the lender, but the duties to each were different. Lei Test. Day 3 P. 208: 11-14. With regard to his duties to the borrower Lei testified that:

- "The duty that I owed to the borrower would be full disclosure with respect to the loans, loan terms, loan parameters, anything that I feel would be critical or important matters, then I would disclose to the borrower". Lei Test. Day 3 P. 208: 18-21;

- With regard to Johnson, he always dealt honestly with him and fully disclosed all loan terms to Johnson or any of his related entities in every loan he brokered between Dynamic/Sabella and Johnson or a Johnson related entity. Lei Test. Day 3 P. 209: 12-23;

- It was Lei's practice to make full disclosure of the loan terms during the negotiations with Johnson. Lei sent written communications to Johnson confirming the loan terms that he and Johnson had negotiated for the various loans. Lei Test. Day 3 P. 209: 16-23 and Exhibits 34, 34A, 40, 50 and 78;

- Lei often times sent Johnson a draft or even multiple drafts of loan documents so he could review the loan terms for accuracy before the loan documents were finalized by The Attorneys. Lei Test. Day 3 P. 210: 6-10; and

- Lei believed that he could and did satisfy both his obligation to disclose important critical material terms to Mr. Johnson and keep confidential his communications with Angela Sabella and Dynamic's Lawyers. Lei Test. Day 3 P. 217: 22-25 and P. 218 1-3.

Thus, Lei recognized his duty of honesty and full disclosure of material terms to the borrower and the uncontradicted evidence in this case proves that he satisfied his duty.

Exhibit 18 best illustrates how Lei was able to balance his duty of "full disclosure" and "honesty" to the borrower while at the same time maintaining the confidentiality of his communications with The Attorneys. Exhibit 18 is a letter from Gruber to Sabella on which Lei is copied. In this letter Gruber discusses with Sabella and Lei the notice of pending action that he discovered on the North Plaza property. Lei testified that in addition to receiving Exhibit 18 he also had discussions with Gruber regarding the notice of pending action. Lei Test. Day 3 P. 213: 4-6. After his discussions with Gruber, Lei discussed the notice of pending action on the North Plaza property with Johnson. Lei Test. Day 3 P. 211: 13-16. Lei had this conversation with Johnson because pursuant to his duties to the borrower, Lei felt this was a was a critical matter that

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

would affect the collateral and it had "significant importance". Lei Test. Day 3 P. 212: 10-25 and 213: 1. However, Lei did not disclose to Johnson that he learned this information from communications with Gruber "Because he [Johnson] doesn't need to know that I have discussion [sic] with Mr. Gruber. It's –a notice of pending action in an important matter. I just addressed it with Mr. Johnson." Lei test. Day 3 P. 213: 7-20. Therefore, Lei was able to fulfill his duty to the borrower while at the same time upholding the confidentiality of communications with The Attorneys.

The frivolity of this argument is further emphasized by the fact that the Trustee presented absolutely no evidence at the hearing to show that Lei breached a single duty that he owed as a licensed California Real Estate Broker to either the lender or the borrower. However, even assuming *arguendo* that Lei did breach a duty he owed as a broker, the punishment for this type of violation would be found in the California Department of Real Estate Regulations or the California Corporations Code, and it would serve to penalize Lei and Alcon not Dynamic and/or Sabella. Essentially, what the Trustee is asking this Court to do is punish Dynamic/Sabella by revealing confidential attorney-client communications as retribution for violations of duties they have not shown that Alcon/Lei have made. Not only is this argument absurd and contrary to the law, but it also is not supported by the evidence that is before this Court.

Based on the above, Lei's duties as a licensed California Real Estate Broker arranging and negotiating the loans between Dynamic/Sabella and Johnson would not and should not automatically destroy the expectation of confidentiality Dynamic/Sabella have in the communications between Lei and The Attorneys. What is more, the uncontroversial evidence in this case has shown that Lei understood what his duties were to both the lender and the borrower in these transactions and he was able to fulfill both while maintaining the confidentiality of his communications with The Attorneys.

///

///

///

///

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

III.

**CONCLUSION**

The Trustee provoked this controversy by claiming that all communications involving Sabella, Dynamic, their legal counsel, and Isaac Lei and the Alcon Group were not privileged under the attorney-client privilege because Lei and Alcon were not the client representatives of Dynamic and/or Sabella. One would have assumed, therefore, that the Trustee would actually provide evidence contradicting the claim that Isaac Lei was Sabella's and Dynamic's client representative; that the Trustee would have attacked the documentary record submitted in evidence at the hearing showing in detail Isaac Lei's activities in the first three loan transactions, which coincidentally included the initial $4.4 million dollar loan to the debtor North Plaza in this case. One would have expected the Trustee to attack the process that Isaac Lei used in the next twenty-one transactions, which although different in terms of the property, the loan details, and timing, utilized exactly the same communication processes showing Isaac Lei acting, as in his words, as "the point man" or, using Dynamic's and Sabella's hearing metaphor, "the hub of the bicycle wheel out from which radiated all the spokes of communications."

The Trustee did none of that. He offered no contravening evidence addressing any of the documents which evidence the patterns of communication and Lei's processes in the first three loan transactions. The Court heard not one contradictory utterance from anyone concerning Lei's testimony about what he did and how he did it in the first three transactions or in any of the succeeding twenty-one transactions. From the Dynamic/Sabella side, the Court heard and saw a detailed presentation on direct examination based on contemporaneously created documents, chronicling a pattern of communications and processes through the first three loan transactions Isaac Lei worked, to bring the parties together to a place where a loan could be consummated. From the Trustee's side, the Court heard about an infamous desk, walking a dog, "flower pots" and Angela Sabella's green card. The most charitable interpretation of the Trustee's presentation is that it addressed issues of marginal interest and wholly irrelevant to the task at hand.

Each attempt by the Trustee at impeaching Lei fell flat. He did not actually walk any dogs, (he used a hypothetical example in response to a hypothetical question.) He focused on flower

pots to protect the underlying business relationship between a somewhat prolific borrower representative who was making numerous loan requests and an up-to-that-point agreeable Lender, becoming irritated about a possibly trivial matter. The deposition question about a home office focused on September 2007, when Lei was no longer working from home primarily, not the time, 1997, 1998, and 1999 when he was, before he embarked on a practice of having "designated desks" at virtually all of his clients, not just Dynamic. While he did not remember Angela Sabella telling him to keep communications with her lawyers confidential, he clearly remembered the lawyers themselves saying that; he clearly remembered the context of the meetings and conversations leading him to believe that the lawyer conversations were confidential; and he was physically removed from meetings by Rick Gruber when confidential matters needed to be discussed - confidentially.

The totality of the circumstances (a *Memry* factor), and the overall patterns of communications and dealings all lead to one, simple, conclusion - Isaac Lei and the Alcon Group functioned as Angela Sabella's and Dynamic Finance's client representative for purposes of their communications with everyone, and most especially with their legal counsel.

The Trustee's attack on the claims of privilege with respect to these communications involving Lei and Alcon are not well taken, Dynamic and Sabella respectfully submit. Isaac Lei and the Alcon Group should be found to be their client representatives for purposes of their communications in this or any related matters with Sabella's and Dynamic's legal counsel.

DATED: April 8, 2008

FRANDZEL ROBINS BLOOM & CSATO, L.C.
MICHAEL GERARD FLETCHER
TRICIA L. LEGITTINO

By: /s/Michael Gerard Fletcher
MICHAEL GERARD FLETCHER
Attorneys for Secured Creditors Angela C. Sabella and Dynamic Finance Corporation

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re

NORTH PLAZA, LLC,

Debtor.

DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,

APPELLANTS,

v.

CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,

APPELLEE

District Case No. 08-CV-01194-W-CAB

Bankruptcy Court No. 04-00769-PB11

Appeal No. 2

**EXHIBITS 13 THROUGH 15 TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**

DATE: To Be Set
TIME: To Be Set
COURTROOM: Seven

The Honorable Thomas J. Whelan, Judge Presiding

**EXHIBIT 13**

EXHIBIT 13
PAGE 206

# WRITTEN DECISION - NOT FOR PUBLICATION

ENTERED 6.2.08
FILED
MAY 30 2008
CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | Case No. 04-00769-PB11<br><br>ORDER ON TRUSTEE'S MOTION TO COMPEL DISCOVERY FROM ISAAC LEI/THE ALCON GROUP |

Richard Kipperman, chapter 11 Trustee ("Trustee") of the estate of North Plaza, LLC ("Debtor") seeks discovery consisting in part of communications between Isaac Lei/The Alcon Group (collectively "Lei") and counsel for Dynamic Finance Corporation ("Dynamic") and Angela Sabella ("Sabella") (referred to at times collectively "Sabella"). Sabella objected to the discovery on the ground that Lei was serving as her "client representative" and hence the information was protected by the attorney-client privilege. The Trustee brought a motion to compel, which is before the Court.

The Court, having conducted an evidentiary hearing and reviewed the authorities cited by the parties, determines that

Lei was not serving as "client representative" of Sabella for the purposes of the attorney-client privilege. The "client representative" extension of the attorney client-privilege does not extend so far as to cover Lei under the facts of this case. Accordingly, the Trustee's motion to compel is granted over the objection by Sabella on the ground of attorney-client privilege.

**FACTS**

Pursuant to Rule 2004 and this Court's Order dated September 19, 2006, the Trustee served the subpoenas to Alcon Group Inc., Custodian of Records of Alcon Group, Inc., and Isaac Lei on February 16, 2007. Under the subpoenas, Alcon and Lei were requested to appear and produce documents on March 2 and 5, 2007. On February 26, 2007, Lei served the Trustee with an Objection to the Subpoenas, which raised several objections including that Lei's communications with counsel for Sabella were protected by the attorney-client privilege because Lei was serving as "client representative" of Sabella.[1]

The Trustee filed a motion to compel responses from Lei. After substantial briefing and a lengthy evidentiary hearing, the Court took the matter under submission. For the reasons set forth below, the Court finds that Lei was not acting as a "client representative" of Sabella, and is thus not covered by her attorney-client privilege.

---

[1] Although the objection was filed by Lei, counsel for Lei explained that Lei would not be participating substantively in the matter – that it was "going to be a Dynamic Sabella show..." See Transcript dated January 29, 2008, at 18:4-5.

**DISCUSSION**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ...." Fed.R.Civ.P. 26(b)(1). Thus, a discovery request is objectionable under Rule 26(b)(1) if it requests information which is privileged.

In deciding whether a particular case presents facts which warrant the recognition and application of a privilege, certain principles apply. Foremost among these is the "fundamental maxim," recognized "[f]or more than three centuries, ... that the public ... has the right to every man's evidence." United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950). Thus, a court shall start "'with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.'" Id., at 323. "Because the privilege 'stands in derogation of the public's "right to every man's evidence, ... it ought to be strictly confined within the narrowest limits consistent with the logic of its principle."'" In re Grand Jury Subpoenas Dated January 20, 1998, 995 F.Supp. 332, 337 (1998) (citations omitted.) It is the party seeking an exception from this principle that bears the burden of establishing the existence of a privilege and its applicability to a particular case. See,

///

///

e.g., United States v. International Bhd. of Teamsters, 119 F.3d 210, 214 (2d Cir.1997).[2]

The attorney-client privilege prevents disclosure of a communication from a client to a lawyer, where that communication:

> relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on the law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358 (D.Mass.1950); Colton v. United States, 306 F.2d 633, 637 (2d Cir.1962).

There is no statutory definition of the attorney-client privilege in the Federal Rules of Evidence (FRE). However, proposed FRE 503 (also referred to as Supreme Court Standard 503) provides guidance which has been used by courts in defining the privilege. The most relevant aspect of Standard 503 is its statement of the general rule:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and his lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between

---

[2] Counsel for Sabella acknowledges that she has the burden of establishing that Lei is a "client representative" because she is the one asserting the attorney-client privilege. See Transcript dated January 29, 2008, at 14:12-17.

> representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

Supreme Court Standard 503(b).

Supreme Court Standard 503 does not define "representative." However, Uniform Evidence Rule 502(a)(4) also explains that communications between an attorney and a client and a client's representative can be protected.[3] Uniform Rule of Evidence 502(a)(4) defines "client representative":

> "Representative of the client" means a person having authority to obtain professional legal services, or to act on legal advice rendered, on behalf of the client or a person who, for the purpose of effectuating legal representation for the client, makes or receives a confidential communication while acting in the scope of employment for the client.

The parties to this dispute agree that, as to the law within the Ninth Circuit, the case of Memry Corp. v. Ky. Oil Tech., NV., 2007 U.S. Dist. LEXIS 3094 (N.D.Cal. 2007), adopting the Eighth Circuit decision in In re Bieter Co., 16 F.3d 929, 937 (8th Cir. 1994), best sets forth the inclusion of "client representatives" within the attorney-client privilege, at least where the client is a corporation.

As stated above, the attorney-client privilege is an exception to the general rule that all information is discoverable, and is thus to be applied narrowly. It is generally destroyed if the client discloses the communications to third parties. The "client representative" concept is a limited

---

[3] Uniform Evidence Rule 502 has been described as "a clear statement of the scope of the privilege as now generally accepted." McCormick on Evidence, (6th Ed. 2006).

extension of the attorney-client privilege to third parties to whom communications are disclosed if such disclosure is necessary for the client to obtain legal services. This extension, in turn, must also be applied narrowly within the limits of its purpose.

Case law shows the "client-representative" to be applicable in two distinct situations. The first is where the client is a corporation and requires communication on its behalf. See e.g. Memry and Bieter. The second is where an individual is in some unique position requiring another to intervene between she and counsel.

In Bieter, the court specifically extended the reach of the test it had adopted in Diversified Indus., Inc. v. Meredith, 572 F.2d 596 (8th Cir. 1977), from corporations to partnerships and other such entities. However, the court drew the line at individuals:

> The test we adopted in Diversified, although expressly applicable to corporations and their employees, is not less instructive as applied to a partnership, or some other client entity (as opposed to an individual), and its employees...."

Bieter, 16 F.3d at 935.

Having considered the evidence produced, the Court determines that the line of cases which governs this dispute are those involving an individual. The objection to the Trustee's subpoenas is made in the name of "Dynamic Finance Corporation and Angella C. Sabella." However, the Court finds that with respect to the lending activities in which Lei was involved, it was

Sabella the individual that was the lender/client. Though the Court is aware that Sabella conducts business at times in the name of Dynamic, it is clearly her individual business and loans made by her. The testimony at the trial indicated that it was Sabella who made the decision of whether to loan personally or through Dynamic. The relationship with Lei began as a personal relationship between Lei and Sabella's husband. Sabella the individual extended to Lei the opportunity to make money acting as loan broker. In the view of the Court, after considering the evidence, this case is about a personal relationship between Sabella and Lei implemented to carry out Sabella's lending business, which sometimes was funded through Dynamic. Thus, the applicable authority is those cases considering the application of the "client representative" extension of the attorney-client privilege to individuals.

In the situation of an individual, courts have recognized the "client representative" extension where the individual client is somehow disabled and unable to conduct their legal affairs. "While individuals can speak for themselves, a corporation must speak through its representatives." Leone v. Fisher, 2006 WL 2982145 at 4 (D.Conn. Oct. 18, 2006). "A private person, however, generally has no need for a representative to communicate with an attorney. Only in extraordinary cases ... has the attorney-client privilege been extended to the designated representative of an individual client." In re Grand Jury Subpoenas Dated January 20, 1998, 995 F.Supp. 332, 340 (1998).

In the case of an individual, the "client representative" exception was held to apply to communications between counsel for a college student involved in a life-threatening accident and his parents where the client's "injuries and the comprehensive medical interventions necessary to treat those injuries inhibited plaintiff from independently seeking legal counsel." See Hendrick v. Avis Rent a Car Sys., Inc., 944 F.Supp. 187, 189 (W.D.N.Y. 1996).

The extension was also applied to a mother's communications with counsel on behalf of her son who was incarcerated. Gerheiser v. Stephens, 712 So.2d 1252, 1254 (Fla.App. 1998). Also, communications between the parents of a minor child and the child's attorney. Grubbs v. K Mart Corp., 411 N.W.2d 477, 480 (Mich.Ct.App. 1987). In each situation, the communication between counsel and the representative was necessitated by the client's inability, temporary or otherwise, to seek legal counsel.

In Leone, on the other hand, the court did not extend the attorney-client privilege to communications between counsel and the client's husband where there was no evidence that the client could not have communicated directly with counsel herself. 2006 WL 2982145 at 5.

In the case at hand, the Court finds no reason to extend the exception to cover the communications between Lei and counsel for Sabella. The parties asserting the exception have established no "disability" which required Lei to communicate with counsel on

Sabella's behalf. The evidence reveals that Sabella is an experienced business woman and that she is fluent in the English language.

As already noted, the evidence adduced at the evidentiary hearing made clear that the relationship between Sabella and Lei was a personal one. But assuming, arguendo, that Lei had a relationship with Dynamic that was not already subsumed in his relationship with Sabella, the Court finds and concludes that Dynamic has failed to meet its burden of establishing that Lei was somehow its "client representative" for purposes of invocation of the attorney-client privilege. Lei denies he was an employee of Dynamic or Sabella. He had no equity participation in any of the projects. His only economic interest was in payment of his commissions, which were payable by the borrowers, not by Dynamic or Sabella. In this Court's view, the relationships of Klohs in In re Bieter Co., supra, and Van Moorleghem's in Memry Corp. v. Ky. Oil Tech., NV, supra, are vastly different than Lei's relationship to Dynamic. Accordingly, if the Court considers Lei's relationship with Dynamic separately from his relationships with Sabella (which the facts do not support), the Court finds and concludes Lei's relationship with Dynamic does not support a finding that he was acting as a "client representative" for Dynamic for purposes of shielding his communications with Sabella's (and Dynamic's) same attorneys under the attorney-client privilege.

///

**CONCLUSION**

The facts of this case do not warrant an extension of Sabella's (or Dynamic's) attorney-client privilege to communications between counsel and Lei. Accordingly, the Trustee's motion to compel production of those records with respect to which the privilege was asserted is granted.

IT IS SO ORDERED.

DATE: MAY 30 2008

PETER W. BOWIE, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

In re Case No. 04-00769-B11

CERTIFICATE OF MAILING

The undersigned, a regularly appointed and qualified clerk in the office of the United States Bankruptcy Court for the Southern District of California, at San Diego, hereby certifies that a true copy of the attached document, to wit:

ORDER ON TRUSTEE'S MOTION
TO COMPEL DISCOVERY FROM
ISAAC LEI/THE ALCON GROUP

was enclosed in a sealed envelope bearing the lawful frank of the Bankruptcy Judges and mailed to each of the parties at their respective address listed below:

**Attorney for Chapter 11 Trustee:**

Ali M. M. Mojdehi, Esq.
Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130-3051

**Attorney for Dynamic Finance and Angela Isabella:**

Michael Gerard Fletcher, Esq.
Frandzel Robins Bloom &
Csato, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, CA 90048-4920

Said envelope(s) containing such document were deposited by me in a regular United States mail box in the City of San Diego, in said district on May 30, 2008.

Barbara J. Kelly (signature)
Barbara J. Kelly, Judicial Assistant

**EXHIBIT 14**

EXHIBIT 14
PAGE 218

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@franzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Appellants Angela C. Sabella and Dynamic Finance Corporation

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | CASE NO. 04-00769-PB 11<br><br>Chapter 11<br><br>**NOTICE OF APPEAL** |

EXHIBIT 14
PAGE 219

NOTICE IS HEREBY GIVEN that appellants Angela C. Sabella ("Sabella") and Dynamic Finance Corporation ("Dynamic") hereby appeal to the United States Bankruptcy Appellate Panel of the Ninth Circuit under 28 U.S.C. § 158 from the Order of the United States Bankruptcy Court for the Southern District of California dated May 30, 2008, and entered June 2, 2008, [Docket No. 772] whereby the Bankruptcy Court granted the Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group, a copy of which is attached hereto as Exhibit 1.

NOTICE IS HEREBY FURTHER GIVEN that the names of the interested parties to this appeal from the Order, and the names, addresses and telephone numbers of the parties and/or their respective attorneys are set out in the attached certificate of service.

Respectfully submitted,

DATED: June 9, 2008

FRANDZEL ROBINS BLOOM & CSATO, L.C.
MICHAEL GERARD FLETCHER
TRICIA L. LEGITTINO

By: /s/ Michael Gerard Fletcher
MICHAEL GERARD FLETCHER
Attorneys for Appellants Angela C. Sabella and Dynamic Finance Corporation

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

EXHIBIT 14
PAGE 220



# WRITTEN DECISION - NOT FOR PUBLICATION

ENTERED 6-2-08
FILED
MAY 30 2008
CLERK, U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY DEPUTY

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | Case No. 04-00769-PB11<br><br>ORDER ON TRUSTEE'S MOTION TO COMPEL DISCOVERY FROM ISAAC LEI/THE ALCON GROUP |
|---|---|

Richard Kipperman, chapter 11 Trustee ("Trustee") of the estate of North Plaza, LLC ("Debtor") seeks discovery consisting in part of communications between Isaac Lei/The Alcon Group (collectively "Lei") and counsel for Dynamic Finance Corporation ("Dynamic") and Angela Sabella ("Sabella") (referred to at times collectively "Sabella"). Sabella objected to the discovery on the ground that Lei was serving as her "client representative" and hence the information was protected by the attorney-client privilege. The Trustee brought a motion to compel, which is before the Court.

The Court, having conducted an evidentiary hearing and reviewed the authorities cited by the parties, determines that

Lei was not serving as "client representative" of Sabella for the purposes of the attorney-client privilege. The "client representative" extension of the attorney client-privilege does not extend so far as to cover Lei under the facts of this case. Accordingly, the Trustee's motion to compel is granted over the objection by Sabella on the ground of attorney-client privilege.

**FACTS**

Pursuant to Rule 2004 and this Court's Order dated September 19, 2006, the Trustee served the subpoenas to Alcon Group Inc., Custodian of Records of Alcon Group, Inc., and Isaac Lei on February 16, 2007. Under the subpoenas, Alcon and Lei were requested to appear and produce documents on March 2 and 5, 2007. On February 26, 2007, Lei served the Trustee with an Objection to the Subpoenas, which raised several objections including that Lei's communications with counsel for Sabella were protected by the attorney-client privilege because Lei was serving as "client representative" of Sabella.[1]

The Trustee filed a motion to compel responses from Lei. After substantial briefing and a lengthy evidentiary hearing, the Court took the matter under submission. For the reasons set forth below, the Court finds that Lei was not acting as a "client representative" of Sabella, and is thus not covered by her attorney-client privilege.

[1] Although the objection was filed by Lei, counsel for Lei explained that Lei would not be participating substantively in the matter – that it was "going to be a Dynamic Sabella show..." See Transcript dated January 29, 2008, at 18:4-5.

**DISCUSSION**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense ...." Fed.R.Civ.P. 26(b)(1). Thus, a discovery request is objectionable under Rule 26(b)(1) if it requests information which is privileged.

In deciding whether a particular case presents facts which warrant the recognition and application of a privilege, certain principles apply. Foremost among these is the "fundamental maxim," recognized "[f]or more than three centuries, ... that the public ... has the right to every man's evidence." United States v. Bryan, 339 U.S. 323, 331, 70 S.Ct. 724, 94 L.Ed. 884 (1950). Thus, a court shall start "'with the primary assumption that there is a general duty to give what testimony one is capable of giving, and that any exemptions which may exist are distinctly exceptional, being so many derogations from a positive general rule.'" Id., at 323. "Because the privilege 'stands in derogation of the public's "right to every man's evidence, ... it ought to be strictly confined within the narrowest limits consistent with the logic of its principle."'" In re Grand Jury Subpoenas Dated January 20, 1998, 995 F.Supp. 332, 337 (1998) (citations omitted.) It is the party seeking an exception from this principle that bears the burden of establishing the existence of a privilege and its applicability to a particular case. See,

///

///

e.g., United States v. International Bhd. of Teamsters, 119 F.3d 210, 214 (2d Cir.1997).[2]

The attorney-client privilege prevents disclosure of a communication from a client to a lawyer, where that communication:

> relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on the law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358 (D.Mass.1950); Colton v. United States, 306 F.2d 633, 637 (2d Cir.1962).

There is no statutory definition of the attorney-client privilege in the Federal Rules of Evidence (FRE). However, proposed FRE 503 (also referred to as Supreme Court Standard 503) provides guidance which has been used by courts in defining the privilege. The most relevant aspect of Standard 503 is its statement of the general rule:

> A client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client, (1) between himself or his representative and his lawyer or his lawyer's representative, or (2) between his lawyer and his lawyer's representative, or (3) by him or his lawyer to a lawyer representing another in a matter of common interest, or (4) between

---

[2] Counsel for Sabella acknowledges that she has the burden of establishing that Lei is a "client representative" because she is the one asserting the attorney-client privilege. See Transcript dated January 29, 2008, at 14:12-17.

EXHIBIT 14
PAGE 224

> representatives of the client or between the client and a representative of the client, or (5) between lawyers representing the client.

Supreme Court Standard 503(b).

Supreme Court Standard 503 does not define "representative." However, Uniform Evidence Rule 502(a)(4) also explains that communications between an attorney and a client and a client's representative can be protected.[3] Uniform Rule of Evidence 502(a)(4) defines "client representative":

> "Representative of the client" means a person having authority to obtain professional legal services, or to act on legal advice rendered, on behalf of the client or a person who, for the purpose of effectuating legal representation for the client, makes or receives a confidential communication while acting in the scope of employment for the client.

The parties to this dispute agree that, as to the law within the Ninth Circuit, the case of Memry Corp. v. Ky. Oil Tech., NV., 2007 U.S. Dist. LEXIS 3094 (N.D.Cal. 2007), adopting the Eighth Circuit decision in In re Bieter Co., 16 F.3d 929, 937 (8th Cir. 1994), best sets forth the inclusion of "client representatives" within the attorney-client privilege, at least where the client is a corporation.

As stated above, the attorney-client privilege is an exception to the general rule that all information is discoverable, and is thus to be applied narrowly. It is generally destroyed if the client discloses the communications to third parties. The "client representative" concept is a limited

[3] Uniform Evidence Rule 502 has been described as "a clear statement of the scope of the privilege as now generally accepted." McCormick on Evidence, (6th Ed. 2006).

extension of the attorney-client privilege to third parties to whom communications are disclosed if such disclosure is necessary for the client to obtain legal services. This extension, in turn, must also be applied narrowly within the limits of its purpose.

Case law shows the "client-representative" to be applicable in two distinct situations. The first is where the client is a corporation and requires communication on its behalf. See e.g. Memry and Bieter. The second is where an individual is in some unique position requiring another to intervene between she and counsel.

In Bieter, the court specifically extended the reach of the test it had adopted in Diversified Indus., Inc. v. Meredith, 572 F.2d 596 (8th Cir. 1977), from corporations to partnerships and other such entities. However, the court drew the line at individuals:

> The test we adopted in Diversified, although expressly applicable to corporations and their employees, is not less instructive as applied to a partnership, or some other client entity (as opposed to an individual), and its employees...."

Bieter, 16 F.3d at 935.

Having considered the evidence produced, the Court determines that the line of cases which governs this dispute are those involving an individual. The objection to the Trustee's subpoenas is made in the name of "Dynamic Finance Corporation and Angella C. Sabella." However, the Court finds that with respect to the lending activities in which Lei was involved, it was

Sabella the individual that was the lender/client. Though the Court is aware that Sabella conducts business at times in the name of Dynamic, it is clearly her individual business and loans made by her. The testimony at the trial indicated that it was Sabella who made the decision of whether to loan personally or through Dynamic. The relationship with Lei began as a personal relationship between Lei and Sabella's husband. Sabella the individual extended to Lei the opportunity to make money acting as loan broker. In the view of the Court, after considering the evidence, this case is about a personal relationship between Sabella and Lei implemented to carry out Sabella's lending business, which sometimes was funded through Dynamic. Thus, the applicable authority is those cases considering the application of the "client representative" extension of the attorney-client privilege to individuals.

In the situation of an individual, courts have recognized the "client representative" extension where the individual client is somehow disabled and unable to conduct their legal affairs. "While individuals can speak for themselves, a corporation must speak through its representatives." Leone v. Fisher, 2006 WL 2982145 at 4 (D.Conn. Oct. 18, 2006). "A private person, however, generally has no need for a representative to communicate with an attorney. Only in extraordinary cases ... has the attorney-client privilege been extended to the designated representative of an individual client." In re Grand Jury Subpoenas Dated January 20, 1998, 995 F.Supp. 332, 340 (1998).

In the case of an individual, the "client representative" exception was held to apply to communications between counsel for a college student involved in a life-threatening accident and his parents where the client's "injuries and the comprehensive medical interventions necessary to treat those injuries inhibited plaintiff from independently seeking legal counsel." See Hendrick v. Avis Rent a Car Sys., Inc., 944 F.Supp. 187, 189 (W.D.N.Y. 1996).

The extension was also applied to a mother's communications with counsel on behalf of her son who was incarcerated. Gerheiser v. Stephens, 712 So.2d 1252, 1254 (Fla.App. 1998). Also, communications between the parents of a minor child and the child's attorney. Grubbs v. K Mart Corp., 411 N.W.2d 477, 480 (Mich.Ct.App. 1987). In each situation, the communication between counsel and the representative was necessitated by the client's inability, temporary or otherwise, to seek legal counsel.

In Leone, on the other hand, the court did not extend the attorney-client privilege to communications between counsel and the client's husband where there was no evidence that the client could not have communicated directly with counsel herself. 2006 WL 2982145 at 5.

In the case at hand, the Court finds no reason to extend the exception to cover the communications between Lei and counsel for Sabella. The parties asserting the exception have established no "disability" which required Lei to communicate with counsel on

Sabella's behalf. The evidence reveals that Sabella is an experienced business woman and that she is fluent in the English language.

As already noted, the evidence adduced at the evidentiary hearing made clear that the relationship between Sabella and Lei was a personal one. But assuming, arguendo, that Lei had a relationship with Dynamic that was not already subsumed in his relationship with Sabella, the Court finds and concludes that Dynamic has failed to meet its burden of establishing that Lei was somehow its "client representative" for purposes of invocation of the attorney-client privilege. Lei denies he was an employee of Dynamic or Sabella. He had no equity participation in any of the projects. His only economic interest was in payment of his commissions, which were payable by the borrowers, not by Dynamic or Sabella. In this Court's view, the relationships of Klohs in In re Bieter Co., supra, and Van Moorleghem's in Memry Corp. v. Ky. Oil Tech., NV, supra, are vastly different than Lei's relationship to Dynamic. Accordingly, if the Court considers Lei's relationship with Dynamic separately from his relationships with Sabella (which the facts do not support), the Court finds and concludes Lei's relationship with Dynamic does not support a finding that he was acting as a "client representative" for Dynamic for purposes of shielding his communications with Sabella's (and Dynamic's) same attorneys under the attorney-client privilege.

///

## CONCLUSION

The facts of this case do not warrant an extension of Sabella's (or Dynamic's) attorney-client privilege to communications between counsel and Lei. Accordingly, the Trustee's motion to compel production of those records with respect to which the privilege was asserted is granted.

IT IS SO ORDERED.

DATE: MAY 30 2008

PETER W. BOWIE, Judge
United States Bankruptcy Court

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re Case No. 04-00769-B11

**CERTIFICATE OF MAILING**

The undersigned, a regularly appointed and qualified clerk in the office of the United States Bankruptcy Court for the Southern District of California, at San Diego, hereby certifies that a true copy of the attached document, to wit:

ORDER ON TRUSTEE'S MOTION
TO COMPEL DISCOVERY FROM
ISAAC LEI/THE ALCON GROUP

was enclosed in a sealed envelope bearing the lawful frank of the Bankruptcy Judges and mailed to each of the parties at their respective address listed below:

**Attorney for Chapter 11 Trustee:**

Ali M. M. Mojdehi, Esq.
Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130-3051

**Attorney for Dynamic Finance and Angela Isabella:**

Michael Gerard Fletcher, Esq.
Frandzel Robins Bloom & Csato, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, CA 90048-4920

Said envelope(s) containing such document were deposited by me in a regular United States mail box in the City of San Diego, in said district on May 30, 2008.

Barbara J. Kelly
Barbara J. Kelly, Judicial Assistant

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**PROOF OF SERVICE**

I, the undersigned, declare and certify as follows:

I am over the age of eighteen years, not a party to the within action and employed in the County of Los Angeles, State of California. I am employed in the office of FRANDZEL ROBINS BLOOM & CSATO, L.C., members of the Bar of the above-entitled Court, and I made the service referred to below at their direction. My business address is 6500 Wilshire Boulevard, Seventeenth Floor, Los Angeles, California 90048-4920.

On June 9, 2008, I served true copy(ies) of the **NOTICE OF APPEAL**, the original(s) of which is(are) affixed hereto, to the party(ies) listed on the attached service list.

☒ **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business. Such document(s) were placed in envelopes addressed to the person(s) served hereunder for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices.

☐ **BY FACSIMILE:** At approximately _____, I caused said document(s) to be transmitted by facsimile. The telephone number of the sending facsimile machine was (323) 651-2577. The name(s) and facsimile machine telephone number(s) of the person(s) served are set forth in the service list. The document was transmitted by facsimile transmission, and the sending facsimile machine properly issued a transmission report confirming that the transmission was complete and without error.

☐ **BY E-MAIL:** At approximately _____, I caused said document(s) to be transmitted by electronic mail. The name(s) and e-mail addresses of the person(s) served are set forth in the service list. The document was transmitted by electronic transmission and without error.

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I caused said document(s) to be served by means of this Court's electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, to the parties and/or counsel who are registered CM/ECF Users set forth in the service list obtained from this Court.

☐ **BY OVERNIGHT DELIVERY:** I deposited such document(s) in a box or other facility regularly maintained by the overnight service carrier, or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier with delivery fees paid or provided for, addressed to the person(s) served hereunder.

I certify under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on June 9, 2008, at Los Angeles, California.

/s/Tiffany Lok
TIFFANY LOK

**SERVICE LIST**

VIA CM/ECF NOTICE OF ELECTRONIC FILING

- K. Todd Curry tcurry@nugentweinman.com
- Stanley E. Goldich sgoldich@pszyjw.com
- John A. Graham jag@jmbm.com
- John L. Hosack jhosack@buchalter.com
- Gerald P. Kennedy gpk@procopio.com
- Richard M Kipperman teresaj@corpmgt.com, ca82@ecfcbis.com
- Dean T. Kirby dkirby@kirbymac.com, tfloros@kirbymac.com;jhebert@kirbymac.com;lackerman@kirbymac.com
- Jana Logan jlogan@kirbymac.com, tfloros@kirbymac.com
- Martin T. McGuinn mmcguinn@kirbymac.com, jlogan@kirbymac.com;abarrett@kirbymac.com
- Ali M.M. Mojdehi ali.m.m.mojdehi@bakernet.com, janet.d.gertz@bakernet.com;joseph.r.dunn@bakernet.com;sam.h.aghili@bakernet.com;sdefile@bakernet.com
- Terry D. Phillips fcp@philaw.com
- Edward G. Schloss egs2@ix.netcom.com
- Dan P. Sedor dsedor@jmbm.com
- Gerald N. Sims jerrys@psdslaw.com
- Scott A. Smylie esqsas@aol.com
- United States Trustee ustp.region15@usdoj.gov

VIA U.S. MAIL

Linda F. Cantor
Richard Pachulski
Pachulski Stang Ziehl Young et.al.
10100 Santa Monica Blvd., Ste. 1100
Los Angeles, CA 90067

Tiffany L. Carroll
Office of the United States Trustee
402 West Broadway, Suite 600
San Diego, CA 92101
tiffany.l.carroll@usdoj.gov

Stacy Elledge Chiang
CPA, CIRA, Director LECG, LLC
655 W. Broadway, Ste. 1300
San Diego, CA 92101

Milford W. Dahl
Rutan & Tucker, LLP
611 Anton Blvd, 14th Floor
Costa Mesa, CA 92626-1931

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Linda D. Fox
Shepard, Mullin , Richter & Hampton
501 West Broadway, Suite 1900
San Diego, CA 92101-3598

Sonali S. Jandial
Richards, Watson & Gershon
355 South Grand Ave 40th Floor
Los Angeles, CA 90071-3101

Neil B. Katz
Collins, Robillard & Katz
2377 Crenshaw Blvd., Suite 310
Torrance, CA 90501-3325

Martha A. Mansell
Law Offices of Martha A. Mansell
1522 So. Saltair Ave. Ste 302
Los Angeles, CA 90025

Steven R. Orr
355 S. Grand Ave, 40th Flr
Los Angeles, CA 90071-3101

Frederick C. Phillips
Phillips, Haskett & Ingwalson, A.P.C.
701 "B" Street, Suite 1190
San Diego, CA 92101-3540

Edmund L. Regalia
Miller Starr & Regalia
1331 N. California Blvd. Fifth Floor
PO Box 8177
Walnut Creek, CA 94596

Martha E. Romero
Romero Law Firm
6516 Bright Avenue
Whittier, CA 90601

Raymond D. Scott
Wheatley, Scott & Company
1835 W. Orangewood Avenue
Suite 255
Orange, CA 92868

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**EXHIBIT 15**

EXHIBIT 15
PAGE 235

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@franzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Appellants Angela C. Sabella and Dynamic Finance Corporation

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re

NORTH PLAZA, LLC,

Debtor.

CASE NO. 04-00769-PB 11

Chapter 11

Adversary No. 08-90035-PB

**DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S NOTICE OF MOTION AND MOTION FOR STAY PENDING APPEAL OF ORDER ON THE TRUSTEE'S MOTION TO COMPEL DISCOVERY FROM ISAAC LEI/THE ALCON GROUP; DECLARATION OF MICHAEL G. FLETCHER IN SUPPORT THEREOF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

[Filed concurrently with ex parte application for order shortening time]

DATE: To Be Set
TIME: To Be Set
DEPT: Courtroom 4

///

///

///

///

**TO THE HONORABLE PETER W. BOWIE, UNITED STATES BANKRUPTCY COURT JUDGE, AND ALL OTHER INTERESTED PARTIES:**

**PLEASE TAKE NOTICE THAT**, on a date and time to be set by the Court, Dynamic Finance Corporation ("Dynamic") and Angela C. Sabella ("Sabella" and with Dynamic, collectively "Privilege Holders"), will and hereby do move this Court, pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure, for a stay pending appeal of the Court's Order On the Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group ("Order").

On June 2, 2008, the Court entered the Order On the Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group. The Privilege Holders objected to the Trustee's Motion to Compel on the basis that Isaac Lei and the Alcon Group were the "client representatives" of Dynamic and Sabella and, as such, any communications they had with Dynamic's and/or Sabella's legal counsel (as well as any conversations between Sabella and Lei discussing the advice sought or received from the legal counsel) are protected from disclosure by the attorney-client privilege. By granting the Order over the Privilege Holder's objection, Lei and Alcon are now required to disclose to the Trustee confidential attorney communications regarding Sabella and Dynamic, which once disclosed will irreparably harm Dynamic and Sabella.

On June 9, 2008, the Privilege Holders filed a notice of appeal of the Order. Through this Motion, the Privilege Holders request a stay of the Order pending the appeal on the grounds that, among other things, the irreparable harm Dynamic and Sabella will suffer if privileged communications with their attorneys are disclosed. The irreversible damage that Dynamic and Sabella will incur if confidential attorney communications are disclosed far outweighs any hardship to the other interested parties (which is negligible to nonexistent) and warrants the issuance of a stay. This motion is based upon the attached Memorandum of Points and Authorities, the Declaration of Michael G. Fletcher filed herewith, all pleadings and papers on file with the Court, and any argument presented to the Court by counsel at the hearing on the Motion.

ANY OPPOSITION OR OTHER RESPONSE TO THE MOTION MUST BE SERVED UPON THE UNDERSIGNED AND THE ORIGINAL AND ONE COPY OF SUCH PAPERS WITH PROOF OF SERVICE MUST BE FILED WITH THE CLERK OF THE U.S.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

BANKRUPTCY COURT AT 325 WEST "F" STREET, SAN DIEGO, CALIFORNIA 92101-6991, AT THE TIME SET BY THE COURT.

**WHEREFORE**, the Privilege Holders pray the Court enter an order staying the Order granting the Trustee's Motion to Compel pending its appeal and granting such other relief as the Court deems just and proper.

DATED: June 12, 2008

Respectfully submitted,

FRANDZEL ROBINS BLOOM & CSATO, L.C.
MICHAEL GERARD FLETCHER
TRICIA L. LEGITTINO

By: /s/ Michael Gerard Fletcher
MICHAEL GERARD FLETCHER
Attorneys for Appellants Angela C. Sabella and Dynamic Finance Corporation

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.

### INTRODUCTION

This Court should grant the request of Dynamic Finance Corporation ("Dynamic") and Angela C. Sabella ("Sabella" and with Dynamic collectively "Dynamic/Sabella" or the "Privilege Holders"), for a stay pending appeal of the Order On the Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group[1] ("Order") for the following reasons:

First, the Privilege Holders will be substantially and irreparably harmed if Lei /Alcon are compelled to divulge communications they had with the Privileged Holders' legal counsel in which they were seeking legal advice regarding loans they were brokering for Dynamic and/or Sabella. The Privilege Holders' injury would be equally as irreparable and substantial if Lei is compelled to disclose communications he had with Sabella in which they discussed either the legal advice sought or obtained from Dynamic/Sabella's attorneys. Once these communications with the legal counsel are disclosed, Dynamic and Sabella will have no way of "un-ringing the bell" should they be successful with their appeal. Thus, a stay is necessary to preserve the confidentiality of these privileged communications while the appeal of the Order is pending.

Second, the relative hardship to the parties favors the issuance of a stay of the Order. If this Court is to grant the stay pending the appeal of the Order, the Trustee and the other parties in interest will not be harmed at all, whereas Dynamic and Sabella will be substantially harmed if Lei/Alcon are required to disclose what all parties at the time (including Dynamic/Sabella's attorneys) considered to be confidential communications with legal counsel for the purpose of seeking legal advice.

Third, the Privilege Holders are likely to succeed on the merits of their appeal. The North Plaza loan was at all times a corporate loan by Dynamic. Also, as argued previously by the Privilege Holders before this Court, Lei/Alcon were at all times acting as Dynamic and Sabella's

[1] For purposes of the Motion Lei and The Alcon Group will be referred to as "Lei/Alcon".

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

"client representative" when they sought legal advice from Dynamic/Sabella's attorneys regarding the loans they were brokering between Dynamic and/or Sabella and the Debtor in this action. From the very beginning of their brokerage relationship, Dynamic/Sabella authorized Lei/Alcon to represent them in securing legal services and advice from Dynamic/Sabella's counsel, including the transmission of information back and forth between Dynamic/Sabella on the one hand and their attorneys on the other, with the understanding and expectation that that those communications would be confidential and afforded the same confidentiality as if Dynamic/Sabella directly communicated with their counsel. Moreover, Lei/Alcon meet the test for a "client representative" as set forth in the cases of *In Re Beiter Co.,* 16 F. 3d 929 (8th Cir. 1994) and *Memry Corp. v. Ky Oil Tech., Nv.,* 2007 U.S. Dist LEXIS 3094 (N.D. Cal. 2007).

Fourth, the Privilege Holders request for a stay would not jeopardize the public interest in any way because no issues of public concern exist in this matter.

## II.

## RELEVANT FACTUAL BACKGROUND

On February 16, 2007, the Trustee issued subpoenas to Lei and Alcon. Lei and Alcon provided documents pursuant to the subpoenas, but they also served the Trustee with an amended privilege log asserting the attorney-client privilege as to a number of documents in relation to communications between them and Dynamic/Sabella's legal counsel directly relating to legal advice sought by Dynamic/Sabella in connection with loans extended to the Debtor and other entitles in which the managing member of the Debtor held an interest.

Despite attempts by the parties to resolve these issues, on May 2, 2007, the Trustee filed a Motion to Compel Responses for Documents and Testimony pursuant to the subpoenas issued to Lei and Alcon ("Motion to Compel") [Docket No. 542]. On May 29, 2007 Lei/Alcon and Dynamic/Sabella filed an Opposition to the Trustee's Motion to Compel ("Opposition") [Docket No. 563]. In connection with the Opposition, Lei and Sabella provided declarations in which it was established that Dynamic/Sabella authorized Lei/Alcon to communicate with their attorneys to secure legal advice during the course of negotiating and documenting the loans which Lei/Alcon were brokering on behalf of Dynamic/Sabella with the Debtor or the "Johnson Related

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Entities". [The Lei Declaration is Docket No.564 and the Sabella Declaration is Docket No. 565].

The Court held a three day evidentiary hearing to resolve the issue of whether Lei/Alcon were the "client representative" of Dynamic/Sabella so as to shield from discovery any communications between legal counsel and Lei/Alcon as well as any legal advice related communications between Lei and Sabella. At the hearing Dynamic/Sabella presented testimony from three witnesses: Lei, Sabella and Richard Gruber, Dynamic's and Sabella's attorney who primarily dealt with Lei while he was arranging and negotiating the loans with the Debtor. The Trustee presented no witnesses. Additionally, at the hearing, Dynamic/Sabella offered into evidence forty-one exhibits. In connection with the evidentiary hearing the parties submitted pre-hearing briefs [Docket Nos. 704 and 712] and post-hearing briefs [Docket Nos. 734 and 735] in which they set forth the law regarding "client representative" and argued their respective positions.

On June 2, 2008 the Court entered an Order finding that Lei/Alcon were not the "client representative" of Dynamic/Sabella and granting the Trustee's Motion to Compel. The Court's holding is based on two key findings. First, the Court found that "this case is about a personal relationship between Sabella and Lei implemented to carry out Sabella's lending business...Thus, the applicable authority is those cases considering the application of the 'client representative' extension of the attorney-client privilege to individuals." Second, the Court held that there was "no reason to extend the exception [attorney-client privilege] to cover communications between Lei and counsel for Sabella. The parties asserting the exception have established no "disability" which required Lei to communicate with counsel on Sabella's behalf." On June 9, 2008 the Privilege Holders filed a Notice of Appeal from the Order.

## III.

## ARGUMENT

### A. **<u>Ample Cause Exists for the Court to Grant a Stay Pending the Privilege Holders' Appeal from the Order.</u>**

Rule 8005 of the Federal Rules of Bankruptcy Procedure ("F.R.B.P.") empowers bankruptcy courts to stay any order upon the request of an appellant pending an appeal of the order. The requirements a party must meet under F.R.B.P. 8005 are virtually identical to the

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

requirements for the issuance of a preliminary injunction. *See, Lynch v. Ca. Pub. Util. Comm'n*, No. C-04-0580 VRW, 2004 U.S. Dist. LEXIS 6022, at *6 (.D. Cal. Apr. 9, 2004). A party seeking a stay under F.R.B.P. 8005 must demonstrate the following:

> (1) the appellant will suffer irreparable injury;
> (2) no substantial harm will come to the appellee;
> (3) the appellant is likely to succeed on the merits of the appeal; and
> (4) the stay will do no harm to the public interest.

*See, Universal Life Church Inc. v. U.S.*, 191 B.R. 433, 444 (E.D. Cal. 1995).

1. <u>Dynamic and Sabella will Suffer Irreparable Injury if a Stay is Not Granted Pending the Appeal of the Order.</u>

Once privileged materials are ordered disclosed, the practical effect of the order is often irreparable by any subsequent appeal. *In re Napster*, 479 F. 3. 1078, 1088 (9th Cir. 2007). If Lei/Alcon are required to disclose confidential communications they had with Dynamic/Sabella's counsel pursuant to the Order the proverbial cat will be out of the bag and any appeal from the Order may essentially be rendered worthless. The whole point of the Privilege Holder's objection was to the Trustee's Motion to Compel was to protect communications they, Lei/Alcon and the attorneys considered confidential attorney-client communications. If the stay is not granted pending the appeal, Dynamic/Sabella will be irreparably injured because confidential communications regarding the loan transactions with the Debtor will be revealed. Further, the information could negatively effect other aspects of Dynamic/Sabella's business. Because there will be no way to "un-ring the bell," the Privilege Holders request that this Court stay the Proceedings pending the appeal of the Order.

2. <u>The Relative Hardship to the Parties Favors a Stay Pending Appeal.</u>

"[T]he relative hardship to the parties is a 'critical element' in determining whether a stay is warranted." *Lynch v. Cal. Pub. Util. Comm'n,* No. C-04-0580 VRW, 2004 U.S. Dist. LEXIS 6022, at *7 (citing *Lopez v. Heckler,* 713 F.2d 1432, 1435 (9th Cir. 1983)). "If the balance of harm tips toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits…." *Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1389 (9th Cir. 1988).

As stated above, Dynamic/Sabella will be irreparably injured if a stay is not granted while

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

the Trustee will suffer no harm if the stay is granted. As stated in Paragraph 5 of the Declaration Michael G. Fletcher ("Fletcher Dec.") filed concurrently with this Motion, the Debtor is no longer operating, the subject property has been sold, and the Trustee is in possession of the cash. Thus, there will be no harm to the collateral of the estate if the stay is granted. Also, the Trustee did not even request this information from Lei/Alcon for three years after the case was filed, thus there cannot be any information in these documents are that critical to the administration of this case. See, ¶ 5 of the Fletcher Dec.

Further, it is expected that the Trustee will argue that he is unable to proceed with other aspects of this case unless or until he has completed his discovery from Lei/Alcon. A stay does not prevent the Trustee from any discovery or taking any actions, other than asking about consequences concerning legal advice and lawyers. Further, in *Upjohn Co. V. United States*, 449 U.S. 383, 389 (1981) the United States Supreme Court stated that:

> The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.
> (internal citations omitted).

In balancing the fundamental purpose of the attorney-client privilege against the Trustee's concerns to expedite this case, the scales tip heavily in the favor of Dynamic/Sabella and preserving their confidential communications with their legal counsel. Since the harm to Dynamic/Sabella if a stay is not granted far outweighs (and is incurable) compared to any harm the Trustee may experience if a stay is granted, the Court should grant the Privilege Holders' Motion.

3. <u>The Court Should Grant the Stay Because the Plaintiff is Likely to Succeed on Merits of the Appeal.</u>

The Privilege Holders are likely to succeed on the merit of their appeal because the basis upon which the Court made its findings are not supported by either the law in the 9th Circuit or in California and is not supported by the evidence from the hearing. While the Privilege Holders are not required to make a strong showing of success on the merits because the relative

hardship to the parties tips in their favor, the Privilege Holders do have a likelihood of succeeding on the merits of their appeal.

As noted above, the Court based its ruling on two key elements: its belief that Lei and Sabella's relationship was personal in nature and that Sabella was not suffering from any "disability" that would have required her to need a client representative to meet with legal counsel on her behalf. However, in coming to the second part of its ruling, the Court relies predominantly on case law from other states whose law regarding whether an individual may use a client-representative to communicate with her attorneys is exactly the opposite of the law in California.

Further, the Order is inconsistent with the evidence from the hearing that the loan which is the subject of this Bankruptcy action proceeding was a corporate loan made and financed exclusively by Dynamic. See, Fletcher Dec. ¶ 6. It was always contemplated by the parties that the loan would be a Dynamic rather than a Sabella loan as is illustrated by the loan commitment letter (Exhibit "A" of the Fletcher Dec.) and the loan term sheet (Exhibit "B" of the Fletcher Dec.) both of which were entered into evidence at the hearing. See, Fletcher Dec. ¶ 7. Further, the loan always remained a corporate loan of Dynamic as is shown by the loan agreement (Exhibit "C" of the Fletcher Dec.) and the loan closing statement (Exhibit "D" of the Fletcher Dec.) both of these documents were entered into evidence at the hearing as well. See, Fletcher Dec. ¶ 7. Thus, the Court's finding in the Order that the relationship between Sabella and Lei was personal may be found by the Bankruptcy Appellate Panel to be contrary to the evidence at the hearing and irrelevant to the loan at issue in this case.

The Court, therefore, should grant the Privilege Holders' request for a stay of the Order.

4. <u>The Court's Decision to Grant a Stay Pending Appeal Would Do No Harm to the Public Interest.</u>

The Privilege Holders request for a stay would not jeopardize the public interest in any way. While no direct issues of public interest exist in this matter, however if it can be argued that one does exist, it would warrant the issuance of a stay. Considering the holding from *Upjohn* quoted above, Dynamic/Sabella in seeking to preserve their attorney-client privilege may actually promote "a broader public interest" on the issue of "client-representative" in this judicial district.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

The Court should, therefore, grant Dynamic's and Sabella's request for a stay.

## IV.

## CONCLUSION

Based upon the foregoing, the Privilege Holders pray this Court enter an order staying the Order Granting the Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group pending its appeal and granting such other relief as the Court deems just and proper.

DATED: June 12, 2008

Respectfully submitted,

FRANDZEL ROBINS BLOOM & CSATO, L.C.
MICHAEL GERARD FLETCHER
TRICIA L. LEGITTINO

By: /s/ Michael Gerard Fletcher
MICHAEL GERARD FLETCHER
Attorneys for Appellants Angela C. Sabella and Dynamic Finance Corporation

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | District Case No. 08-CV-01194-W-CAB<br><br>Bankruptcy Court No. 04-00769-PB11<br><br>Appeal No. 2 |
| DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,<br><br>APPELLANTS,<br>v.<br><br>CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,<br><br>APPELLEE | **EXHIBITS 16 THROUGH 19 TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**<br><br>DATE: To Be Set<br>TIME: To Be Set<br>COURTROOM: Seven<br><br>The Honorable Thomas J. Whelan, Judge Presiding |

**EXHIBIT 16**

EXHIBIT 16

PAGE 246

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Privilege Holders Dynamic Finance Corporation and Angela Sabella

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | CASE NO. 04-00769-PB11<br><br>Chapter 11<br><br>**DECLARATION OF MICHAEL GERARD FLETCHER IN SUPPORT OF DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL ON THE TRUSTEE'S MOTION TO COMPEL**<br><br>[Filed concurrently with ex parte application for order shortening time]<br><br>DATE: To Be Set<br>TIME: To Be Set<br>PLACE: Courtroom 4 |

/ / /

/ / /

/ / /

/ / /

/ / /

527259.1 1 33360-036

DECLARATION OF MICHAEL GERARD FLETCHER IN SUPPORT OF DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL ON THE TRUSTEE'S MOTION TO COMPEL

EXHIBIT 16

PAGE 247



FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**DECLARATION OF MICHAEL GERARD FLETCHER**

Michael Gerard Fletcher declares:

1. I am an attorney admitted to practice before the bar of this Court and am a member of Frandzel Robins Bloom & Csato, L.C., attorneys for Angela C. Sabella ("Sabella") and Dynamic Finance Corporation's ("Dynamic") (collectively "Dynamic/Sabella") in this matter. I have personal knowledge of the matters set forth herein, and I could and would testify competently thereto if called upon to do so.

2. The documents in this case that will have to be produced if the Court's June 2, 2008, Order on the Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group (the "Order") is enforced generally break out into the following categories:

(a) Correspondence between Dynamic Finance and its attorneys regarding legal advice sought and given in connection with the loan transactions involving the Debtor and/or other "Johnson Related Entities". This category of documents includes correspondence written by the legal counsel directly to Angela Sabella some of which Isaac Lei is copied on as well as correspondence written by the legal counsel directly to Isaac Lei most of which Angela Sabella is copied on. This category also includes correspondence written by Isaac Lei directly to Dynamic/Sabella's legal counsel in which Lei was seeking legal advice on behalf of Dynamic/Sabella from the attorneys in connection with the loans to the Debtor and/or the Johnson Related Entities;

(b) Correspondence between Angela Sabella and Isaac Lei in which they discuss the legal advice sought and/or received from Dynamic/Sabella's counsel regarding the loan transactions either to the Debtor or to the Johnson Related Entities; and

(c) Preliminary drafts of documents drafted by the legal counsel in connection with the loan transactions.

3. Further, there are two categories of conversations that will be subject to disclosure if the Order is enforced. The first category is conversations that have taken place between Sabella and Isaac Lei. These conversations include "legal advice related" topics such as (a) Sabella telling Lei the legal questions either she or Dynamic had in connection with the loans and then directing Lei to ask the attorneys these questions on either her or Dynamic's behalf; (b) Lei relaying back to Sabella the response from legal counsel regarding these questions; and (c) Lei and Sabella discussing this legal advice, the potential effect it may have on the loan transactions and whether

527259.1 2 33360-036

DECLARATION OF MICHAEL GERARD FLETCHER IN SUPPORT OF DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL ON THE TRUSTEE'S MOTION TO COMPEL

EXHIBIT 16

PAGE 248

any further clarification was needed from the attorneys. The second category of conversations that will be subject to disclosure if the Order is not stayed pending the appeal are the conversations between Lei and Dynamic/Sabella's lawyers wherein Lei and the counsel discussed the legal advice Lei was seeking on behalf of Dynamic/Sabella and, in turn, the actual legal advice and opinions that the attorneys gave in response which Lei would then relay from the attorneys to Dynamic/Sabella.

4. Dynamic and Sabella will be substantially and irreparably harmed if their Motion for Stay Pending Appeal of the Order ("Motion ") is not granted. Dynamic/Sabella will be damaged if these documents and conversations are ordered disclosed while their appeal is pending not only because what they and their attorneys believed to be confidential legal advice will be disseminated, but also because if Dynamic/Sabella are successful with their appeal there will be no way to return the confidentiality of these attorney-client communications back to the status quo. The instant these documents and conversations are disclosed the confidential nature of them is destroyed and no appeal or judicial decree can ever compensate Dynamic/Sabella for what will have been lost. Further, enforcement of the Order pending the appeal will strip Dynamic/Sabella not only of their right to have confidential communications with their counsel, but possibly also their right to an appeal. A denial of the Motion may effectively render moot Dynamic/Sabella's appeal since even if they are successful before the Bankruptcy Appellate Panel, they will have already lost the right they were seeking to preserve, namely the confidential communications with their legal counsel.

5. The Trustee will suffer no harm if the Motion is granted. Granting the Motion does not present any exigent circumstance that could harm or even effect the collateral of the estate. The Debtor is no longer in operation, the subject property has been sold, and the Trustee is in possession of the cash. Further, this case has been pending since January 2004, yet the Trustee did not even seek this confidential information from Isaac Lei/the Alcon Group until February 2007; thus for three years this case was able to be administered without the disclosure of the documents and conversations detailed in Paragraphs 3 and 4 above. Regardless of what method or test is used, when the hardships Dynamic/Sabella will suffer if the Motion is not granted are

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

527259.1 3 33360-036

DECLARATION OF MICHAEL GERARD FLETCHER IN SUPPORT OF DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL ON THE TRUSTEE'S MOTION TO COMPEL

EXHIBIT 16
PAGE 249

balanced against the "concerns" the Trustee may have if the Motion is granted, the scales tip exceedingly in favor of granting the Motion since Dynamic/Sabella will be substantially and irreparably harmed if the Order is not stayed pending their appeal.

6. Based on the exhibits and testimony at the "client representative" hearing (the "Hearing") the loan to the Debtor which is the subject of this proceeding ("North Plaza Loan") was a corporate loan made by Dynamic Finance Corporation to the Debtor. It was always contemplated by the parties that the lender on the North Plaza Loan would be Dynamic and not Angela Sabella personally.

7. I was lead counsel on behalf of Dynamic/Sabella and was present for each day of the Hearing from which the Order stems. The following evidence from the Hearing illustrates that the North Plaza Loan was always a Dynamic Finance corporate loan: (a) the letter of intent sent by Dynamic to the Borrower (Exhibit 34A at the Hearing and attached hereto as Exhibit "A"); (b) the loan term sheet sent by Dynamic to the Borrower (Exhibit 50 at the Hearing and attached hereto as Exhibit "B"); (c) the North Plaza Loan Agreement (Exhibit 70 at the Hearing and attached hereto as Exhibit "C"); and (d) the loan closing statement (Exhibit 75 at the Hearing and attached hereto as Exhibit "D"). Further, there was no evidence at the Hearing that the North Plaza Loan was financed personally by Angela Sabella or that the parties even contemplated this as an option.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed this 12th day of June, 2008, at Los Angeles, California.

/s/ Michael Gerard Fletcher
MICHAEL GERARD FLETCHER

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

527259.1 4 33360-036
DECLARATION OF MICHAEL GERARD FLETCHER IN SUPPORT OF DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL ON THE TRUSTEE'S MOTION TO COMPEL

EXHIBIT 16
PAGE 250

**EXHIBIT 17**

EXHIBIT 17
PAGE 251

Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
**BAKER & McKENZIE LLP**
12544 High Bluff Drive, Third Floor
San Diego, CA 92130-3051
Telephone: +1 858 523 6200
Facsimile: +1 858 259 8290

Counsel for Chapter 11 Trustee,
Richard M Kipperman

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>NORTH PLAZA, LLC,<br>a California Limited Liability Company,<br><br>Debtor | Case No.04-00769 PB11<br><br>Chapter 11<br><br>**OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]**<br><br>DATE: July 2, 2008<br>TIME: 2 p.m.<br>DEPT: 4<br>JUDGE: Chief Judge, Peter W. Bowie |

//

//

//

//

//

//

//

1

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]

SDODMS1/690854.1

EXHIBIT 17

PAGE 252

## TABLE OF CONTENTS

Page

I. THE STANDARD FOR A DISCRETIONARY STAY UNDER FRBP 8005 REQUIRES ANALYSIS OF THE EQUITIES IN LIGHT OF THE MOVANTS PROBABILITY OF SUCCESS ON THE MERITS OF THEIR APPEAL .......... 2

II. THE MOVANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR APPEAL .......... 4

A. The Factual Record Has Been Fully Developed and Is Not Susceptible to Review for Clear Error .......... 5

B. Movants Have Raised No Legitimate Questions of Law Requiring Review .......... 8

III. THE MEASURE OF THE HARM TO THE MOVANTS IS NULLIFIED BY THE FACT THAT THEY HAVE NO COLORABLE CHANCE FOR SUCCESS ON THE MERITS; ALTERNATIVELY, THE ESTATE AND ITS CREDITORS WILL SUFFER SEVERE PREJUDICE FROM A STAY PENDING APPEAL .......... 9

IV. A BRIEF COMMENT ON POLICY CONSIDERATIONS AND THE PUBLIC INTEREST .......... 12

V. CONCLUSION .......... 12

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

# TABLE OF AUTHORITIES

Page

## CASES

Ariz. Contrs. Association,Inc. v. Candelaria, 2008 U.S.Dist. LEXIS 16555 (D. Ariz. Feb. 19, 2008) .......... 2

In re Bieter Co., 16 F.3d 929 (8th Cir. 1994) .......... 4, 9

Blankenship v. Boyle, 447 F.2d 1280 (D.D.C. 1971) .......... 5

County of Alameda v. Weinberger, 520 F.2d 344, 1975 U.S.App. LEXIS 14117 (9th Cir.1975) .......... 3

In re Dial Industries, Inc., 137 Bankr. 247, 250-251 (Bankr. N.D. Ohio 1992) .......... 4

Gagan v. Sharer, 2005 U.S. Dist. LEXIS 27409 (D. Ariz. Nov. 1, 2005) .......... 5

Garcia-Mir v. Meese, 781 F.2d 1450 (11th Cir. 1986) .......... 4

In re General Credit Corp., 283 B.R. 658 (S.D.N.Y. 2002) .......... 4

Golden Gate Restaurant Association v. City of San Francisco, 512 F.3d 1112 (9th Cir. 2008) .......... 3

Hilton v. Braunskill, 481 U.S. 770 (1987) .......... 2, 4

Ohanian v. Irwin (In re Irwin) 338 B.R. 839 (E.D. Cal. 2006) .......... 4

Lopez v. Heckler, 713 F.2d 1432 (9th Cir. 1983), *rev'd on other grounds*, 469 US. 1082 .......... 3

Natural Resources Defense Council, Inc. v. Winter, 502 F.3d 859 (9th Cir. 2007) .......... 3

Rose Townsend Trust v. Johnston (In re Johnston) No. 06-80040, 2007 Bankr. LEXIS 3092 (E.D. Wash. Sept. 7, 2007) .......... 3

Silicon Valley Bank v. Pon (In re Pon) 1994 U.S.Dist. LEXIS 2559 (N.D. Cal. Feb. 25, 1994) .......... 4

United States v. Fitzgerald, 884 F.Supp. 376 (D. Idaho 1995) .......... 4

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

## TABLE OF AUTHORITIES
**(continued)**

**Page**

United States v. Texas, 523 F.Supp. 703 (E.D. Tex. 1981) ..... 2, 4

Yeganeh v. Sims, 2006 U.S.Dist. LEXIS 32765 (N.D. Cal. May 12, 2006) ..... 4, 9

**FEDERAL STATUTES & RULES**

11 U.S.C. §§ 323 ..... 11

11 U.S.C. § 502, ..... 11

11 U.S.C. § 541 ..... 11

11 U.S.C. §§ 547(b) ..... 11

11 U.S.C. § 704 ..... 11

11 U.S.C. § 721 ..... 11

11 U.S.C. § 1106(a) ..... 11

28 U.S.C. § 158 ..... 2

Fed. R. Civ. Proc. 62 ..... 5

Fed. R. Bankr. Proc. 8001 ..... 2, 3

Fed. R. Bankr. Proc. 8005 ..... 2, 5, 7

Fed. R. Bankr. Proc. 8013 ..... 8

**OTHER**

Bender Practice Guide, Federal Pretrial Civil Procedure in California § 19.08[3][f] ..... 3, 5

Wright, Miller & Kane, Federal Practice and Procedure Civil 2d § 2904 (West Pub. 1995 & Supp. 2008) ..... 3

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
**BAKER & McKENZIE LLP**
12544 High Bluff Drive, Third Floor
San Diego, CA 92130-3051
Telephone: +1 858 523 6200
Facsimile: +1 858 259 8290

Counsel for Chapter 11 Trustee,
Richard M Kipperman

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>NORTH PLAZA, LLC,<br>a California Limited Liability Company,<br><br>Debtor | Case No.04-00769 PB11<br><br>Chapter 11<br><br>**OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]**<br><br>DATE: July 2, 2008<br>TIME: 2 p.m.<br>DEPT: 4<br>JUDGE: Chief Judge, Peter W. Bowie |

Chapter 11 Trustee, Richard M Kipperman ("Trustee"), the prevailing party in respect to the Order on Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group dated May 30, 2008, hereby submits this Opposition to the Motion of Dynamic Finance Corporation ("DFC") and Angela C. Sabella ("Ms. Sabella") (collectively, the "Movants")[1] for Stay Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8005 ("Motion"). For the reasons set forth below, the

[1] The Movants' own reference to themselves as the "Privilege Holders," is presumptuous at this point and will not be incorporated herein.

1

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]

SDODMS1/690854.1

EXHIBIT 17
PAGE 256

Trustee respectfully requests the Court to deny the Motion.

A stay pending appeal is an "extraordinary remedy" that should be used sparingly. *Ariz. Contrs. Ass'n, Inc. v. Candelaria*, 2008 U.S. Dist. LEXIS 16555 (D. Ariz. Feb. 19, 2008) (citing *United States v. Texas*, 523 F. Supp. 703, 729 (E.D. Tex. 1981). Here, there is no just reason for granting a stay. Movants raise no legitimate legal questions in respect to the Order; rather, the Movants' chances of success on the merits is virtually nil. The Movants cannot receive a stay pending appeal under Fed. Rule Bankr. Proc. 8005 based solely upon assertions of irreparable harm, absent a colorable case on the merits on appeal. As such, their request for a stay pending appeal should be denied.

## I. THE STANDARD FOR A DISCRETIONARY STAY UNDER FRBP 8005 REQUIRES ANALYSIS OF THE EQUITIES IN LIGHT OF THE MOVANTS PROBABILITY OF SUCCESS ON THE MERITS OF THEIR APPEAL

A stay of an order is "an extraordinary device which should be sparingly granted." *Ariz. Contrs. Ass'n, Inc. v. Candelaria*, 2008 U.S. Dist. LEXIS 16555 at *5-6. In determining whether a discretionary stay should be granted from an appeal to a district court or bankruptcy appellate panel from the final[2] order of the bankruptcy court under Fed. Rule Bankr. Proc. 8005, most courts have adopted the standard used in determining whether to grant a stay pending appeal of a *preliminary* injunction under Federal Rule Civ. Proc. 62(c). That familiar four-part test articulated by the Supreme Court in *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987), has been adopted by virtually all the circuit courts of appeal, including the Ninth Circuit. That test is:

(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits;

(2) whether the applicant will be irreparably injured absent a stay;

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and

(4) where the public interest lies.

*Id.*

[2] Under 28 U.S.C. § 158 and Fed. R. Bankr. Proc. 8001, generally only "final" orders of a bankruptcy court are appealable.

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

Because the burden of meeting this standard lies with the moving party and is a heavy one, "more commonly stay requests will not meet this standard and will be denied." Wright, Miller & Kane, *Federal Practice and Procedure Civil 2d* § 2904 (West Pub. 1995 & Supp. 2008); *see also* 2 Matthew Bender Practice Guide, Federal Pretrial Civil Procedure in California § 19.08[3][f] (noting that the moving party bears the burden of proof as to each element of the test).

Although under Rule 8005 the four enumerated factors utilized in determining the applicability of a stay are identical to those used for determination of a stay of a preliminary injunction pending appeal, the practical application of these four factors in a case arising under the Bankruptcy Code is very different. In the context of consideration of a stay pending injunction under Rule 62(c), courts often apply several alternative formulations of this traditional test in a "sliding scale" fashion, with the strength of any one factor varying inversely with the strength of the remaining factors. *See, e.g., Lopez v. Heckler*, 713 F. 2d 1432 (9th Cir. 1983, *rev'd on other grounds*, 469 US. 1082 (1984).[3]

Courts of this circuit, as well as those of other circuits, generally agree[4] that under Rule 8005 a sliding scale formulation is not appropriate for use in making the determination of whether a stay should be granted pending the appeal of a bankruptcy court order. *See Rose Townsend Trust v. Johnston (In re Johnston)*, No. 06-80040, 2007 Bankr LEXIS 3092 (E.D. Wash. Sept. 7, 2007) (rejecting movants' citations to cases, such as *Lopez v. Heckler*, 713 F. 2d 1432, that did not rely upon F.R.B.P. 8005). The reason for the rejection of a sliding scale analysis under Fed. R. Bankr. Proc. 8005 relates to the procedural posture of an appeal, i.e., whether it is from a final order of a

---

[3] The Ninth Circuit, for example uses at least three "alternative" tests of this type. For example, to prevail the moving party must show either (1) "a strong likelihood of success on the merits" and "the possibility of irreparable injury to plaintiff if preliminary relief is not granted" or (2) "that serious legal questions are raised and that the balance of hardships tips sharply in its favor." *Golden Gate Restaurant Ass'n. v. City of San Francisco*, 512 F.3d 1112, 1116 (9th Cir. 2008) (quoting *Natural Res. Def. Council, Inc. v. Winter*, 502 F.3d 859, 862 (9th Cir. 2007); *Lopez v. Heckler*, 713 F.2d 1432, 1435 (9th Cir. 1983)). Under the second alternative, the legal questions must be so "serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." *County of Alameda v. Weinberger*, 520 F.2d 344, 1975 U.S. App. LEXIS 14117, 349 n.12 (9th Cir.1975).

[4] The existing case law, although unanimous on this point, could benefit from a published opinion more clearly elucidating the Rule 8005 standard to prevent the occasional mistaken reliance by applicants on the more liberal *construction* of the identical standard under cases construing Fed. R. Civ. Proc. 62(c).

3

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
REPLY OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]
SDODMS1/690854.1

EXHIBIT 17
PAGE 258

bankruptcy court on the merits; or from a preliminary determination, not on the merits. In other words, a stay upon injunction "presupposes no prior judicial ruling." *In re General Credit Corp.*, 283 B.R. 658 (S.D.N.Y. 2002) (Rakoff, J.).[5] In contrast, a stay of an order decided on the merits interrupts the ordinary process of judicial review and postpones relief for the prevailing party at trial. *See United States v. Texas*, 523 F. Supp. 703, 729 (E.D. Tex. 1981).

Under Rule 8005, therefore, the strength of any one factor does not vary inversely with the strength of the remaining factors. Rather, *each factor* must be proved by the moving party by a preponderance of the evidence. *See, e.g., Silicon Valley Bank v. Pon (In re Pon)*, 1994 U.S. Dist. LEXIS 2559 at * 6 (N.D. Cal. Feb. 25, 1994) (citing *In re Dial Industries, Inc.*, 137 Bankr. 247, 250-251 (Bankr. N.D. Ohio 1992). An appellant's failure to persuade the court regarding even one of these factors thus requires denial of the stay. *Id.; see also, e.g., Ohanian v. Irwin (In re Irwin)*, 338 B.R. 839 (E.D. Cal. 2006); *Yeganeh v. Sims*, 2006 U.S. Dist. LEXIS 32765 at *19 (N.D. Cal. May 12, 2006) (stating that failure to prove likelihood of success on the merits alone would be grounds for denial of the stay).

## II. THE MOVANTS ARE NOT LIKELY TO SUCCEED ON THE MERITS OF THEIR APPEAL

First, to receive a stay under Rule 8005, the Movants must demonstrate a "*strong* showing that [they are] likely to succeed on the merits." *Hilton v. Braunskill*, 481 U.S. 770 at 776. The likelihood of success on the merits is a threshold issue, normally "the most important" factor in the determination of whether a stay may be granted. *United States v. Fitzgerald*, 884 F. Supp. 376, 377 (D. Idaho 1995) (citing *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986)).

Here, as shown below, Movants' chances of success on the merits of their appeal are virtually nil. A fully developed record establishes the inapplicability of the attorney-client privilege as to communications in which Mr. Lei was included. The law is decidedly clear that the "client representative" extension of the privilege is a corporate construct. *In re Bieter Co.*, 16 F.3d 929, 937

---

5 Significantly, the courts of the Second Circuit have suggested that a higher standard for likelihood of success is appropriate under Rule 8005. *See, e.g., id.* ( "In determining a stay upon appeal of a bankruptcy court order under Rule 8005, "a lower court has already ruled adversely to the proponent of the stay." . . . . [R]espect for that ruling and concern for husbanding scarce judicial resources counsels a higher burden.").

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

(8th Cir. 1994). Thus, the stay may not be granted absent a threshold strong showing of likely success on the merits, regardless of any showing on the Movants' part of irreparable harm. *See, e.g.*, *Blankenship v. Boyle*, 447 F.2d 1280 (D.D.C. 1971); *cf. Gagan v. Sharer*, 2005 U.S. Dist. LEXIS 27409 (D. Ariz. Nov. 1, 2005)[6]

**A. The Factual Record Has Been Fully Developed and Is Not Susceptible to Review for Clear Error**

The Movants make a fundamental error in stating that they "are not required to make a strong showing of success on the merits because the relative hardship tips in their favor." [Motion at 8-9.] As stated above, this is an incorrect statement of the law in respect to Fed. Rule Bankr. Proc. 8005. Rather, the Movants must, by a preponderance of the evidence, make a "strong showing that [they are] likely to succeed on the merits."

Here, Movants' burden will be extraordinarily heavy. In this case, following extensive briefing of the Trustee's Motion to Compel and counsels' submission of pre-trial briefs, the Court held a three-day evidentiary hearing on the issue of whether Isaac Lei could qualify as a "client representative" for either DFC or Sabella. Testimony was heard from various witnesses, including Ms. Sabella and, of course, from Mr. Lei.

Specifically, the Movants challenge the factual finding by the Court that

> with respect to the lending activities in with Lei was involved, it was Sabella the individual that was the lender/client . . . The testimony at the trial indicated that it was Sabella who made the decision of whether to loan personally or through Dynamic. . . . In the view of the Court, after considering the evidence, this case is about a personal relationship between Sabella and Lei implemented to carry out Sabella's lending business, which sometimes was funded through Dynamic.

Order on Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group dated May 30, 2008 at 6-7 ("Order").

In challenging these findings, the Movants point to the loan commitment letter, the loan term

---

[6] In this respect, the Movants would not be able to obtain a stay even under the "alternative" formulations used under Fed. R. Civ. Proc. 62(c), under which "it must be shown as an irreducible minimum that there is a *fair chance* of success on the merits," even if the balance of harm tips sharply in their favor. 2 Matthew Bender Practice Guide, Federal Pretrial Civil Procedure in California § 19.08[3][d] (emphasis added).

5

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
REPLY OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]
SDODMS1/690854.1

EXHIBIT 17
PAGE 260

sheet, and the loan agreement, each admitted into evidence and pertaining to the loan made to North Plaza.[7] The Movants, however, ignore the testimony of Mr. Lei, which establishes the Court's factual findings that the relationship was a personal one between Ms. Sabella and Mr. Lei. Although the record is replete with examples, the following brief extract of the trial transcript is representative:

Q: [By Mr. Murray]. Would you agree that in excess of 90 percent of the loans you brokered over the last ten years have been for Ms. Sabella?

A: [By Mr. Lei]. Yes.

Q: Now, Ms. Sabella you have referred to often as the lender. Is that correct?

A: Excuse me?

Q: You have referred, throughout your testimony today and yesterday, to Ms. Sabella as the lender; correct?

A: Yes.

Q: Sometimes you refer to Ms. Sabella; correct?

A. Yes.

Q: Sometimes you refer to Dynamic; is that correct?

A: Yes.

Q. Now, ultimately if Ms. Sabella decides to make a loan, would you agree that she decides whether she's making the loan in her individual capacity as opposed to through Dynamic.

A: Yes.

Q: Now, ultimately if Ms. Sabella decides to make a loan, would you agree that she decides whether she's making the loan in her individual capacity as opposed to through Dynamic?

A: Yes.

Q: And with respect to the decision whether or not to make the loan, she's the one who makes that decision; true?

A: Ultimately, yes.

[Transcript of Evidentiary Hearing dated March 20, 2008 at 182 line 16 through 183 line 14.]

---

[7] The subject of the Evidentiary Hearing, of course, necessarily concerned the entire relationship between Lei and Sabella relating to the Bill Johnson affiliated entities, and not just in their dealings in respect to North Plaza.

6

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
REPLY OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]
SDODMS1/690854.1

EXHIBIT 17
PAGE 261

Q: [By the Court]. [W]hat are specific—not hypothetical examples, but specific examples of the kinds of services that you would perform if asked or would volunteer to perform for Ms. Sabella.

A: [By Mr. Lei]. Like, if there's something on the west side on my way that needs to be delivered, I would deliver it on may way home.

Q: [By Mr. Murray]. So in other words, you provide services that don't really have anything to do with your brokerage work; is that correct?

A: Yes.

Q: She'd ask you to pick something up, you would pick it up; is that correct?

A: If it's within that vicinity, yes.

Q: If she needs something delivered, you'd be happy to deliver it for her; is that correct?

A: To provide more services, yes.

Q: And so you are willing to provide these extra services; is that correct?

A: Yes.

[*Id.* at 189, line 18 to 190, line 16.]

Furthermore, the Court clearly addressed the fact that although it was aware that nominally "Sabella conducts her business at times in the name of Dynamic, it is clearly her individual business and loans made by her." [Order at 7, lines 1-4.] The documents alluded to by the Movants are merely examples of this convenient arrangement. Furthermore, the full documentary record specifically exemplifies Court's factual analysis and repudiates Movants' contention that "[i]t was always contemplated by the parties that the loan would by a Dynamic rather than a Sabella loan . . . ." For example, Trial Exhibit No. 39 establishes that on June 12, 1998, Isaac Lei informed Angela Sabella that Ron Vallas and Bill Johnson called Isaac Lei to see if Ms. Sabella was "interested in providing a loan" to North Plaza. Likewise, the initial term sheet provided to Bill Johnson, Trial Exhibit No. 40, states that "[p]ursuant to our conversation, the following are the terms of the proposed $3,400,000 loan *with Angela Sabella*" (emphasis added).

Not mentioned in the Motion, but to the extent Movants would seek to challenge the Court's factual findings concerning Lei's relationship as a "client representative" of DFC, again the Court's

7

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
REPLY OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]
SDODMS1/690854.1

EXHIBIT 17
PAGE 262

findings are overwhelmingly supported by the evidence. Here, the evidence fully demonstrates, as noted by the Court, [Order at 9], the distinctions between Mr. Lei's relationship with DFC to the factual circumstances present in respect to the *In re Bieter* case.

Under Fed. R. Bankr. Proc. 8013, on appeal to a district court, "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." The court's factual findings are well supported by the substantial evidence and cannot be overturned.

**B. <u>Movants Have Raised No Legitimate Questions of Law Requiring Review</u>**

The Movants otherwise claim that the Court made an error of law. In this respect, the Movants complain about the Court's ruling that the client representative extension of the attorney-client privilege will only apply to an individual client "where the individual client is somehow disabled and unable to conduct their legal affairs." [Order at 7, lines 16-18.] In this respect, Movants raise the flimsy argument that this ruling will be overturned on appeal because "the Court relies predominantly on case law *from other states* whose law regarding whether an individual may use a client [] representative to communicate with her attorneys is exactly the opposite of the law in California." [Motion at 9.]

Movants are patently incorrect and grossly misapply *Erie* principles in making this assertion. The Court did not use "case law from other states." The Court utilized federal common law, which is the correct approach under principles of *Erie* and under the dictates of Federal Rules of Evidence. Federal Rule of Evidence 501 states that

> the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted ***<u>by the courts of the United States</u>*** in the light of reason and experience.

There is no disagreement under federal common law with respect to the Court's conclusions of law in respect to the individual client. Thus, the Movants' legal argument appears to boil down to an assertion that Federal Rule of Evidence 501 should be ignored. This is not an argument that should win them a stay under any circumstances. A meritless argument does not entitle a party to a

8

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
REPLY OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]
SDODMS1/690854.1

EXHIBIT 17
PAGE 263

stay.

Furthermore, it is a bit late in the game for the Movants to now attempt to disown *In re Bieter Co.*, 16 F.3d at 929, a case Movants embraced and cited with approval numerous times in their pleadings—both in post pre- and post-trial briefs—and invoked numerous times at the evidentiary hearing. *In re Bieter* itself enunciates the federal common law principle that the "client representative" extension only applies in the case of where the client is a corporation. *Id.* at 935.

## III. THE MEASURE OF THE HARM TO THE MOVANTS IS NULLIFIED BY THE FACT THAT THEY HAVE NO COLORABLE CHANCE FOR SUCCESS ON THE MERITS; ALTERNATIVELY, THE ESTATE AND ITS CREDITORS WILL SUFFER SEVERE PREJUDICE FROM A STAY PENDING APPEAL

The Movants stress the "irreparable harm" that they will suffer if the privileged communications with their attorneys are disclosed. They couple this with the standard references to "un-ringing the bell" (sometimes alternatively stated prosaically as "unscrambling the egg."). This allegory assumes, however, that there is a bell to be un-rung or an egg to be unscrambled. Here, there is no privilege to be lost. The Movants have raised no colorable question of law or fact that rebuts this fact. As such, the Movants' claim of irreparable harm is an illusory chimera. A stay under these circumstances would only result in unnecessary delay of the execution of the Court's lawful order. As stated above, a moving party's failure to establish success on the merits is reason for denial of a stay, and any irreparable harm that Movants may demonstrate is nullified by their failure to raise a colorable case for appeal on the merits.

On the other hand, the Movants must show that the bankruptcy estate and its creditors would not be harmed by a stay. *Yeganeh v. Sims (In re Yeganeh)*, 2006 U.S. Dist. LEXIS 32765 (N.D. Cal. May 12, 2006). Here, the Movants (focusing on the harm to come to themselves from enforcement of the Order) have not met this burden. In characterizing the harm to the other interested parties, as "negligible to nonexistent," [Notice at 2], Movants have merely given lip service to this very important consideration.

The Court is, of course, distinctly familiar with the history of this Bankruptcy Case—along with the various and longstanding shenanigans of the Movants in respect to attempting to shield the documents at issue from production through their improper claims of attorney-client privilege. In

9

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
REPLY OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]
SDODMS1/690854.1

EXHIBIT 17
PAGE 264

view of this, and because much of the background has also previously been discussed at length in the Trustee's Points and Authorities in Support of the Motion to Compel, the Trustee will spare the Court an exhaustive review of the Trustee's long struggle to obtain the documents. Suffice it to say that, contrary to the Movants' self-serving proclamations, the documents are both *relevant* and *critical* to: (i) the Trustee's defense of the estate against the pending adversary proceeding brought by DFC, Adv. Proc. No. 08-90035, *Dynamic Finance Corporation v. Richard Kipperman*; and (ii) to the final determination of this Bankruptcy Case and the proper distribution of assets of the estate to creditors. Delay in the production under any stay will cause distinct prejudice to the Trustee and the estate in both of these respects.

The Movants claim that "the Trustee did not even request this information from Lei/Alcon for three yeas after the case was filed," and thus make the related assumption that "there cannot be any information in these documents that are that critical to the administration of this case." [Motion at 8]. This argument rings unusually shallow. The Trustee was not even appointed in this case until June 16, 2006. The Order authorizing the Trustee's issuance of Rule 2004 subpoenas was not entered until September 19, 2006. After numerous battles regarding obtaining the books and records of the estate and after meeting strong resistance from initial deponents (and accordant delays), the Trustee was first in a position to issue the Subpoena to Mr. Lei on February 16, 2007. It has taken well over a year and a half to obtain the Order compelling the production of documents pursuant to this Subpoena. The docket is also replete with evidence of the struggles to obtain these documents endured by creditors of the estate, prior to the Trustee's appearance, in particular with respect to discovery conducted with respect to the Second Motion for Order on Settlements by the Bree Creditors. As such, the battle—rather, in light of its long duration, perhaps better phrased as the "war"—to obtain production of these documents dates back at least to January of 2006, if not earlier. [*See, e.g.,* Motion for Ex Parte Relief -- Ex Parte Application By Dynamic Finance Corp. and Angela Sabella For Order Shortening Time to Serve Notice and Motion For Protective Order and to Specially Set Hearing Thereon dated January 18, 2006 (Docket Entry 373); *see also* Notice of Motion and Motion to Compel Production of Documents by Bree Creditors, dated March 16, 2006 (Docket Entry 421.)]

10

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
REPLY OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]
SDODMS1/690854.1

EXHIBIT 17
PAGE 265

Movants' suggestion that "[a] stay does not prevent the Trustee from taking any discovery or taking any actions, other than asking about consequences concerning legal advice and lawyers" sorely misses the point. Quite candidly, the very fact of the critical importance of these documents to the determination of the proper equities in this case is ***proved*** by the extreme determination of Movants to keep these documents out of the hands of the Trustee (or at least delay the Trustee from obtaining them), no matter how long it takes; no matter what the cost.

As to the importance of the documents to the progress of the case, the statements contained in the Trustee's Points and Authorities in Support of the Motion to Compel were true then—and (as affirmed by the Court's Order compelling production) remain so today:

> As set forth below, Lei is not a mere disinterested third party in this case: Lei possesses extensive personal knowledge of the interrelationships of the Johnson/Sabella Affiliated Entities in the larger Johnson/Sabella business empire, particularly as it relates to North Plaza. Lei appears to have acted for Ms. Sabella in most, if not all, of the transactions involving North Plaza and is therefore likely to possesses documents that reveal the true characterization and nature of the interrelated transactions between North Plaza and the Johnson/Sabella Affiliated Entities. The Trustee is informed and believes that Lei holds key information pertinent to the true extent of the property of the estate—which may include recapture of substantial, highly valuable real and other tangible property interests. Information and documents in Lei's possession may otherwise be relevant to potential claims by the estate against insiders of the Debtor and such persons' agents. The Trustee is informed and believes that, in many respects, Examinees may be the only reliable source for certain key documents and information.
>
> . . .
>
> Should Lei be successful in withholding documents on these purported grounds, the Trustee will be impeded and/or prevented from carrying out his statutory duties, which include accounting for and maximizing all property of the estate, investigating the debtor's financial affairs, objecting to claims, and recovering fraudulent and other avoidable transfers. See, e.g., 11 U.S.C. §§ 323, 502, 541, 11 U.S.C. §§ 547(b), 704, 721, 704(1) & (2), 1106(a), 1106(a). As such, the Trustee respectfully requests this Court grant the Trustee's Motion, thereby permitting the Trustee to obtain the information necessary for him to fulfill his statutory duties to the bankruptcy estate.

[Richard M Kipperman, Chapter 11 Trustee's Motion to Compel Responses to Subpoenas for Documents and Testimony to Isaac Lei, The Alcon Group and Custodian of Records of The Alcon Group Under FRCP 45 and FRBP 9016, dated May 2, 2007 at 3, Docket Entry 542.] In short, if a

11

Baker & McKenzie LLP
12544 High Bluff Drive, Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
REPLY OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]
SDODMS1/690854.1

EXHIBIT 17
PAGE 266

stay is granted, the entire bankruptcy case will come to a most discouraging halt.

## IV. A BRIEF COMMENT ON POLICY CONSIDERATIONS AND THE PUBLIC INTEREST

This is not a case "affecting the public interest." Although a Bankruptcy Case is an *in rem* proceeding and thus affects the rights of the public in general to the "*res*" constituting the bankruptcy estate, there is not a public right at stake in the traditional sense used under the four factor test, such as a constitutional issue or other right affecting the public at large. As such, this factor need not be specifically added into the equitable determination regarding the granting of the stay.

In the end analysis, however, larger policy considerations are necessarily a factor in the determination of any motion requesting a stay of an order of a bankruptcy court in a case arising under the Bankruptcy Code. A longstanding core policy of the Bankruptcy Code is to provide a cost-effective and speedy process to minimize the cost to creditors. Thus, Rule 8005, along with all the other Fed. Rules Bankr. Proc., need to be construed in light of this overriding policy goal. Rule 1001 states: "These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding." In light of these considerations and the havoc the continued delay from a stay would continue to wreak on the estate—and particularly viewed in light of the very thin meritorious reed upon which their Motion hinges—the policy of the Bankruptcy Code militates against granting the Movants' Motion.

## V. CONCLUSION

For the reasons set forth above, the Trustee respectfully requests that the Court deny the Movants' Motion for a stay pending appeal.

Dated: June 25, 2008 BAKER & McKENZIE LLP

By: /s/ Ali M.M. Mojdehi
Ali M.M. Mojdehi
Janet D. Gertz
Counsel for Chapter 11 Trustee,
Richard M Kipperman

12

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 04-00769-PB11
REPLY OPPOSITION OF CHAPTER 11 TRUSTEE, RICHARD M KIPPERMAN TO MOTION OF DYNAMIC FINANCE CORPORATION AND ANGELA C. SABELLA FOR STAY PENDING APPEAL [FRBP 8005]
SDODMS1/690854.1

EXHIBIT 17
PAGE 267

**EXHIBIT 18**

EXHIBIT 18
PAGE 268

Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
**BAKER & McKENZIE LLP**
12544 High Bluff Drive, Third Floor
San Diego, CA 92130-3051
Telephone: +1 858 523 6200
Facsimile: +1 858 259 8290

Counsel for Chapter 11 Trustee,
Richard M Kipperman

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re:<br><br>NORTH PLAZA, LLC,<br>a California Limited Liability Company,<br><br>Debtor | Case No.04-00769 PB11<br><br>Bankruptcy Appeal No. 2<br><br>Chapter 11<br><br>**ELECTION TO HAVE MATTER HEARD BY DISTRICT COURT** |

Richard M Kipperman, Chapter 11 Trustee, respectfully elects pursuant to 28 U.S.C. §158(c)(1)(B) to have the appeal taken from the Order on Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group, dated May 30, 2008, heard by the United States District Court, Southern District of California.

Dated: June 25, 2008

BAKER & McKENZIE LLP

By: /s/ Ali M.M. Mojdehi
Ali M.M. Mojdehi
Janet D. Gertz
Counsel for Chapter 11 Trustee,
Richard M Kipperman

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

1

CASE NO 04-00769-PB11
ELECTION TO HAVE MATTER HEARD BY DISTRICT COURT

SDODMS1/690888.1

EXHIBIT 18
PAGE 269

**EXHIBIT 19**

EXHIBIT 19
PAGE 270

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@franzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Appellants Angela C. Sabella and Dynamic Finance Corporation

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re<br><br>NORTH PLAZA, LLC,<br><br>Debtor. | CASE NO. 04-00769-PB 11<br><br>Bankruptcy Appeal No. 2<br><br>Chapter 11<br><br>**REPLY TO OPPOSITION OF TRUSTEE TO DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL OF ORDER ON THE TRUSTEE'S MOTION TO COMPEL DISCOVERY FROM ISAAC LEI/THE ALCON GROUP**<br><br>DATE: July 2, 2008<br>TIME: 2:00 p.m.<br>DEPT: Courtroom 4 |

///

///

///

///

///

///

///

///

528486.1 1 33360-036
REPLY TO OPPOSITION TO DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL
EXHIBIT 19
PAGE 271

## TABLE OF CONTENTS

PAGE

I. INTRODUCTION.....1

II. ARGUMENT.....2

A. The Standard for a Discretionary Stay of Appeal pursuant to Rule 8005.....2

B. The Balance of the Hardships Tips in Favor of Granting the Motion.....3

C. Dynamic and Sabella Have a Likelihood of Success on Appeal.....5

III. CONCLUSION.....13

528486.1 i 33360-036

REPLY TO OPPOSITION TO DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL

EXHIBIT 19
PAGE 272

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alaska v. Native Village of Venetie,
856 F.2d 1384 (9th Cir. 1988)........................................ 2

Atmel Corp v. St. Paul Fire & Marine Insurance Co.,
409 F. Supp. 2d 1180 (N.D.Cal. 2005) ........................................ 7

Baird v. Koerner,
279 F.2d 623 (9th Cir. 1960)........................................ 12

In re Bautista,
2007 Bankr. LEXIS 4170 (Bankr. N.D. Cal. 2007) ........................................ 11

In re Couch,
80 B.R. 512 (S.D.Cal. 1987) ........................................ 9

Covell v. Heyman,
111 U.S. 176 (1884) ........................................ 12

Darr v. Burford,
339 U.S. 200 (1950) ........................................ 11

Garrison v. General Motors,
213 F. Supp. 515 (S.D.Cal. 1963) ........................................ 12

In re General Credit,
283 B.R. 658 (S.D.N.Y 2002)........................................ 3

In re Geothermal Resources,
93 F.3d 648 (9th Cir. 1996)........................................ 9

In re International Horizons,
689 F.2d 996 (11th Cir. 1982)........................................ 9

In re Johnson,
960 F.2d 396 (4th Cir. 1992)........................................ 9

Leon v. County of San Diego,
202 F.R.D. 631 (S.D.Cal. 2001)........................................ 7, 12

Lynch v. Ca. Public Utility Commission,
2004 U.S. Dist. LEXIS 6022 (N.D. Cal. 2004)........................................ 2

In Re Napster,
479 F.3d 1078 (9th Cir. 2007) .......... 3, 4, 13

U.S. v. Sanford,
979 F.2d 1511 (11th Cir. 1992) .......... 9

In re Wymer,
5 B.R. 802 (9th Cir. 1980) .......... 2, 3

Younger v. Harris,
401 U.S. 37 (1971) .......... 11

**STATE CASES**

City and County of San Francisco v. The Superior Court,
37 Cal. 2d 227 (1951) .......... 7, 12

Insurance Company of North America v. Superior Court of Los Angeles County,
108 Cal. App. 3d 758 (1980) .......... 6

In re Jordan,
7 Cal. 3d 930 (1972) .......... 7

**STATUTES**

California Evidence Code Section 951 .......... 6

Evidence Code section 952 .......... 6, 7

Federal Rule of Bankruptcy Procedure Rule 8005 .......... 1, 2, 3, 14

Federal Rule of Evidence Section 501 .......... 8

Federal Rule of Bankruptcy Procedure Rule 2004 .......... 9

**SECONDARY SOURCES**

Lawrence P. King, Collier on Bankruptcy, 4:502.03[1] [a] (15th ed. rev. 2000) .......... 9

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

528486.1 iii 33360-036

REPLY TO OPPOSITION TO DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL

EXHIBIT 19
PAGE 274

# I.

# INTRODUCTION

The parties agree that in order for this Court to grant the Privilege Holders' Motion to Stay pending Appeal ("Motion") pursuant to Federal Rule of Bankruptcy Procedure Rule 8005 ("Rule 8005") , Dynamic and Sabella must meet a four-part test. The parties further agree that one prong of the test, whether the public interest will be impacted by the Court granting a stay, is not really at issue in this case since the public interest is not implicated in this matter. However, the agreement between the parties ends there. The difference in the arguments of the parties in support of their positions, is that the Privilege Holders' arguments are supported both by relevant case law and the facts of this case while the Trustee's arguments are not.

Because of this deficiency, the Trustee begins his Opposition to the Motion ("Opposition") by trying to hold Dynamic and Sabella to a higher standard than the four-part test requires. The Trustee argues first that there is no "sliding scale" when applying the four-part test and then argues that Dynamic and Sabella must make a "strong showing" of the likelihood of success on the merits. However, neither of these arguments are supported by the relevant case law on Rule 8005. Rather, the well established case law on Rule 8005 does not require the Privilege Holders make a "strong showing" of the likelihood of success on the merits and the most recent case to discuss Rule 8005 declares that the ***relative hardship*** to the parties is a "critical element" in determining whether a stay is warranted.

Further, the Trustee is unable to point to any law or other authority for the proposition that his lack of access to confidential attorney client communications (which is normally never a part of any litigation proceeding) constitutes a "substantial irreparable harm" to him and the estate to pursuing the other aspects of his investigation and litigation until the matter is resolved at the appellate level. Essentially, the Trustee's arguments on this point boil down to a "woe is me" appeal to this Court. However, when the Trustee's illusory "hardships" are balanced against the legally recognized irreparable harm Dynamic and Sabella will incur if the Motion is not granted, the scales tip significantly in favor of granting the Motion.

Finally, the Trustee's argument that the Privilege Holders have not raised a legitimate question of law requiring review is wrong as well. As set forth in more detail below, there are substantial questions of law regarding application of Federal Rule of Evidence 501 in this situation as well as the principles of Comity and Federalism at play in this case that not only necessitate review, but a review in which the Privilege Holders are likely to succeed.

Based on the arguments set forth in the Motion and this Reply, the Motion should be granted since the Privilege Holders have met the four-part test for a stay pending appeal pursuant to Rule 8005.

**II.**

**ARGUMENT**

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**A. The Standard for a Discretionary Stay of Appeal pursuant to Rule 8005**

In the seminal case of *In Re Wymer*, the Ninth Circuit held that the accepted standard for discretionary stays pursuant to Rule 8005 requires the appellant to show that: (1) they will suffer irreparable injury if the stay is not granted; (2) no substantial harm will come to the appellee if the stay is granted; (3) the appellant is likely to succeed on the merits of the appeal; and (4) the stay will do no harm to the public interest. *In re Wymer*, 5 B.R. 802, 806 (9th Cir. 1980).

In the Opposition, the Trustee disputes that there is a 'sliding scale' among the four factors. Specifically, the Trustee disputes the holding in *Lynch v. Ca. Pub Util. Comm'n*, 2004 U.S. Dist. LEXIS 6022, *7 (N.D. Cal. 2004) which states that the relative hardship to the parties is a "critical element" in determining whether a stay is warranted and the holding in *Alaska v. Native Village of Venetie*, 856 F.2d 1384, 1389 (9th Cir. 1988) which states that if the balance of harm tips toward the movant then the movant need not show as robust a likelihood of success on the merits. However, the main case the Trustee cites in support of this argument is from a district court in another state (whereas *Lynch* was decided by the Northern District of California) and this case does not discredit the holding in *Alaska* above which discusses the sliding scale.

Additionally, the Trustee's argument that the Privilege Holders must make a "strong showing" of the likelihood of success on the merits is also without support. As stated above, the

seminal case of *Wymer* does not require a "strong showing" of success on the merits. Further, the case of *In re General Credit*, 283 B.R. 658, 659 (S.D.N.Y 2002) specifically rejected the argument that the strength-of-the-case standard required the appellant to show a "strong likelihood" of success on the merits in a Rule 8005 motion for stay. Rather, the Court concluded, that the proper standard governing the strength-of-the-case component of a motion for a stay pending appeal of a bankruptcy court order is a "substantial possibility" of success on the merits. *Id.* at 660.

Based on the above, the four-part test as set forth in *Wymer* should be applied to this case in conjunction with the guidance from *Lynch, Alaska,* and *General Credit*. As set forth in the Motion and in the balance of this Reply, because the Privilege Holders have met this four-part test, the Motion should be granted for a stay of the order requiring them to divulge what they consider to be attorney client privileged material and information until the appeal is decided.

**B. <u>The Balance of the Hardships Tips in Favor of Granting the Motion.</u>**

Understandably, the Opposition glosses over the irreparable damage that Dynamic and Sabella will incur if the Motion is denied. However, since the balance of the hardships of the parties is a "critical element" in a Rule 8005 analysis it cannot be so easily brushed aside. The Privilege Holders will, in fact, be irreparably harmed if the Motion is not granted because there will be no way to give them back what they will have lost, namely the confidential communications with their legal counsel.

While the Trustee attempts in his Opposition to minimize this irreparable injury, it has been recognized by the Ninth Circuit. In *In Re Napster*, the Ninth Circuit specifically stated that once privileged materials are ordered disclosed, the practical effect of the order is often *irreparable* by a subsequent appeal. *In Re Napster*, 479 F. 3d 1078, 1088 (9th Cir. 2007) (Emphasis added). The Court further refined this idea when it said, in the case of an order involving the disclosure of privileged information, "once the cat is already out of the bag, it may not be possible to get it back in." *Id.* Based on this reasoning, the *Napster* Court went on to hold that orders vitiating claims of privilege qualify under the collateral order doctrine for immediate appeals because the right of a client to preserve privileged communications with his or her counsel

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

is "too important to be denied review..." *Id.*

The certain irreparable injury that Dynamic and Sabella will incur if privileged information is disclosed was the reason why this Court conducted the three day evidentiary hearing in the first place. After hearing legal arguments from counsel on the Trustee's Motion to Compel, this Court commented, "And my sensitivity to this question is because, once the cat's out of the bag, the cat's out of the bag, which is always the problem of privilege". P. 50: 3-6, Transcript of hearing dated July 25, 2007 [Docket No. 659].

The Trustee, on the other hand, is unable to cobble together any recognizable claim of irreparable harm that he will suffer if disclosure is stayed pending appeal. The biggest "hardship" the Trustee points to in his Opposition is the "struggle to obtain documents." Further, as discussed in the Motion (and not even addressed by the Trustee in his Opposition), there are no exigent circumstances that would necessitate a denial of the Motion. There is no operating debtor. The estate has been reduced to cash. The Trustee holds the cash and presumably is collecting interest. There is no wasting asset. If anyone could possibly be harmed by a stay in this case it would be the primary secured creditors -which are Dynamic and Sabella, who are likely hold the largest unsecured claims even if the Trustee prevails in various threatened and real litigation matters. The Trustee can hardly claim that he has no ability to proceed with other aspects of his case just because attorney client communications are not available to him for the time being. Trustees are generally not in possession of attorney client communications, whether investigating their cases or engaging in litigation. Relegating this Trustee to that body of information and documents that he would normally never possess while the appeal proceeds creates no hardship for him whatsoever.

However, the Trustee's "hardship" has the weight of a feather when compared to the outright destruction Dynamic and Sabella will face of two legally cognizable rights. Not only will enforcement of the Order decimate Dynamic's and Sabella's rights to protect communications with their attorneys from disclosure, but it may also practically obliterate their rights to be heard on appeal since if the Order is enforced any success on the merits of the appeal would really be no success at all because the attorney client communications will already have been disclosed. Based

on this, the Privilege Holders have met their burden with regard to this "critical element" of the four-part test thus, the Motion should be granted.

**C. Dynamic and Sabella Have a Likelihood of Success on Appeal.**

When the Court decided that its focus was whether an individual could have a client representative it had no federal common law to follow because *Bieter* and *Memry*, in the Court's opinion, apply to client representative "at least where the client is a corporation."[1] Order P. 5:13-19. In the absence of existing federal common law, the Order adopted holdings from cases applying other states' law on privilege which allow a finding of privilege only if "the communication between counsel and the representative was necessitated by the client's inability, temporary or otherwise, to seek legal counsel." Order, P. 8: 14-17.

Privilege Holders' primary argument on appeal is that California law provides the rule of decision in this case, therefore California law must be applied to determine the scope of the attorney client privilege here. Since California extends the attorney client privilege to representative of individuals without the requirement that they are unable to speak with the attorneys themselves, the communications at issue are privileged.

Alternatively, Privilege Holders will argue on appeal that principles of Comity and Federalism oblige the Court to fill the gap in federal common law on this narrow issue with California law on the scope of the attorney communications as if the client had made them herself. Again, this would result in the communications at issue being privileged.

1. Under California Law Lei/Alcon's Communications with Counsel are Privileged.

From the very beginning of this discovery dispute, the Privilege Holders have argued that California law should apply. In the Opposition to the Motion to Compel [Docket No. 563], Dynamic and Sabella argued:

> Dynamic/Sabella's assertion of the attorney client/privilege in the course of litigation with the Bree Parties was based on California law.

[1] The principal secured creditor in this case is a corporate entity, Dynamic Finance Corporation.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

> In that any objection by the Trustee to the Dynamic and Sabella claims would still have to be determined under California law, and in that the period to initiate avoidance actions under the Bankruptcy Code has expired, it would appear that any claims for turnover would have to be based on California law. Nevertheless if federal common law of privilege is to be applied, the qualified communications of Lei/Alcon on behalf of Dynamic/Sabella remain privileged.

Opposition to Motion to Compel, P. 10: 21-28.

Dynamic and Sabella reiterated this argument in their Pre-Hearing Brief [Docket No. 704]. On pages 9-11 of their Pre-Hearing Brief, the Privilege Holders set forth an analysis of the California law on "client representative" which would readily hold as privileged the communications between Lei/Alcon and the legal counsel. Part of this analysis is as follows:

In California, the attorney-client privilege is codified in Evidence Code section 952 which states:

> As used in this article, "confidential communication between client and lawyer" means information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons ***other than those who are present to further the interest of the client*** in the consultation ***or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted***, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship. (Emphasis added.)

Moreover, California Evidence Code Section 951 defines "client" as:

> A person who, directly ***or through an authorized representative***, consults a lawyer for the purpose of retaining the lawyer or securing legal service or advice from him in his professional capacity, and includes an incompetent (a) who himself so consults the lawyer or (b) whose guardian or conservator so consults the lawyer in behalf of the incompetent. (Emphasis added).

As interpreted by California case law, "the privilege extends to communications which are intended to be confidential, if they are made to attorneys, family members, business associates, or agents of the party or his attorneys on matters of joint concern, when disclosure of the communication is reasonably necessary to further the interest of the litigant." *Insurance Company of North America v. Superior Court of Los Angeles County*, 108 Cal.App.3d 758, 766-67 (1980)

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

(holding that attorney-client communications in the presence of, or disclosed to, clerks, secretaries, interpreters, physicians, spouses, parents, business associates, or joint clients, when made to further the interest of the client or when reasonably necessary for transmission or accomplishment of the purpose of the consultation, remain privileged). In essence, if the communication is disclosed to a third party whose presence is necessary to advance the client's interest, or if the third party is an agent of the client or the attorney, then the communication is covered by the attorney-client privilege. *In re Jordan*, 7 Cal.3d 930 (1972).[2]

The Privilege Holders again argued that California law on privilege should apply to this case on pages 6 through 9 of their Closing Brief. [Docket No. 734]. Not only did the Privilege Holders again discuss California Evidence Code 952 and 951, but also analyzed the holdings of the two cases the Court relied on in the Order: *Leone v. Fisher* and *In re Grand Jury Subpoenas*. As set forth in the Privilege Holders' Closing Brief, the aspect of these cases the Order finds compelling (communication between the agent and the attorney was necessitated by the client's inability to speak with counsel) which is grounded in the state privilege laws of Connecticut and New York, is directly contrary not only with California Evidence Code Sections 952 and 951 but also with the California Supreme Court holding in *City and County of San Francisco v. The Superior Court,* 37 Cal. 2d 227, 236 (1951) which held:

> It is no less the client's communication to the attorney when it is given by the client to an agent for transmission to the attorney, and it is immaterial whether the agent is the agent of the attorney, the client or both. The client's freedom of communication requires a liberty of employing other means than his own personal action. The privilege of confidence would be a vain one unless its exercise could thus be delegated. A communication, then by *any form of agency* employed or set in motion by the client is within the privilege.

*Superior Court of San Francisco* at 236-237 [Emphasis in original].

[2] The Pre-Hearing Brief also provided a detailed analysis of *Atmel Corp v. St. Paul Fire & Marine Ins. Co.*, 409 F. Supp 2d 1180 (N.D.Cal. 2005) in which a Federal Court held that Evidence Code Section 952 extended the attorney client privilege to third party agents or brokers of the client. Pre-Hearing Brief P. 10:4-22.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

When California law is applied to this case, the communications between Lei/Alcon and the attorneys would be covered by the attorney client privilege. As argued in both the Privilege Holders' Pre Hearing and Closing Briefs and proven at the hearing, Lei was included in communications between Dynamic/Sabella and the attorneys because he was present to further the interest of the client (be it Dynamic or Sabella). Further, Lei communicated with the attorneys on behalf of Dynamic and/or Sabella because the disclosure of legal advice to him was reasonably necessary for the transmission of the information back to the client and the accomplishment for which the lawyer was consulted, namely to "get the deal done" between Dynamic and North Plaza.

Not only does the Order apply law from other states which is contrary to California law, but it does not even address Evidence Code Sections 951, 952 or the California and Federal cases applying California privilege law consistently cited by the Privilege Holders. As discussed in more detail in the next sections, both Federal Rule of Evidence Section 501 and the doctrine of comity require that California law be applied, which would have a significant impact on this case as it would reach the opposite result.

2. Since California Law Provides the Decision of Law in this Case, California Privilege Law is Controlling.

It is undisputed that the Federal Rules of Evidence apply to proceedings in U.S. Bankruptcy Courts. *See*, FRE 101; FRBP 9017. FRE 501 is the only Federal Rule of Evidence concerning privilege and it states that:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness, person, government, State, or political subdivision thereof shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an ***element of a claim or defense as to which State law supplies the rule of decision***, the privilege of a witness, person, government, State, or political subdivision thereof ***shall be*** determined in accordance with ***State law***. FRE 501 (Emphasis added).

Bankruptcy proceedings, especially contested matters and adversary proceedings, are unquestionably "a civil action or proceeding," so the second sentence of FRE 501 is always at play

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

in these types of Bankruptcy proceedings. The fact that California law provides the rule of decision in this matter (and therefore California law on privilege applies) is supported not only by the relevant case law in the area, but also by the Trustee himself.

As for the case law, the case of *In re Int'l Horizons*, 689 F.2d 996, 1003 (11th Cir. 1982) applied FRE 501 when deciding between federal common law or the forum state's law on privilege applicable to documents requested at the very outset of a bankruptcy case in a Rule 2004 examination. In its analysis of the second sentence in FRE 501, the *Horizon* Court first looked to the source of the underlying "claim or defense" at issue, ignoring the federal procedural rules which generated the subpoena. The Court went on to apply federal law of privilege only because "the bankruptcy proceeding ***did not yet involve state claims***." Id. (Emphasis added). The corollary to this ruling is that the forum state's laws on privilege do apply when already asserted state claims underlie a bankruptcy discovery dispute.

Additionally, in *In re Couch*, 80 B.R. 512 (S.D.Cal. 1987), the Southern District of California reversed an order of the Bankruptcy Court compelling disclosure of documents in a discovery dispute. The Court based its opinion on an analysis of FRE 501 and concluded that because the adversary proceeding asserted claims under California insurance law and California law was in the line of proof that culminated in an element of a state law claim or defense, California privilege law applied. *Id* at 515. Further, in *In re Geothermal Resources*, 93 F. 3d 648, 653 (9th Cir. 1996), the Ninth Circuit specifically cited to the second sentence in FRE 501 as justification for its reliance upon California law to determine the scope of the attorney client privilege asserted in bankruptcy litigation of a California employment agreement. [3]

As to the claims in this case, the rule of decision of any claims Dynamic and Sabella have in the North Plaza Bankruptcy case must come from California law. As stated in both the Privilege

---

[3] It should also be noted that when the bankruptcy court determines the amount of a contested claim, it must do so using "otherwise applicable state or federal law." 4 Collier on Bankruptcy ¶ 4:502.03[1] [a], p.502-20 *citing*, In re Johnson, 960 F.2d 396, 404 (4th Cir. 1992) (existence of claim is question of state law); *see also*, *U.S. v. Sanford*, 979 F.2d 1511, 1513-1514, (11th Cir. 1992) (existence and amount of claim must be determined by applicable non-bankruptcy law).

Holders' original objection to the Trustee's Motion to Compel [Docket No. 563] and their Pre-Hearing Brief [Docket No. 704], since the period for the Trustee to initiate any avoidance actions has expired, any objection he has to Dynamic's and/or Sabella's claims would have to be founded on California law.

What is more, the Trustee himself has even conceded that his objections to these claims will be based on California law. In his Motion to Compel Discovery [Docket No. 542], the Trustee points to the following state law issues as reasons why he needs the disputed discovery from Lei/Alcon:

- There are concerns over the proposed settlement of the Sabella/Dynamic claims in light of, *inter alia,* issues of usury law and holder in due course. P. 10:8-11;

- Lei's role as an employee of Dynamic/Sabella or as an "independent broker" who "arranged" the Dynamic/Sabella loans is extraordinarily relevant to this case: According to the Trustee's preliminary calculations determination that Lei did not "arrange" the loan for another as an independent "broker" would decrease the value of the Dynamic Claim No. 16 alone by a minimum of $8 million. P. 16: 22-25; [4]

- The proposed settlement...elicited extensive debate concerning, *inter alia,* the propriety of the settlement amount of Dynamic Claims 14 and 16 in light of issues related to usury law and whether Sabella/Dynamic was each a holder in due course. PP. 16: 27-28 and 17:1-2;

- The issue of Lei's business and/or employment relationship with Dynamic/Sabella is also most relevant to the determination of the usury safe harbor as it affects the Dynamic/Sabella claims against the estate. P. 24: 11-13;

- The Trustee also respectfully suggests that, in light of Lei's present attempt to claim the benefit of the attorney-client privilege on the basis of his claimed status as a de facto employee of Dynamic/Sabella, Lei should be estopped from making future assertions in this case that he otherwise could have functioned at any point in time as an "independent broker". P. 29: 3-6. This passage then refers to footnote 12 which states, "Under governing law, a

[4] This, of course, is referring to the usury provisions of the California Constitution.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

functional employee of Dynamic and/or Sabella could not possibly have "arranged" loans for Dynamic and/or Sabella while under their directions and control. *See Park Terrace LTD v. Teasdale*, 100 Cal. App. 4th 802 (2002) (usury exemption is inapplicable where broker acts on own behalf)."

It is anticipated that the Trustee will argue that the "claim or defense" presently at issue in this case is not the state usury or holder in due course claims, but rather the scope of his examination under FRBP 2004. This argument lacks merit for several reasons. First, this type of circular logic would effectively nullify FRE 501 because it would never allow any state privilege in any federal court because all discovery in federal court is carried out pursuant to federal procedure. Further, the case of *In re Bautista*, 2007 Bankr. LEXIS 4170, *3-4 (Bankr. N.D. Cal. 2007) may at first glance seem to support this argument. However, in *Bautista* the scope of the attorney client privilege was the same on both the state and federal level and the cases actually cited by *Bautista* do not, in fact, support that Court's presumption.

One only needs to review the Trustee's allegations in his initial Counter Claim asserted in the companion adversary proceeding to see that the Trustee is, in fact, primarily asserting California state law claims against Dynamic. See, Exhibit 1 to Privilege Holders' Request for Judicial Notice, filed concurrently herewith. Since California law will provide the rule of decision on these claims and defenses underlying this discovery dispute and the claims that the Trustee is in fact pursuing against Dynamic and Sabella, pursuant to FRE 501, California privilege law is controlling.

3. Principles of Comity Require Application of California Law.

Black's Law Dictionary defines judicial comity as "[t]he respect a court of one state or jurisdiction shows to another state or jurisdiction in giving effect to the other's laws and

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

judicial decisions."[5] The rule of comity is an enduring and essential component of the United States' system of government. *See, Darr v. Burford*, 339 U.S. 200, 204 (1950) (describing need for comity between federal and state courts). While the doctrine of comity is one of policy and not an absolute rule, the Supreme Court has spoken of the doctrine with the highest regard, noting:

> The forbearance which courts of co-ordinate jurisdiction, administered under a single system, exercise towards each other, whereby conflicts are avoided, by avoiding interference with the process of each other, is a principle of comity, with perhaps no higher sanction than the utility which comes from concord; but between State courts and those of the United States, it is something more. It is a principle of right and of law, and therefore, of necessity.

*Covell v. Heyman*, 111 U.S. 176, 182 (1884).

Further, as a matter of comity, federal courts should attempt to ascertain what interests inspire relevant state doctrine and should take into account the view of state authorities about the importance of those interests. *See, Leon v. County of San Diego*, 202 F.R.D. 631, 636 (S.D.Cal. 2001). As stated above, the interest the California Supreme Court sought to protect in *City and County of San Francisco* was to make sure that the privilege of confidence was not "a vain one" and thus extended the attorney client privilege to cover ***any*** agent the client authorized to speak to her legal counsel for any legal advice related purpose.

Also, in line with the doctrine of comity are the federal cases which hold that on the question of privileged communication, the federal courts follow the law of the state of the forum. *See, Baird v. Koerner*, 279 F. 2d 623, 628 (9th Cir. 1960) (because the attorney is created by state law, and differs from state to state, so the nature and extent of the privilege that exist between attorney and client varies); and *Garrison v. General Motors*, 213 F. Supp 515, 517 (S.D.Cal. 1963). As part of its reasoning for applying the law of the forum in which it was situated-

---

[5] BLACK'S LAW DICTIONARY 262 (7th ed. 1999); *See also, Younger v. Harris*, 401 U.S. 37, 44 (1971)(defining comity). In Younger, the Supreme Court defined comity as: [A] proper respect for state court functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways. Id.

California, the *Garrison* Court said:

> In summation we find that because the relationship of client and attorney is created and controlled by the law of the various states; and that such creation and control is recognized, followed and approved by the federal courts, the nature and extent of the privilege created between a lawyer and his client by the attorney-client relationship requires the federal court to follow the state law…

*Id.*

In this case, Dynamic and Sabella delegated the duty of speaking with their legal counsel to Lei. Under California law, not only is the type of delegation sanctioned, but it is also afforded the same privilege as if Dynamic or Sabella had consulted with the attorneys themselves. It is inequitable to now analyze this "client representative" relationship pursuant to the laws of Connecticut, New York, Michigan, and/or Florida which deny the extension of the attorney client privilege unless Sabella was somehow incapacitated or unable to do so herself. The attorney client relationship at issue in this case was created in California and therefore, California privilege rules governing this relationship should apply.

Based on the above arguments, there is a substantial possibility that Dynamic and Sabella will likely succeed on the merits of their appeal. Therefore, the Motion should be granted.

## III.

## CONCLUSION

The impact on Dynamic and Sabella of having to disclose potential communications with their lawyers while their appeal is pending will, as a practical matter, prove irreparable in the context of this case. Once the Trustee knows the content of privilege and confidential communications, he knows it. Even if Dynamic and Sabella are ultimately successful in their appeal, the proverbial "cat" will be out of the mystical "bag." This harm to Dynamic and Sabella is real, would be immediate, and would severely impact the utility of the appeal. Denial of a stay, in a very real sense, will deny Dynamic and Sabella, as a practical matter, any right to appeal, which, of course, the Ninth Circuit has recognized in the *Napster* case the importance of the questions involved.

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

On the other hand, the Trustee is hard press to identify any harm that would be occasioned to him or to the estate if the stay is granted. One proceeds in an investigation or litigation on the basis that they do not have access to attorney client confidential communications. If such are found to be available, it is outside the norm for investigations and for litigation. It would be the height of silliness to claim, as the Trustee apparently claims, that he is stymied from proceeding with his investigation, or discovery, or litigation because he is not allowed to know what Dynamic's and Sabella's lawyers were saying to Lei/Alcon. There are no operations in this estate, the estate's property has been liquidated and the proceeds are being held by the Trustee. No one wants to see litigation and bankruptcy proceedings simply linger, yet there is no harm that can be identified in the estate in being delayed during the appellate process from learning what Dynamic's and Sabella's lawyers had to say.

With the greatest deference to this Court, Dynamic and Sabella simply believe that they have a reasonable chance of prevailing in the appeal, which is why they brought it. This Court does not need to find that they will prevail on the appeal or even that this Court's ruling that is the subject of the appeal is wrong. All the Court needs to find pursuant to a Rule 8005 motion for stay is that there is a chance of success on the merits of the appeal which, coupled with the balancing of the relative harms that will be occasioned to the various parties, tips in favor of granting a stay pending appeal to Dynamic and Sabella on the limited issues of whether their attorney-client confidential communications are a fair subject of discovery.

DATED: June 30, 2008

FRANDZEL ROBINS BLOOM & CSATO, L.C.

By: /s/Tricia L. Legittino
MICHAEL GERARD FLETCHER
TRICIA L. LEGITTINO
Attorneys for Secured Creditors Angela C. Sabella and Dynamic Finance Corporation

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**PROOF OF SERVICE**

I, the undersigned, declare and certify as follows:

I am over the age of eighteen years, not a party to the within action and employed in the County of Los Angeles, State of California. I am employed in the office of FRANDZEL ROBINS BLOOM & CSATO, L.C., members of the Bar of the above-entitled Court, and I made the service referred to below at their direction. My business address is 6500 Wilshire Boulevard, Seventeenth Floor, Los Angeles, California 90048-4920.

On June 30, 2008, I served true copy(ies) of the **REPLY TO OPPOSITION OF TRUSTEE TO DYNAMIC FINANCE CORPORATION'S AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL OF ORDER ON THE TRUSTEE'S MOTION TO COMPEL DISCOVERY FROM ISAAC LEI/THE ALCON GROUP**, the original(s) of which is(are) affixed hereto, to the party(ies) listed on the attached service list.

☒ **BY MAIL:** I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing with the United States Postal Service. Under that practice, it would be deposited with the United States Postal Service that same day in the ordinary course of business. Such document(s) were placed in envelopes addressed to the person(s) served hereunder for collection and mailing with postage thereon fully prepaid at Los Angeles, California, on that same day following ordinary business practices.

☐ **BY FACSIMILE:** At approximately _____, I caused said document(s) to be transmitted by facsimile. The telephone number of the sending facsimile machine was (323) 651-2577. The name(s) and facsimile machine telephone number(s) of the person(s) served are set forth in the service list. The document was transmitted by facsimile transmission, and the sending facsimile machine properly issued a transmission report confirming that the transmission was complete and without error.

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I caused said document(s) to be served by means of this Court's electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, to the parties and/or counsel who are registered CM/ECF Users set forth in the service list obtained from this Court.

☐ **BY OVERNIGHT DELIVERY:** I deposited such document(s) in a box or other facility regularly maintained by the overnight service carrier, or delivered such document(s) to a courier or driver authorized by the overnight service carrier to receive documents, in an envelope or package designated by the overnight service carrier with delivery fees paid or provided for, addressed to the person(s) served hereunder.

I certify under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on June 30, 2008, at Los Angeles, California.

/s/Tiffany Lok
TIFFANY LOK

FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BOULEVARD, 17TH FLOOR
LOS ANGELES, CALIFORNIA 90048-4920
(323) 852-1000

**SERVICE LIST**

VIA CM/ECF NOTICE OF ELECTRONIC FILING

- K. Todd Curry tcurry@nugentweinman.com
- Stanley E. Goldich sgoldich@pszyjw.com
- John A. Graham jag@jmbm.com
- John L. Hosack jhosack@buchalter.com
- Gerald P. Kennedy gpk@procopio.com
- Richard M Kipperman teresaj@corpmgt.com, ca82@ecfcbis.com
- Dean T. Kirby dkirby@kirbymac.com, tfloros@kirbymac.com;jhebert@kirbymac.com;lackerman@kirbymac.com
- Jana Logan jlogan@kirbymac.com, tfloros@kirbymac.com
- Martin T. McGuinn mmcguinn@kirbymac.com, jlogan@kirbymac.com;abarrett@kirbymac.com
- Ali M.M. Mojdehi ali.m.m.mojdehi@bakernet.com, janet.d.gertz@bakernet.com;joseph.r.dunn@bakernet.com;sam.h.aghili@bakernet.com;sdefile@bakernet.com
- Terry D. Phillips fcp@philaw.com
- Edward G. Schloss egs2@ix.netcom.com
- Dan P. Sedor dsedor@jmbm.com
- Gerald N. Sims jerrys@psdslaw.com
- Scott A. Smylie esqsas@aol.com
- United States Trustee ustp.region15@usdoj.gov

VIA U.S. MAIL

Ali M.M. Mojdehi
Janet Gertz
BAKER MCKENZIE
12544 High Bluff Drive, Third Floor
San Diego, California

Tiffany L. Carroll
Office of the United States Trustee
402 West Broadway, Suite 600
San Diego, CA 92101
tiffany.l.carroll@usdoj.gov

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re

NORTH PLAZA, LLC,

Debtor.

DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,

APPELLANTS,

v.

CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,

APPELLEE

District Case No. 08-CV-01194-W-CAB

Bankruptcy Court No. 04-00769-PB11

Appeal No. 2

**EXHIBITS 20 THROUGH 24 TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**

DATE: To Be Set
TIME: To Be Set
COURTROOM: Seven

The Honorable Thomas J. Whelan, Judge Presiding

**EXHIBIT 20**

EXHIBIT 20
PAGE 291

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## Minute Order

***Hearing Information:***

| | | | |
|---|---|---|---|
| **Debtor:** | NORTH PLAZA, LLC | | |
| **Case Number:** | 04-00769-PB11 | **Chapter:** | 11 |
| **Date / Time / Room:** | WEDNESDAY, JULY 02, 2008 02:00 PM | DEPARTMENT 4 | |
| **Bankruptcy Judge:** | PETER W. BOWIE | | |
| **Courtroom Clerk:** | MARILYN WILKINSON | | |
| **Reporter / ECR:** | LYNETTE ALVES | | |

***Matter:***

DYNAMIC FINANCE CORPORATION AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL OF ORDER ON TRUSTEE'S MOTION TO COMPEL DISCOVERY FROM ISAAC LEI/THE ALCON GROUP (ON SHORTENED TIME)

***Appearances:***

Janet D. Gertz, ATTORNEY FOR RICHARD M KIPPERMAN
Ali M.M. Mojdehi, ATTORNEY FOR RICHARD M KIPPERMAN, CHAPTER 11 TRUSTEE
Tricia L. Legittino, ATTORNEY FOR ANGELLA SABELLA & DYNAMIC FINANCE CORP
Richard M Kipperman, Trustee

***Disposition:***

Denied. Order to come from Mojdehi. Contested.

# EXHIBIT 21

EXHIBIT 21
PAGE 293

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF CALIFORNIA

CHIEF JUDGE PETER W. BOWIE, PRESIDING

| | |
|---|---|
| NORTH PLAZA, LLC | ) CASE NO. 04-00769-PB |

DYNAMIC FINANCE CORPORATION AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL OF ORDER ON TRUSTEE'S MOTION TO COMPEL DISCOVERY FROM ISAAC LEI/THE ALCON GROUP (ON SHORTENED TIME)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SAN DIEGO, CALIFORNIA

WEDNESDAY, JULY 2, 2008

SAN DIEGO BANKRUPTCY REPORTERS
BY: LYNETTE ALVES
P.O.BOX 496
SOLANA BEACH, CA 92075
(858) 336-8558

**APPEARANCES**

**ALI M.M. MOJDEHI**
BAKER & MCKENZIE
12544 HIGH BLUFF DRIVE, THIRD FLOOR
SAN DIEGO, CA 92130-3051
(858) 523-6200

**JANET D. GERTZ**
BAKER & MCKENZIE
12544 HIGH BLUFF DRIVE, THIRD FLOOR
SAN DIEGO, CA 92130-3051
(858) 523-6200

**TRICIA L. LEGITTINO**
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 WILSHIRE BLVD., 17TH FLOOR
LOS ANGELES, CA 90048-4920
(323) 852-1000

SAN DIEGO, CALIFORNIA, WEDNESDAY, JULY 2, 2008, 2:00 PM

--- O O O ---

THE CLERK: IN THE MATTER OF NORTH PLAZA, LLC. THIS IS DYNAMIC FINANCE CORPORATION AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL.

APPEARANCES, PLEASE.

MS. LEGITTINO: GOOD AFTERNOON, YOUR HONOR.

TRICIA LEGITTINO, L-E-G-I-T-T-I-N-O, ON BEHALF OF DYNAMIC FINANCE CORPORATION AND ANGELA SABELLA.

MR. MOJDEHI: GOOD AFTERNOON, YOUR HONOR.

ALI MOJDEHI AND JANET GERTZ APPEARING ON BEHALF OF MR. KIPPERMAN, THE CHAPTER 11 TRUSTEE, WHO IS PRESENT.

THE COURT: MS. LEGITTINO, ANYTHING TO ADD TO YOUR PAPERS?

MS. LEGITTINO: JUST BRIEFLY, YOUR HONOR.

WE JUST WANT TO STRESS TO THE COURT TODAY THAT WE'RE NOT ASKING THIS COURT TO OVERTURN IT'S ORDER; TO COME TO A DIFFERENT CONCLUSION. WHAT WE'RE ASKING THE COURT FOR TODAY IN THIS RULE 8005 MOTION IS TO BALANCE, TO MAKE A BALANCE BETWEEN THE HARDSHIPS THAT THE PARTIES WILL GO THROUGH IF THE ORDER IS NOT STAYED PENDING APPEAL.

AND I'M NOT GOING TO REHASH ALL THE LAW THAT'S IN ALL OF OUR MOVING PAPERS BECAUSE WE COULD BE HERE ALL DAY ARGUING ABOUT SLIDING SCALES AND THE STANDARDS.

BUT JUST TO LOOK AT THE SUCCESS ON THE APPEAL PORTION -- THE STRENGTH OF SUCCESS ON THE APPEAL PORTION, WE BELIEVE THAT THE MORE APPROPRIATE FOCUS WOULD HAVE BEEN FOR AN APPLICATION OF CALIFORNIA LAW. AND WE'VE RAISED ARGUMENTS UNDER FEDERAL RULE OF EVIDENCE 501 AND COMITY THAT CALIFORNIA LAW AND PRIVILEGE SHOULD HAVE APPLIED IN THIS CASE.

RULE 501 IS BASED ON THE FACT THAT THE RULE OF DECISION SHOULD COME FROM STATE LAW. THERE'S NO FEDERAL AVOIDING POWERS LEFT FOR THE TRUSTEE. THE MOTION TO COMPEL STATED THE REASONS WHY THE TRUSTEE WANTS THE INFORMATION FROM LEI AND ALCON; AND THAT'S TO DEVELOP STATE LAW CLAIMS OF USURY AND HOLDER IN DUE COURSE. AND THERE'S NO FEDERAL LAW THAT'S CONTRARY TO THE CALIFORNIA PRIVILEGE LAW.

FURTHER IN SUPPORT OF THIS, YOUR HONOR, WE'VE CITED TO THIS COURT THE *COUCH* CASE WHICH IS A BANKRUPTCY CASE WHERE THERE WAS AN UNDERLYING INSURANCE CASE -- OR CLAIMS, EXCUSE ME. AND THE COURT, USING A 501 ANALYSIS, APPLIED CALIFORNIA LAW.

WE'VE ALSO CITED TO COURT THE *GEOTHERMAL* CASE, ANOTHER BANKRUPTCY CASE, WHICH WAS FOUNDED ON A BREACH OF FIDUCIARY DUTY CLAIM. AFTER A 501 ANALYSIS, THE COURT APPLIED CALIFORNIA LAW.

WE'VE ALSO ARGUED THAT COMITY SHOULD APPLY HERE, YOUR HONOR. AND THAT IF COMITY APPLIES, THEN CALIFORNIA

LAW SHOULD APPLY TO THIS CASE.

THESE ARGUMENTS ARE NOT OUT OF LEFT FIELD; THEY ARE NOT UNREASONABLE. AND IT'S NOT UNREASONABLE TO THINK THAT REASONABLE MINDS MAY DIFFER; THAT THERE'S A POSSIBILITY THAT THE APPELLATE COURT OR A REVIEWING COURT, IN THIS CASE, THE DISTRICT COURT, COULD AGREE WITH US. WE BELIEVE THAT IT COULD BE LOOKED AT ANOTHER WAY.

AND WHEN YOU TAKE THAT POSSIBILITY IN CONJUNCTION WITH THE BALANCING OF THE HARDSHIPS IN THIS CASE -- I'M NOT GOING TO SET FORTH AGAIN THE IRREPAIRABLE INJURY THAT DYNAMIC AND SABELLA WILL SUFFER IF THE ORDER GOES LIVE WHILE THE APPEAL IS PENDING THAT'S SET FORTH IN ALL OF OUR MOVING PAPERS -- BUT WE BELIEVE THAT WHEN YOU TAKE A LOOK AT THAT IRREPAIRABLE INJURY WHICH IS RECOGNIZED BY THE NINTH CIRCUIT IN THE *NAPSTER* CASE AND BALANCE IT AGAINST THE FACT THAT THE TRUSTEE, REALLY, WILL HAVE NO INJURY IN THIS CASE IF THE ORDER IS STAYED PENDING APPEAL.

THE DEBTOR -- THERE'S NO DEBTOR THAT HAS AN INTEREST; THERE'S MONEY IN A BANK ACCOUNT. WE'RE REALLY TALKING ABOUT LEDGER ENTRIES AND SLIPS OF PAPER. AND THERE'S LOTS OF OTHER THINGS THAT THE TRUSTEE COULD BE DOING IN THIS CASE, OTHER THAN LOOKING AT DOCUMENTS THAT THE TRUSTEE WOULD NEVER BE ABLE TO LOOK AT IN A NORMAL LITIGATION ANYWAY, WHILE WE'RE PRESERVING THE RIGHTS OF DYNAMIC AND SABELLA.

THIS MOTION IS REALLY ABOUT MAINTAINING THE STATUS QUO WHILE THE APPEAL IS PENDING. AND WE'RE JUST ASKING THAT DYNAMIC AND SABELLA HAVE THE RIGHT TO FULLY AND COMPLETELY PURSUE THEIR APPEAL AND HAVE A MEANINGFUL APPEAL, WHICH IS SOMETHING THAT LITIGANTS ACROSS THIS COUNTRY HAVE EVERY DAY IN COURTS; TO ASK FOR A SECOND OPINION, TO HAVE SOMEONE ELSE TAKE A LOOK AT IT.

BUT THIS CASE IS UNIQUE, BECAUSE IF THE ORDER IS ENFORCED WHILE THE APPEAL IS PENDING, THEY WILL BE IRREPARABLY INJURED.

SO BASED ON THAT, YOUR HONOR, WE ASK THAT YOU GRANT THE MOTION TO STAY PENDING APPEAL.

THANK YOU.

THE COURT: MR. MOJDEHI.

MR. MOJDEHI: THANK YOU VERY MUCH, YOUR HONOR.

ONE OF THE WONDERFUL THINGS ABOUT PRACTICING LAW IS THAT IT CAN BE HUMILIATING AT TIMES. AFTER TWENTY YEARS -- ALMOST TWENTY-FIVE YEARS -- YOU ASSUME THAT YOU DON'T UNDERSTAND WHY THEY'RE SEEKING A STAY AND YOU LOOK AT THE CASES AND YOU FIND THAT THERE'S SO MANY DIFFERENT NUANCES AND OPINIONS THAT ARE OUT THERE.

BUT NO MATTER WHAT KIND OF TEST YOU APPLY TO THE ISSUANCE OF A STAY -- AND WE BELIEVE, AS WE HAVE SET FORTH IN OUR PAPERS, THAT THE PROCEDURAL CONTEXT IN WHICH A STAY REQUEST IS MADE IS SIGNIFICANT.

AND HERE, AS THE COURT FULLY KNOWS, THE COURT ISSUED IT'S RULING AFTER AN EVIDENTIARY HEARING THAT LASTED SEVERAL DAYS. A STAY REQUEST FOLLOWING AN EVIDENTIARY HEARING IS VERY DIFFERENT THAN ONE ASKED WHERE ISSUES ARE DECIDED ON THE PAPERS. SO NO MATTER WHAT THE STANDARD, YOUR HONOR, WE BELIEVE IT'S IMPORTANT THAT THE STAY REQUEST BE VIEWED MINDFUL OF THE PROCEDURAL CONTEXT IN WHICH ARISES.

THE CLASSIC CASE ON THIS POINT, OF COURSE, IS THE SUPREME COURT'S CASE OF *HILTON*. AND THAT CASE SHOWS THAT -- STATES THAT A STRONG SHOWING HAS TO BE MADE. AND THE NINTH CIRCUIT MODIFIES THAT SOMEWHAT BY SAYING THAT A STRONG LIKELIHOOD OF SUCCESS NEEDS TO BE SHOWN. AND THEN THERE'S OTHER LAW OUT THERE IN THE NINTH CIRCUIT THAT USES THE WORDS "SERIOUS LEGAL QUESTIONS".

BUT THANKFULLY THERE'S ALSO LAW IN THE NINTH CIRCUIT THAT TRIES TO BETTER DEFINE WHAT "SERIOUS LEGAL QUESTIONS" MEANS. AND THOSE QUESTIONS ARE DEFINED AS THOSE WHICH ARE SERIOUS, SUBSTANTIAL, DIFFICULT, DOUBTFUL SO AS TO MAKE THEM FAIRGROUND FOR LITIGATION.

NOW, THE LAW CERTAINLY IS NOT WHENEVER YOU'RE APPEALING FROM AN ORDER REGARDING ALLEGEDLY PRIVILEGED MATERIAL THEN YOU'RE AUTOMATICALLY ENTITLED TO THE STAY BECAUSE SOMEONE CAN JUMP UP AND DOWN AND SAY I'M GOING TO BE IRREPARABLY HARMED. SO THAT CAN'T BE THE BLUFF;

OTHERWISE, YOU'D GET A STAY IN EVERY CASE.

SO AT THE END OF THE DAY, THE ANSWER, WE BELIEVE, NEEDS TO LIE IN SOMEONE BEING ABLE TO MAKE A CREDIBLE CASE ABOUT PROBABILITIES OF SUCCESS. NOW IN ANALYZING THAT, THERE'S REALLY TWO ISSUES. ONE IS A CHALLENGE TO FACTUAL FINDINGS. AND I THINK, TO THE MOVANT'S CREDIT, THEY DON'T REALLY SAY THAT THERE'S ANY SERIOUS CHALLENGE TO THE FACTS. AND I THINK THAT'S TO THEIR CREDIT, BECAUSE THEY REALLY CAN'T, BECAUSE THERE WAS A FULL HEARING; THE COURT LOOKED AT THE EVIDENCE; SAW THE WITNESSES; AND MADE A FINDING. SO THE FACTS CAN'T BE CHALLENGED IN ANY CREDIBLE WAY. AND I THINK THEIR PAPERS CONCEDE THAT.

NEXT, WE GET TO THE QUESTION OF LAW. AND THEIR LATEST CLAIM THERE IS THAT THE COURT NEEDS TO LOOK AT CALIFORNIA LAW. NOW THE PROBLEM WITH THAT ARGUMENT, OF COURSE, IS THAT THE DISPUTE BEFORE THE COURT ARISES OUT OF A 2004 ORDER ISSUED BY THIS COURT AND A SUBPOENA ISSUED BY THIS COURT MORE THAN A YEAR AGO. AND IT IS HORNBOOK LAW THAT THE QUESTION OF PRIVILEGE IN THE CONTEXT OF THE 2004 ORDER AND A SUBPOENA ISSUED PURSUANT THERETO IS GOVERNED BY FEDERAL COMMON LAW.

AND THE HORNBOOK THAT WE GENERALLY REFER TO IS JUDGE RUSSELL'S BANKRUPTCY EVIDENCE MANUAL. AND IF WE GO THERE AND TAKE A LOOK AT SECTION 501.3 WE FIND BLACK LETTER LAW TO THE EFFECT THAT WHENEVER YOU'RE LOOKING AT THE ISSUE

OF PRIVILEGE IN THE CONTEXT OF A 2004 ORDER AND SUBPOENA, THEN FEDERAL COMMON LAW GOVERNS, WHICH IS PRECISELY THE LAW THAT WAS APPLIED IN THIS CASE.

AND IN FACT, I WILL SAY NOT ONLY WAS IT APPLIED IN THIS CASE BUT IT WAS THE LAW THAT OUR FRIENDS ON THE OTHER SIDE EMBRACED. THEY ALWAYS CAME IN AND EMBRACED TO BE HERE. THEY NEVER DISOWNED IT, UNTIL RECENTLY. SO THE FACT IS THAT IT IS HORNBOOK LAW SET FORTH IN THE HORNBOOK WE USE FOR PROCEEDINGS IN BANKRUPTCY AS TO WHAT THE LAW IS. AND WHAT'S INTERESTING IS THAT THEY REALLY HAVE NOT BEEN ABLE TO COME UP WITH ANY CASE THAT SUGGESTS OTHERWISE.

SO WE HAVE CASES ON OUR SIDE. WE HAVE HORNBOOK LAW ON OUR SIDE THAT SUGGESTS THAT THE ARGUMENTS THAT THEY ARE TRYING TO MAKE ARE LIGHT IN WEIGHT.

LET ME FINALLY ADDRESS THE QUESTION OF EQUITIES. AND WE'VE ADDRESSED THIS IN OUR PAPERS, BUT THERE OBVIOUSLY IS A SERIOUS POLICY ISSUE WHEN IT COMES TO BANKRUPTCY PROCEEDINGS TO GET THINGS DONE RATHER QUICKLY AND DEAL WITH THE ADMINISTRATION OF THE ESTATE AND GET THINGS CLOSED AND GET CREDITORS PAID.

I MEAN, THAT POLICY IS REFLECTED ALL OVER THE BANKRUPTCY CODE. I MEAN, WHEN WE GO TO THE BANKRUPTCY RULES, THE POLICIES OF MOVING QUICKLY ARE SET OUT WITH CLARITY THERE. WHEN WE, FOR EXAMPLE, LOOK AT THE TIME FRAME FOR APPEALS, WE SEE THAT UNDER BANKRUPTCY LAW IT'S

TEN DAYS; WHEREAS, IF YOU WERE IN DISTRICT COURT, IT'S THIRTY DAYS.

WE SEE THIS ISSUE WITH RESPECT TO THE CONCEPT OF EQUITABLE MOOTNESS WHERE OFTENTIMES BANKRUPTCY CASES BECOME MOOTED OUT BECAUSE THINGS HAPPEN. AND THE CASE LAW, AGAIN, SAYS THAT THE OVERRIDING POLICY OF ACHIEVING A SPEEDY AND INEXPENSIVE DETERMINATION IN EVERY CASE IS CENTRAL TO THE BANKRUPTCY COURT SYSTEM.

SO THE NOTION THAT, YOU KNOW, WE'RE JUST SITTING AROUND WITH LEDGERS AND CASH IN THE BANK MISSES THE STRUCTURE, THE POLICIES, THE UNDERLYING FOUNDATIONS OF THE BANKRUPTCY CODE THAT ARE REALLY DESIGNED TO HAVE A PROMPT ADJUDICATION OF BANKRUPTCY CASES.

I DON'T HAVE ANYTHING FURTHER, UNLESS THE COURT HAS ANY QUESTIONS.

THE COURT: NO QUESTIONS.

MS. LEGITTINO.

MS. LEGITTINO: THANK YOU, YOUR HONOR.

A JUDGE ONCE SAID THAT BEFORE EITHER SIDE EVEN WALKS INTO A COURTROOM, EVEN STEPS FOOT IN THE WELL, THEY EACH HAVE A THIRTY PERCENT CHANCE OF LOSING. IT DOESN'T BUILD A LOT OF CONFIDENCE FOR LAWYERS. AND I DON'T KNOW WHERE THE JUDGE GETS HIS HANDICAPPING SKILLS. BUT THE POINT OF IT IS THAT YOU JUST DON'T KNOW. YOU DON'T KNOW WHAT COULD HAPPEN IN ANY LITIGATION. ONE SIDE THINKS

THEY'RE RIGHT; THE OTHER SIDE THINKS THEY'RE RIGHT. THEY BOTH HAVE A CHANCE OF BEING CORRECT. AND THAT'S WHAT THIS BOILS DOWN TO, YOUR HONOR: WE JUST DON'T KNOW. WE DON'T KNOW WHAT THE APPELLATE COURT WILL SAY WHEN IT SEES OUR ARGUMENTS.

BUT WHAT WE DO KNOW IS THAT SABELLA AND DYNAMIC WILL BE IRREPARABLY HARMED IF THE ORDER IS ENFORCED WHILE THE APPEAL IS PENDING.

YOUR HONOR, WE UNDERSTAND THAT WE LOST. WE GET THAT. BELIEVE ME, WE GET THAT. AND WE ARE NOT HERE, AGAIN, ASKING THIS COURT TO CHANGE IT'S MIND. WE'RE ASKING THIS COURT TO TAKE INTO CONSIDERATION THE POSSIBILITY THAT AN APPELLATE COURT MAY SEE IT DIFFERENTLY, AND COUPLE THAT WITH THE HARDSHIPS THAT DYNAMIC AND SABELLA WILL SUFFER.

I HAVE TO DISAGREE WITH THE TRUSTEE THAT'S IT BLACK LETTER LAW IN A 2004 EXAMINATION THAT FEDERAL PRIVILEGE LAW APPLIES. THERE IS NO CASES THAT SAY THAT. THERE'S NO CASE ON POINT IN THIS CIRCUIT THAT SAYS THAT. AND IF THAT WERE TRUE, IT WOULD ESSENTIALLY CUT THE LEGS OUT FROM FEDERAL RULE OF EVIDENCE 501, BECAUSE 2004 IS PROCEDURE. ALL THINGS IN FEDERAL COURT FALL UNDER FEDERAL PROCEDURE OR MOVE PURSUANT TO FEDERAL PROCEDURE.

BUT THE POINT OF 501 IS TO LOOK PAST THE PROCEDURE AND TO LOOK AT THE SUBSTANTIVE CLAIMS AND DEFENSES THAT ARE BEING SET FORTH. AND IF THE RULE OF

DECISION COMES FROM THE STATE LAW, THEN YOU APPLY THE STATE PRIVILEGE. BUT EVEN IF THAT'S TRUE, EVEN IF FEDERAL LAW SHOULD APPLY BECAUSE THIS WAS A 2004 EXAMINATION, THERE IS NO FEDERAL LAW ON POINT REGARDING WHETHER OR NOT AN INDIVIDUAL CAN HAVE A CLIENT REPRESENTATIVE. AND BECAUSE OF THAT, UNDER RULES OF COMITY AND FEDERALISM, CALIFORNIA LAW SHOULD HAVE BEEN, AT LEAST, CONSIDERED.

WE HAVE GREAT DEFERENCE FOR THIS COURT. WE KNOW THAT THE COURT REVIEWED, IN DETAIL, EVERY BRIEF THAT WAS SUBMITTED; LISTENED TO THE EVIDENCE FOR THREE DAYS; AND, CAME TO WHAT THIS COURT BELIEVED TO BE THE APPROPRIATE DECISION UNDER THE CIRCUMSTANCES.

AND THIS IS A DIFFICULT MOTION TO MAKE TO A COURT THAT MADE THE DECISION. BUT AS I HAVE SAID REPEATEDLY, WE'RE NOT ASKING THIS COURT TO REVERSE ITSELF. WE'RE ASKING THE COURT TO CONSIDER THAT THERE'S A POSSIBILITY THAT THE APPELLATE COURT COULD SEE IT DIFFERENTLY AND TO MAINTAIN THE STATUS QUO AND MAKE SURE THAT THE CONFIDENTIALITIES THAT SABELLA AND DYNAMIC ALWAYS BELIEVED WERE THERE REMAIN INTACT.

THANK YOU, YOUR HONOR.

THE COURT: ALL RIGHT.

WELL, FIRST OFF, YOU SHOULD TAKE SOME CONSOLATION IN THE FACT THAT I DO NOT VIEW THE MOTION AS A CHALLENGE TO THIS COURT'S DECISION ON IT'S MERITS IN THAT SENSE. I

MEAN, I FILED PLENTY OF NOTICES OF APPEAL AS A LITIGATOR MYSELF AND I KNOW WHAT IT MEANS AND I KNOW SOMETIMES THE DIFFERENT REASONS WHY NOTICES OF APPEAL ARE FILED.

THIS CASE HAS BEEN AN INTERESTING CASE AND I'VE WRESTLED WITH THIS PARTICULAR MOTION FOR A COUPLE REASONS. ONE IS BECAUSE, PHILOSOPHICALLY, IT'S ALWAYS AN INTRIGUING QUESTION WHEN YOU HAVE A TEST THAT REQUIRES A DECIDING JUDGE TO DECIDE WHETHER THERE'S, YOU KNOW, WHATEVER STANDARD YOU CHOOSE TO CALL IT; A PROBABILITY OR LIKELIHOOD THAT I'M WRONG.

YOU CHOSE TO USE THE WORD POSSIBILITY, WHICH IS ONE OF THOSE CLASSIC T.V. SHOW QUESTIONS OF CROSS-EXAMINATION TO AN EXPERT WITNESS. WELL DOCTOR, ISN'T IT POSSIBLE THAT? YOU KNOW? AND THE ANSWER USUALLY IS JUST ABOUT ANYTHING IS POSSIBLE. OKAY?

AND SO I'M BACK TO PONDERING THE SAME QUESTION THAT MR. MOJDEHI WAS PONDERING AND THAT IS, IS THE TEST -- DOES IT REALLY BOIL DOWN TO IRREPARABILITY AND DEGREE OF IRREPARABILITY, IF THERE'S ANY POSSIBILITY. AND IF THERE'S ALWAYS A POSSIBILITY, THEN THE TEST BECOMES A ONE-PRONG TEST; IF YOU CAN SHOW IRREPARABILITY.

I ALSO HAVE A QUESTION IN MY MIND ABOUT THE EXTENT TO WHICH IRREPARABILITY AS URGED HERE IS REALLY, IN FACT, IRREPARABILITY IN THAT WHILE IT'S CLEARLY NOT THE SITUATION IN A DAMAGE CASE WHERE YOU CAN BOND AROUND

SOMETHING. BUT AT THE SAME TIME, PROTECTIVE ORDERS ARE ISSUED ALL THE TIME IN TERMS OF HOW CONFIDENTIAL OR INFORMATION IS HANDLED AND WHO GETS TO HANDLE IT AND LIMITED DISCLOSURE REQUIREMENTS AND THAT SORT OF THING.

THERE ARE EVEN INSTANCES AND THERE WERE IN THE CONTEXT OF THIS CASE IN THE CONTEXT OF MR. LEI'S DEPOSITION EARLIER -- OR I GUESS IT WAS THE 2004 IN WHICH ALL OF A SUDDEN THE QUESTION WAS, WAIT A MINUTE, THOSE DOCUMENTS, I THINK THEY WERE INADVERTENTLY PRODUCED. WE STOPPED EVERYTHING AND WENT THROUGH THAT PROCESS, THEN DEALT WITH THAT IN THAT CONTEXT.

SO TO SAY THAT IT IS AUTOMATICALLY IRREPAIRABLE IN THE, YOU KNOW, IN THE DENOTATIVE SENSE OF THE WORD IRREPAIRABLE GIVES ME SOME PAUSE BECAUSE I'M NOT PERSUADED THAT THAT'S NECESSARILY SO.

AT THE SAME TIME, I'VE BEEN REALLY TROUBLED BY -- IN THE CONTEXT OF THIS MOTION FOR STAY -- THE NOTION THAT THE INFORMATION ONCE DISCLOSED IS DISCLOSED. BUT I'M CONSTRAINED BY THE LAW, AS I READ IT, APPLICABLE IN THIS CIRCUIT, UNDER 8005 AND THE CASES DECIDED UNDER THERE TO APPLY ALL THE PRONGS OF THE TEST. AND THE MOVANT HAS TO MEET EACH OF THOSE.

I'M NOT PERSUADED THAT THE POSSIBILITY OF SUCCESS ON THE MERITS, HOWEVER REMOTE, IS SUFFICIENT UNTO ITSELF INDEPENDENT OF IRREPARABILITY OR EVEN DEPENDENT ON

IRREPARABILITY SUFFICIENT TO SATISFY THE TEST.

I'M ALSO, AS I'VE INDICATED, NOT SO SANGUINE THAT THE IRREPARABILITY IS AS DIRE AND CANNOT BE MITIGATED AS YOU SUGGEST. I DO AGREE, IN THE ABSTRACT, THAT THE CONTEXT OF THIS CASE, YOU KNOW, AS LONG AS IT'S TAKEN UP TO THIS POINT IN TIME, IS NOT GOING TO IMPOSE IRREPARABLE HARM ON THE TRUSTEE TO HAVE TO AWAIT THE RESULTS OF AN APPEAL.

BUT AT THE SAME TIME, I AM CONCERNED ABOUT WHAT HAS HAPPENED IN THE COURSE OF THIS CASE; I'M CONCERNED ABOUT HOW MS. SABELLA'S AND DYNAMIC'S COUNSEL HAVE CHANGED HORSES. THEN WE HAD THE PROBLEM OF GETTING COUNSEL FOR MR. LEI, WHO HAD BEEN REPRESENTED BY THE PACHULSKI FIRM UP TO THAT POINT IN TIME IN THE CONTEXT OF THE PROCEEDINGS AND THE DISCOVERY. AND I AM CONCERNED WITH THE AMOUNT OF DELAY THAT HAS ALREADY OCCURRED IN THIS CASE.

ADDING ALL THOSE PIECES UP, I HAVE TO FIND THAT EVEN THOUGH I'M TROUBLED BY THE DISCLOSURE WHICH NECESSARILY FOLLOWS, AND I INDICATE AGAIN THAT I'M WILLING TO WORK WITH THE PARTIES SO LONG AS IT DOESN'T CREATE A DELAY AS WELL TO TRY AND FIND SOME WAY TO MITIGATE THE EFFECT OF IT. BUT I CANNOT FIND THAT ALL THE PRONGS OF THE TEST HAVE BEEN SATISFIED SUFFICIENT TO WARRANT THE ISSUANCE OF THE STAY PENDING APPEAL UNDER 8005.

NOW, THAT RULING, OF COURSE, IS WITHOUT PREJUDICE TO YOUR MAKING A SIMILAR APPLICATION TO THE DISTRICT COURT.

AND THE DISTRICT COURT MAY BE PERSUADED WHERE I'M NOT. YOU KNOW, THAT'S THE NATURE OF THE BEAST. BUT 8005 CONTEMPLATES THAT YOU'VE GOT TO ASK ME FIRST. AND I'VE LOOKED AT IT AND THOUGHT ABOUT IT, AND MY BEST ANSWER TO YOU IS I DON'T SEE THAT THE TEST IS SATISFIED.

MS. LEGITTINO: YOUR HONOR, IF I MAY BE HEARD ONE MOMENT PLEASE?

BASED ON THE COURT'S RULING, WE'D ASK THAT THERE BE A SHORT TEMPORARY STAY OF ENFORCEMENT OF THE ORDER SO THAT WE CAN PURSUE THE APPEAL OF THE COURT'S DECISION IN THE DISTRICT COURT.

THE COURT: WELL, THE ORDER HAS GOT TO BE LODGED. SO THE ORDER WILL COME IN; IT'LL BE LODGED; YOU'LL HAVE FIVE BUSINESS DAYS TO OBJECT TO THE FORM OF THE ORDER THAT COMES FROM MR. MOJDEHI, DURING WHICH, YOU CAN MAKE YOUR APPLICATION TO THE DISTRICT COURT.

MS. LEGITTINO: OKAY.

THANK YOU, YOUR HONOR.

MR. MOJDEHI: THANK YOU.

THE COURT: THAT WILL BE THE ORDER.

WE ARE IN RECESS.

STATE OF CALIFORNIA

COUNTY OF SAN DIEGO

I, LYNETTE ALVES, OFFICIAL REPORTER, DO HEREBY CERTIFY:

THAT I REPORTED IN SHORTHAND THE PROCEEDINGS HELD IN THE FOREGOING CAUSE ON THE 2ND DAY OF JULY, 2008; THAT MY NOTES WERE LATER TRANSCRIBED INTO TYPEWRITING UNDER MY DIRECTION; AND, THAT THE FOREGOING TRANSCRIPT CONTAINS A CORRECT STATEMENT OF THE PROCEEDINGS.

DATED THIS 8th DAY OF July, 2008.

Lynette Alves

LYNETTE ALVES, CSR #12534, RPR #61256

**EXHIBIT 22**

EXHIBIT 22
PAGE 311

LEXSEE 411 N.W.2D 477

Caution
As of: Jul 10, 2008

**Debra M. Grubbs, as Conservator of the Estate of Rhonda Ann Moser, a minor, Plaintiff-Appellee, v. K Mart Corporation, Defendant-Appellant**

**Docket No. 80105**

**Court of Appeals of Michigan**

*161 Mich. App. 584*; *411 N.W.2d 477*; *1987 Mich. App. LEXIS 2624*

**November 12, 1986, Submitted**
**July 20, 1987, Decided**

**DISPOSITION:** **[***1]** Affirmed.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Appellee conservator brought an action against appellant discount store on behalf of a minor child who suffered severe injuries when her pajamas caught on fire. The store brought a motion pursuant to *Mich. Ct. R. 2.310* for the production, inspection, and copying of two statements that were in the custody of the child's attorney. The Kalamazoo Circuit Court (Michigan) denied the motion. The store appealed.

**OVERVIEW:** The child's father was referred to an attorney five years after the incident took place. The attorney took statements from the child's mother and father prior to filing the lawsuit. The store asserted that the expert witness for the child reviewed the transcribed statements, that the child's attorney did not permit the store to examine the statements, and that the statements might contain critical information relative to the location of the purchase of the pajamas. The store further alleged that there was a contradiction between the testimony of the father and the mother regarding the place of purchase. The court rejected the store's argument that the statements were not protected by the attorney-client privilege. Although the parents were not the attorney's clients, the court found that the statements were privileged because the parents were acting as the child's agents in seeking legal advice. The court also rejected the store's assertion that the privilege was waived because the statements were recorded in front of a certified shorthand reporter, because they were disclosed to the trial court, and because they were disclosed to the child's expert witness.

**OUTCOME:** The court affirmed the order.

**LexisNexis(R) Headnotes**

***Evidence > Privileges > Attorney-Client Privilege > General Overview***

[HN1] The attorney-client privilege attaches to communications made by a client to the attorney acting as a legal adviser and made for the purpose of obtaining legal advice on some right or privilege. The purpose of the privilege is to allow a client to confide in his attorney, secure in the knowledge that the communication will not be disturbed.

***Evidence > Privileges > Attorney-Client Privilege > General Overview***

[HN2] Communications made through a client's agent are

privileged.

***Evidence > Privileges > Attorney-Client Privilege > Waiver***
[HN3] The attorney-client privilege is the client's alone and may only be waived by the client.

**COUNSEL:** *Sloan, Benefiel, Farrer, Newton & Glista* (by *Gary C. Newton*), for plaintiffs.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Joel E. Krissoff* and *John A. Ferroli*), for K mart Corporation.

**JUDGES:** R. M. Maher, P.J., and D. F. Walsh and C. Stell, * JJ.

> * Circuit judge, sitting on the Court of Appeals by assignment.

**OPINION BY:** PER CURIAM

**OPINION**

**[*585] [**478]** Defendant K mart Corporation appeals by leave granted from an order of the Kalamazoo Circuit Court denying K mart's discovery request for two statements in the custody of plaintiff's attorney. We affirm the trial court's order.

In the latter part of 1981, Terry Holderman consulted an attorney, Kevin Kleidon, about a divorce from his wife, Sandra Holderman (Moser). In the course of that consultation, Terry Holderman mentioned that his daughter, Rhonda Ann Moser, had been severely injured five years previously **[*586]** when her pajamas caught on fire. After learning of the injury, Kleidon referred Terry Holderman to a Kalamazoo law firm.

Gary Parker, an attorney with the Kalamazoo law firm, took six statements based upon Kleidon's referral. On September 9, 1981, the statements of **[***2]** Sandra Holderman, Rhonda Ann Moser, Ed Kelly and Barbara Holderman were taken. On November 3, 1981, the statement of Terry Holderman was taken. The statements of Terry and Sandra Holderman were recorded by a certified shorthand reporter.

Some time after the statements were taken, Debra M. Grubbs, another attorney with the Kalamazoo law firm, was appointed as Rhonda Moser's conservator. On April 23, 1982, Grubbs filed the instant action on behalf of Rhonda Moser in the circuit court. Both K mart and Meijer Thrifty Acres were named as defendants, though Meijer was later dismissed by stipulation of the parties.

On August 25, 1982, Sandra Holderman filed her answers to Meijer's interrogatories. In the course of those answers, Sandra Holderman acknowledged the six statements taken by Gary Parker.

On December 12, 1983, K mart took the deposition of Charles D. Beroes, Ph.D., a professor of chemical engineering. Beroes is plaintiff's expert. In the course of the deposition, Beroes testified that he may **[**479]** have based his opinion in part on the statements taken by Gary Parker.

On December 27, 1983, K mart filed a motion for production, inspection and copying of documents **[***3]** pursuant to *MCR 2.310*. K mart's motion alleged that Beroes reviewed the transcribed statements, that K mart was not permitted by plaintiff's attorney to examine the statements and that the statements might contain critical information relative to the location of the purchase of the pajamas. K **[*587]** mart further alleged that there was a contradiction between the testimony of Terry Holderman and Sandra Holderman regarding the place of purchase of the pajamas.

K mart's motion was heard on January 9, 1984. The circuit court denied the motion, which was based upon K mart's claim that the statements were necessary for impeachment purposes. The circuit court further held:

> The second ground, however, is something that causes the Court more of a problem. The deposition of the expert was apparently taken, and it appears that he relied in his expert opinion not only on hypothetical questions but also on information furnished him through statements of Plaintiff's witnesses. If these statements were used by the expert in arriving at his opinion, then, because of the lack of any other evidence, the garment having been totally destroyed, or at least not being available, the Court **[***4]** believes that those statements, to the extent that they were revealed to and relied upon by the expert, should be disclosed and furnished to the Defendant.

> I recognize that this might cause some editorial work to be necessary by the Court. If there are things in some of those statements that have nothing to do with the expert that the Plaintiff feels should not be disclosed, the Court will pass upon that as to whether or not there ought to be some deletions in the information shown to defense counsel. But to the extent that the expert found material in those statements on which to base his opinions, the Court believes that those statements should be revealed to the Defendant.
>
> If the Plaintiff feels there's no problem with editing any parts of these statements out, he should furnish those statements within 20 days. If the Plaintiff feels that there is some editing necessary to protect Plaintiff's interest, the Plaintiff shall file within 20 days a Motion to Delete parts of those statements.

**[*588]** Plaintiff did file a motion to delete and on May 7, 1984, the circuit court conducted an in camera review of the six statements, explaining:

> All right. Well, the Court **[***5]** believes that statements taken of your own client are privileged. They are putting on paper what the client tells his lawyer and, if a court reporter is brought in instead of the lawyer's secretary or instead of using a dictaphone, this doesn't seem to me to change the situation; that it's still a privileged communication. This privilege can be lost just as most privileges can be and, if those statements were then of a nature that would help an expert to form a decision, then I think plaintiff has to determine whether or not he wants to furnish those statements to the expert, so the expert can rely on them.
>
> I don't think that necessarily furnishing that to an expert alone would waive the privilege but, if there was something in there that the expert could rely upon and does rely upon and then that expert is offered as a witness, as I understand as [sic] is being offered in this case, sometimes if you get an adverse result, you might not want that result, but assuming that the expert is going to be helpful to the plaintiff, then I think possibly the privilege is waived, and I will look at the statements if they are available right now to see whether there's anything in there that **[***6]** an expert on inflammatory [sic] clothing could possibly have used in coming to a decision as to what his opinion should be in the matter.

On May 16, the circuit court entered its opinion, ordering that one page of the transcript of Sandra Holderman's statement be provided to K mart. The circuit court reasoned that the page contained testimony upon which Dr. Beroes could have relied in **[**480]** forming his expert opinion. The balance of Sandra Holderman's statement and all of Terry Holderman's statement were held to be protected.

**[*589]** On appeal, K mart argues that the statements of Terry and Sandra Holderman were neither privileged nor protected by Michigan's work product discovery rule.

[HN1] The attorney-client privilege attaches to communications made by a client to the attorney acting as a legal adviser and made for the purpose of obtaining legal advice on some right or privilege. *Alderman v People, 4 Mich 414, 422 (1857)*. The purpose of the privilege is to allow a client to confide in his attorney, secure in the knowledge that the communication will not be disturbed. *Parker v The Associates Discount Corp, 44 Mich App 302, 306; 205 NW2d 300 (1973)*; *Kubiak* **[***7]** *v Hurr, 143 Mich App 465, 472-473; 372 NW2d 341 (1985)*.

K mart first argues that the privilege did not attach because Terry and Sandra Holderman were not "clients." We disagree. [HN2] Communications made through a client's agent are privileged. *People v Bland, 52 Mich App 649, 653; 218 NW2d 56 (1974)*, citing 58 Am Jur, Witnesses, § 498, p 279. See also *81 Am Jur 2d, Witnesses, §§ 191-192*, pp 226-229. It is apparent that Rhonda, who was approximately nine years old at the time, was not able to bring suit in her own name. GCR 1963, 201.5(1) and (2). We believe that Rhonda's parents were, of necessity, acting as her agents in seeking legal

advice.

K mart also argues that, because the statements were recorded in front of a third party -- the certified shorthand reporter -- the privilege was waived. It is clear to us that the reporter was acting as the agent of the attorney and that the privilege was not waived by her presence. *Stephenson v Golden (On Rehearing), 279 Mich 710, 734-735; 276 NW 849 (1937)*. Since a recorded statement was essential to provide an accurate factual base from **[*590]** which their attorney might provide legal advice, we believe that the privilege **[***8]** was not waived.

K mart next argues that the attorney-client privilege was waived by disclosure to the trial court of the statements. However, the statements were provided under court order for an in camera review necessitated by K mart's motion. To conclude that the attorney-client privilege was thus waived is to conclude that K mart held the power to waive the privilege merely by asserting a need for the information in a motion. We cannot draw that conclusion. It is well established that [HN3] the privilege is the client's alone and may only be waived by the client. *Kubiak, supra, 473*.

Finally, K mart contends that the privilege was waived by disclosure of the information to plaintiff's expert. Again we disagree. *People v Hilliker, 29 Mich App 543, 547; 185 NW2d 831 (1971)*.

We conclude that the statements provided by Terry and Sandra Holderman were privileged communications and were therefore not discoverable beyond those portions ordered by the trial court. Our resolution of this matter makes unnecessary discussion of the other issues raised **[***9]** by K mart.

Affirmed.

**EXHIBIT 23**

EXHIBIT 23
PAGE 316

LEXSEE 712 SO.2D 1252

Caution
As of: Jul 10, 2008

**KAREN GERHEISER, Petitioner, v. SEAN STEPHENS and THE STATE OF FLORIDA, Respondents.**

**CASE NO. 98-1109**

**COURT OF APPEAL OF FLORIDA, FOURTH DISTRICT**

*712 So. 2d 1252; 1998 Fla. App. LEXIS 8093; 23 Fla. L. Weekly D 1615*

**July 8, 1998, Opinion Filed**

**SUBSEQUENT HISTORY:** [**1] Released for Publication July 24, 1998.

**PRIOR HISTORY:** Petition for writ of certiorari to the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Harold J. Cohen, Judge; L.T. Case No. 95-5039 CFA02.

**DISPOSITION:** Petition for a writ of certiorari denied.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Petitioner filed a writ of certiorari to quash an order of the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County (Florida), which required petitioner to give in camera testimony regarding communications she had with an attorney.

**OVERVIEW:** Petitioner's son was convicted of second-degree murder. Petitioner had a meeting with an attorney on behalf of her son. The attorney eventually became only the co-defendant's attorney. After a co-defendant filed an appeal based on ineffective assistance of counsel, respondent, the State of Florida, requested information regarding the communications petitioner had with the attorney. The co-defendant claimed that, pursuant to *Fla. R. Crim. P. 3.850*, the communications were privileged. After a trial court ordered petitioner to provide in camera testimony regarding the communications, petitioner filed a writ of certiorari to quash the order. The court held that a trial court was entitled to require in camera testimony regarding the privileged information because respondent established that the privileged information was material to its defense. The court denied petitioner's request.

**OUTCOME:** The petition to quash an order that required petitioner to give in camera testimony regarding communications with an attorney was denied. The court concluded that respondent state demonstrated a reasonable probability that the privileged matters contained material information necessary to its defense.

**LexisNexis(R) Headnotes**

***Evidence > Privileges > Attorney-Client Privilege***
[HN1] Existence of attorney-client privilege does not depend on whether client actually hires attorney. It is enough if client consults attorney with a view to employing attorney professionally.

***Evidence > Privileges > Attorney-Client Privilege***
[HN2] See *Fla. Stat. ch. 90.502(1)(c)* (1995).

***Evidence > Privileges > Attorney-Client Privilege >***

***Scope***
[HN3] The attorney-client privilege extends to the necessary intermediaries and agents through whom such communications are made. A communication, then, by any form of agency employed or set in motion by the client is within the privilege. This of course includes communications through an interpreter, and also communications through a messenger or any other agent of transmission, as well as communications originating with the client's agent and made to the attorney.

***Evidence > Privileges > Attorney-Client Privilege***
[HN4] A defendant must satisfy a stringent test to justify in camera disclosure of privileged matters. To obtain in camera review of confidential communications or records, a defendant must first establish a reasonable probability that the privileged matters contain material information necessary to his defense. Only then may a trial court conduct an in camera hearing to determine if, in fact, the privileged communications contain such information.

**COUNSEL:** Ronald S. Chapman, West Palm Beach, for petitioner.

Robert A. Butterworth, Attorney General, Tallahassee, and Consuelo Maingot, Assistant Attorney General, Fort Lauderdale, for Respondent-The State of Florida.

**JUDGES:** GUNTHER, WARNER and SHAHOOD, JJ., concur.

**OPINION**

**[*1253]** PER CURIAM.

The petitioner, Karen Gerheiser, seeks a writ of certiorari quashing the lower court's order requiring her to give *in camera* testimony regarding communications she had with an attorney.

Gerheiser's son, Ronald Knight, and a codefendant, Sean Stephens, were charged with first degree murder, robbery and grand theft. Knight was convicted after a jury trial, and Stephens pled guilty to second degree murder, robbery and grand theft. In May 1997, Stephens filed a motion pursuant to *Florida Rule of Criminal Procedure 3.850*, alleging that his trial attorney, V. Ted Brabham, rendered ineffective assistance of counsel. **[**2]** Stephens alleged, *inter alia*, that Brabham labored under a conflict of interest.

In support of this claim, Stephens submitted an affidavit from Gerheiser, stating that after Knight's arrest, she met with Brabham about representing Knight, who was being held at the jail. Gerheiser's affidavit asserts that she and Brabham discussed his fee and other matters that she expected to remain confidential, including possible defenses and strategies. She subsequently advised Brabham that she could not afford his fee, and Brabham ended up representing Stephens instead.

Stephens' 3.850 motion alleged that Brabham obtained privileged and confidential information about Knight that he would have been obligated to use against Knight had Stephens' case gone to trial. Stephens alleged that he wanted to go to trial, that he had meritorious defenses that Brabham failed to pursue, and that Brabham pushed Stephens into pleading guilty based in part on the conflict.

**[*1254]** The trial court summarily denied the 3.850 motion, and on appeal, we remanded for an evidentiary hearing on the conflict issue. At the evidentiary hearing, Stephens' counsel sought to call Gerheiser to testify about her conversation with **[**3]** Brabham. Gerheiser's attorney objected, asserting the attorney-client privilege on the ground that Gerheiser was acting as an agent for her son when she met with Brabham. Stephens' attorney indicated that she wished to ask Gerheiser general questions as to whether she conveyed privileged information to Brabham, without disclosing what was discussed. Stephens' counsel advised the court that in securing Gerheiser's affidavit, she had been careful not to ask Gerheiser anything that would be considered privileged and that Knight's appellate attorney had reviewed the affidavit before Gerheiser signed it. Gerheiser's counsel expressed concern that any inquiry into Gerheiser's meeting with Brabham would open the door to the entire conversation. The State took the position that the conversation was not covered by the attorney-client privilege (an argument it did not pursue before this court).

The trial court asked Gerheiser some preliminary questions about the nature and purpose of her meeting with Brabham. The court then concluded that Gerheiser was acting as her son's agent and that her conversation with Brabham was therefore privileged. At that point, the State requested that the court **[**4]** conduct an *in camera* hearing to inquire into the substance of the

communications between Gerheiser and Brabham. Gerheiser's counsel objected. Stephens took the position that the trial court did not need to know the substance of the communications in order to find that Brabham rendered ineffective assistance of counsel based on a conflict of interest. Rather, it was Stephens' contention that Gerheiser's affidavit and testimony thus far were enough to demonstrate the existence of a privileged and confidential relationship, which, he claimed, precluded Brabham from taking Stephens' case to trial.

The trial court reserved ruling on the motion for *in camera* testimony until after hearing Brabham's testimony. Brabham testified that nothing confidential outside of his fee was discussed at the meeting with Gerheiser and that he did not learn anything from her about Knight that he had not already read in the newspapers. The state renewed its motion for an *in camera* examination, arguing that without such an examination the State would be prejudiced in defending against Stephens' conflict of interest claim.

The trial court granted the motion for an *in camera* examination of Gerheiser, **[**5]** who then filed this petition for writ of certiorari.

**Applicability of attorney-client privilege**

As a preliminary matter, we agree with the trial court that Gerheiser's conversation with Brabham was protected by the attorney-client privilege, as she was acting as an agent for her son for the purpose of securing legal representation for him. In responding to the petition for certiorari, the State did not argue to the contrary. The fact that Brabham was not retained by Gerheiser is immaterial. See *Dean v. Dean, 607 So. 2d 494 (Fla. 4th DCA 1992)*, rev. dismissed, *618 So. 2d 208 (Fla. 1993)* ([HN1] existence of attorney-client privilege does not depend on whether client actually hires attorney; it is enough if client consults attorney with a view to employing attorney professionally).

[HN2] *Section 90.502(1), Florida Statutes*, provides that:

A communication between lawyer and client is "confidential" if it is not intended to be disclosed to third persons other than:

1. Those to whom disclosure is in furtherance of the rendition of legal services to the client.

2. Those reasonably necessary for the transmission of the communication.

*§ 90.502(1)(c), Fla. Stat.* (1995). **[**6]** Gerheiser essentially acted as the messenger for her son, who was incarcerated in the jail and who asked her to find him an attorney. As such, she was "reasonably necessary for the transmission of the communication."

We believe this conclusion is consistent with cases holding that [HN3] the attorney-client privilege "extends to the necessary intermediaries and agents through whom such communications are made." *State v. Kociolek, 23 N.J. 400, 129 A.2d 417, 424 (1957)*; *City and County of San Francisco v.* **[*1255]** *Superior Court, 37 Cal. 2d 227, 231 P.2d 26, 31 (1951)* (en banc). As stated in Wigmore on Evidence § 2317, "A communication, then, by *any form of agency* employed or set in motion by the client is within the privilege. This of course includes communications through an *interpreter*, and also communications *through a messenger* or any other *agent of transmission,* as well as communications *originating with the client's agent* and made to the attorney." 8 Wigmore, Evidence § 2317, at 618 (McNaughton rev. 1961) (footnotes omitted; emphasis in original). We also agree with the trial court's conclusion that Gerheiser had standing to assert the privilege on her son's behalf **[**7]** at the evidentiary hearing.

Propriety of ordering an *in camera* examination

Both Gerheiser and the State rely on *State v. Pinder, 678 So. 2d 410 (Fla. 4th DCA 1996)*, as setting forth the standard for determining whether an *in camera* disclosure of privileged communications is permissible. (Stephens, although given an opportunity to file a response to Gerheiser's petition, declined to do so.) In Pinder, a defendant charged with sexual assault moved for an *in camera* review of the victim's statements to sexual assault counselors, on the ground that such statements might contain information favorable to the defendant. The trial court granted the motion, and this court granted a writ of certiorari and quashed the order.

Noting the importance of the sexual assault counselor-victim privilege in encouraging victims to seek assistance, we stated that "even in camera disclosure to the trial judge (and to court reporters, appellate courts and their staff) 'intrudes on the rights of the victim and dilutes the statutory privilege.'" *Id. at 415* (citations omitted). Accordingly, we held:

In light of the policy values behind the privilege, the dangers of lenient disclosure **[**8]** and the availability of broad pretrial discovery, [HN4] a defendant must satisfy a stringent test to justify in camera disclosure of privileged matters. To obtain in camera review of confidential communications or records under section 90.5035 [codifying the sexual assault counselor-victim privilege], *a defendant must first establish a reasonable probability that the privileged matters contain material information necessary to his defense.* ... Only then may a trial court conduct an in camera hearing to determine if, in fact, the privileged communications contain such information.

*Id. at 417* (emphasis added).

We conclude that under the unique circumstances presented here, the State has established a reasonable probability that the privileged matters contain material information necessary to defend against Stephens' claim of ineffective assistance of counsel created by Brabham's conflict of interest. Under *Cuyler v. Sullivan, 446 U.S. 335, 348, 64 L. Ed. 2d 333, 100 S. Ct. 1708 (1980)*, Stephens must prove that his attorney labored under an actual conflict of interest that adversely affected his attorney's performance. See also *Gorby v. State, 630 So. 2d 544 (Fla. 1993)*, **[**9]** cert. denied, *513 U.S. 828, 130 L. Ed. 2d 48, 115 S. Ct. 99 (1994)*. As noted, Stephens asserts that he has already met his burden, based on Gerheiser's affidavit and testimony that Brabham had a "terrible conflict" because they engaged in confidential communications during which they discussed possible defenses and strategies. The trial court has not yet ruled whether Stephens' evidence is sufficient to prove his claim, and nothing we say herein should be interpreted as holding that his evidence is in fact sufficient. However, by agreeing to execute an affidavit for Stephens in support of his conflict claim, Gerheiser herself created a situation where the State has demonstrated a need to know what was discussed. Here, unlike in Pinder, the person holding the privilege has voluntarily described the nature of the conversation with the attorney but, at the same time, has asserted the privilege -- in effect using the privilege as a sword instead of a shield. And here, unlike in Pinder, the information is not being sought as part of a fishing expedition. See *Pinder, 678 So. 2d at 416*. By volunteering information that *might* be deemed sufficient to prove Stephens' claim, **[**10]** Gerheiser has left the State with no choice but to inquire into the content of the communications, in order to rebut Gerheiser's testimony. As such, the State has demonstrated **[*1256]** a reasonable probability that the privileged matters contain material information necessary to its defense. Accordingly, the petition for a writ of certiorari is denied.

GUNTHER, WARNER and SHAHOOD, JJ., concur.

**EXHIBIT 24**

EXHIBIT 24
PAGE 321

Case M:00-cv-01369-MHP Document 937 Filed 05/17/2006 Page 1 of 7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE NAPSTER, INC. COPYRIGHT LITIGATION

**No. C MDL-00-1369 MHP**

This Document Relates To:

UMG RECORDINGS, INC. et al.,

Plaintiffs,

No. C 04-1166 MHP

v.

HUMMER WINBLAD VENTURE PARTNERS et al.,

Defendants.

UMG RECORDINGS, INC. et al.,

Plaintiffs,

No. C 04-1351 MHP

v.

BERTELSMANN AG et. al.,

Defendants.

JERRY LEIBER et al.,

Plaintiffs,

No. C 04-1671 MHP

v.

BERTELSMANN AG et al.,

Defendants.

UNITED STATES DISTRICT COURT
For the Northern District of California

CAPITOL RECORDS, INC. et al.,

Plaintiffs,

v.

BERTELSMANN AG et. al.,

Defendants.

No. C 04-2121 MHP

**MEMORANDUM & ORDER**
**Re: Motions to Stay and for Reconsideration**

On April 21, 2006 this court granted three motions to compel production of documents previously withheld as privileged, based on the crime-fraud exception to the attorney-client privilege. The court ordered plaintiff UMG Recordings, Inc. ("UMG"), plaintiff Capitol Records, Inc. ("EMI"), and defendant Bertelsmann AG ("Bertelsmann") to produce the withheld documents within 30 days of the court's order.[1]

On May 1, 2006 UMG and EMI requested leave to seek reconsideration of the court's order. Simultaneously, UMG and EMI sought a stay of the court's order pending reconsideration. Bertelsmann did not seek reconsideration, but also sought a stay pending appeal to the Ninth Circuit, which Bertelsmann noticed on May 2, 2006. UMG and EMI also filed a notices of appeal on May 9, 2006.

The notices of appeal divest this court of jurisdiction to entertain UMG and EMI's requests for reconsideration. "The filing of a notice of appeal generally divests the district court of jurisdiction over the matters appealed." McClatchy Newspapers v. Central Valley Typographical Union No. 46, 686 F.2d 731, 734 (9th Cir. 1982). Here, the parties are appealing this court's orders to compel production, and as a result this court cannot now reconsider the merits of those orders.

Even if this court retained jurisdiction, or in the event that the Ninth Circuit might wish to remand to this court in order to permit adjudication of the motions for reconsideration, the court would not be inclined to reconsider its rulings. "Reconsideration is appropriate if the district court (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was

manifestly unjust, or (3) if there is an intervening change in controlling law." School Dist. No. 1J, Multnomah County v. ACandS, Inc., 5 F.3d 1255, 1263 (9th Cir. 1993). Both EMI and UMG present voluminous new evidence in support of their requests for reconsideration, but with the exceptions discussed below, none of the evidence is "newly discovered" as it was in the parties possession prior to the briefing and argument for the motions to compel. See id. ("The overwhelming weight of authority is that the failure to file documents in an original motion or opposition does not turn the late filed documents into 'newly discovered evidence.'"). The court considers the arguments offered by EMI and UMG in turn.

Only three of the pieces of evidence submitted by EMI in support of reconsideration were even arguably before the court at the time of its decision. First, EMI claims that the appendix to the EMI White Paper—a document comprising roughly 800 pages of dense legal language—was "referred to at oral argument" and "shown to the Court at that hearing." EMI Motion at 5 n.1. Even if showing a document to the court were the same as "fil[ing]" for purposes of reconsideration, cf. Multnomah County, 5 F.3d at 1263, the arguments EMI advances based on specific citations to portions of the appendix were not before the court, and could not reasonably have served as the basis for denying Hummer's motion to compel. EMI's argument that the court committed "clear error" by failing to appreciate the significance of the appendix is absurd.

Second, EMI points out that Exhibit 64 to the Anderson Declaration was before the DOJ, and in fact was discussed in the EMI White Paper. The court notes, however, that Hummer also submitted Exhibit 62, which contains more specific language as to the similarity of terms offered to the record label parents: MusicNet offered to give EMI a deal that "treats everyone the same." This additional document, in combination with the vague language in the White Paper, provides further *prima facie* evidence of fraud. The order relied on Exhibit 64 as only one factor among several establishing Hummer's *prima facie* case.

Third, EMI cites two portions of the MusicNet White Paper in support of its argument that the DOJ would have realized that EMI was not a "Distribution Stockholder" and therefore would have been permitted to receive a copy of MusicNet's license to Napster. The MusicNet White Paper

UNITED STATES DISTRICT COURT
For the Northern District of California

states broadly that "the Distribution Agreements themselves and Section 5.4(c) of the Amended and Restated Stockholders Agreement [with the parent record labels] prohibit disclosure of the terms of the Distribution Agreements." Anderson Dec., Exh. 7 at 22. EMI now argues that footnote 35, which is cited in support of the broad statement, puts the DOJ on notice that only "Distribution Stockholders" were prohibited from seeing the terms of distribution agreements. The footnote states, in relevant part, that "the terms and conditions of the Distribution Agreements . . . [are] not divulged to any other Distribution Stockholder . . . ***or any other third parties***." Id. at 22 n.35 (emphasis added). Far from supporting EMI's position, the language in the footnote reinforces the White Paper's assertion that terms of distribution agreements were to be kept strictly confidential. EMI's citation to another passage limiting the ability of Distribution Stockholders to "participate in negotiations relating to distribution agreements" is also not relevant to prove that the DOJ knew the EMI was entitled to receive the entire Napster distribution agreement.

Finally, EMI offers the newly-produced deposition testimony of Paul Vidich, a former Warner Music executive and former member of the MusicNet board of directors. Mr. Vidich stated the opinion that "EMI was entitled to [see MusicNet's distribution agreements with entities such as Napster.]" Simmons Dec. Exh. 3, at 288:22–290:13. Mr. Vidich's opinion is based on his interpretation of the Stockholders Agreement, which was attached as an exhibit to the MusicNet White Paper. Whatever limited probative value Mr. Vidich's opinion may have as to the meaning of the Stockholders Agreement, the court fails to see how it bears on the DOJ's reasonable interpretation of the broad, clear statements of independence in the White Paper itself.

In sum, to the extent EMI's arguments for reconsideration are based on appropriate evidence, they are unavailing.

UMG's principal argument in support of reconsideration is that the court mischaracterized UMG's positions with respect to the prevalence and effect of Most-Favored Nation clauses in UMG's content licenses. The court's order does make broad statements about UMG's concessions: "UMG does not disagree with Hummer's characterization of the effect of MFN clauses, or dispute that each of the agreements cited in the White Paper contains an MFN clause" (Order at 6), and

UNITED STATES DISTRICT COURT
For the Northern District of California

"[UMG does not deny] the consistent practice of including MFNs in all license agreements" (Order at 7). Even if the court's order overstates UMG's concessions, the court is not inclined to revisit its ruling because the evidentiary record submitted by Hummer as to the prevalence and similarity of MFNs—the numerous agreements listed in Hummer's papers and relied upon at oral argument—is more than adequate to make out a *prima facie* case of a consistent practice which was deliberately hidden from the DOJ.

UMG's other arguments are similarly without merit. First, UMG argues, as it did in opposing Hummer's motion, that the presence of MFNs in the labels' agreements with third parties is not relevant to prove that the labels exchanged information through the joint ventures—the purported antitrust violation. The court found MFNs to be relevant under a different theory: they undermine the evidentiary value of the supposedly disparate licensing terms. The "disparate licensing" argument was the centerpiece of the pressplay White Paper and provided the primary stated rationale for the DOJ's decision to cease pursuing its antitrust case. The MFNs need not directly prove the sharing of information to be relevant to the DOJ's decision to drop its investigation.

Second, UMG argues that the pressplay Guidelines make broad representations about pressplay's independence from its parents. Although the court does not accept UMG's characterization of the quote it selectively offers from the Guidelines, UMG's argument does not appear to help its case. To the extent that the Guidelines make broad representations of independence, they are belied by the documents offered by Hummer in support of its motion.

The remainder of UMG's arguments are based entirely on newly offered documents which were in UMG's possession prior to briefing and argument for the motion to compel, or are new arguments not raised in the parties' papers or at oral argument. The court may not rely on them in deciding whether to reconsider its order.

The remaining issue is whether the court should stay its discovery orders pending appeal. Ninth Circuit law is not settled as to whether an order vitiating privilege under the crime-fraud exception is appealable at all: "Our circuit has not resolved the general question of 'whether a

UNITED STATES DISTRICT COURT
For the Northern District of California

discovery order disposing of an asserted claim of privilege could be independently appealed under the collateral order doctrine of Cohen[ v. Beneficial Indus. Loan Corp., 337 U.S. 541 (1949)]'" Agster v. Maricopa County, 422 F.3d 836, 838 (9th Cir. 2005) (citing United States v. Fernandez, 231 F.3d 1240, 1245 n. 4 (9th Cir.2000)); but see Bittaker v. Woodford, 331 F.3d 715 717–18 (9th Cir. 2003) (en banc) (exercising jurisdiction over appeal of grant of protective order); United States v. Griffin, 440 F.3d 1138, 1142 (9th Cir. 2006) (exercising jurisdiction over appeal of order denying application of marital privilege).

Even if the parties succeed in obtaining appellate review of the orders, the court has serious doubts about their likelihood of success on the merits. A stay is therefore not appropriate at this time.

UMG also objects to the scope of the order, which requires production of all communications related to the antitrust investigation. Since the court's injunction order is on appeal, thus depriving this court of jurisdiction, even opining on what the court would do if the matter were remanded before the Circuit rules on the appeal is not warranted or appropriate.

CONCLUSION

For the foregoing reasons, the court hereby DENIES UMG's, EMI's and Bertelsmann's motions to stay and DENIES UMG's and EMI's motions for leave to seek reconsideration.

IT IS SO ORDERED.

Dated: May 17, 2006

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

ENDNOTES

1. The court will not restate the facts underlying the motions to compel, which are set forth in the court's previous orders.

Michael Gerard Fletcher (State Bar No. 070849)
mfletcher@frandzel.com
Tricia L. Legittino (State Bar No. 254311)
tlegittino@frandzel.com
FRANDZEL ROBINS BLOOM & CSATO, L.C.
6500 Wilshire Boulevard
Seventeenth Floor
Los Angeles, California 90048-4920
Telephone: (323) 852-1000
Facsimile: (323) 651-2577

Attorneys for Movants/Appellants
Dynamic Finance Corporation and Angela C. Sabella

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

In re

NORTH PLAZA, LLC,

Debtor.

DYNAMIC FINANCE CORPORATION and ANGELA C. SABELLA,

APPELLANTS,

v.

CHAPTER 11 TRUSTEE RICHARD KIPPERMAN,

APPELLEE

District Case No. 08-CV-01194-W-CAB

Bankruptcy Court No. 04-00769-PB11

Appeal No. 2

**EXHIBITS 25 THROUGH 26 TO REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR STAY PENDING APPEAL OF BANKRUPTCY COURT ORDER**

DATE: To Be Set
TIME: To Be Set
COURTROOM: Seven

The Honorable Thomas J. Whelan, Judge Presiding

**EXHIBIT 25**

EXHIBIT 25
PAGE 329

**General Docket**
**United States Court of Appeals for the Ninth Circuit**

**Court of Appeals Docket #:** 06-15886
**Nature of Suit:** 3820 Copyright
UMG Recording, Inc., et al v. Bertelsmann AG, et al
**Appeal From:** US District Court for Northern California, San Francisco

**Docketed:** 05/10/2006
**Termed:** 03/14/2007

**Case Type Information:**
**1)** civil
**2)** private
**3)** null

**Originating Court Information:**
**District:** 0971-3 : CV-00-01369-MHP
**Court Reporter:** Katherine Pope Wyatt, Court Reporter
**Trial Judge:** Marilyn H. Patel, U.S. District Judge
**Date Filed:** 10/16/2000
**Date Order/Judgment:** 04/21/2006
**Date NOA Filed:** 05/02/2006

**District:** 0971-3 : CV-04-01166-MHP
**Date Filed:**
**Date Order/Judgment:** 04/21/2006
**Date NOA Filed:** 05/02/2006

**District:** 0971-3 : CV-04-01671-MHP
**Date Filed:**
**Date Order/Judgment:** 04/21/2006
**Date NOA Filed:** 05/02/2006

**District:** 0971-3 : CV-04-01351-MHP
**Date Filed:**
**Date Order/Judgment:** 04/21/2006
**Date NOA Filed:** 05/02/2006

**District:** 0971-3 : CV-04-02121-MHP
**Date Filed:**
**Date Order/Judgment:** 04/21/2006
**Date NOA Filed:** 05/02/2006

**Prior Cases:**
01-16011
**Date Filed:** 05/24/2001 **Date Disposed:** 03/25/2002 **Disposition:** Affirmed - Opinion
01-16556
**Date Filed:** 08/09/2001 **Date Disposed:** 12/26/2001 **Disposition:** Dismissed - Judge Order
02-15149
**Date Filed:** 01/28/2002 **Date Disposed:** 03/22/2002 **Disposition:** Rule 42-1 Dismissal - Clerk Order
04-76592
**Date Filed:** 12/22/2004 **Date Disposed:** 02/14/2005 **Disposition:** Denied - Judge Order

**Current Cases:**

| | Lead | Member | Start | End |
|---|---|---|---|---|
| Companion | | | | |
| | 06-15886 | 06-15895 | 05/10/2006 | |
| | 06-15886 | 06-15896 | 05/10/2006 | |
| Consolidated | | | | |
| | 06-15886 | 06-72571 | 08/31/2006 | |

EXHIBIT 25

| | | | |
|---|---|---|---|
| | 06-15895 | 06-15896 | 05/19/2006 |
| | 06-15895 | 06-72789 | 08/31/2006 |
| Related | | | |
| | 06-15886 | 06-72789 | 05/31/2006 |
| | 06-15896 | 06-72789 | 05/31/2006 |
| | 06-72571 | 06-72789 | 05/31/2006 |

In re: NAPSTER, INC COPYRIGHT LITIGATION
In Re - -

------------------------------

UMG RECORDING, INC.
Plaintiff - Appellee

Daniel P. Collins, Esq., Attorney
Direct: 213-683-9100
Email: Daniel.Collins@mto.com
Fax: 213/687-3702
[COR LD NTC Retained]
MUNGER TOLLES & OLSON, LLP
35th Floor
355 S. Grand Avenue
Los Angeles, CA 90071

Kelly M. Klaus, Esq., Attorney
Direct: 213/683-9238
Fax: 213/683-4038
[COR LD NTC Retained]
MUNGER TOLLES & OLSON, LLP
35th Floor
355 S. Grand Avenue
Los Angeles, CA 90071

Glenn Douglas Pomerantz, Esq., Attorney
Direct: 213/683-9100
Fax: 213
[COR LD Retained]
MUNGER TOLLES & OLSON, LLP
35th Floor
355 S. Grand Avenue
Los Angeles, CA 90071

Fred A. Rowley, Jr., Esq., Attorney
Direct: 213-683-9100
Fax: 213-683-3702
[COR LD NTC Retained]
MUNGER TOLLES & OLSON, LLP
35th Floor
355 S. Grand Avenue
Los Angeles, CA 90071

INTERSCOPE RECORDS
Plaintiff - Appellee

Kelly M. Klaus, Esq., Attorney
Direct: 213/683-9238
[COR LD NTC Retained]
(see above)

Glenn Douglas Pomerantz, Esq., Attorney
Direct: 213/683-9100
[COR LD Retained]
(see above)

| | |
|---|---|
| MOTOWN RECORD COMPANY, L.P.<br>Plaintiff - Appellee | Kelly M. Klaus, Esq., Attorney<br>Direct: 213/683-9238<br>[COR LD NTC Retained]<br>(see above)<br><br>Glenn Douglas Pomerantz, Esq., Attorney<br>Direct: 213/683-9100<br>[COR LD Retained]<br>(see above) |
| JERRY LEIBER<br>Plaintiff - Appellee | Lynn B. Bayard, Esq., Attorney<br>Direct: 212/373-3000<br>Fax: 212/656-1284<br>[COR LD Retained]<br>PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064<br><br>Carey Ramos, Esq.<br>Direct: 212/373-3000<br>[COR LD NTC Retained]<br>PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064 |
| MIKE STOLLER, individually and dba as Mike Stoller Music<br>Plaintiff - Appellee | Lynn B. Bayard, Esq., Attorney<br>Direct: 212/373-3000<br>[COR LD Retained]<br>(see above)<br><br>Carey Ramos, Esq.<br>Direct: 212/373-3000<br>[COR LD NTC Retained]<br>(see above) |
| FRANK MUSIC CORPORATION<br>Plaintiff - Appellee | Lynn B. Bayard, Esq., Attorney<br>Direct: 212/373-3000<br>[COR LD Retained]<br>(see above)<br><br>Carey Ramos, Esq.<br>Direct: 212/373-3000<br>[COR LD NTC Retained]<br>(see above) |
| PEER INTERNATIONAL CORPORATION, on behalf of themselves & all others similarly situated<br>Plaintiff - Appellee | Lynn B. Bayard, Esq., Attorney<br>Direct: 212/373-3000<br>[COR LD Retained]<br>(see above)<br><br>Carey Ramos, Esq.<br>Direct: 212/373-3000<br>[COR LD NTC Retained]<br>(see above) |
| CAPITOL RECORDS, INC.<br>Plaintiff - Appellee | Peter L. Simmons, Esq., Attorney<br>Direct: 212/859-8000<br>Fax: 212/859-4000<br>[COR LD NTC Retained]<br>FRIED, FRANK HARRIS, SHRIVER & JACOBSEN<br>One New York Plaza |

New York, NY 01004-1980

| | |
|---|---|
| CAROLINE RECORDS, INC.<br>Plaintiff - Appellee | Mitchell E. Epner, Esq., Attorney<br>Direct: 212/859-8000<br>Fax: 212/859-4000<br>[COR LD Retained]<br>FRIED, FRANK HARRIS, SHRIVER & JACOBSEN<br>One New York Plaza<br>New York, NY 01004-1980<br><br>Peter L. Simmons, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD NTC Retained]<br>(see above) |
| NOO TRYBE RECORDS, INC.<br>Plaintiff - Appellee | Mitchell E. Epner, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD Retained]<br>(see above)<br><br>Peter L. Simmons, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD NTC Retained]<br>(see above) |
| VIRGIN RECORDS AMERICA, INC.<br>Plaintiff - Appellee | Mitchell E. Epner, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD Retained]<br>(see above)<br><br>Peter L. Simmons, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD NTC Retained]<br>(see above) |
| NARADA PRODUCTIONS, INC.<br>Plaintiff - Appellee | Mitchell E. Epner, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD Retained]<br>(see above)<br><br>Peter L. Simmons, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD NTC Retained]<br>(see above) |
| HIGHER OCTAVE MUSIC, INC.<br>Plaintiff - Appellee | Mitchell E. Epner, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD Retained]<br>(see above)<br><br>Peter L. Simmons, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD NTC Retained]<br>(see above) |
| PRIORITY RECORDS LLC<br>Plaintiff - Appellee | Mitchell E. Epner, Esq., Attorney<br>Direct: 212/859-8000<br>[COR LD Retained]<br>(see above)<br><br>Peter L. Simmons, Esq., Attorney |

Direct: 212/859-8000
[COR LD NTC Retained]
(see above)

FOREFRONT COMMUNICATIONS GROUP, INC.
Plaintiff - Appellee

Mitchell E. Epner, Esq., Attorney
Direct: 212/859-8000
[COR LD Retained]
(see above)

Peter L. Simmons, Esq., Attorney
Direct: 212/859-8000
[COR LD NTC Retained]
(see above)

JUBILEE COMMUNICATIONS, INC.
Plaintiff - Appellee

Mitchell E. Epner, Esq., Attorney
Direct: 212/859-8000
[COR LD Retained]
(see above)

Peter L. Simmons, Esq., Attorney
Direct: 212/859-8000
[COR LD NTC Retained]
(see above)

EMI CHRISTIAN MUSIC GROUP, INC.
Plaintiff - Appellee

Mitchell E. Epner, Esq., Attorney
Direct: 212/859-8000
[COR LD Retained]
(see above)

Peter L. Simmons, Esq., Attorney
Direct: 212/859-8000
[COR LD NTC Retained]
(see above)

BRIDGEPORT MUSIC, INC.
Plaintiff - Appellee

Richard Steven Busch, Esq., Attorney
Direct: 615/ 259-3456
Fax: 615/ 726-5417
[COR LD NTC Retained]
KING & BARROW
Union St. Plaza
Suite 1100
315 Union St.
Nashville, TN 37201-0000

Paul H. Duvall, Esq., Attorney
Direct: 858/597-6000
Email: pduvall@kingballow.com
Fax: 858/597-6008
[COR LD NTC Retained]
KING & BALLOW
Suite 340
9404 Genesee Ave.
La Jolla, CA 92037-0000

SOUTHFIELD MUSIC, INC.
Plaintiff - Appellee

Richard Steven Busch, Esq., Attorney
Direct: 615/ 259-3456
[COR LD NTC Retained]
(see above)

Paul H. Duvall, Esq., Attorney
Direct: 858/597-6000

[COR LD NTC Retained]
(see above)

WESTBOUND RECORDS, INC.
Plaintiff - Appellee

Richard Steven Busch, Esq., Attorney
Direct: 615/ 259-3456
[COR LD NTC Retained]
(see above)

Paul H. Duvall, Esq., Attorney
Direct: 858/597-6000
[COR LD NTC Retained]
(see above)

Peter L. Simmons, Esq., Attorney
Direct: 212/859-8000
[COR LD NTC Retained]
(see above)

v.

BERTELSMANN AG
Defendant - Appellant

Gregory S. Coleman, Esq., Attorney
Direct: 512-533-0150
Fax: 512-533-0120
[COR LD NTC Retained]
YETTER WARDEN & COLEMAN, LLP
Chase Tower
Suite 750
221 West 6th Street
Austin, TX 78701

Gayle Rosenstein Klein, Esq., Attorney
Direct: 212-402-9405
Fax: 212-402-9444
[COR LD NTC Retained]
MCKOOL SMITH, PC
Suite 3200
399 Park Avenue
New York, NY 10022

Matthew D. Powers, Esq., Attorney
Direct: 650-802-3022
Fax: 650-802-3100
[COR LD Retained]
WEIL GOTSHAL & MANGERS LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065-0000

R. Bruce Rich, Esq., Attorney
[COR LD NTC Retained]
WEIL, GOTSHAL AND MANGES, LLP
767 Fifth Ave.
New York, NY 10153-0000

Kenneth L. Steinthal, Esq., Attorney
Direct: 212/310-8000
Fax: 212/310-8007
[COR LD Retained]
WEIL, GOTSHAL AND MANGES, LLP
767 Fifth Ave.

| | |
|---|---|
| | New York, NY 10153-0000 |
| BERTELSMANN, INC.<br>Defendant - Appellant | Gregory S. Coleman, Esq., Attorney<br>Direct: 512-533-0150<br>[COR LD NTC Retained]<br>(see above)<br><br>Gayle Rosenstein Klein, Esq., Attorney<br>Direct: 212-402-9405<br>[COR LD NTC Retained]<br>(see above)<br><br>Matthew D. Powers, Esq., Attorney<br>Direct: 650-802-3022<br>[COR LD Retained]<br>(see above)<br><br>R. Bruce Rich, Esq., Attorney<br>[COR LD NTC Retained]<br>(see above)<br><br>Kenneth L. Steinthal, Esq., Attorney<br>Direct: 212/310-8000<br>[COR LD Retained]<br>(see above) |
| BEMUSIC, INC.<br>Defendant - Appellant | Gregory S. Coleman, Esq., Attorney<br>Direct: 512-533-0150<br>[COR LD NTC Retained]<br>(see above)<br><br>Gayle Rosenstein Klein, Esq., Attorney<br>Direct: 212-402-9405<br>[COR LD NTC Retained]<br>(see above)<br><br>Matthew D. Powers, Esq., Attorney<br>Direct: 650-802-3022<br>[COR LD Retained]<br>(see above)<br><br>R. Bruce Rich, Esq., Attorney<br>[COR LD NTC Retained]<br>(see above)<br><br>Kenneth L. Steinthal, Esq., Attorney<br>Direct: 212/310-8000<br>[COR LD Retained]<br>(see above) |
| HUMMER WINBLAD VENTURE PARTNERS<br>Defendant - - | John W. Keker, Esq., Attorney<br>Direct: 415/391-5400<br>Fax: 415<br>[COR LD Retained]<br>KEKER & VAN NEST, LLP<br>710 Sansome Street<br>San Francisco, CA 94111-1704<br><br>Michael H. Page, Esq.<br>Direct: 415/391-5400 |

| | |
|---|---|
| | Fax: 415/397-7415<br>[COR LD Retained]<br>KEKER & VAN NEST, LLP<br>710 Sansome Street<br>San Francisco, CA 94111-1704 |
| HUMMER WINBLAD VENTURE PARTNERS IV, LP<br>Defendant - - | John W. Keker, Esq., Attorney<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above)<br><br>Michael H. Page, Esq.<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above) |
| HUMMER WINBLAD TECHNOLOGY FUND IV, LP<br>Defendant - - | John W. Keker, Esq., Attorney<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above)<br><br>Michael H. Page, Esq.<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above) |
| HUMMER WINBLAD EQUITY PARTNERS IV, LLC<br>Defendant - - | John W. Keker, Esq., Attorney<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above)<br><br>Michael H. Page, Esq.<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above) |
| HANK BARRY<br>Defendant - - | John W. Keker, Esq., Attorney<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above)<br><br>Michael H. Page, Esq.<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above) |
| JOHN HUMMER<br>Defendant - - | John W. Keker, Esq., Attorney<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above)<br><br>Michael H. Page, Esq.<br>Direct: 415/391-5400<br>[COR LD Retained]<br>(see above) |

In re: NAPSTER, INC COPYRIGHT LITIGATION,

In Re

------------------------------

UMG RECORDING, INC.; INTERSCOPE RECORDS; MOTOWN RECORD COMPANY, L.P.; JERRY LEIBER; MIKE STOLLER, individually and dba as Mike Stoller Music; FRANK MUSIC CORPORATION; PEER INTERNATIONAL CORPORATION, on behalf of themselves & all others similarly situated; CAPITOL RECORDS, INC.; CAROLINE RECORDS, INC.; NOO TRYBE RECORDS, INC.; VIRGIN RECORDS AMERICA, INC.; NARADA PRODUCTIONS, INC.; HIGHER OCTAVE MUSIC, INC.; PRIORITY RECORDS LLC; FOREFRONT COMMUNICATIONS GROUP, INC.; JUBILEE COMMUNICATIONS, INC.; EMI CHRISTIAN MUSIC GROUP, INC.; BRIDGEPORT MUSIC, INC.; SOUTHFIELD MUSIC, INC.; WESTBOUND RECORDS, INC.,

Plaintiffs - Appellees

v.

BERTELSMANN AG; BERTELSMANN, INC.; BEMUSIC, INC.,

Defendants - Appellants

and

HUMMER WINBLAD VENTURE PARTNERS; HUMMER WINBLAD VENTURE PARTNERS IV, LP; HUMMER WINBLAD TECHNOLOGY FUND IV, LP; HUMMER WINBLAD EQUITY PARTNERS IV, LLC; HANK BARRY; JOHN HUMMER,

Defendants

| | | |
|---|---|---|
| 05/10/2006 | 2 | DOCKETED CAUSE AND ENTERED APPEARANCES OF COUNSEL. CADS SENT (Y/N): n. setting schedule as follows: appellant's designation of RT is due 5/12/06,, ; appellee's designation of RT is due 5/22/06,, ; appellant shall order transcript by 6/1/06,, ; court reporter shall file transcript in DC by 7/3/06; certificate of record shall be filed by 7/10/06 ; appellant's opening brief is due 8/18/06,, ; appellees' brief is due 9/18/06,, ; appellants' reply brief is due 10/2/06,, ; [06-15886] |
| 05/10/2006 | 3 | filed notice of representation of Gayle E. Rosenstein, Matthew D. Powers, R. Bruce Rich and Kenneth L. Steinthal as counsel for aplts [06-15886] |
| 05/10/2006 | 4 | Filed Gayle E. Rosenstein Civil Appeals Docketing Statement served on 5/2/06 (to CONFATT) [06-15886] [06-15886] |
| 05/10/2006 | 29 | Prior case 01-15998 MMS RRB RAP ** TO ANY PANEL PER RRB * [06-15886, 06-15895, 06-15896] |
| 05/12/2006 | 6 | Filed Appellants Bertelsmann AG, Bertelsmann, Inc., BeMusic, Inc.'s motion for stay pending appeal [06-15886] served on 5/12/06 (to MOATT) [06-15886] |
| 05/17/2006 | 7 | Filed aples UMG Recording, Inc., et al's motion to expedite Bertelsmann's appeal [06-15886] served on 5/17/06 [MOATT] |
| 05/17/2006 | 8 | Filed Appellee UMG Recording, Inc.'s response to Bertelsmann's mtn for stay; served on 5/17/06 (MOATT) [06-15886] |
| 05/17/2006 | 9 | Filed Appellee Capitol Records, Inc in 06-15886 Corporate Disclosure Statement. Served on 5/17/06 (MOATT) [06-15886] |
| 05/17/2006 | 10 | Filed Appellee UMG Recording, Inc. in 06-15886 Corporate Disclosure Statement. Served on 5/17/06 (MOATT) [06-15886] |
| 05/17/2006 | 11 | Filed Appellee Jerry Leiber response opposing appellant's motion staying further action [5821889-1] served on 5/17/06 faxed directly to MOATT [06-15886] Original and copies with exhibits recd 5/18/06 MOATT |
| 05/18/2006 | 12 | Filed Appellant Bertelsmann emergency motion that its motion to stay pending appl receive emergency consideration [06-15886] ; served on 5/18/06 [5827472] MOATT |

EXHIBIT 25

| | | |
|---|---|---|
| 05/18/2006 | 13 | Rec'd from Bertelsmann copies of dc's 5/17/06 order. MOATT [06-15886] |
| 05/18/2006 | 14 | Filed Appellant Bertelsmann AG reply to response supporting appellant's motion staying further action [5821889-1] ; served on 5/18/06 Faxed directly to MOATT [06-15886] Original and copies with exhibits rec'd 5/18/06 |
| 05/19/2006 | 15 | Filed Appellant Bertelsmann AG, Bertelsmann, Inc. and BeMusic, Inc.'s motion to consolidate cases [06-15886, 06-72515] served on 5/19/06 [5829244] faxed to MOATT [06-15886, 06-72515] Original and copies recd 5/19/06 |
| 05/19/2006 | 16 | Filed order ( Richard C. TALLMAN, CONSUELO M. CALLAHAN, ): Appellant's motion to stay the dc's 4/21/06 order pending appl is granted. [5821889-1] Aplt's mtn to consolidate this appl with its pet for a writ of mandamus is denied. However, the clerk shall assign this appl to the same merits panel assigned to hear the merits of the pet for mandamus filed in 06-72515. In addition, the clerk shall assign this appl to the merits panel assigned to hear 06-15895 and 06-15896, and pet for writ of mandamus 06-72571. [5829244-1] The unoposed mtn to expedite appeal is granted. The provisions of 9th CR 31-2.2(a) shall not apply to this appeal. Any motion to extend time to file the briefs will be strongly disfavored. The parties shall monitor the issuance of the cert of record. [5826416-1] setting schedule as follows: appellant's brief due 5/26/06,, ; appellees' brief due 6/16/06, opt reply br is due 7 calendar days from service of the ans br. [06-15886] |
| 05/25/2006 | 19 | Filed certificate of record on appeal RT filed in DC 5/22/06 [06-15886] |
| 05/26/2006 | 18 | Filed original and 15 copies Appellants Bertelsmann AG, Bertelsmann, Inc., BeMusic, Inc.'s opening brief (Informal: No) 55 pages and five excerpts of record in 4 volumes; served on 5/26/06 [06-15886] |
| 05/26/2006 | 20 | Filed Appellant Bertelsmann AG's reply opposing aple's response to alter the brfg schedules; served on 5/25/06 (MOATT) [06-15886, 06-72515] |
| 05/26/2006 | 21 | Received Appellants Bertelsmann & Winblad's letter dated 5/26/06 re: notification of EMI & UMG's mtn to expedite--aplt retracts this statement of non-receipt & still opposes any change to the brfg schedules (MOATT) [06-15886, 06-72515] |
| 05/26/2006 | 22 | Filed Appellees ( UMG & EMI)'s (FAXED) response in opposition to aplts' letters regarding the brs filing dates; served on 5/26/06 (COPY IN MOATT) [06-15886, 06-15895, 06-15896, 06-72515, 06-72571] |
| 06/15/2006 | 24 | Calendar check performed [06-15886, 06-15895, 06-15896] |
| 06/16/2006 | 25 | Filed original and 15 copies appellees' Jerry Leiber, Mike Stoller, Frank Music Corp., Peer International Corp.'s 61 pages brief; served on 6/16/06 [06-15886] |
| 06/16/2006 | 27 | Filed original and 15 copies appelles Capitol Records, et al & Capitol Records, et al,'s 55 pages brief, & suppl excs (5 vols) (Vol 4 & 5 are under seal); served on 6/16/06 [06-15886] |
| 06/16/2006 | 28 | Received notice of Proof of svc via hand delivery from Appellee Capitol Records, Inc of docs: 1) notification filing under seal, 2) jt answer of real parties Capitol Records & UMB to Bertelsmann's pet for a writ of mandamus, 3) (Sealed) consolidated appendices; served on 6/16/06 (CASEFILE) |
| 06/22/2006 | 31 | Filed Appellants motion to extend time to file reply brief served on 6/22/06 (PROMO) [06-15886] |
| 06/23/2006 | 34 | Filed original and 15 copies Bertelsmann AG in 06-15886, Bertelsmann, Inc. in 06-15886, BeMusic, Inc. in 06-15886 reply brief, ( Informal: NO ) 27 pages; served on 6/23/06 [06-15886] |
| 06/26/2006 | 30 | Calendar materials being prepared. [06-15886] [06-15886] |
| 06/29/2006 | 32 | Filed PROMO order (Deputy Clerk: amt) Hummer Winblad's unopposed mtn to file an ovsz ans br/resp to petition for nos 06-15895, 06-15896, 06-75271, & 06-72789 is GRANTED. Within 7 calendar days after the date of this order, Hummer Winblad Venture shall submit an orig & 15 copies of the ans br/response that does not exceed 20,948 words. The opt rpy brs & replies are due 7 calendar days after the date of this order. Aple Hummer Winblad Venture's mtn to strike evidence improperly included in the consolidated excs of rec & any related filings shall be referred to the merits panel for resolution. Aplts' mtn for an ext of tm to file the reply br for 05-15886 is GRANTED. The opt rpy br is due 7 calendar days after the date of this order. in 06-15886 [06-15886, 06-15895, 06-15896, 06-72571, 06-72789] |

| | | |
|---|---|---|
| 07/05/2006 | 35 | CALENDARED: San Francisco September 13, 2006 9:00 am Courtroom 1 [06-15886] |
| 08/04/2006 | 37 | FILED CERTIFIED RECORD ON APPEAL IN 17 CLERKS RECORD, AND 23 BULKY DOCUMENTS IN EXPANDO FILES. (PLEASE NOTE; THAT THIS RECORD IS FOR ALL OF THE FOLLOWING NINTH CIRCUIT APPEALS AS WELL- #06-15895 #O6-72515 #06-72571 #06-15371 ) [06-15886] |
| 08/21/2006 | 38 | Filed notice of appearance of Gregory S. Coleman for aplts [06-15886] |
| 08/28/2006 | 39 | Received John W. Keker, Gregory S. Coleman, Peter L. Simmons, Carey Ramos letter dated 8/25/06 re: format of oral argument. PANEL [06-15886, 06-15895, 06-15896, 06-72515, 06-72571, 06-72789] |
| 08/31/2006 | 40 | Filed order (Deputy Clerk: jf) 1) UMG Recordings v. Bertelsmann 06-15886 and Bertelsmann v. USDC 06-72515 are consolidated for argument. Each side will be allowed 20 minutes. 2) Capital Records v. Hummer Winblad 06-15895 and Capital Records v. USDC 06-72789 are consolidated for argument. Each side will be allowed 20 minutes. 3) UMG Recordings v. Hummer Winblad 06-15896 and UMG Recordings v. USDC 06-72571 are consolidated for argument. Each side will be allowed 20 minutes. Argument is sched for 9/13/06. The order of argument will be 1, 2, and 3. FAXED TO PARTIES. [06-15886, 06-15895, 06-15896, 06-72515, 06-72571, 06-72789] |
| 09/07/2006 | 42 | Filed appellees UMG Recording, Inc., Interscope Records, Motown Record Co., in 06-15886, rpi UMG Recordings Inc., Interscope Records, Motown Record Co. in 06-72515 additional citations, FRAP 28(j) letter, served on 9/7/06 (PANEL by fax) [06-15886, 06-72515] |
| 09/13/2006 | 43 | ARGUED AND SUBMITTED TO Ferdinand F. FERNANDEZ, William A. FLETCHER, Johnnie B. RAWLINSON [06-15886, 06-72515] |
| 09/27/2006 | 44 | Case rejected from Circuit Mediation Program. |
| 03/14/2007 | 47 | FILED OPINION: REVERSED REMANDED ( Terminated on the Merits after Oral Hearing; Reversed; Written, Signed, Published. Ferdinand F. FERNANDEZ; William A. FLETCHER, author; Johnnie B. RAWLINSON. ) FILED AND ENTERED JUDGMENT. [06-15886, 06-72515] |
| 03/15/2007 | 48 | rrecd notice of appearance of Fred A. Rowley Jr. as counsel for UMG Recordings Inc. CASEFILE [06-15886, 06-15895, 06-15896, 06-72515, 06-72571, 06-72789] |
| 04/05/2007 | 49 | MANDATE ISSUED [06-15886, 06-72515] |
| 07/02/2007 | 51 | RECORD RETURNED TO THE D.C. IN 17 CLERKS RECORD, AND 23 BULKY DOCUMENTS. |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 07/10/2008 09:43:00 | | | |
| **PACER Login:** | mi0098 | **Client Code:** | Dynamic |
| **Description:** | Docket Report (filtered) | **Search Criteria:** | 06-15886 |
| **Billable Pages:** | 6 | **Cost:** | 0.48 |

**EXHIBIT 26**

EXHIBIT 26
PAGE 341

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

## Minute Order

***Hearing Information:***

**ADV: 08-90035**

**DYNAMIC FINANCE CORPORATION VS RICHARD KIPPERMAN**

**Debtor:** NORTH PLAZA, LLC

**Case Number:** 04-00769-PB11 **Chapter:** 11

**Date / Time / Room:** WEDNESDAY, JUNE 11, 2008 10:00 AM DEPARTMENT 4

**Bankruptcy Judge:** PETER W. BOWIE

**Courtroom Clerk:** JILLMARIE MCGREW

**Reporter / ECR:** LYNETTE ALVES

***Matter:***

PLAINTIFF & COUNTER-DEFENDANT'S MOTION TO DISMISS TRUSTEE DEFENDANT'S COUNTERCLAIMS

***Appearances:***

Tricia L. Legittino, ATTORNEY FOR Dynamic Finance Corporation
Janet D. Gertz, ATTORNEY FOR Richard Kipperman
Richard Kipperman, Present

***Disposition:***

Granted as to Counterclaims 1-9 with leave to amend counterclaim within 20 days.

6/11/2008 10:45:51AM