1 | Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
2 | **BAKER & McKENZIE LLP**
12544 High Bluff Drive, Third Floor
3 | San Diego, CA 92130-3051
Telephone: +1 858 523 6200
4 | Facsimile: +1 858 259 8290

5 | Counsel for Appellee, Chapter 11 Trustee,
Richard M Kipperman

6

7

8 | UNITED STATES DISTRICT COURT

9 | SOUTHERN DISTRICT OF CALIFORNIA

10

11 | In re: | District Case No. 08-CV-01194-W-CAB

12 | | Bankruptcy Court No.04-00769 PB11

13 | NORTH PLAZA, LLC,
a California Limited Liability Company, | Appeal No. 2

14 | Debtor | **APPELLEE CHAPTER 11 TRUSTEE
RICHARD M KIPPERMAN'S
15 | | REQUEST FOR JUDICIAL NOTICE
IN SUPPORT OF TRUSTEE'S
16 | DYNAMIC FINANCE CORPORATION and
ANGELA C. SABELLA, | OPPOSITION TO THE MOTION FOR
STAY PENDING APPEAL OF
17 | | APPELLANTS DYNAMIC FINANCE
CORPORATION AND ANGELA C.
18 | APPELLANTS, | SABELLA**

19 | v.

20 | CHAPTER 11 TRUSTEE RICHARD
KIPPERMAN, | DATE:    N/A
TIME:    N/A
21 | | COURTROOM: 7
JUDGE:   Hon. Thomas J. Whelan
22 | APPELLEE.

23

24 |     Pursuant to Federal Rule of Evidence 201, which is made applicable to this proceeding

25 | pursuant to Federal Rule of Bankruptcy Procedure 9017, Richard M. Kipperman, chapter 11 trustee

26 | of the estate of North Plaza, LLC, respectfully requests that this Court take judicial notice of the

27 | following documents:

28 |     Exhibit 1.    A true and correct copy of the order dated June 5, 2006 directing the

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/691643.1

1  appointment of a chapter 11 trustee in this case filed in the proceeding entitled *In re North Plaza,*

2  *LLC, Debtor*, Case No. 04-00769-PB11, United States Bankruptcy Court for the Southern District of

3  California. [Bankruptcy Docket No. 479] .

4       Exhibit 2.    A true and correct copy of the Declaration of Isaac Lei filed November 24,

5  2004 in the proceeding entitled *In re North Plaza, LLC, Debtor*, Case No. 04-00769-PB11, United

6  States Bankruptcy Court for the Southern District of California. [Bankruptcy Docket No. 195.]

7       Exhibit 3.    A true and correct copy of the order requiring an Evidentiary Hearing

8  specifically on the "client representative" issue, entered on September 7, 2007 in the proceeding

9  entitled *In re North Plaza, LLC, Debtor*, Case No. 04-00769-PB11, United States Bankruptcy Court

10  for the Southern District of California. [Bankruptcy Docket No. 661.]

11       Exhibit 4.    A true and correct copy of the Evidentiary Hearing Response Brief filed by

12  the Trustee on March 14, 2008 in the proceeding entitled *In re North Plaza, LLC, Debtor*, Case No.

13  04-00769-PB11, United States Bankruptcy Court for the Southern District of California.

14  [Bankruptcy Docket No. 712.]

15       Exhibit 5.    A true and correct copy of the Trustee's Closing Brief, filed on April 8, 2008

16  in the proceeding entitled *In re North Plaza, LLC, Debtor*, Case No. 04-00769-PB11, United States

17  Bankruptcy Court for the Southern District of California. [Bankruptcy Docket No. 735.]  Section

18  III, dealing with the applicability of the exceptions to the attorney-client privilege, was limined out,

19  based upon the fact that the Evidentiary Hearing was limited to determination of the "client

20  representative" issue, without prejudice to a later raising of these issues.

21       Exhibit 6.    A true and correct copy of the Order of the Bankruptcy Court denying the stay

22  entered on July 15, 2007 in the proceeding entitled *In re North Plaza, LLC, Debtor*, Case No. 04-

23  00769-PB11, United States Bankruptcy Court for the Southern District of California. [Bankruptcy

24  Docket No. 802.]

25       Exhibit 7.    A true and correct copy of applicable portions of Reporter's Transcript of

26  Proceedings, July 25, 2007 in the proceeding entitled *In re North Plaza, LLC, Debtor*, Case No. 04-

27  00769-PB11, United States Bankruptcy Court for the Southern District of California. [Bankruptcy

28  Court Docket No. 659.]

2

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/691643.1

1   Exhibit 8.    A true and correct copy of the Appellants' Objection to the Trustee's proposed

2   lodged order on the Motion to Compel dated August 23, 2007, filed by Appellants in the proceeding

3   entitled *In re North Plaza, LLC, Debtor*, Case No. 04-00769-PB11, United States Bankruptcy Court

4   for the Southern District of California. [Bankruptcy Docket No. 656.]

5       Exhibit 9.    A true and correct copy of the Notice of Motion and Motion to Compel

6   Production of Documents dated March 16, 2006 (less exhibits) filed by Bree Creditors, filed in the

7   proceeding entitled *In re North Plaza, LLC, Debtor*, Case No. 04-00769-PB11, United States

8   Bankruptcy Court for the Southern District of California. (Bankruptcy Docket Entry 421.]

9

10  Dated:  July 16, 2008                    BAKER & McKENZIE LLP

11

12                                   By: /s/ Ali M.M. Mojdehi
                                         Ali M.M. Mojdehi
13                                       Janet D. Gertz
                                         Counsel for Appellee, Chapter 11 Trustee,
14                                       Richard M Kipperman

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

SDODMS1/691643.1

EXHIBIT 1

CSD 1001C [08/22/03]
Name, Address, Telephone No. & I.D. No.
TIFFANY L. CARROLL, ATTORNEY #157054

ASSISTANT UNITED STATES TRUSTEE
OFFICE OF THE UNITED STATES TRUSTEE
402 WEST BROADWAY, SUITE 600
SAN DIEGO, CA 92101-8511
619-557-5013

ED

Order Entered on
June 05, 2006
by Clerk U.S. Bankruptcy Court
Southern District of California

**UNITED STATES BANKRUPTCY COURT**
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re

NORTH PLAZA, LLC,

                                        Debtor.

BANKRUPTCY NO. 04-00769-PB11

Date of Hearing: May 23, 2006
Time of Hearing: 10:00 a.m.
Name of Judge:  Peter W. Bowie

## ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE

IT IS ORDERED THAT the relief sought as set forth on the continuation pages attached and numbered two (2)

through <u>two (2)</u> with exhibits, if any, for a total of <u>two (2)</u> pages, is granted.  Notice of Lodgment Docket Entry No. _461_

//

//

//

//

//

//

DATED:  June 05, 2006

Signature by the attorney constitutes a certification under
Fed. R. of Bankr. P. 9011 that the relief in the order is the
relief granted by the court.

Submitted by:

OFFICE OF THE UNITED STATES TRUSTEE

By: /s/ Tiffany L. Carroll
    Tiffany L. Carroll

Judge, United States Bankruptcy Court

CSD 1001C

CSD 1001C {08/22/03} (Page 2)
ORDER DIRECTING THE APPOINTMENT OF A CHAPTER 11 TRUSTEE
DEBTOR: NORTH PLAZA, LLC                                CASE NO: 04-00769-PB11

The Debtor's Motion for Order Authorizing Debtor to Engage Douglas P. Wilson and Douglas Wilson Companies as Manager of Debtor-in-possession, including Use of Cash Collateral to Pay Post-petition Retainer ("Motion") came on for hearing on May 22, 2006 at 10:30 a.m. in Department Four of the United States Bankruptcy Court, the Honorable Peter W. Bowie, presiding.  Tiffany L. Carroll appeared on behalf of the United States Trustee.  All other appearances were noted on the record.

Based upon the Motion, the arguments of counsel, and for cause, the Court finds that the appointment of a Chapter 11 Trustee is in the best interest of the estate;

IT IS HEREBY ORDERED that the Motion is denied.

IT IS FURTHER ORDERED that pursuant to 11 U.S.C. §1104(a), the United States Trustee is authorized and directed to appoint a Chapter 11 Trustee in this case.

CSD 1001C

*Signed by Judge Peter W. Bowie June 05,2006*

EXHIBIT 2

ORIGINAL

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

2  Stanley E. Goldich (CA Bar No. 92659)
   Richard M. Pachulski (CA Bar No. 90073)
3  PACHULSKI, STANG, ZIEHL, YOUNG, JONES
       & WEINTRAUB P.C.
4  10100 Santa Monica Blvd.
   11th Floor
5  Los Angeles, California 90067-4100
   Telephone: 310/277-6910
6  Facsimile: 310/201-0760

7  Attorneys for Secured Creditors Dynamic Finance
   Corporation and Angela Sabella

8
                  UNITED STATES BANKRUPTCY COURT
9
                  SOUTHERN DISTRICT OF CALIFORNIA
10

11  In re:                              Case No.: 04-00769-PB11

12  NORTH PLAZA, LLC,                   R.S. NO. MTM-2

13                     Debtor           Chapter 11

14                                      **DECLARATION OF ISAAC LEI IN
                                        SUPPORT OF:**
15
                                        **JOINDER OF DYNAMIC FINANCE
16                                      AND ANGELA SABELLA TO
                                        OPPOSITIONS OF NORTH PLAZA,
17                                      LLC AND PHILLIPS, HASKETT &
                                        INGWALSON TO MOTION FOR
18                                      RELIEF FROM AUTOMATIC STAY
                                        TO PROCEED WITH STATE COURT
19                                      LITIGATION**

20
                                        Date: December 8, 2004
21  ─────────────────────────────       Time: 10:00 a.m.
    SOUTH TEMECULA GATEWAY, LLC; JAMES  Dept.: Four
22  BREE; DOREEN MAE BREE,              Honorable Peter W. Bowie

23                     Movants,

24         v.

25  NORTH PLAZA, LLC, Debtor and Debtor In
    Possession,
26
                       Respondent.
27

28

20298-005\DOCS_LA:132578.1                    1

I, ISAAC LEI, declare:

1.      I am a licensed real estate broker in the State of California and I am over eighteen years of age. The facts stated herein are of my own personal knowledge, and if called upon as a witness to testify, I could and would competently testify thereto.

2.      I am an independent real estate broker employed by the Alcon Group, Inc., and as such, have arranged loans for Dynamic Finance Corporation ("Dynamic"), Angela Sabella ("Sabella") and other clients.

3.      As a licensed real estate broker, I arranged Dynamic's loans to the Debtor which were secured by a first deed of trust on the North Plaza property (the "Property").

4.      Dynamic's first priority lien on the Property is based on a loan to the Debtor in July 1998 in the original principal amount of $4.4 million. The principal loan amount was increased to $6 million, $8 million and then $9.5 million pursuant to three Loan Amendment and Extension Agreements entered into in October 1999, January 2001 and October 2001 which also extended the original July 31, 1999 maturity date of the loan. In October 2003, the Debtor entered into a Fourth Loan Amendment and Extension Agreement extending the maturity date of the Dynamic loan from July 31, 2002 under the Third Amendment and Extension Agreement to December 31, 2003. These Dynamic loans secured by a first deed of trust on the Property have nothing to do with the alleged claims of the Brees in the state court litigation case no. RIC40076 (the "State Court Litigation").

5.      As a licensed real estate broker, in May, 1999, I arranged a $617,256.79 loan of Sabella (the "Sabella Loan") to the Debtor's principal William P. Johnson and his wife, Patricia J. Johnson (the "Johnsons"). The Sabella Loan was secured by a collateral assignment of the second deed of trust on the Debtor's Property. The second deed of trust secured a $739,064.07 note of Robert Chambers (the "Chambers Note") dated January 28, 1998 which was assigned to Sabella in May, 1999 in conjunction with the Sabella Loan. In October 2002, following the Johnsons' default in repaying the Sabella Loan, the second deed of trust was fully assigned to Sabella. Attached hereto as **Exhibit A** is the Assignment of the Second Deed of Trust which was recorded on October 28, 2002. Sabella's claim under the Chambers Note and second deed of trust on the Property have nothing to do with the alleged claims of the Brees in the State Court Litigation.

6.    As a licensed real estate broker, in or around January 2001, I brokered a loan made by Dynamic Finance Corporation to Rancho California Country Club, LLC in the original principal amount of $18 million, which loan was to be secured, in part, by a deed of trust on what was then Parcel 14 of the Property as additional collateral for the loan.  The third trust deed securing this $18 million loan was mistakenly recorded on the entire Property and then mistakenly removed from the entire Property instead of being retained on Lot 14 per the agreement with the Debtor.  As previously briefed to the Court in the litigation that STG's lien was in bona fide dispute, the $18 million lien was not removed as consideration for the Brees' lien on the Property which the Brees' subsequently assigned to STG in conjunction with seeking to foreclose on the Property.

I declare under penalty perjury that the foregoing is true and correct.

Executed this 23 'd of November, 2004, at Los Angeles, California.

ISAAC LEI

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

RECORDING REQUESTE    ʸ AND

WHEN RECORDED RETURN TO:

Angela C. Sabella
853 East Valley Blvd., Suite 200
San Gabriel, CA  91776

APN: _____

COPY of Document Recorded
on OCT 2 8 2002 as No. 608992
has not been compared with
original.
**GARY L. ORSO**
**County Recorder**
**RIVERSIDE COUNTY CALIFORNIA**

---

SPACE ABOVE THIS LINE FOR RECORDER'S USE

## ASSIGNMENT OF DEED OF TRUST

FOR VALUE RECEIVED, the undersigned hereby grants, assigns and transfers to **Angela C. Sabella**, an Individual, all beneficial interest under that certain Deed of Trust dated January 28, 1998 executed by **North Plaza, LLC**, a California limited liability company, ("Trustor"), to United Title Company, a California corporation, ("Trustee"), and recorded as Instrument No. 459371 on October 23, 1998 in Book __, page __, of Official Records in the County Recorder's office of Riverside County, California, describing land therein as:

**SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE APART HEREOF.**

**This is to release the Collateral Assignments of Deed of Trust recorded June 4, 1999 as Instrument Nos. 1999- 247348, 1999-247349 and 1999-247350 of Official Records in the County Recorder's office of Riverside County.**

Together with the note or notes therein described or referred to the money due and to become due thereon with interest, and all rights accrued or to accrue under said Deed of Trust.

BC Lake Villas, LLC, a California limited liability company

Dated: 10/3/02

William P. Johnson, Manager

State of California    }§
County of Los Angeles Orange§

On 10/3/2002 _____ before me, notary public, personally appeared William P. Johnson proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that she executed the same in her authorized capacity, and that by her signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

OFFICIAL SEAL
MARK W. MASTERS
NOTARY PUBLIC - CALIFORNIA
COMMISSION # 1215637
ORANGE COUNTY
My Commission Exp. April 11, 2003

WITNESS my hand and official seal.

Notary Public

| Capacity claimed by signer (principal) | | Description of attached document |
|---|---|---|
| ☐ Individual | ☐ Corporate officer | Title / type of document: |
| ☐ Partner(s) | ☐ Manager of LLC | |
| ☐ Trustee(s) | ☐ Attorney-in-fact | # of pages: |
| ☐ Guardian/conservator | ☐ Other: | |
| Signer is representing (name of person / entity(ies)): | | Date of document: |

**EXHIBIT A**

Assignment of DOT-ncs

**PROOF OF SERVICE**

STATE OF CALIFORNIA    )
                       )
CITY OF LOS ANGELES    )

I, Diane H. Hinojosa, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 11th Floor, Los Angeles, California 90067-4100.

On November 24, 2004, I caused to be served the **DECLARATION OF ISAAC LEI IN SUPPORT OF: JOINDER OF DYNAMIC FINANCE AND ANGELA SABELLA TO OPPOSITIONS OF NORTH PLAZA, LLC AND PHILLIPS, HASKETT & INGWALSON TO MOTION FOR RELIEF FROM AUTOMATIC STAY TO PROCEED WITH STATE COURT LITIGATION** in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

*See Attached Service List*

☑ (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☐ (BY FAX) I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

☐ (BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s).

☐ (BY OVERNIGHT DELIVERY) By sending by            to the addressee(s) as indicated on the attached list.

I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

Executed on November 24, 2004, at Los Angeles, California.

_____
Diane H. Hinojosa

Service List

Debtor
North Plaza, LLC
Attn: William Johnson
29400 Rancho California Road
Temecula, CA 92591

Office of the US Trustee
Tiffany L. Carroll
Office of the United States Trustee
402 W. Broadway, Suite 600
San Diego, CA 92101

Attorney for Phillips, Haskett & Ingwalson
Terry D. Phillips
Phillips, Haskett & Ingwalson, A.P.C.
701 "B" Street, Suite 1190
San Diego, CA 92101-3540

First American Title Insurance Company
c/o Miller, Starr & Regalia
Edmund L. Regalia
1311 N. California Blvd., Fifth Floor
P.O. Box 8177
Walnut Creek, CA 94596

South Temecula Gateway, LLC
c/o James Bree
Cortez Development
1754 Laguna Drive
Vista, CA 92084

Attorney for Creditor Clifford Douglas
Neil B. Katz
Robillard & Katz
2377 Crenshaw Blvd., Ste. 310
Torrance, CA 90501

Attorney for City of Temecula
Steven R. Orr
Peter M. Thorson
Sonali S. Jandial
Richards, Watson & Gershon
355 S. Grand Ave., 40th Flr.
Los Angeles, CA 90071-3101

Saul Breskal, Esq.
Christensen, Miller, Fink, Jacobs,
  Glaser, Weil & Shapiro
10250 Constellation Blvd., 19th Flr.
Los Angeles, CA 90067

<u>Attorneys for JHCH Redlands Land,</u>
<u>DCH Investments, Davidson Enterprises,</u>
<u>And Meg Investments</u>
Gerald N. Sims, Esq.
Pyle Sims Duncan & Stevenson
401 "B" Street, Ste. 1500
San Diego, CA 92101

<u>Attorney for County of Riverside, CA</u>
Martha E. Romero
Romero Law firm
7743 South Painter Ave., Ste. E
Whittier, CA 90602

Edward G. Schloss
Edward G. Schloss Law Corp.
11300 W. Olympic Blvd., Ste. 620
Los Angeles, CA 90064

<u>Attorney for Secured Creditor South Temecula Gateway</u>
Martin T. McGuinn
Dean T. Kirby, Jr.
Jana Logan
Kirby & McGuinn
600 B Street, Suite 1950
San Diego, CA 92101

Laura S. Taylor, Esq.
Linda D. Fox, Esq.
Sheppard Mullin Richter & Hampton LLP
501 W. Broadway, 19th Floor
San Diego, CA 92101

<u>Attorney for First American Title</u>
Edmund L. Regalia
Miller Starr & Regalia
1331 N. California Blvd., Fifth Flr.
Walnut Creek, CA 94596

Gregson Perry
Law Offices of Greson M. Perry
12304 Santa Monica Boulevard
2nd Floor, Suite 300
Los Angeles, CA 90025

Charles X. Delgado
Wood and Delgado
27349 Jefferson Avenue, Suite 105
Temecula, CA 92590

John Holmberg
County Records Research
Trustee Division
4952 Warner Avenue #105
Huntington Beach, CA 92649

Creditor
Clifford Douglas
P.O. Box 2729
Rancho Santa Fe, CA 92067

Secured Creditor
Tom Tahara
1101 Via Mil Cumbres
Solana Beach, CA 92075

Attorney for Debtor North Plaza
K. Todd Curry, Esq.
Nugent & Newnham
1010 Second Avenue, Suite 2200
San Diego, CA 92101

Attorney for Corporate Funding/Clifford Douglas
F. Gregory Pyke
Higgs, Fletcher & Mack LLP
401 W. "A" Street #2600
San Diego, CA 92101-7910

Attorney for Secured Creditor KIP Inc.
Martha A. Mansell
Law Offices of Martha A. Mansell
1522 S. Saltair Avenue, Suite 302
Los Angeles, CA 90025

Robert E. Chambers
11439 Laurel Crest Drive
Studio City, CA 91604

Attorney for Creditor Peter Suprunuk
Milford W. Dahl, Jr.
Rutan & Tucker, LLP
611 Anton Blvd., 14th Floor
Costa Mesa, CA 92626-1931

Attorneys for Angela Sabella & Dynamic Finance
Stanley E. Goldich
Pachulski, Stang, Ziehl, Young, Jones & Weintraub PC
10100 Santa Monica Blvd., Suite 1100
Los Angeles, CA 90067

EXHIBIT 3

CSD 1001A [11/15/04]
Name, Address, Telephone No. & I.D. No.
Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
BAKER & McKENZIE LLP
101 West Broadway, Twelfth Floor
San Diego, CA  92101-3890
619-236-1441
Attorneys for Richard M Kipperman, Chapter 11
Trustee for North Plaza, LLC, Debtor

Order Entered on
September 10, 2007
by Clerk U.S. Bankruptcy Court
Southern District of California

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re.
NORTH PLAZA, LLC, a California limited liability
company

                                              Debtor.

BANKRUPTCY NO. 04-00769 PB11

Date of Hearing:   July 25, 2007
Name of Judge:     Hon. Peter W. Bowie

## [PROPOSED] ORDER REGARDING MOTION OF RICHARD M KIPPERMAN, CHAPTER 11 TRUSTEE TO COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY TO ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP UNDER FRCP 45 AND FRBP 9016

IT IS ORDERED THAT the relief sought as set forth on the continuation pages attached and numbered two (2)

through 3, for a total of 3 pages, is granted.  Motion/Application Docket Entry No. 542.  Notice of Lodgment of Order Docket

Entry No. 658.

/ / /

/ / /

/ / /

DATED:
          September 07, 2007

Signature by the attorney constitutes a certification under
Fed. R. of Bankr. P. 9011 that the relief in the order is the
relief granted by the court.

Submitted by:

**BAKER & McKENZIE LLP**
(Firm name)


By:  /s/ Ali M.M. Mojdehi
     Attorney for ☒ Movant ☐ Respondent

CSD 1001A
SDODMS1/679152.4

Judge, United States Bankruptcy Court

American LegalNet, Inc.
www.USCourtForms.com

CSD 1001A [11/15/04] (Page 2)

[PROPOSED] ORDER ON MOTION OF RICHARD M KIPPERMAN, CHAPTER 11 TRUSTEE TO COMPEL
RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY TO ISAAC LEI, THE ALCON GROUP AND
CUSTODIAN OF RECORDS OF THE ALCON GROUP UNDER FRCP 45 AND FRBP 9016
DEBTOR : NORTH PLAZA, LLC, a California limited liability company          CASE NO : 04-00769 PB11

---

### ORDER

The Court, having reviewed the MOTION OF RICHARD M KIPPERMAN, CHAPTER 11 TRUSTEE TO

COMPEL RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY TO ISAAC LEI, THE ALCON

GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP UNDER FRCP 45 AND FRBP 9016

("Motion") filed on behalf of Chapter 11 Trustee Richard M Kipperman ("Trustee"), and all papers filed in response

and reply thereto, and having heard the arguments of counsel, and upon the record of the hearing on the Motion;

IT IS HEREBY ORDERED that, for the reasons stated by the Court and based upon the findings of fact

made by the Court at the conclusion of the July 25, 2007 hearing on the Motion:

(i)        Determination of the issues relating to attorney-client privilege under the Motion is continued pending an

Evidentiary Hearing, which shall be held concerning the issue of whether Isaac Lei may qualify as a "client

representative" of Dynamic Finance Corporation and/or Angela C. Sabella for purposes of assertion of the attorney-

client privilege on behalf of the same ("Evidentiary Hearing").  Further, in preparation for the Evidentiary Hearing,

Mr. Isaac Lei shall submit to a deposition by the Trustee ("Deposition"), regarding facts relevant to whether Mr.

Isaac Lei may qualify as a client representative of Dynamic Finance Corporation and/or Angela C. Sabella (which

Deposition shall be without prejudice or limitation to the Trustee's right to depose Examinees pursuant to the

Subpoenas for documents and testimony previously served on Examinees by the Trustee on February 16, 2007

pursuant to Fed. R. Bankr. Proc. 2004 and Order of this Court dated September 19, 2006 ("Subpoenas")).  As

limited herein, the Deposition shall be held at the earliest mutually agreeable date. ~~At least three (3) business days~~

~~prior to the date of the Deposition, Mr. Isaac Lei shall produce to the Trustee at the offices of Baker & McKenzie~~

~~LLP, 101 W. Broadway, San Diego, CA 92101 all non-privileged documents that are intended to be used by him at~~

~~the Evidentiary Hearing and which refer or relate to whether he may qualify as a "client representative" of Dynamic~~

PWB   ~~Finance Corporation and/or Angela C. Sabella.~~  Following the Deposition, the Trustee will schedule the Evidentiary

Hearing with the Court and serve notice of same, which shall be set for the first mutually agreeable available

hearing date that is at least three (3) business days following the Trustee's completion of the Deposition.  Mr. Isaac

Lei shall testify at the Evidentiary Hearing;

American LegalNet, Inc
www.USCourtForms.com

CSD 1001A
SDODMS1/679152.4

*Signed by Judge Peter W. Bowie September 07, 2007*

CSD 1001A [11/15/04] (Page 3)

(ii)     The Motion is DENIED IN PART, to the extent the Motion requests that Examinees be compelled to provide documents in addition to the information contained in the "Exhibit 53" (which was previously entered as evidence in the evidentiary hearing held in this case April 6-13, 2006 and has been updated by Examinees); and

(iii)     The Motion is GRANTED IN PART to the effect that the Court determines that certain facts concerning Vail Lake USA, LLC are relevant to the property of the estate.  Examinees shall therefore produce all non-privileged documents responsive to the Subpoena in the possession or control of Examinees that refer or relate to Vail Lake USA, LLC, provided however that such documents are only required to be produced to the extent such were generated or created up to and including January 1, 2004; provided further however that this Order shall be without prejudice to the Trustee's ability to submit additional evidence demonstrating the relevance to this case and the need for production by Examinees of such documents that were generated or created after January 1, 2004.

IT IS SO ORDERED.

American LegalNet, Inc.
www.USCourtForms.com

CSD 1001A
SDODMS1/679152.4

*Signed by Judge Peter W. Bowie September 07,2007*

EXHIBIT 4

1   Ali M.M. Mojdehi, State Bar No. 123846
    Janet D. Gertz, State Bar No. 231172
2   **BAKER & McKENZIE LLP**
    12544 High Bluff Drive, Third Floor
3   San Diego, CA  92130-3051
    Telephone:  +1 858 523 6200
4   Facsimile:  +1 858 259 8290

5   Counsel for Chapter 11 Trustee,
    Richard M Kipperman
6

7

8                   UNITED STATES BANKRUPTCY COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11  In re:                              Case No.04-00769 PB11

12                                      Chapter 11
    NORTH PLAZA, LLC,
13  a California Limited Liability Company,   **CHAPTER 11 TRUSTEE, RICHARD
                                        M KIPPERMAN'S RESPONSE TO
14              Debtor                   EVIDENTIARY HEARING BRIEF OF
                                        CREDITOR DYNAMIC FINANCE
15                                      CORPORATION AND ANGELA C.
                                        SABELLA**
16
                                        Hearing Date:   March 19, 2008
17                                      Time:           9:00 a.m.
                                        Place:          Dept. 2
18                                      Judge:          Hon. Peter W. Bowie

19

20

21          Richard M. Kipperman, chapter 11 trustee ("Trustee") of the estate of North Plaza, LLC

22  ("Debtor"), hereby files his Response to the Trial Brief of creditors, Dynamic Finance Corporation

23  ("DFC"), a California corporation, and Ms. Angela Chen Sabella ("Sabella"), an individual, pursuant

24  to this Court's Minute Order dated January 29, 2008. [Docket Entry 701]. The Evidentiary Hearing

25  has as its genesis the Trustee's Motion to Compel Responses to Subpoenas for Documents and

26  Testimony to Isaac Lei, The Alcon Group and Custodian of Records of the Alcon Group under

27  FRCP 45 and FRBP 9016, filed May 2, 2007 [Docket Entry 502.] ("Trustee's Motion"), which was

28  continued by the Court pending "[d]etermination of the issues relating to attorney-client privilege

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

1

CASE NO 05-6040 H11

SDODMS1/687131.1

under the Trustee's Motion." More particularly, an evidentiary hearing was requested by this Court for the purpose making factual findings "concerning the issue of whether Isaac Lei may qualify as a 'client representative' of DFC or Sabella for purposes of assertion of the attorney client privilege on behalf of the same. The evidence will show that he cannot.

## I. INTRODUCTION

Simply put, the evidence will show that Isaac Lei/The Alcon Group (collectively "Lei") cannot have served as a client representative to either Sabella or to DFC. *First*, the evidence will preclude any assertion of Lei's client representative status as to acts taken on behalf of Sabella. Sabella is an individual, not a corporation and has not in any way been otherwise incapacitated from communicating with her legal counsel during the applicable time frame. *Second*, the evidence will show that Mr. Lei acted as a mere clerical employee of DFC, and thus cannot prove the facts necessary to show that he was integrated into DFC in the manner required to establish a client representative relationship. *Third*, Mr. Lei has represented himself to have been the "mortgage broker" in respect to the loan transactions with North Plaza. The scope of any employment by DFC of Lei as a "client representative" is, however, inconsistent with principles of agency and the associated fiduciary duties *to both parties to the transaction* that are incident to any broker role. Lei's underlying duty of full disclosure as a licensed California real estate broker would necessarily preclude his accepting any undertaking as a client representative, or otherwise render such role fraudulent as to the borrower. *Fourth*, the evidence will show that no privilege attaches in any event to the withheld communications, which were made for primarily a business purpose—that of consummating the various lending transactions in connection with the Bill Johnson entities.[1]

---

[1] These entities are: 1. North Plaza, LLC, a California limited liability company; 2. BC Lake Villas LP, a California limited partnership; 3. BC Lake Villas, LLC, a California limited liability company; 4. Vail Lake-Rancho California, LLC, a California limited company; 5. Vail Lake USA, LLC, a California limited liability company; 6. Vail Lake Village & Resort, LLC, a California limited liability company; 7. Rancho California Spa & Country Club, LLC, a California limited liability company; 8. Fountainhead Country Club, LLC, a California limited liability company; 9. Shining City, Inc., a Wyoming corporation; and 10. Rancho California Reality Corp., a California corporation (hereinafter, collectively, "Bill Johnson Entities").

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
(1 858 523 6200

SDODMS1/687131.1

2

CASE NO 05-6040 H11

## II. JURISDICTION AND VENUE[2]

The jurisdiction of the District Court is original as to this proceeding, as jurisdiction is and exclusive as to this title 11 case and the property of the estate. Jurisdiction of this Court is therefore proper under 28 U.S.C. § 1334(a). Jurisdiction is also proper under 28 U.S.C. § 157, which provides that "Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." This a core proceeding, in that it emanates from a motion to compel brought by the Trustee in this Chapter 11 case, pursuant to a subpoena issued under Order of this Court and Fed. R. Bankr. Proc. 2004.

## III. GOVERNING LAW

As was earlier briefed in the Trustee's Motion, under Federal Rule of Evidence 501, the applicable law governing privileges is determined with reference to the substantive law that provides the rule of decision. This is a core proceeding "arising under title 11." Federal privilege law supplies the rule of decision here because the Trustee is seeking to enforce an order of examination under Bankruptcy Rule 2004. *See In re Bautista*, 2007 Bankr. LEXIS 4170, *3-4 (Bankr. N.D. Cal. Dec. 10, 2007) (citing *Moore v. Eason (In re Bazemore)*, 216 B.R. 1020 (Bankr. S.D. Ga. 1998); *Clarke v. American Commerce National Bank*, 974 F.2d 127 (9th Cir. 1992)).

DFC and Sabella have failed to explain any basis whatsoever for how California law of privilege might otherwise apply to this Evidentiary Hearing. They make vague reference to the state law claims of the Bree Parties, which are not any part of this proceeding—they are being litigated in another court. They otherwise suggest that whether the period to initiate avoidance actions may or may not have expired may have relevance. That is equally irrelevant to this proceeding, which arises under Rule 2004. Furthermore, the Trustee's ability to object to creditors' claims pursuant to 11 U.S.C. §502 is completely unaffected by the running of any statutes of limitation as to avoidance actions.

---

[2] The Trial Brief of DFC and Sabella fails to set forth this statement. As such, the Trustee's statement in Response should be deemed unopposed.

3

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

CASE NO 05-6040 H11

1  Sabella and DFC's discussion of the law of privilege of California, as well as that of

2  numerous other states, is absolutely irrelevant to this proceeding. In the interest of judicial economy,

3  therefore the Trustee will spare the Court a response to those cases cited in DFC and Sabella's Trial

4  Brief.

5  **IV. BURDEN OF PROOF APPLICABLE TO THIS EVIDENTIARY HEARING**

6  As the party asserting the attorney-client privilege, DFC and Sabella have the burden of

7  proving that the documents withheld from the Trustee are indeed privileged. *In re Grand Jury*

8  *Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992); *see also United States v. Martin*, 278 F.3d 988,

9  999 (9th Cir. 2002). DFC and Sabella must therefore show that the documents they have withheld

10 from the Trustee adhere to the essential elements of the attorney-client privilege: "(1) Where legal

11 advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the

12 communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his

13 instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the

14 protection be waived." 974 F.2d at 1071, n.2 (citing *In re Fischel*, 557 F.2d 209, 211 (9th Cir.

15 1977)). The privilege is limited to "only those disclosures—necessary to obtain informed legal

16 advice—which might not have been made absent the privilege." *In re Grand Jury Investigation*, 974

17 F.2d 1068, 1070 (9th Cir. 1992) (citing *Fisher v. United States*, 425 U.S. 391, 403 (1976)).

18 Sabella and DFC must satisfy each of these elements, document by document, both by

19 reference to the privilege logs and by the evidence to be put forth at the Evidentiary Hearing.

20 **V. HISTORICAL FOUNDATION AND JUDICIAL APPLICATION OF THE CLIENT**
   **REPRESENTATIVE DOCTRINE BY COURTS OF THE NINTH CIRCUIT**
21
   As a threshold matter, it is helpful to define the scope and purpose of the "client
22
   representative" doctrine under federal common law. The concept of a "client representative" has its
23
   source in Supreme Court Standard 503, which reads as follows: "A client has a privilege to refuse to
24
   disclose and to prevent any other person from disclosing confidential communications made for the
25
   purpose of facilitating the rendition of professional legal services to the client, . . . . between
26
   representatives of the client or between the client and a representative of the client. Regrettably, the
27
   Standard contains no definition of "representative of the client." In the opinion of the Advisory
28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

4

CASE: NO 05-6040 H11

1    Committee, the matter is better left to resolution by decision on a case-by-case basis. Courts and

2    commentators appear to have struggled with the construct ever since, which has left intra-circuit

3    splits in its wake.

4        At its most basic level, however, the "client representative" concept is simply a part of the

5    larger body of law concerning the applicability of attorney-client privilege to corporations.

6    *McCaugherty v. Siffermann*, 132 F.R.D 234, 239 (N.D. Cal. 1990). As such, the definition of the

7    term first proposed by the Advisory Committee in 1969 grew out of the so-called "control group"

8    test previously used by federal courts in determining the applicability of the privilege to a corporate

9    client. The control group standard was, however, subsequently rejected by the Supreme Court in

10    *Upjohn Co. v. United States*, 449 U.S. 383, 396-97, (1981). The Court in *Upjohn*, although stopping

11    short of proposing a replacement standard, created limits to the applicability of the privilege to

12    corporations, holding that information from a corporation's employee would be privileged only when

13    (i) the communications concerned matters within the scope of the employee's corporate duties; and

14    (ii) the employee is aware that the information is being furnished to enable the attorney to provide

15    legal advice to the corporation. 449 U.S. at 394 Based upon the principles pertaining to corporate

16    employees that is set forth in *Upjohn*, courts have, under certain very limited circumstances,

17    extended the protections of Standard 503 beyond corporate employees to consultants hired by

18    corporations.

19        Courts of the Ninth Circuit remain sharply divided on the evidence that is required to

20    establish that an independent contractor of a corporation may qualify as a client representative of

21    that corporation. The better view appears to be that of *Regents of the Univ. of Cal. v. Micro*

22    *Therapeutics*, 2007 U.S. Dist. LEXIS 43879 (N.D. Cal. June 6, 2007), which adopted the view of

23    one of the leading cases on attorney client privilege and communications with third parties, *United*

24    *States v. Kovel*, 296 F2d 918, 922 (2d Cir. 1961).[3] Following *Kovel*, the *Micro Therapeutics* court

25    limited the role of a consultant client representative to that of a "translator," *i.e.*, where the individual

26    is required to enable "counsel to understand aspects of the client's own communications that could

27

28

---

[3] Although the *CV Therapeutics* court commented regarding the "expansive view" of attorney client privilege vis-à-vis corporate agents, it actually relied primarily upon the much more narrow construction set forth in *Kovel*. *See id*.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

1    not otherwise be appreciated in the rendering of legal advice." *Id.* at \*18-19

2          Other courts of the Ninth Circuit utilize what might be referred to as the "if it quacks like an

3    employee, it is an employee" approach, requiring "[a] detailed factual showing" . . . that a third party

4    is . . . functionally equivalent to the corporation's employee." *See Memry Corp. v. Ky. Oil Tech.,*

5    *N.V.*, 2007 U.S. Dist. LEXIS 3094 (N.D. Cal. Jan. 4, 2007) (quoting *Energy Capital Corp. v. U.S.*,

6    45 Fed. Cl. 481, 492 (2000) (emphasis added)). Just like corporate employees under *Upjohn*, under

7    the "functional equivalent" test utilized in the Ninth Circuit, the consultant must be proved to be

8    acting within the scope of their employment by the corporation, under the direction of the corporate

9    supervisor when communicating with the lawyer, and where the communications were deemed

10   "highly confidential" and the company took explicit steps to maintain confidentiality. *See*

11   *McCaugherty v. Siffermann*, 132 F.R.D. 234, 239 (N.D. Cal. 1990).

12          The "functional employee" status cannot be asserted casually. Nor is it a mere talismanic

13   phrase to be adopted apart from detailed factual findings. That finding requires that an

14   extraordinarily close relationship between the consultant and the corporation is shown, to the effect

15   that the consultant be "part of the 'client' and the "functional equivalent of an in-house department"

16   of the client. *See, e.g., In re Grand Jury Subpoenas Dated March 24, 2003*, 265 F. Supp. 2d 321

17   (S.D.N.Y. 2003).

18          Some courts of the Ninth Circuit have cited with approval the standard set forth in *In re*

19   *Bieter Co.*, 16 F.3d 929 (8th Cir. 1994), adopting it as to the appropriate approach to determining

20   whether an individual can be deemed the "functional equivalent" of an employee for purposes of

21   asserting privilege. In *Bieter*, the consultant's relationship was formalized in several consulting

22   agreements. The agreements provided for the consultant to work out of Bieter's office and to be paid

23   a monthly fee and expenses. Although the consultant was originally retained as an independent

24   contractor to provide advice and guidance regarding commercial and retail development in

25   Minnesota, later he became "significantly involved in the investigation of Bieter's claims" relating to

26   litigation regarding the development.

27          In applying client representative status, the *Bieter* court focused on the consultant's deep

28   integration as an insider of the corporation. Noting that the partnership had retained the consultant

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

6

CASE NO 05-6040 HH

SDODMS1/687131.1

specifically "to provide advice and guidance," regarding commercial and retail development in Minnesota, the court found Klohs to be "meaningfully associated with the corporation in a way that makes it appropriate to consider [him an] 'insider[ ]' for purposes of the privilege." *Bieter*, 16 F.3d at 936 (quoting John E. Sexton, A Post-*Upjohn* Consideration of the Corporate Attorney-Client Privilege, 57 N.Y.U. L. Rev. 443, 490 (1982)).

The leading case in the Ninth Circuit that follows *Bieter* similarly requires a showing that the consultant was a "functional employee," but also requires a specific evidentiary showing concerning the individual's relationship with the corporation in order to properly establish this. *See Memry Corp.*, 2007 U.S. Dist. LEXIS 3094. In fact, the evidence required under *Memry Corporation* requires a showing very similar to that used by courts in determining if a consultant should be deemed a statutory employee under state law.[4]

Accordingly, the *Memry* court required a detailed evidentiary showing as to the following seven criteria: (i) the consultant's exact duties for the corporation; (ii) the consultant's integration into the corporate structure (iii) the consultant's possession of information not known by other persons at the corporation; (iv) the exact amount of the consultant's time devoted to consulting activities for the corporation; (v) the consultant's physical location when performing his alleged duties; and (vi) how the consultant was paid for his services. This indicates that in the Ninth Circuit, a client representative must not only be closely allied to the corporation, but must also be identified by all the relevant indicia as the fair equivalent of a statutory employee for all intents and purposes.

## VI. EVIDENTIARY ANALYSIS

### A.    Lei Cannot Be a Client Representative to Sabella

It is black letter law that the "client representative" construct only applies to a *corporation* and, except in very extraordinary circumstances, may not be asserted by the individual client. Under federal common law, an individual may utilize a representative in respect to legal affairs only where

---

[4] Under California law, for example, a salesperson's status as an employee is a question of fact. The factors used are "(i) employer's right to control the mode and manner of work; (ii) employer's right to terminate and the employee's right to quit; (iii) whether it is a distinct occupation; (iv) nature of the occupation; (v) the skill required; (vi) who supplies the instrumentality and place of work; (vii) the length of services; (viii) method of payment; (ix) whether the work is part of the employer's regular business; (x) what the parties' believe. Miller & Starr § 3:18 (citing Workers' Compensation Act).

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

7

CASE NO 05-6040 H11

1  "the information communicated is: (1) related to the subject matter of the underlying attorney-client

2  relationship; (2) necessary to effectuate the representation; and (3) *could not have been*

3  *communicated by the client herself.*" *Leone v. Fisher*, No. 3:05-CV-521, 2006 U.S. Dist. LEXIS

4  75571 (D. Ct. Oct. 18, 2006) (emphasis added); see also *In re Grand Jury Subpoenas*, 995 F. Supp.

5  332, 340 (E.D.N.Y. 1998) (holding that generally an individual, unlike a corporation, cannot assert

6  privilege for a client representative unless they have some insurmountable physical disability

7  (distinguishing *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994)):

8          A private person . . . generally has no need for a representative to
            communicate with an attorney.  Only in *extraordinary* cases, as, for
9          example, where a client needs an interpreter, or where he is so
            seriously injured that he cannot deal directly with counsel has the
10         attorney-client privilege been extended to the designated
            representative of an individual client.

11

12         Here, the evidence will show that Lei has specifically testified that any communications in

13  respect to loans made by Sabella (as opposed to those made by DFC) were in his capacity as a client

14  representative for Sabella, not as client representative for Dynamic.  According to Lei, it was a very

15  clean and clear distinction.  The evidence also will demonstrate that during the relevant time frame

16  of the claimed privileged communications (1996-2001), Angela Sabella was generally available in

17  Los Angeles (where she makes her home) and was able to conveniently make and receive any

18  communications (written or oral) with each of her Los Angeles attorneys.  Furthermore, as the

19  evidence will show, Sabella has no difficulty whatsoever communicating in the English language.

20  Indeed, all of the written communications from Lei to Sabella that have been produced to the Trustee

21  were written in English.

        The evidence will further show Sabella needs no assistance regarding "translation" of

22  business or real estate financing concepts, as is demonstrated by her many years of business

23  experience.  The evidence will show that she gives the orders, and Lei simply obeys.  Indeed,

24  Sabella appears to be readily able to communicate on sophisticated business topics  The Court has

25  already made findings that Sabella is a "sophisticated" individual.  [*See* July 25, 2007 Transcript of

26  Proceedings, Chapter 11 Trustee's Motion to Compel Responses to Subpoena for Documents and

27  Testimony to Isaac Lei.]  The evidence will otherwise show that Ms. Sabella was not at any time

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

SDODMS1/687131.1

8

CASE NO 05-6040 H11

1  under any physical disability, which would have prevented or hampered her from communicating

2  directly with her Los Angeles attorneys.  Nor did she appear to be traveling extensively during the

3  relevant time frame.  Lei generally dispatched his communications to her to a location in Los

4  Angeles.  Rather, the evidence lends an inference that Sabella simply didn't want to be bothered with

5  the mundane details, which she left to Lei.

6       As such, the evidence will show that any communications relating to the Sabella loans cannot

7  be clothed with the privilege.  The evidence will thus show that all of the claimed "privileged"

8  communications with Lei relating to the Sabella loans have been improperly withheld from the

9  Trustee by Sabella.

10 **B.   Lei Is Not a "Functional" Employee of DFC**

11      As stated above, in the courts of the Ninth Circuit, the necessary evidentiary showing

12 relevant to the "functional employee" status of Lei for the purposes of assertion of privilege will

13 require factual inquiry into: (i) Lei's exact duties for Dynamic; (ii) Lei's integration into Dynamic's

14 corporate structure (iii) Lei's possession of information not known by other persons at Dynamic; (iv)

15 the exact amount of Lei's time devoted to consulting activities for Dynamic; (v) Lei's physical

16 location when performing his alleged duties; and (vi) how Lei was paid for his services.  *See Memry*

17 *Corp.*, 2007 U.S. Dist. LEXIS 3094.

18      Here, based upon these primary factors, the evidence will show that Lei was most certainly

19 operated as a *de facto* employee of Dynamic.  The evidence will otherwise show, however, that it is

20 not appropriate to consider Lei an "insider" of Dynamic for purposes of the privilege.  As such, he is

21 not a "functional employee" as defined under *In re Beiter*, and cannot have been a client

22 representative for purposes of DFC's privilege assertions.  *In re Bieter*, 16 F.3d at 936.

23      The evidence will instead show:

24      a.    Lei's Duties Were Largely Clerical in Nature.

25      Lei had no formal consulting agreement with either Dynamic or Sabella.  His duties appear to

26 have been flexible and fluid, depending upon Sabella's whims.  Although initially, he appears to

27 have had a role similar to a loan processing clerk for Dynamic, sending faxes and maintaining files,

28 he eventually he became something of a "Guy Friday" for Sabella, doing whatever she needed done

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

SDODMS1/687131.1

9

CASE NO 05-6040 H11

1  with respect to the Bill Johnson Entities.  The evidence will show he was accustomed to performing

2  menial tasks at her command.

3         b.    Lei Was Not an Insider Nor Was He Integrated into Dynamic's Corporate
              Hierarchy.

4      Lei appears to have been "integrated" into Dynamic's operations in an administrative

5  capacity only.  He certainly was not a "key employee," in the common usage of that term.  He

6  appears to have had little to no decision making authority.  The evidence will show that, with respect

7  to his activities in respect to the Bill Johnson Entities, Lei performed internal Dynamic

8  administrative tasks, giving regular updates to Sabella, composing interoffice memoranda to

9  Dynamic administrative staff, occasionally giving them direction.  He used Dynamic's standard

10  forms in his work, which he freely pulled out of Dynamic's files.  He appears to have assumed some

11  portion of the job of Dynamic's internal bookkeeper after that person was indicted in 2001 for

12  embezzling money from Sabella.  The evidence will further show that Lei was not a key employee of

13  Dynamic.  He had very little to do with the high level internal affairs of Dynamic and was not in any

14  sense an "insider" who was privy to confidential information regarding Dynamic.  Unlike the

15  consultant Klohs in the *Bieter* case, who was hired for his specialized expertise, and thus is decision

16  making capability, here the evidence will show that Sabella alone (and not the consultant Lei) was

17  the decision maker for Dynamic.  Lei was just a clerk.

18         c.    The Information Possessed by Lei Was Possessed by Others.

19      The evidence will show that Sabella's knowledge concerning transaction with the Bill

20  Johnson Entities was at least co-extensive with Lei's knowledge—*if not greater*.  Dynamic and

21  Sabella's Trial Brief concedes as much, in that it states that "other than possibly Sabella, nobody at

22  Dynamic possessed" the knowledge Lei had of facts underlying transactions.  [Trial Brief at 8.]

23  Furthermore, the evidence will show that other employees within Dynamic reviewed and had

24  knowledge of the loan files and transactions concerning the Bill Johnson Entities.  Indeed, the

25  evidence will show that information regarding the details of the loan transactions, including the

26  communications with the attorneys, was freely shared with an independent loan reviewer consultant.

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

10

CASE NO 05-6040 H11

d.     <u>Time Spent by Lei on Dynamic's Affairs and at Dynamic's Location Was Extensive.</u>

The evidence will show that, despite his representations to the contrary made to the California Department of Real Estate, Lei appears to have spent the majority of his time at the Dynamic offices. Although the Department of Real Estate regulations preclude this sort of business activity at any other than the broker's licensed location, this improper pattern appears to have increased over time, particularly after Lei took over some of the responsibilities of the bookkeeper of Dynamic and Sabella after the bookkeeper's indictment for embezzlement. Lei had a desk at Dynamic, received mail there, and was even given a key to the building. After awhile, he simply changed his Alcon Group letterhead to reflect DFC's address. That was where people could find him.

e.     <u>Lei's Compensation Is Ambiguous and Possibly Suspect.</u>

The issue of Lei's compensation is an interesting topic indeed, about which the Trustee is anxious to learn more. Nonetheless, the extant evidence will show that Lei represents that the services he provided to Dynamic and Sabella were either gratuitous or in exchange for new business from Sabella.

The strange nature of Lei's compensation structure is perhaps best summarized by DFC and Sabella's own words, where they struggle to explain the ambiguous scope of Lei's employment— and the compensation for that arrangement—as follows:

> The evidence will show that Lei/Alcon undertook to arrange loans *under their licenses as real estate brokers* for Sabella/Dynamic for cooperation and with the expectation of cooperation. The evidence will also show that Lei/Alcon, in an effort to retain a "presence" before Sabella/Dynamic in order to obtain additional loan brokering assignments, undertook additional duties with relation to transactions in which it was involved . . . [including] communicating any pertinent advice from counsel to Sabella/Dynamic. There can be no evidence to the contrary.

[Trial Brief at 6:20 to 7:3]. This statement appears to crystallize the evidentiary *pièce de résistance* of DFC's intended case in chief.[5] But DFC's and Sabella's assertions in this respect raise grave

---

[5] It appears that DFC and Sabella meant to say "for compensation and with the expectation of compensation." But perhaps we assume too much. Assuming it is merely a typographical error, it represents a rather telling Freudian slip.

11

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

CASE NO 05-6040 H11

1  concerns.  Among other things, any licensed real estate broker in California acting as a mortgage

2  broker must disclose all compensation or other economic benefit received or to be received in the

3  transaction.  *See* Miller & Starr § 3:32.  The evidence will show that no disclosures were made to

4  North Plaza regarding the unusual compensation structure that was apparently in place between

5  Dynamic and Lei.

6      The evidence will also demonstrate that Lei's commissions were not paid as required under

7  the loan agreements, were not paid out of escrow, as is customary, and were instead paid in

8  accordance with some undisclosed side arrangement with Sabella.  Indeed, the evidence will show

9  that the arrangements between Lei and Sabella concerning the payment of Lei's brokerage

10  commissions were highly irregular.  It begs the question of whether the "commissions" paid by

11  North Plaza and the other Johnson Entities as the borrowers in the loan transactions actually

12  included some portion that is more accurately attributable to Dynamic's underlying duty to pay Lei

13  for these "other services."  Significantly, the evidence will show that Lei considered himself to be in

14  "sales" as the "account officer" for the Bill Johnson Entities.

15      In summary, the evidence will show that Lei was not a functional employee of DFC.

16  **C.**  **Lei's Claimed Status As a Broker Defeats Any Finding of Client Representative Under the *Bieter* Standard**

17

18  *In re Bieter*, 16 F.3d at 929, is frequently cited to as the applicable test for determining if a

19  consultant is a "client representative."  Under this test, in order to maintain a privilege for a client

20  representative, once a consultant has first been demonstrated to be a functional equivalent of an

21  employee, the entity asserting the privilege must then meet the burden of proof that, as to *each of the*

22  *communications*, they were (i) made for the purpose of seeking legal advice; (ii) under the direction

23  and at the request of the corporate supervisor when communicating with the lawyer; (iii) while

24  acting within the scope of Lei's employment and (iv) where the communications were deemed

25  highly confidential and DFC took explicit steps to maintain confidentiality.  *Id.*

26      The evidence will show that, although Lei's communications were likely directed by Sabella

27  for DFC, the proper showing of the other factors under *In re Bieter* cannot be made by DFC.

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

CASE NO 05-6040 HH

1. **The Communications Were for the Purpose of Seeking Business Advice**

Courts are generally unanimous in holding that communications with a consultant will only maintain privilege where information is being furnished to the consultant to enable the attorney to provide legal advice to the corporation—not business advice. *See, e.g., McCaugherty v. Siffermann,* 132 F.R.D. 234 (N.D. Cal. 1990) ("No privilege can attach to any communication as to which a business purpose would have served as a sufficient cause . . . ."). When considering whether a nominal third party is an agent of the attorney, "the crucial question is whether a communication to that party was made for a legal purpose. . . . If the third party agent or consultant is retained by the client for non-legal purposes, the privilege is lost." *In re CV Therapeutics, Inc.,* 2006 U.S. Dist. LEXIS 41568 at *20.

Under the test prevalent in the courts of the Ninth Circuit, the critical question concerning the determination of whether a communication is for a legal purpose "is the extent to which the communication solicits or provides legal advice or functions to facilitate the solicitation or provision of legal advice." *Id.* In this respect, documents distributed to both business personnel and legal counsel are typically not deemed by courts to be for purposes of legal advice. *Id.* The test is stated thus, as to any "dual purpose" documents:

> The court examines whether the threat of litigation "animated" preparation of the document, and whether the litigation purpose "so permeates" the non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a whole.

*Id.* (quoting *In re Grand Jury Subpoena,* 357 F. 3d at 910 (citation omitted).)

For example, courts have found that where "[i]t is a common practice . . to make an implied request for legal review and advice from [the company's] attorneys, by sending or copying communications and documents to the attorneys, even where such communications or documents do not expressly solicit legal review or advice," the communication is not made for purposes of legal advice. *Id.* Indeed, the "mere fact that a document was sent to an attorney does not make it a privileged communication. DFC's conclusory statements to the contrary are not the law in the courts of the Ninth Circuit.

Furthermore, under the governing standard, if the advice sought is the [consultant's] rather

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

13

CASE NO 05-6040 H11

1  than the lawyer's, no privilege exists." *Kuehne v. United States*, Civ. No. 06-MC-7008-AA, 2006

2  U.S. Dist. LEXIS 80784 (Dist. Or. Oct. 12, 2006). at \*6 (quoting *United States v. Kovel*, 296 F2d

3  918, 922 (2d Cir. 1961)). It does not matter if perchance some legal opinions may be contained

4  within those communications. *See Occidental Chemical Corp. v. OHM Remediation Servs. Corp.*,

5  175 F.R.D. 431 (W.D.N.Y. 1997) ( refusing to grant privilege to documents containing legal

6  opinions and strategic considerations regarding litigation shared with a consultant who was hired for

7  the purpose of designing the cleanup of an environmentally contaminated site, rather than to "assist

8  in the rendition of legal services").

9          In this case, the evidence will show that the communications withheld by DFC all relate to

10  business—not legal—advice. DFC has the burden to demonstrate otherwise. DFC's assertions of

11  privilege concerning the communications contained in their privilege logs is not only unsupported by

12  the evidence contained in the document descriptions on the privilege logs, but also fails to appreciate

13  both the facts and reasoning of the body of case law construing the client representative theory—

14  which generally protects communications made to a consultant during the course of active litigation.

15  It is important to note that in *Bieter*, as in virtually all the other cases we have reviewed, the only

16  communications for which privilege was asserted were those that occurred during the course of

17  threatened or active litigation. *See, e.g., In re Bieter*, 16 F.3d, at 929 (claims of privilege for

18  communications concerning "the investigation of *Bieter's* [litigation] claims," *not to any of the*

19  *consultant's prior business communications with the lawyers regarding the land development*.)

20          Here, the privilege logs indicate that all but a *de minimis* amount of the withheld documents

21  either relate to or arise out of the loan transactions entered into by North Plaza and/or the Bill

22  Johnson Entities with Dynamic and/or Sabella. Very few, if any, of the withheld documents appear

23  to relate to discussions concerning any anticipated litigation, much less pending litigation.[6] As such,

24  the primary purpose of these communications was not to obtain legal advice, but rather to

25  accomplish a business transaction. In this respect, under common law of agency, Mr. Lei "owed a

---

[6] Indeed, the evidence will show that the few documents appearing on the privilege logs that on their face appear to relate to any anticipated litigation are with the **counsel to Vail Lake, USA**— communications as to which Lei somehow in appropriately insinuated himself. North Plaza, LLC was an undisputed member of Vail Lake, USA at the time of these communications and strenuously objects to the improper withholding of these documents by Lei.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

CASE NO 05-6040 HH

1   duty to [his principal], as agent, to do every act that was legitimate and proper to secure the

2   acceptance of the loan." *Turner v. Turner*, 123 Ga 5, 11 (1905). Thus, the general business purpose

3   of negotiating and/or arranging the loans served as a separate and entirely sufficient cause for each

4   of the communications. As such, the communications with the attorneys relating to the loans are not

5   privileged, regardless of whether or not the communications may have contained some legal advice.

6        Furthermore, the evidence will show that Lei did not *assist* the lawyers, as is a client

7   representative's proper role. It appears he may have occasionally been guilty of practicing law

8   without a license—these activities certainly were not permitted in his claimed capacity as a

9   "broker."[7] Other communications reflect the fact that Lei also appears to have been used by Sabella

10  as her go-between with counsel in extracting fee discounts from the lawyers. Whether these

11  discounts were refunded to North Plaza (which paid for legal fees on the loan transactions from the

12  loan proceeds) is presently unknown, but is of interest to the Trustee.

13  **D.   The Communications Were Not Within the Scope of Lei's Employment**

14       Lei's representations to both the borrower and to this Court that he was an "independent

15  mortgage broker" dooms his claims that his scope of employment could include duties as a client

16  representative of DFC. This is because any broker licensed by the State of California has the

17  affirmative duty of honest and fair dealing and good faith, the duty to exercise reasonable care, and

18  the ***duty to disclose ALL material facts affecting the relevant transaction,*** to all parties to the

19  transaction, without regard to whether the lender or borrower is that agent's client. *See* 3-63

20  California Real Estate Law & Practice § 63.12..

21       Under California law, "in most cases, a mortgage loan broker owes fiduciary duties to both

22  the lender and the borrower. The use of a statutory disclosure form does not supersede the broker's

23  fiduciary obligation to exercise the highest good faith to both parties and to disclose to each all such

24  material facts concerning the transaction that may affect [either the borrower or the lender's]

25  decision to enter into the transaction. Miller & Starr, California Real Estate 3d § 4:32; see also id.

26  _____

27  [7] It is notable in this respect that a broker is precluded from the unauthorized practice of law in
    respect to mortgage transactions. The practice of law "includes legal advice and counsel and the
    preparation of legal instruments and contracts by which legal rights are secured although such matter

28  may or may not be pending in court." *Baron v. City of Los Angeles*, 2 Cal. 3d 535, 542 (1970). It
    would appear that Lei fully crossed this line.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

15

CASE NO 05-6040 H11

1 §§ 3:38-3:45 (agent's duties to disclose, and negligence duty, owed to other party in transaction).

2       It does not matter that Lei claims he acted only as the broker for DFC and at DFC's direction:

3 "[E]ven though the licensee is acting pursuant to a specific agreement with the lender or receives

4 compensation from the lender, in the usual case, absent a specific disclaimer, the borrower *considers*

5 the licensee to be the borrower's agent, and *relies* on the licensee to perform the fiduciary duties for

6 the benefit of the borrower." Miller & Starr § 4:31 (citing *Montoya v. McLeod*, 176 Cal.App.3d 57,

7 65 (1985). Therefore, Lei's service as a client representative is an impossible (and illegal) construct,

8 as it would otherwise have caused him to breach his statutory duty of disclosure of material facts

9 affecting the transaction to the borrower.

10       But in this case, questions of fiduciary duties and conflicts of interest by Lei in filling any

11 client representative role would not stop there. In this case, the evidence will show that Lei did a fair

12 amount of meddling in the confidential internal affairs of North Plaza, apparently at the direction of

13 Sabella. Documents indicate that Lei drafted corporate resolutions, corporate consents, and even

14 drafted binding agreements for North Plaza, along with the other Bill Johnson Entities. He attended

15 confidential meetings with counsel for the Entities. The evidence will show that Lei became a

16 fiduciary to North Plaza, along with the other Bill Johnson Entities, separate and apart from any

17 purported "brokerage" role. This fiduciary status alone would absolutely prevent Lei from

18 attempting to withhold information from North Plaza concerning all material facts of the transactions

19 he became aware of, whether such facts were communicated to the lender's counsel or not.

20                        \* \* \* \* \* \* \* \* \* \* \* \* \*

21       Based upon the facts that will be proved at the Evidentiary Hearing as to each of the above

22 factors, the evidence will show that <u>all</u> documents listed on the privilege logs must be immediately

23 produced.[8] It is improper for DFC and Sabella to seek to withhold these documents from the Trustee

24

25 [8] DFC and Sabella complain that the Trustee "*baselessly* asserts that communications directly between counsel and Sabella Dynamic or solely between counsel for Sabella/Dynamic" should be

26 produced. [Trial Brief at 1 n.1.] It apparently escapes their notice that each of the documents appearing on the privilege logs were determined by DFC's and Sabella's counsel to be responsive to

27 a subpoenas issued to Lei, which subpoenas only requested documents *in Lei's possession and control*. Furthermore, the Trustee invites the Court to peruse the subject matter descriptions

28 contained on the privilege logs as to the withheld documents, which appear to relate to business, not legal, communications.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/687131.1

16

CASE NO 05-6040 H11

1  under the protection of the attorney-client privilege, whether based upon a client representative

2  theory or otherwise.  Both the Trustee and the Court need to *quickly* get to the bottom of this matter.

3  The sooner, the better.

4  **VII.  CONCLUSION**

5          For this and other reasons that will be adduced at the Evidentiary Hearing, the Trustee

6  requests that the Court grant the Trustee's Motion to Compel in its entirety and command immediate

7  production of the documents withheld.

8

9  Dated:  March 14, 2008                          BAKER & McKENZIE LLP

10

11                                                  By: /s/

12                                                      Ali M.M. Mojdehi
                                                        Janet D. Gertz
13                                                      Counsel for Chapter 11 Trustee,
                                                        Richard M Kipperman

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

SDODMS1/687131.1

17

CASE NO 05-6040 H11

EXHIBIT 5

1   Ali M.M. Mojdehi, State Bar No. 123846
    Janet D. Gertz, State Bar No. 231172
2   **BAKER & McKENZIE LLP**
    12544 High Bluff Drive, Third Floor
3   San Diego, CA  92130-3051
    Telephone: +1 858 523 6200
4   Facsimile:  +1 858 259 8290

5   Counsel for Chapter 11 Trustee,
    Richard M Kipperman

6

7

8                 UNITED STATES BANKRUPTCY COURT

9                 SOUTHERN DISTRICT OF CALIFORNIA

10

11  In re:                               | Case No.04-00769 PB11

12                                         Chapter 11
    NORTH PLAZA, LLC,
13  a California Limited Liability Company,  **CHAPTER 11 TRUSTEE, RICHARD
                                             M KIPPERMAN'S POST-TRIAL
14                  Debtor                   EVIDENTIARY HEARING BRIEF**

15                                         Hearing Date:   March 19-21, 2008
                                           Place:          Dept. 2
16                                         Judge:          Hon. Peter W. Bowie

17

18

19

20        Richard M. Kipperman, chapter 11 trustee ("Trustee") of the estate of North Plaza, LLC

21  ("Debtor"), hereby files his Post-Trial Brief to the Evidentiary Hearing held March 19-21, 2008,

22  regarding the issue of whether Isaac Lei/The Alcon Group (collectively "Lei") may qualify as a

23  "client representative" of DFC or Sabella for purposes of assertion of the attorney client privilege on

24  behalf of the same.  The evidence adduced at the Evidentiary Hearing has demonstrated that he

25  cannot.

26

27        / / /

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

1

CASE NO 05-6040 H11

SDODMS1/688047.2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I. INTRODUCTION

"When *I* use a word," Humpty Dumpty said, in rather a scornful tone, "it means just what I choose it to mean—neither more nor less." "The question is," said Alice, "whether you *can* make words mean so many different things." "The question is," said Humpty Dumpty, "which is to be master—that's all."[1]

Lei has represented to this Court on numerous occasions that he served as an "independent broker" in respect to the transactions between North Plaza LLC and Dynamic Finance Corporation ("Dynamic") and Angela Chen Sabella ("Sabella"). Now, perceiving that the law does not recognize an attorney-client privilege for conversations between a broker and his or her client's attorneys, *see, e.g., In re Grand Jury Proceedings*, 602 F.Supp. 603, 605-06 (D. R.I. 1985). Dynamic and Sabella have recently come before this Court to claim that Lei was actually not "independent" at all, but was their *de facto* employee, for purposes of their assertion of the attorney client privilege as to such communications.

Dynamic/Sabella/Lei can't, in Humpty-Dumpty fashion, have it both ways. A person's usage of terms of agency, such as "broker," will not control how the actor will be characterized for legal purposes. *See* Restatement (Third) of Agency § 1.02. Rather, under the governing law, in respect to all the facts and circumstances either related to or arising out of the loan transactions, Lei must have been either the *de-facto* employee of the lender, **or** an independent broker; he cannot have been both in respect to the facts arising out of or related to the loan transactions. Nor can Lei, chameleon like, have first assumed the fiduciary mantle of a broker but then proceeded to change or partition his roles and responsibilities or the scope of his agency as easily as he would have a hat.

In truth, Lei was neither "broker" nor "client representative." Although the evidence has demonstrated that Lei was licensed as a broker in California, the evidence also shows he was acting in all respects connected with the loan transactions as a *de facto* employee of Dynamic and Sabella (and thus not, as he has previously represented, an "independent broker"). The evidence also

---

[1] LEWIS CARROLL (Charles L. Dodgson), *Through the Looking-Glass and What Alice Found There*, chapter 6, p. 205 (1934).

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2

2

CASE NO 05-6040 HH

1   demonstrates that Dynamic and Sabella appear to have been the only "broker(s)" acting as such in

2   the relevant loan transactions with each of the Bill Johnson entities. As explained below, in light of

3   the evidence, under the governing law, Lei cannot have served as a "client representative" of either

4   Dynamic or Sabella against North Plaza's interests. The law pertaining to agency and fiduciary

5   relationships is the ultimate linguistic master here, finally ending all of the word games.

6   ## II.  EVIDENTIARY ANALYSIS

7   **A.    Sabella Cannot Invoke the "Client Representative" Construct As an Individual**

8   First, the evidence has demonstrated beyond a doubt that Sabella cannot claim privilege for

9   any of the communications with Lei regarding each of her personal loans, because the privilege has

10  been waived.

11  The evidence presented at the Evidentiary Hearing ("Evidence") has shown that:

12  1.    The communications with the attorneys in respect to loans made by *Sabella* to the Bill

13  Johnson entities (as opposed to those made by Dynamic) were understood by Lei to be made solely

14  in his capacity as an agent for *Sabella*, not for Dynamic. [F/126:2 – 127:21.][2] (stating that if the loan

15  was granted by Sabella, communications with counsel would be strictly on behalf of Sabella but if

16  the loan was granted by Dynamic, communications with counsel would be strictly on behalf of

17  Dynamic)]. As such, the communications regarding the Sabella loans were communications made

18  on behalf of an individual, not on behalf of a corporation. The client representative concept is thus

19  unavailing. *In re Bieter Co.*, 16 F.3d 929 n.7 (8th Cir. 1994); *United States v. Campbell*, 73 F.3d 44,

20  47 (5th Cir. Tex. 1996); *see also In re Grand Jury Subpoenas*, 995 F. Supp. 332, 340 (E.D.N.Y.

21  1998).

22  2.    There were no extraordinary circumstances under which Sabella was otherwise

23  disabled from communicating with her Los Angeles attorneys during all relevant times:

24  a.    No evidence has been proffered that she was traveling extensively during the

25  relevant time frame. Rather, the evidence shows that the attorneys (and Lei)

26  generally dispatched their communications to her to a location in Los Angeles.

---

[2] Transcripts labeled "T" refer to Reporters Transcript of Proceedings, Evidentiary Hearing
Thursday, March 20, 2008. Transcripts labeled "F" refer to Reporters Transcript of Proceedings,
Evidentiary Hearing Friday, March 21, 2008.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2

3

CASE NO 05-6040 IH1

1   [Ex. 18; Ex. 19; Ex. 35; Ex. 36; Ex. 47; Ex. 72; Ex. HU.] Sabella makes her

2   home in Los Angeles. [F/25:14-17; 26:5-15.] There is thus no evidence

3   whatsoever that Sabella was unable to make and receive communications (in

4   writing or over the phone) with each of her Los Angeles attorneys.

5     b. Sabella needs no "translation" assistance for communications with her

6   attorneys. She has no difficulty whatsoever communicating in the English

7   language. Certainly, she would not rely on Lei as a translator in any case. He

8   described his fluency in Chinese as merely being able to order food in a

9   restaurant. On a scale of 1-10 (1 being the lowest), Lei states he is a "2" in

10  writing Chinese. [F/231:20 – 233:3. ] All of the written communications

11  from Lei to Sabella that have been produced to the Trustee were in English.

12    c. Sabella otherwise needs no assistance regarding technical "translation" of

13  business or real estate financing concepts, as is demonstrated by her many

14  years of business experience. Since at least 1997, Sabella has been

15  continuously been in the following businesses in the US: rental income

16  property management for properties she or her companies own, which number

17  more than 3,000 units; land development entitlements, tentative and final

18  maps, a tedious process; master plan community, meaning development of

19  300 to over 1,000 acres, infrastructure, construction of utilities and roadways;

20  and tract home construction; apartment construction; lending, acquisitions of

21  real properties; and sales of real properties. [F/13:24 – 16:3; 16:21 – 18:20.]

22  She has been involved in "unconventional lending" and deals with raw land

23  for her own account, including entitlements and construction. [F/18:21 –

24  19:21; F/20:14-20.] Sabella received a BA in Economics from UCLA and a

25  BS in Architecture from USC. She is a California licensed architect. [F/16:4-

26  17.] She considers herself to be a sophisticated businesswoman. [F/27:5-9.]

27  Sabella therefore is perfectly competent to communicate on sophisticated

28  business topics.

4

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

SDODMS1/688047.2

CASE NO 05-6040 H11

d.    No evidence has been proffered that she at any time was under any physical disability that would have prevented or hampered her from communicating directly with her Los Angeles attorneys.

3.    Sabella has admitted that she simply didn't want to be bothered with the mundane details, which she left to Lei to work out with her attorneys. [F/10:8-24.] Sabella "doesn't do email." [F/90:9-10.] This is not a sufficiently compelling reason to clothe the communications involving Lei with the attorney-client privilege.

As such, the privilege has been waived as to all communications including Lei that refer or relate to loans made personally by Sabella to any of the Bill Johnson entities.

**B.    Dynamic Cannot Assert the Attorney-Client Privilege for Communications Involving Lei, Because Lei Is Not Dynamic's "Client Representative"**

In light of the evidence that Sabella cannot assert that Lei is her client representative, it remains only to determine whether Lei (i) functioned in substance as the *de facto* employee of Dynamic _and_ (ii) the communications otherwise met the requirements for Lei's being Dynamic's "client representative" under the governing law. The evidence has adduced that, although indeed Lei was Dynamic's *de facto* employee, he still was not their "client representative" for purposes of Dynamic's assertion of the attorney-client privilege.

**1.    Lei Was the *De Facto* Employee of Dynamic**

Dynamic has done an extraordinary job of meeting its burden of proof that, during all relevant times, Lei was its *de facto* "employee" _and_ that the scope of that employment by Dynamic co-extensive with the facts and circumstances of the loan transactions with the Bill Johnson Entities. Under California law, an "employee" is one who is

> subject to the absolute control and direction of his employer in regard to any act, labor, or work to be done in the course and scope of his employment. The term 'employee' has been held to be synonymous with the word 'servant.' . . . . [T]he relationship of master and servant contemplates that the servant be *entirely* under the control and direction of the employer; it presupposes also the right to direct the method and mode of doing the service.

*Gipson v. Davis Realty Co.*, 215 Cal. App. 2d 190, (1963).[3] Lei was Dynamic's employee.

---

[3] An employee is a special form of agent. Although an employee is necessarily an agent of a principal, not all agents are employees. The touchstone for the distinction is the principal's complete

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 05-6040 HH

SDODMS1/688047.2

*First*, the evidence has shown that Lei was a servant of Dynamic's, having been under the complete direction and control of Dynamic:

1.     Lei had no formal consulting agreement with either Dynamic or Sabella. [F/195:10-12.] He had no written agreement with either of them whatsoever. [F/195:4-9.] Rather, his duties appear to have been dictated by Sabella. For example, at the first December 1997 meeting with Lei and the attorneys, Sabella told Lei he needed to work with the borrower and to see the loan documents are properly documented. He needed to work with the attorney and to report to Sabella any material changes, and he would earn a fee. [F/9:14-20.]

2.     Sabella would page Lei constantly to get answers with respect to the loans to the Bill Johnson Entities, which Lei described as "high maintenance." [F/89:3-22; 90:1-3.] When Sabella calls Lei, she expects an [immediate] answer. [F/89:3 – 91/4.]

3.     Although initially, Lei appears to have had a role similar to a loan processing clerk for Dynamic, sending faxes and maintaining files, he eventually he became something of a "Guy Friday," doing whatever he was requested to do with respect to the Bill Johnson Entities, running errands, delivering documents and doing personal favors for Sabella. [T/186:6 – 187:23; 189:22 – 190:2.] Lei was thus accustomed to performing menial tasks at Sabella's command, for example, driving from Los Angeles to Temecula to pick up flower pots that belonged to Sabella and then delivering them to Sabella. [Ex. MG; T/198:7 – 199:2; Ex. MH; T/199:10 – 202:8; F/35:19 – 36:4.]

4.     Lei appears to have had no decision making authority at Dynamic. For example, Sabella was the person who made the decisions whether to go forward with the loans. [F/98:13 – 99:2.] Sabella performed any necessary "negotiation" of the loans, [F/54:8-21.],--assuming that any negotiation could actually take place on a take-it-or-leave-it-deal. The substantial part of Lei's duties was to collect information and give it to Sabella. [F/98:13 – 99:2.]

5.     Lei once threatened to "quit." [F/84:8-10; F/85:3-24; Ex. KU.] He discussed his desire to quit with Sabella, who apparently persuaded him otherwise. [F/86:20 – 87:17.]

control over the employee-agent. *Id.*

6

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2

CASE NO 05-6040 HH

1    6.    Lei performed internal Dynamic administrative tasks, giving regular updates to

2    Sabella. He also composed interoffice memoranda to Dynamic administrative staff, giving them

3    direction, based upon Sabella's commands. [Ex. IS; F/188:19 – 190:2.]

4    7.    Lei was a form filler for Dynamic. He used Dynamic's standard forms in his work,

5    including commitment letters and letters of interest. [F/136:16-24.] He used the forms to create

6    these letters for Sabella's signature, using Dynamic standard templates. [F/142:12-11.] The draft

7    North Plaza commitment letter is an example of one of the standard forms that existed at Dynamic

8    that Lei would use from time to time. [F/144:8 – 145:6; Ex. 34A.]

9    8.    Lei had free access to Dynamic's computers. [F/137:11-15; F/141:1 – 142:1.] He

10    saved documents on Dynamic's computers. [F/146:18-20; F/147:21-25.]

11    9.    Lei had access to Dynamic's files, and sometimes took them home. [F/114:23 –

12    115:7; F/115:8-25; F/116:1-12; Ex. HZ 01/27/99 (Lei Memo to Lew informing Lew that Lei had

13    removed documents from DFC files maintained by Lew, who was Sabella's assistant); F/191:23;

14    F/192:13-17; F/193:1-3.] The files Lei maintains for the various transactions he brokers were

15    located at Dynamic. [T/179:20-23.]

16    10.    Lei prepared legal documents for Dynamic, [see, e.g., F/124:2-10], something he is

17    not permitted to do as an "independent broker," for it would be the unauthorized practice of law.

18    11.    Lei assumed some portion of the job of Dynamic's internal bookkeeper after that

19    person was indicted in 2001 for embezzling money from Sabella. [F/29:3-15; F/30:19 – 31:20; cf.

20    Ex. EJ, Sabella Depo 05/24/02, Vol. II, Pg. 181.]

21    12.    Lei had very little to do with the high level internal affairs of Dynamic and was not in

22    any sense an "insider" who was privy to confidential information regarding Dynamic. For example,

23    Lei is not privy to the source of funding for the Dynamic loans. [T/183:15-21.] Lei was just a clerk.

24    13.    Lei has a desk, mail slot and use of a phone at Dynamic. He also makes calls and

25    sends and receives faxes there. [F/77:7-9; T/176:12-258.] Lei directed his mail to Dynamic.

26    [F/77:10-11; F/132:10– 135:12; Ex. BR 08/04/99 (fax Memo to Tony Rice, escrow officer, asking

27    Rice to forward insurance to Lei at Dynamic address); Ex. BS 06/19/00 (fax to Goldberg, a lender on

28    a Johnson project, asks Goldberg to send agreement to Alcon at the Dynamic address); Ex. BQ

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

7

CASE NO 05-6040 HH

SDODMS1/688047.2

1  03/14/01 (fax Memo to Shetler at Johnson & Johnson asks her to forward information to Lei at the

2  Dynamic office and to Phillips, Johnson's legal counsel).] It was more convenient that way.

3  [F/228:18 – 229:4.] Lei was even given a key to Dynamic's offices. [F/33:24 – 34:7.] Dynamic

4  was where people could find him.

5       14.    Lei spent the majority of his time at the Dynamic offices, being there on a daily basis.

6  [T/175:9-16; 176:9-11; F/32:23 – 33:23.] He came in on the weekend or late at night. [F/50:21 –

7  51:6.] He doesn't really have a home office. [T/179:7-19.] He keeps the files on the floor. He

8  doesn't have a file to hold them in. The room is a mess. So it's usually on the floor in a box. Lei's

9  only computer in that room is his laptop. [F/221:8 – 222:24.] It is beyond contemplation that Lei

10  would possibly greet clients in such a place. Not that he had any other clients of substance—

11  Dynamic and Sabella constituted "in excess of 95 percent" of Lei's loan activity. [F/77:12-15.]

12  Dynamic and Sabella constituted 100 percent of his loan business for all but a brief period of time.

13  [F/79:3-23.]

14       15.    Lei testified as the Person Most Knowledgeable of Dynamic in the so-called

15  "Sundance" litigation. [ F/185:5 – 186:12.] Strangely enough, he did not appear as Dynamic's

16  Person Most Knowledgeable at Sabella's request. He did it at his own request. [F/186:14-15.]

17       16.    After awhile, Lei simply changed his Alcon Group letterhead to reflect Dynamic's

18  address. [*See, e.g.*, Ex. OD; PB.]

19       17.    In numerous fax memos to Johnson over 10 years, Lei used the word "we," such as,

20  "*we* need." He testifies that he was referring to himself and Sabella. [F/76:12-15.] Lei never

21  appears to have referred to Alcon independently in any communications. He did not list his broker's

22  license number on communications. He just referred therein to the euphemistic "we."

23       18.    Lei's compensation structure otherwise suggests an employment relationship with

24  Dynamic—one that is tainted with fraud against the borrower. Dynamic had the ability to control

25  both the timing and the amount of the payments that were made to Lei for his services in respect to

26  the loans. The evidence reveals that Lei's purported "commissions" were not paid as required under

27  the loan agreements, were not paid out of escrow, as is customary, and were instead paid in

28  accordance with some undisclosed side arrangement with Dynamic. The loan agreement and each of

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2

8

CASE NO 05-6040 H11

1   the loan extensions required the purported "commissions" to Lei to be paid "in full at the Closing."

2   [See, e.g., Ex. 58 ¶3; Trustee's Request for Judicial Notice, filed concurrently herewith, Exhibit 2.]

3   The "Closing" was defined in the initial loan agreement, for example, as the date the borrower

4   executed and delivered the promissory note to Dynamic. [See, e.g., Ex. 58 ¶1.] A pattern developed

5   instead, however, where Lei agreed with Dynamic to defer half of the money until the loan was paid

6   off. [F/160:10-13.] The initial loan agreement (as well as all extensions) contained an integration

7   clause. [See, e.g., Ex. 58 ¶10.] There is no evidence of any signed writing with North Plaza

8   regarding Lei's side deal concerning these payments between Dynamic and Lei.

9          19.     In light of the irregularities, the evidence suggests that the purported "commissions"

10   paid by North Plaza and the other Johnson Entities as the borrowers in the loan transactions were

11   instead attributable to Dynamic's underlying duty to pay Lei as their servant. The process appears to

12   have worked as follows: Lei would request Dynamic's accounting clerk to cut him a check, which

13   was paid based upon some criteria, discussed first with Sabella. [F/164:5-10; F/165:13-18; Ex. HK

14   08/05/98 (Memo to Sebastian, Lei writes "kindly issue checks for the following items," one of which

15   is $22,000 to Alcon).]

16          The evidence is simply overwhelming that Lei was a *de facto* employee of Dynamic.

17   **2.     The Communications With the Lawyers Were Within the Scope of Lei's
          Employment by Dynamic**

18
19          The evidence has also adduced the fact that the communications with Dynamic's lawyers

     concerning the loan transactions with the Bill Johnson Entities were within the scope of Lei's
20
     employment by Dynamic. In fact, the evidence shows that the scope of Lei's employment by
21
     Dynamic was co-extensive with the subject matter of the transactions between Dynamic and the Bill
22
     Johnson entities:
23
            1.     Lei considered himself to be in "sales" and Dynamic's "account officer" for its
24
     transactions with the Bill Johnson Entities. [F/85:3-24; Ex. KU; F/195:17-25; F/196:15 — 197:6.]
25
            2.     Lei's communications with the attorneys on behalf of Dynamic all arose out of or
26
     were in connection with the loans between Dynamic and the Bill Johnson entities. [Trial Brief at
27
     6:20 to 7:3.]
28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2

9

CASE NO 05-6040 H11

1      3.      Lei's scope of employment, including the communications with the attorneys on

2    behalf of Dynamic, were deemed by Dynamic to be acts done pursuant to Lei's real estate broker's

3    license. As has been admitted by Dynamic:

> Lei/Alcon undertook to arrange loans **under their licenses as real estate brokers** for Sabella/Dynamic for cooperation and with the expectation of cooperation. The evidence will also show that Lei/Alcon, in an effort to retain a "presence" before Sabella/Dynamic in order to obtain additional loan brokering assignments, undertook **additional duties with relation to transactions in which it was involved** . . . [including] communicating any pertinent advice from counsel to Sabella/Dynamic. [Trial Brief at 6:20 to 7:3 (emphasis added)].

9    Although this *Bieter* criterion is satisfied, as explained in § III below, that fact is otherwise

10   problematic for Dynamic's contentions as to privilege generally.

11      **3.      Lei Cannot Satisfy the Additional Criteria for Establishing "Client Representative Status Under the *Bieter* Standard**

12

13      Dynamic cannot rest upon its laurels having merely proved that Lei's communications with

14   the lawyers were made within the scope of Lei's *de facto* employment by Dynamic. They must also

15   prove (i) that the communications were for the purpose of seeking legal advice, *and* (ii) that the

16   communications were deemed confidential and were kept confidential. Dynamic can prove neither

17   of these factors.

18      *First*, the evidence speaks loudly that the communications were made for the purpose of

19   seeking business advice, not legal advice. Sabella says, regarding Lei's communications with her

20   lawyers, in working with her attorneys, she told Lei that he needed to see the loan documents as

21   perfected and he needed to report to Sabella if there's any major problems. If Lei could not work it

22   out with the attorney, then Lei needed to report to Sabella to have it resolved. And she did not want

23   to be bothered very much. [F/10:8-24.] As stated in its Trial Brief, the communications with the

24   lawyers were all made in relation to the loan transactions in which Lei was involved, purportedly as

25   a "broker." [Trial Brief at 6:20 to 7:3.]

26      *Second*, the evidence demonstrates that the communications between Lei and the lawyers

27   were neither deemed confidential nor kept confidential:

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

SDODMS1/688047.2

10

CASE NO 05-6040 HH

1        1.    There has been no evidence brought forward of the existence of a written or oral

2    confidentiality agreement between Lei and Dynamic. [F/166:4-22.] To the contrary, the evidence

3    demonstrates that there was none. Lei testified that Sabella never told him that communications he

4    would have with her counsel would be confidential. [*Id.*; F/168:1-8] Lei testified he was merely

5    told that he was a "point person" or "front person," brokering the transaction and he claims he

6    merely made assumptions based upon that. [F/153:19-24; F/154:1-5; F/154:11-16; *cf.* F/157:21-

7    158:14.]

8        2.    There has been no evidence brought forward of an agreement between Dynamic and

9    the lawyers regarding Lei's role, whether oral or written. No retention agreements with the lawyers

10   have been produced. Lei also testified that he doesn't remember somebody actually using the word

11   "confidential" at his first meeting with the lawyers in December 1997. [F/158:20 – 159:1.]

12       3.    There is conflicting evidence, at best, that any attorney ever told Lei that their

13   communications with him would be confidential. Lei's testimony seems to equivocate and suggests

14   that this fact was merely assumed at some undefined point in time. Referring to his declaration and

15   responding to the question whether at any time anybody told Lei that communications described in

16   paragraph 4 therein would be confidential, Lei testified he "would say it would be legal counsel

17   telling him things, and Dynamic would know and this whole thing would be confidential."

18   [F/206:16 – 207:8.] This is not compelling testimony on this primary point of evidence. The

19   transactional attorney at the Pachulski Firm, Gruber, doesn't recall ever having a conversation with

20   Lei about his role as client representative. [F/250:21 – 251:4.] At most, the transactional attorney

21   states he recalls having pulled Lei aside and reminded him that there were certain kinds of dialogue

22   that should not take place in front of parties who were not clients. [F/251:9-25.] Nonetheless, the

23   transactional attorney also states that there was no discussion at the initial meeting with Lei about

24   how he would interface with Lei. He said it was always his understanding, but was not sure how he

25   came to this understanding. He did not recall a specific conversation. [F/259:8-17.]

26       4.    Much less there having been an actual agreement with anyone regarding the

27   confidentiality of discussions with Lei, there is no evidence that there was any discussion

28   whatsoever as to how the communications could possibly be confidential in light of Lei's role as a

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

1  broker with respect to the transactions that were the subject of the communications. For example,

2  Sabella did not tell the Pachulski Firm at their first meeting with Lei that she considered Lei part of

3  her team. She introduced Lei to the Pachulski Firm lawyer as the "broker" for the loan transactions

4  and stated that Lei would be the one handling the transactions. [F/156:20-24; F/241:7-19.] There is

5  no evidence that the significant potential for conflicts of interest was ever discussed. The Pachulski

6  Firm lawyer testified that he could not recall any conversation between Gruber and Lei regarding

7  Lei's role of wearing two hats in a transaction or whether he could consistently do that as a broker.

8  Lei did not discuss with the Pachulski Firm that Lei owed fiduciary obligations to the borrower.

9  [F/157:5-7.] Nor did he explain to the Pachulski Firm that he had certain disclosure obligations with

10  respect to the borrower. [F/157:17-20.]

11      5.      Furthermore, Lei's communications with counsel were not treated as confidential.

12  On cross-examination, Lei could not think of a single example of having a confidential meeting with

13  Gruber and Sabella that he withheld from Johnson. [F/180:23 – 181:2.] Johnson was often included

14  in the discussions with the Pachulski Firm. [F/172:11-17.] Johnson was also included in meetings

15  with the Gibson Dunn & Crutcher Firm. [Ex. FO; F/182:5 – 184:3.] Lei also stated under oath that

16  anything "material" to the loan transactions would need to be disclosed to the borrower. [F/174:21 –

17  176:19.] Sabella also admitted that if there was "something material," Lei had to be honest to the

18  borrower. [F/41:9-18.][4]

19      6.      There was certain advice and concerns that the Pachulski Firm lawyers relayed to Lei

20  that "he had to share with Johnson. It happened all the time." [T/218:7-12.]

21      7.      Information regarding the details of the loan transactions, including the

22  communications with the attorneys, was freely shared with an independent loan reviewer consultant.

23  [See, e.g., F/111:10-22.]

24      8.      Other low-level employees within Dynamic reviewed and had knowledge of the loan

25  files and transactions concerning the Bill Johnson Entities. See, e.g., F/164:5-10 (accounting clerk.)]

---

[4] Oddly, however, Lei admitted that information with respect to the *risks* of the loan, such as not enough margin for the loan-to-value ratios, was not disclosed to the borrower but was only discussed with the lender—and presumably, with the attorneys. [F/176:23 – 177:3.] It is hard to fathom how this information would not be material and its non-disclosure thus demonstrates a clear fiduciary breach.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 05-6040 H11

SDODMS1/688047.2

1    Because the communications were not deemed or kept confidential and were otherwise

2    related to business rather than legal advice, Dynamic cannot protect the communications by asserting

3    that Lei was a *de facto* employee of Dynamic.

4    **III.  DISCLOSURE IS OTHERWISE REQUIRED BY SPECIFIC EXCEPTIONS TO THE**
     **ATTORNEY CLIENT PRIVILEGE**

5

6    Even assuming *arguendo* that Dynamic could have met its burden of proof under *In re*

     *Bieter*, it would have been a futile endeavor. The same facts that are required to meet their burden of
7
     proof otherwise destroy the privilege. This is because any findings that Lei—the self-proclaimed
8
     fiduciary to North Plaza—was the *de facto* employee of Dynamic and made the communications
9
     within the scope of that employment relationship would be fatal to the privilege under established
10
     exceptions to the attorney-client privilege.
11
     The law carves out numerous exceptions to the attorney-client privilege by virtue of
12
     consideration of countervailing policy considerations. Two such exceptions are specifically
13
     applicable here. First, federal common law recognizes a "fiduciary exception" to the attorney-client
14
     privilege. *See, e.g., Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970). Second, the crime-fraud
15
     exception enumerated by Federal Rule of Evidence 503(1) applies to communications made in
16
     contemplation or furtherance of a crime and/or fraud.
17
     **A.    The Fiduciary Exception to the Attorney-Client Privilege Requires Disclosure**
18
     The federal common law fiduciary exception, first set forth in *Garner v. Wofinbarger* (which
19
     itself applied English common law of fiduciary relationships) has been adopted within virtually
20
     every federal circuit, including by the Ninth Circuit. *See, e.g., United States v. Mett*, 178 F.3d 1058,
21
     1062-63 (9th Cir. 1999). Like its analogue, *Riggs Nat'l Bank v. Zimmer*, 355 A.2d 709 (Del. Ch.
22
     1976), in which the Delaware Chancery Court which appears to have been the first to adopt the
23
     doctrine in the U.S., the *Garner* doctrine has its underpinning in the common law of trust
24
     relationships. The federal common law fiduciary exception has thus been applied to numerous
25
     fiduciary relations, such as those arising between partners,[5] joint venturers, a creditors' committee
26
     and the parties it represented, and a corporation and its bondholders. Furthermore, courts have
27

28   _____

     [5] Sabella has otherwise proclaimed that she is a "partner" to Bill Johnson. [*See* Trustee's request for
     judicial notice, Exhibit 1.]

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2                                    13                           CASE NO 05-6040 H11

1     applied *Garner* in cases involving contractual relations in which the court has determined that the

2     nature of the contractual relationship gives rise to a fiduciary duty, such as where the defendant

3     acquired and managed real estate for the benefit of the defendant. As explained below, the principle

4     is entirely applicable to the fiduciary relationship between a mortgage broker and a borrower.

5         **1.     Under California Law, a Mortgage Broker Is a Fiduciary to a Borrower**

6        Under California law, a mortgage broker has a fiduciary duty to the borrower. *Wyatt v.*

7     *Union Mortgage Co.*, 24 Cal. 3d 773, 782 (1979). The California Supreme Court has likened the

8     duty owed by a mortgage broker to that of a trustee:

9               [G]eneral principles of agency combine with statutory duties created

10              by the Real Estate Law to impose upon mortgage loan brokers an
                obligation to make a full and accurate disclosure of the terms of a loan
                to borrowers and to act always in the utmost good faith toward their

11              principals. "*The law imposes on a real estate agent 'the same*
                *obligation of undivided service and loyalty that it imposes on a trustee*

12              *in favor of his beneficiary.'* This relationship not only imposes upon
                him the duty of acting in the highest good faith toward his principal

13              but precludes the agent from obtaining any advantage over the
                principal in any transaction had by virtue of his agency." A real estate

14              licensee is "charged with the duty of fullest disclosure of all material
                facts concerning the transaction that might affect the principal's

15              decision."

16     *Id.* (emphasis added) (internal citations omitted.). A mortgage broker's duty includes an absolute

17     duty to disclose all facts material to a loan transaction. *Id.* [6] "[T]he broker's duties [of disclosure]

18     are not limited to matters of fact but also include the legal ramifications of the transaction. Miller &

19     Starr § 3:26 (emphasis added), *citing Alhino v. Starr*, 112 Cal. App. 3d 158, 172, 169 Cal. Rptr. 136

20     (1980) (dual agency case); *UMET Trust v. Santa Monica Medical Inv. Co*, 140 Cal.App.3d 864, 873,

21     189 Cal. Rptr. 922 (1983) (mortgage broker)).[7]

22        "The broker's fiduciary relationship not only imposes upon him the duty of acting in the

23     highest good faith towards his principal but precludes the agent from obtaining any advantage over

---

24    [6] Unlike a transaction for the purchase and sale of real property where the agent's duty to disclose is

25    limited to facts regarding the suitability of the property, the mortgage broker's duty of disclosure are
     comprehensive and embraces *all facts* material to the transaction. *Wyatt v. Union Mortgage Co.*, 24

26    Cal. 3d at 782.
     [7] This rule holds true in a dual agency situation, where one agent is acting for two principals. The

27    principal "may be liable for the affirmative misrepresentations or failure to disclose by the dual
     agent." When one principal benefits from the fraud of the dual agent toward the other principal, the

28    principal who receives the benefit may be liable to the defrauded principal." Miller Starr § 3:17.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2

CASE NO 05-6040 H11

the principal in any transaction had by virtue of his agency." *Batson v. Strehlow*, 68 Cal. 2d 662, 674-675 (Cal. 1968). Thus, a broker cannot compete with his principal concerning the subject matter of the agency or use information acquired in the course of the agency to his advantage. *Menzel v. Salka*, 179 Cal. App. 2d 612, 4 Cal. Rptr. 78 (Cal. App. 2d Dist. 1960); 3-63 California Real Estate Law & Practice § 63.12; *cf.* Cal. Civ. Code § 2230:

> Neither a trustee nor any of his agents may take part in any transaction concerning the trust in which he or anyone for whom he acts as agent has an interest, present or contingent, adverse to that of his beneficiary, except as follows: "1. When the beneficiary, having capacity to contract, with a full knowledge of the motives of the trustee, and of all other facts concerning the transaction which might affect his own decision, and without the use of any influence on the part of the trustee, permits him to do so; . . .

Although a mortgage broker also may owe duties to a lender, he is generally viewed—first and foremost—as the borrower's agent. Indeed, "even though the licensee is acting pursuant to a specific agreement with the lender or receives compensation from the lender, in the usual case, absent a specific disclaimer, the borrower considers the licensee to be the borrower's agent, and relies on the licensee to perform the fiduciary duties for the benefit of the borrower." Miller & Starr § 4:31 (*citing Montoya v. McLeod*, 176 Cal. App. 3d 57, 65, 221 Cal. Rptr. 353 (1985)).

Here, Lei, as well as Sabella, have admitted that he was the sole "broker" involved in the loan transactions.[8] [T/205:23 – 206:8; F/40:21-25]. Bill Johnson did not act as a broker in any of the loan transactions. [F/149:9 – 150:5.] Lei has further admitted that he owed a fiduciary duty to North Plaza. F/81:19 – 82:3.] As such, Lei owed North Plaza an absolute duty to disclose to North Plaza all material facts arising out of or connected to the transactions. This included the communications with Dynamic's counsel that Lei deemed "confidential," the scope of which Lei described as "anything critical or of importance" regarding the transactions. [F/174:6-10.] Sabella has admitted as much, when she stated under oath that if she had known that Lei had a fiduciary duty of full disclosure to the broker, she would never have hired him as a client representative. [F/43:18 – 44:7.]

Dynamic cannot otherwise avoid this result by attempting to argue that Lei was its *de facto*

---

[8] The Trustee accepts this admission, but reserves the right to contend that Lei did not either "negotiate" or "arrange" the loan transactions with North Plaza.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2

CASE NO 05-6040 H11

1  employee regarding the loan transactions only in some respects (*i.e.*, for purposes of asserting the

2  attorney-client privilege), but had a broker's fiduciary duties in other limited respects connected with

3  the loan transactions.  Under California law, brokers are not allowed to so "partition" away their

4  fiduciary duties. *Montoya v. McLeod*, 176 Cal. App. 3d 57, 63 (1985) (stating that "[t]his would

5  subvert the real estate law's purpose to upgrade the standards of the real estate profession and to

6  provide protections to the consuming public").  "An agent has a fiduciary duty to act loyally for the

7  principal's benefit *in all matters connected with the agency relationship.*  Restatement (Third)

8  Agency § 8.01 (emphasis added).  Lei's fiduciary duty to North Plaza was completely co-extensive

9  with all matters related to or arising out of the loan transactions—and thus was co-extensive with the

10  scope of Lei's employment with Dynamic/Sabella.

11       Nor can Dynamic attempt to set up an arbitrary "Chinese Wall," by contending that the

12  fiduciary duty to North Plaza is Lei's duty alone.  That same duty—the duty to disclose—is

13  furthermore imputed to Lei's de facto employer, Dynamic Finance Corporation.  Indeed, where Lei

14  violates his fiduciary duty to North Plaza within the scope[9] of his (*de facto*) employment with

15  Dynamic, there is no question that Dynamic would be liable for the fiduciary breach of their

16  employee, Lei. *See* Restatement (Third) Agency §§ 7.03; 7.07; *see also* Restatement of the Law,

17  Second, Torts § 551(2)(a).  Under the law of agency, the duty is imputed to Dynamic.  Under

18  California law, a principal acts through his or her agent.  This is because the acts of an agent are

19  legally the acts of the principal. Cal. Civ. Code § 2330.  An agent represents the principal for all

20  purposes within the scope of his or her actual or ostensible authority, and *all the rights and liabilities*

21  *which would accrue to the agent from transactions* within such limit, if they had been entered into

22  on his own account, *accrue to the principal.*"  *Id.* (emphasis added).  A principal is responsible to

23  third parties for the negligence or other wrongful act of an agent in the transaction of the principal's

24  business. Cal. Civ. Code § 2338.  This is because whatever duties an agent owes to another in

25  transacting the principal's business accrue to the principal.  Indeed, there can be no tort absent a

26

27  [9] The determination of whether a tort occurred within the scope of an agent's employment "turns on

28  whether or not : 1) the act performed was either required or 'incident to his duties,' or 2) could be
reasonably foreseen by the employer in any event. *Alhino v. Starr*, 112 Cal. App. 3d 158, 173-74
(1980) (citations omitted).

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2

1    duty. Thus, if the agent has a duty to disclose material facts about a transaction to another, that duty

2    accrues to the principal, and the principal is liable for any breach.[10]

3        As such, Dynamic Finance owed North Plaza a fiduciary duty to disclose all material facts

4    arising out of, related to, or in any way connected with the loan transactions. But, the analysis does

5    not stop there. As stated below, under the federal common law fiduciary exception, the fiduciary

6    duties of disclosure and loyalty each extend beyond liability for breach of that duty to otherwise

7    negate any assertion of attorney-client privilege by a fiduciary against its principal.

8        **2.    The Rationale of the Federal Common Law Fiduciary Exception Fits These
             Facts**

9
10       The fiduciary exception prohibits a trustee/fiduciary from preventing a beneficiary access to

11   attorney-client communications regarding management of the trust or asset entrusted to them. *See*

12   *Mett*, 178 F.3d 1058 (noting that exception had been applied to numerous fiduciary relationships);

13   *see also United States v. Evans*, 796 F.2d 264, 266 (9th Cir. 1986) ("The trustee . . . cannot

14   subordinate the fiduciary obligations owed to the beneficiaries to their own private interests under

15   the guise of attorney-client privilege.") Furthermore, where a fiduciary is also the agent or employee

16   of a corporation, the corporation may not assert the attorney-client privilege against those

17   constituents to whom the fiduciary duty accrues. *See* Restatement (Third) of the Law Governing

18   Lawyers §85.

19       The rationale behind the fiduciary exception is two-fold. First, a trustee/fiduciary has a duty

20   to disclose all information regarding trust assets to the beneficiaries. *United States v. Evans*, 796

21   F.2d 264, 266. "Viewed in this light, the fiduciary exception can be understood as an instance of the

22   attorney-client privilege giving way in the face of a competing legal principle." *Id.* The doctrine has

23   added strength where the recipient of the attorney's advice has a fiduciary conflict of interest:

24           Where a fiduciary represents conflicting interests, the only purpose to
             be served by the use of the privilege to withhold information from

25   ─────────────────────
     [10] Indeed, if, as Dynamic contends, Lei was its de facto employee and acted under the direction and
26   control of Dynamic in connection with the loan transactions, then Lei was a mere subagent of
     Dynamic. Dynamic was thus the de facto (although unlicensed) broker and had imputed to it Lei's
27   same fiduciary duties in respect to all matters connected with the loan transactions. *See*
     Restatement (Third) of Agency § 3.14; *see also Hercules v. Robedeaux, Inc.*, 329 N.W. 2d 240
28   (Wisc. Ct. App. 1982) (under agency principals, a subagent's duty to disclose to the principal is
     imputed to the appointing agent).

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92130
+1 858 523 6200

SDODMS1/688047.2

17

CASE NO 05-6040 HH

1  those to whom the fiduciary obligation runs is fraud. The more
   general and important right of those who look to fiduciaries to
2  safeguard their interests, to be able to determine the proper functioning
   of the fiduciary, outweighs the need for the privilege and its base of
3  attorney-client confidence.

4  *Valente v. Pepsico, Inc.*, 68 F.R.D. 361, 369 & n.15 (D. Del. 1975).

5      Second, when a trustee/fiduciary seeks advice affecting the trust assets, the real "clients" are

6  deemed to be the beneficiaries to the trust. *Id.; see also Evans*, 796 F.2d at 266 ("[A]s a

7  representative for the beneficiaries of the trust which he is administering, the trustee is not the real

8  client in the sense that he is personally being served.").

9      Both of these precepts were analyzed at length by the United States District Court for the

10 Northern District of California in *Roberts v. Heim*, 123 F.R.D. 614 (1988). In *Roberts*, the court

11 explained that the attorney-client privilege must yield "where there exists a relationship of trust and

12 confidence" and where a failure by the fiduciary to make "full disclosure of all material facts within

13 his knowledge relating to the transaction in question and any concealment of material facts is a

14 fraud." *Id.* at 625. The court reasoned that to hold otherwise and to still permit the assertion of the

15 attorney-client privilege would "make a mockery of the requirement of full disclosure in a fiduciary

16 relationship." *Id.*

17      The fiduciary exception is thus applicable here. As stated above, "*[t]he law imposes on a

18 *real estate agent 'the same obligation of undivided service and loyalty that it imposes on a trustee in

19 *favor of his beneficiary.'* *Wyatt v. Union Mortgage Co.*, 24 Cal. 3d at 782. As stated above, the

20 evidence has demonstrated that (i) Lei is a licensed real estate broker; (ii) Lei has admitted he was a

21 fiduciary of North Plaza; and (ii) Lei is Dynamic's *de facto* employee. Therefore, Dynamic and its

22 servant Lei each owed—and *still owe*—North Plaza and the other Bill Johnson Entities fiduciary

23 duties, including the duty to disclose all material facts arising out of or connected with the loan

24 transactions. That fiduciary relationship with North Plaza and/or the Bill Johnson Entities has been

25 continuous from 1997 up to the present. [F/79:24 – 80:2; F/81:19 – 82:3; F:82:15-19; F/82:25 –

26 83:17; 84:5-7; F/131:11-21.] Neither Dynamic nor Sabella nor Lei can now hide behind the attorney-

27 client privilege. This is particularly true in light of the fact that the subject matter of the attorney-

28 client communications was identical with the subject matter of the loan transactions themselves.

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

CASE NO 05-6040 H11

SDODMS1/688047.2

**B.**    **The Crime-Fraud Exception to the Attorney-Client Privilege Requires Disclosure**

Under the law of the Ninth Circuit, the crime-fraud exception to the attorney-client privilege applies were it is shown that the communications between the client and counsel were in furtherance of a future or ongoing crime or fraud. The crime or fraud may be that of either the client, the attorney, or both, and there is no requirement that the attorney be aware of the client's criminal or fraudulent intent. Demonstrating that the communications were "in furtherance of an intended or present illegality and that there is some relationship between the communications and the illegality" makes a prima facie case for the crime-fraud exception. *United States v. Martin*, 278 F.3d 988, 1001 (9th Cir. 2002.)

Here, Dynamic and Lei each owed North Plaza fiduciary duties with respect to the entire subject matter of the loan transactions, which required full disclosure to North Plaza of all material facts within their knowledge relating to or arising out of the transactions in question. Furthermore, the historical failures by Dynamic and Lei to make full disclosure of all material facts within their knowledge regarding the loan transactions was a continuing fraud, entitling North Plaza to the right of rescission under California law. *See, e.g., Gordon v. Beck*, 196 Cal 768 (1925). A failure by a fiduciary to make full and complete disclosure to those the duty runs implicates the crime-fraud exception. *See Garner*, 430 F.2d at 1102-03. North Plaza has recently filed claims that it was the victim of improprieties at the hands of Dynamic. [*See* Answer to Complaint (Related Doc # 1), Counterclaim by Richard Kipperman against Dynamic Finance Corp. Adv. Proc. 08-90035, Docket Entry 17.] In particular, the crime-fraud exception to attorney-client privilege is applicable to communications with the attorney regarding whether the proposals Dynamic had in mind (for example, with respect to charging the borrower usurious interest rates) were illegal or fraudulent. *Cf. id.* at 1103. Where such communications are made to a fiduciary of the borrower, they are not covered by the attorney-client privilege, regardless of whether they have a litigation purpose. *Cf. id.*

## IV.  CONCLUSION

For these and other reasons adduced at the Evidentiary Hearing, the Trustee requests that the Court grant the Trustee's Motion to Compel in its entirety and that the Court command immediate production of each of the documents that have been withheld on the basis of attorney-client

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2

1 | privilege. The Trustee respectfully suggest that, under the proven facts, production should be

2 | commanded, absent the need for the Court's in-camera review of the withheld documents.

3

4 | Dated:   April 8, 2008                    BAKER & McKENZIE LLP

5

6                                           By: /s/ Ali M.M. Mojdehi

7                                               Ali M.M. Mojdehi
                                                Janet D. Gertz
8                                               Counsel for Chapter 11 Trustee,
                                                Richard M Kipperman
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA 92130
+1 858 523 6200

SDODMS1/688047.2                                    20                              CASE NO 05-6040 H11

1

**TABLE OF CONTENTS**

2
3

**Page**

I.

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Baker & McKenzie LLP
12544 High Bluff Drive,
Third Floor
San Diego, CA  92139
+1 858 523 6200

i

SDODMS1/688047.2

EXHIBIT 6

CSD 1001C (08/22/03)
Name, Address, Telephone No. & I.D. No.
Ali M.M. Mojdehi, State Bar No. 123846
Janet D. Gertz, State Bar No. 231172
**BAKER & MCKENZIE LLP**
12544 High Bluff Drive, Third Floor
San Diego, CA 92130-3051
Telephone: +1 858 523-6200
Facsimile: +1 858 259-8290
Attorneys for Richard M Kipperman, Chapter 11 Trustee

)GED

Order Entered on
July 15, 2008
by Clerk U.S. Bankruptcy Court
Southern District of California

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re

North Plaza, LLC
a California Limited Liability Company

Debtor.

BANKRUPTCY NO. 04-00769 PB11

Date of Hearing: July 2, 2008
Time of Hearing: 2:00 p.m.
Name of Judge: Hon. Peter W. Bowie

## ORDER DENYING DYNAMIC FINANCE CORPORATION AND ANGELA SABELLA'S MOTION FOR STAY PENDING APPEAL OF ORDER ON TRUSTEE'S MOTION TO COMPEL DISCOVERY FROM ISAAC LEI/THE ALCON GROUP (ON SHORTENED TIME)

IT IS ORDERED THAT the relief sought by Dynamic Finance Corporation and Angela Sabella in their Motion for Stay

Pending Appeal of Order on Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group (On Shortened Time),

Docket Entry No. 775, is denied.  Notice of Lodgment Docket Entry No. 797.

//

//

//

//

//

DATED:

July 15, 2008

Signature by the attorney constitutes a certification under
Fed. R. of Bankr. P. 9011 that the relief in the order is the
relief granted by the court.

Submitted by:

**BAKER & MCKENZIE LLP**

(Firm name)

By:   /s/ Ali M.M. Mojdehi
    Ali M.M. Mojdehi,
    Attorneys for Richard M Kipperman,
    Chapter 11 Trustee for North Plaza, LLC

Judge, United States Bankruptcy Court

CSD 1001C
SDODMS1/691263.1

American LegalNet, Inc
www.USCourtForms.com

CSD 1001C {08/22/03} (Page 2)
ORDER DENYING DYNAMIC FINANCE CORPORATION AND ANGELA SABELLA'S
MOTION FOR STAY PENDING APPEAL OF ORDER ON TRUSTEE'S MOTION TO
COMPEL DISCOVERY FROM ISAAC LEI/THE ALCON GROUP (ON SHORTENED
NOTICE)
DEBTOR:   NORTH PLAZA, LLC                          CASE NO:   04-000769 PB11

The Court, having considered Dynamic Finance Corporation and Angela Sabella's Motion for Stay Pending

Appeal of Order on Trustee's Motion to Compel Discovery from Isaac Lei/The Alcon Group (On Shortened Time)

("Motion") [Docket Entry 775], having reviewed all papers, and having heard the arguments of counsel,

IT IS HEREBY ORDERED that the Motion be, and hereby is, denied.

American LegalNet, Inc.
www.USCourtForms.com

*Signed by Judge Peter W. Bowie July 15, 2008*

EXHIBIT 7

1                  UNITED STATES BANKRUPTCY COURT

2                 SOUTHERN DISTRICT OF CALIFORNIA

3               JUDGE PETER W. BOWIE, PRESIDING

4

5   IN THE MATTER OF:            )

6                            )

7                            )

8                            )

9                            )

10   NORTH PLAZA, LLC             )   CASE NO. 04-00769-PB

11   _____ )

12

13

14

15         1) CHAPTER 11 TRUSTEE'S MOTION TO COMPEL RESPONSES

16             TO SUBPOENA FOR DOCUMENTS AND TESTIMONY TO

17             ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF

18             RECORDS FO THE ALCON GROUP (FR. 7/6/07)

19

20         3) DEBTOR'S MOTION FOR ORDER REGARDING TURNOVER OF

21             DOCUMENTS (FR. 7/6/07)

22

23         4) CHAPTER 11 TRUSTEE'S MOTION FOR ORDER

24             DISQUALIFYING K. TODD CURRY FROM REPRESENTING

25             THE DEBTOR (FR. 7/6/07)

26

27         5) CHAPTER 11 TRUSTEE'S MOTION OR TURNOVER OF

28                DOCUMENTS FROM NUGENT, WEINMAN, ABBENE &

29                ALCOCK,

30                APC (FR. 7/6/07)

31

32

33

34

2

1            REPORTER'S TRANSCRIPT OF PROCEEDINGS

2                SAN DIEGO, CALIFORNIA

3

4             WEDNESDAY, JULY 25, 2007

5

6   U.S. COURTHOUSE     FEDERAL COURT REPORTERSDEPARTMENT

7   NO. 4   BY PATRICIA A. CALLIHAN325 WEST F STREET    325

8   WEST F STREETSAN DIEGO, CA 92101 SAN DIEGO, CA 92101

9       (760)639-0998

10               APPEARANCES:

11   FOR THE DEBTOR:

12   K. TODD CURRY

13   CURRY & ASSOCIATES525 B STREET, SUITE 1500

14   SAN DIEGO, CA 92101(619)238-0004FOR CREDITORS:MICHAEL

15   FLETCHERFRANDZEL ROBINS BLOOM & CSATO, L.C.6500 WILSHIRE

16   BLVD., 17TH FLOORLOS ANGELES, CA 90048(323)852-

17   1000STANLEY E. GOLDICHSTEVEN J. KAHNPACHULSKI STANG ZIEHL

18   YOUNG JONES & WEINTRAUB10100 SANTA MONICA BLVD., 11TH

19   FLOORLOS ANGELES, CA 90067

20   (310)277-6910FOR THE TRUSTEE:

21   ALI MOJDEHIJanet D. GERTZ

22   BAKER & MCKENZIE101 W. BROADWAY, 12TH FLOORSAN DIEGO, CA

23   92101(619)236-1441ALSO PRESENT:

24   TIFFANY CARROLLOFFICE OF THE UNITED STATES TRUSTEE402 W.

25   BROADWAY, SUITE 600

26   SAN DIEGO, CA 92101

27   (619)557-5013

28    SAN DIEGO, CALIFORNIA, WEDNESDAY, JULY 25, 2007, 9:30

29               --- oOo ---

30   THE CLERK:  *North Plaza, LLC.*  Four matters.  Chapter 11

31   trustee's motion to compel responses to subpoenas;

32   debtor's motion for order regarding turnover of

33   documents; Chapter 11 trustee's motion for order

34   disqualifying Todd Curry from representing the debtor;

35   and, Chapter 11 trustee's motion for turnover of

36   documents from Nugent Weinman.  I'll take the telephonic

37   appearance first followed by those in court. MR. GOLDICH:

3

1    Stan Goldich.  I'm actually just listening in.  Steve

2    Kahn, who is in court, will be handling the

3    representation for Dynamic Finance and Angela Sabella and

4    Isaac Lei.MR. KAHN:  Steven Kahn, of Pachulski Stang

5    Ziehl Young Jones & Weintraub, for the examinees Isaac

6    Lei and the Alcon Group, and as to matters of privilege

7    also Angela Sabella and Dynamic Finance Corporation. MR.

8    FLETCHER:  Good morning, your Honor.  Mike Fletcher,

9    Frandzel Robins, appearing on behalf of Dynamic Finance

10   Corporation and Angela Sabella. MR. MOJDEHI:  Good

11   morning, your Honor.  Ali Mojdehi and Janet Gertz

12   appearing on behalf of the trustee, Mr. Kipperman, man,

13   who is present and in the courtroom. MS. CARROLL:  Good

14   morning, your Honor.  Tiffany Carroll on behalf of US

15   trustee.  Your Honor, I will be monitoring this hearing

16   and I may need to leave in the middle.  I just wanted to

17   ask to be excused at that time if I need to.THE COURT:

18   Very well.  Mr. Curry.MR. CURRY:  Good morning, your

19   Honor.  Todd Curry of Curry & Associates. THE COURT:  Mr.

20   Mojdehi, I want to take the motion to disqualify Mr.

21   Curry first. MR. MOJDEHI:  Thank you very much, your

22   Honor.  We have fully briefed this, and I really don't

23   have much more to add, except I'd like to make a couple

24   observations.  First, we brought this motion after we

Pages 4-33 intentionally omitted

34

1    think there's a discovery motion pending, and I'd like to

2    be excused. THE COURT:  There is.  You don't want to

3    stay?  MR. CURRY:  I prefer not to. THE COURT:  All

4    right. MR. CURRY:  Thank you, your Honor.  THE COURT:

5    All right.  Now to the big paper motion.  Mr. Mojdehi.

6    MR. MOJDEHI:  Thank you very much, your Honor.  I'd like

7    to -- this motion has various parts, and with the Court's

8    permission what I'd like to do is I'd like to address the

9    whole question of client representative and then yield

10    the podium to my able colleague Ms. Gertz to address the

11    question of relevancy and scope, work product,

12    confidential settlement communications with Phillips and

13    the related issues.  And the reason why I'm suggesting

14    that we approach it this way is that if the Court rules

15    one way in terms of the client representative issue, then

16    there won't be any further need to get into the question

17    of, well, let's look at these documents and see whether

18    they are, you know, really protected, whether they're

19    business communications or confidential attorney/client

20    communications.  So our thought process was that that

21    threshold issue could drive a lot of the other related

22    issues as well. THE COURT:  Well, I'm intrigued by the

23    notion, but I'm not sure how it answers it because there

24    is, as my review indicates, there's a five-part test to

35

1    be applied, and that's going to be very fact specific as

2    to the context of each document, and I don't know how I

3    get to that in a generic sense. MR. MOJDEHI:  Well,

4    that's a -- and indeed your Honor made a similar

5    observation in your order of March 30th, 2006.THE COURT:

6    Ancient history.  As Justice Jackson would say, things

7    may not have appeared to me then as they appear to me

8    now.  I don't know.  MR. MOJDEHI:  But, your Honor, these

9    are your words:  "The Court is unable to determine from

10   the face of most of the documents whether the claim of

11   privilege for each document is sustainable.  And the

12   previously filed general declarations of Mrs. Sabella and

13   Mr. Lei concerning Mr. Lei's role are of little help

14   because many of the documents suggest a role more of an

15   employee than an independent broker.  The problem for the

16   Court is to ascertain which role is in play as to each of

17   the relevant documents."  Now, the sort of metaphysical

18   observation I would make is that they could take the

19   position that, you know, at 10:00 o'clock Mr. Lei was

20   wearing one hat, at 10:01 he was wearing another hat.

21   And that's the fundamental problem with their position.

22   And that's why I do believe that on the record before you

23   an insufficient showing has been made.  But let me start

24   out with some of easy stuff about which we can have

36

1   agreement. THE COURT:   I thought I'd never hear that

2   word. MR. MOJDEHI:   First, under federal law privileges

3   are to be narrowly construed.   I don't think that's a

4   issue that -- THE COURT:   That's not a shocker.   It's

5   just what does it mean. MR. MOJDEHI:   I'll get to that.

6   The second is the question of burden, who has the burden

7   of proof.   And of course the law is relatively clear that

8   the party asserting the privilege has the burden of

9   proof.   And the law is also consistent in general that a

10  party asserting the privilege can't make just sort of

11  blanket general statements; instead the party is

12  obligated to make a detailed and specific factual

13  showing.   Now, to satisfy their burden, your Honor, Mr.

14  Lei needs make a detailed and factual showing that he is

15  a, quote, client representative, or in the words of

16  virtually all of the cases in the ninth circuit that I've

17  looked at this issue, a functional employee.   He needs to

18  demonstrate that his relationship is of the type which

19  justifies the application of the privilege.   And the

20  *Bieter* court, of course, which is a seminal case in this

21  area, defines the analysis in that way.   It looks at the

22  relationship first, then it dissects that relationship in

23  light of the five-part test.   The problem here is -- sort

24  of harkens back to, I think, a TV show I once saw that

37

1    said, "Would the real Mr. Lei please stand up."  For

2    months Mr. Lei, in declarations before your Honor, has

3    been parading around as an independent broker.  Now he

4    wants to change his mask and put on the mask of a

5    functional employee.  And the problem I have is that our

6    able opponents don't want to embrace "functional

7    employee" even though they keep saying, It really doesn't

8    make a difference, your Honor, as a legal matter, what

9    difference does it make.  And if that's the case, then I

10   invite my able opponents to embrace "functional

11   employees" and come out and say and come out and embrace

12   the notion and say that he was a functional employee.

13   Come out and say that he was under the control and

14   direction, come out and say that the scope of his duties

15   were such that he was essentially, in the terms of agency

16   law, a servant, that there was a master-servant

17   relationship here.  They don't want to do that.  What

18   they want to do is they want to have it both ways.  But

19   I'm perfectly fine -- and I again invite them today to

20   come out and tell us who the real Mr. Lei is and come out

21   and embrace the concept of a functional employee.  But so

22   far, based on the record, they haven't done it.  And they

23   haven't done it because they have a heightened burden

24   because of the way that have paraded around Mr. Lei in

38

1    the past.  And none of the cases deal with situations

2    where someone was paraded around as one person and then

3    shows up later in the case and says, I'm really someone

4    else.  What I think, your Honor, is most constructive is

5    really to take the facts of the *Bieter* case, dissect them

6    and align them with what we have here.  So the *Bieter*

7    court's analysis, the Court focusing on the relationship

8    issue, first made the general observation that *Bieter* of

9    course was an entity that was set up to develop real

10   estate and the real estate development went awry, as a

11   result of that lawsuits were filed against the city and

12   competing developers alleging RICO.  And Mr. Klohs was in

13   there from the beginning.  He was brought in from the

14   beginning, and he was in there through the litigation

15   against the city.  So the *Bieter* court, the eighth

16   circuit, made the observation that Klohs was intimately

17   involved in the client's unsuccessful development and had

18   been the client's sole representive.  No showing of the

19   type of intimacy that was present in *Bieter* has been

20   demonstrated despite the fact that they have had months

21   to do it.  They have had months, but they have failed.

22   And they have failed because they sort of want to say

23   that he's a functional employee, but then they come back

24   because they want to have it both ways.  *Bieter* makes the

39

1    observation that the principal of *Bieter* and Klohs shared

2    the same offices and interacted on a daily basis.  No

3    such showing has been made.  Yes, Mr. Lei says he uses

4    the offices of Dynamic, but no showing has been made how

5    much time he has spent there and no showing has been made

6    about the extent of his interactions with Ms. Sabella.

7    There's general blanket sort of generic statements.  I'll

8    quote again from the eighth circuit.  Quote, *Bieter* was

9    formed with a single objective, and Klohs has been

10   intimately involved in the attempt to achieve that

11   objective.  No such showing has been made.  No statement

12   has been made that essentially Mr. Lei is the raison

13   d'etre for Dynamic and Ms. Sabella, that his sort of --

14   his existence and the same.  In *Bieter* there was a formal

15   agreement with Mr. Klohs.  He was paid on a monthly

16   basis.  Here what do we have?  No showing of regular

17   payments for, quote, services has been made.  The only

18   showing that has been made is that the Alcon Group

19   received commissions.  Now, no suggestion is made, but

20   perhaps it's there, that these commissions were really

21   for services for acting as a client representative.  But

22   there is no money being paid, according to them, to Mr.

23   Lei, and the only form of compensation is commissions on

24   brokerage deals.  So were those commissions partly for

40

1   services and they were simply labeled as commissions?  We

2   don't know.  *Bieter* makes the observation that Klohs was

3   knowledgeable about development and had particular

4   expertise.  No particular expertise on the part of Mr.

5   Lei has been demonstrated.  We know that he was a broker.

6   The evidence on the question of relationship, your Honor,

7   particularly in light of the hole from which they begin,

8   is insufficient.  And that hole again is the whole

9   argument that this court was presented about him being a

10  so-called independent broker.  The relationship test

11  hasn't been met.  Now, Bieter, of course, instructs that

12  we need to take a second step, that once you establish

13  that this relationship justifies invoking the privilege,

14  then you need to apply a multi-part test.  And chief

15  among the factors that *Bieter* considered relevant are

16  two:  Direction and control, and secondly, scope of the

17  representative's duties.  In *Bieter* again, by way of

18  contrast, Klohs received direction from the principal of

19  *Bieter* on a daily basis.  Clearly there was direction and

20  control.  They have not submitted any specific evidence

21  other than a general declaration from Ms. Sabella that

22  says "He had my authority."  That is insufficient

23  evidence to demonstrate the type of direction and

24  control.  Again, this harkens back to the agency law of

41

1   master-servant, and that type of showing has not been

2   made.  Second, in these tests -- and I'm going to only

3   address two, because they're the most important -- is the

4   scope of the representative's duties.  And once again the

5   eighth circuit's words are instructive.  In the words of

6   the eighth circuit, "Klohs's duties were in many respects

7   coterminous with the reason for the client's existence

8   and the scope of the transactions that led to this

9   litigation."  In other words, Klohs was perhaps an alter

10  ego.  He was so intimately involved that he essentially

11  was one and the same.  Here no such showing has been

12  made.  Mr. Lei was here, there and everywhere.  And one

13  day he was an independent broker; another day I guess he

14  was doing something else.  In sum, despite having ample

15  time, our colleagues have failed to put on sufficient

16  evidence.  And more importantly -- and again, I make this

17  invitation, because they could perhaps help themselves by

18  embracing the functional employee test.  And since they

19  seem not to be worried about the consequences of that, I

20  invite them to come out and embrace it instead of taking

21  one step forward two steps back.  And if they do embrace

22  it, then we still need to look at the documents, but it

23  becomes a different type of a analysis.  So in summary I

24  repeat my invitation for the third time that they come

42

1    out and say it, explain his role, concede that there was

2    a master-servant relationship, concede that he was under

3    control, concede that the scope of his duties made him

4    coterminous and functionally the same as Dynamic and Ms.

5    Sabella.    THE COURT:  Mr. Kahn.  MR. KAHN:  Good morning,

6    your Honor.  And I guess I'll start out by saying that

7    that's an invitation I do not believe I have to embrace,

8    accept or whatever other actions I've been invited to do.

9    I think that the question when it comes to this and

10   counsel left out -- many of the factors that were listed

11   by *Bieter* that did not suit his needs, and I believe even

12   those factors that he did point out which he believed

13   suits his needs have been met.  And I think that there's

14   been no masquerading, no putting on masks, no changing

15   masks.  And the I think the Court is well aware as to who

16   Mr. Lei is, because the Court has read many declarations

17   and the Court has heard Mr. Lei's testimony in this

18   courtroom for a number of days in which he defined and

19   explained what it is he does, how he does it, what his

20   compensation is, why he provides additional services to

21   Dynamic or Sabella to keep his face in front of her in

22   order to obtain additional work from her.  I think to

23   start out we need to address the first statement made in

24   this regard by counsel, which is that privileges are

43

1    narrowly construed, because that is not what the cases in

2    the ninth circuit state.  If one looks at the *CB*

3    *Therapeutics* case, which is from the ninth circuit and

4    which embraces *Bieter*, that court says that the courts

5    have taken an expansive view of protected communications

6    between independent contractors and counsel providing

7    information facilitating the obtaining of legal advice.

8    And *Bieter* itself says -- and I think this was totally

9    illustrative of where we need to go here -- is that too

10   narrow a definition of representative of a client will

11   lead to attorneys not being able to confer confidentially

12   with nonemployees.  So I do not have to embrace

13   "employee."  Nonemployees who, due to their relationship

14   with the client, possess the very sort of information

15   that the privilege envisions flowing freely.  Now *Bieter*

16   goes on to list five different factors that the Court

17   says are not conjunctive, they are disjunctive, and

18   there's no requirement that all five factors be met but

19   they're the types of things to look at.  One is the

20   length of the relationship.  Here there has been a long-

21   term relationship between Mr. Lei and the Alcon Group and

22   Dynamic and Sabella going back to, I believe, '97 or '98.

23   Two, the involvement of the independent contractor in

24   transactions and litigation.  Here, as the Court has

44

1    seen, Mr. Lei has been involved in all of the

2    transactions on an intimate basis and has been involved

3    in all of the litigation as demonstrated here today.

4    Next it's direct communication with the client's counsel.

5    Here and as there has been evidence put forward both back

6    during the Bree litigation and again here that Ms.

7    Sabella and Dynamic rely upon Mr. Lei and have directed

8    Mr. Lei to communicate on their behalf with counsel so as

9    to obtain the rendition of legal services and advice and

10   communicate back and forth between counsel on that basis.

11   The next factor, representation by the client that the

12   agent is the authorized representative of the client.

13   That's been shown over and again both in live testimony

14   in this court and in declarations.  The next is counsel's

15   treatment of the agent as a client representative.  The

16   Court has had my declaration and the declaration of Mr.

17   Gruber in the context of the Bree litigation, which

18   demonstrates that we always treated Mr. Lei as being the

19   representative for communications with Dynamic and

20   Sabella.  So all of these factors are present as they

21   were in Bieter.  There is a reference that Mr. Lei -- or

22   that Mr. Klohs in the Bieter case -- that they shared the

23   came office offices and had daily interaction.  Well,

24   there is no requirement of Bieter that you be in this

45

1   office every day and there's no requirement stated, as

2   presented in counsel's papers, that, oh, you must show

3   that 85 percent of the representative's time has to be

4   spent representing the client.  There's nothing in any

5   case law that states that.  And the evidence have been

6   shown before this Court that Mr. Lei and Alcon has spent

7   a substantial amount of time on that basis.  Also it says

8   that there's no showing that Mr. Lei is not knowledgeable

9   or has particular expertise.  Well, Dynamic and Sabella

10  are in the business, at least in part, of making loans,

11  and he certainly has the knowledge and expertise and the

12  detailed knowledge as to the basic facts that went into

13  each and every one of the transactions, of tracking the

14  loans through, working on loan modification and

15  extensions.  I think that every single aspect shows that

16  we fall within what *Bieter* says needs to be shown.  And

17  *Bieter* does not require that we then say, oh, Mr. Lei is

18  therefore an employee.  And the reason why counsel for

19  the trustee wants us to say that is so that he can then

20  say, Well, if that is the case, then none of the loans

21  that Mr. Lei brokered are exempt from usury.  And there

22  is no case law that says that an employee cannot do that,

23  but there's no reason and there's no need to make that

24  admission or embrace a fact that need not be embraced.

46

1    Now, all that being said, yes indeed we do need to look

2    at all of the documents.  And I have made an offer to the

3    trustee, as I indicated in court here July 6th, that 90

4    percent, at least, of the documents which are contained

5    on the privilege log we believe are privileged, but in

6    order to benefit the trustee and benefit the Court and

7    put an end to what has become an extremely burdensome and

8    oppressive amount of discovery that has been propounded,

9    is that we would reveal and produce those documents with

10   the sole condition that the production of those documents

11   would not be argued to constitute an issue waiver and

12   without any restriction against the trustee from

13   asserting that any other documents that are not so

14   produced are not privileged or confidential.  Counsel has

15   declined that offer because he thinks that, well, since I

16   might get everything today, there's no reason to be

17   cooperative, there's no reason to meet and confer in good

18   faith, let's just get past this juncture and move on from

19   there.  I have nothing further really to say on this

20   issue. THE COURT:  Mr. Mojdehi, on this issue?  MR.

21   MOJDEHI:  He got into other issues, your Honor.  But let

22   me start by noting that, first, I did not ask that they

23   concede that he was a functional -- that was an employee.

24   That wasn't my request.  My request was that he concede

47

1   that he was a de facto or a functional employee.  I'd

2   like to restate that question if counsel misheard it.  I

3   think the Court deserves -- THE COURT:  He didn't mishear

4   it.  He does the same thing you do, and that is, spin

5   your statements to assert your straw man. MR. MOJDEHI:

6   Second question.  If he's not a functional employee, how

7   do we square that with Mr. Lei's declaration that he's an

8   independent -- those are his words.  I didn't make that

9   up.  Those are his words, his declaration that was

10  submitted to you.  How can you have, as a matter of

11  logic, independence yet be under direction and control?

12  He doesn't address that.  He needs to. THE COURT:  He's

13  got a tightrope he's got to walk. MR. MOJDEHI:  I

14  understand.  That's why he's got the burden, and that's

15  why he needs to make the detailed factual showing that he

16  hasn't made today despite the fact that he's had ample

17  opportunity -- more than ample opportunity.  *CV*

18  *Therapeutics*, your Honor, involved a case that dealt with

19  a lawyer hiring people.  That's a totally different

20  factual scenario.  And in fact there's good language in

21  *CV* that the privilege shouldn't apply if the independent

22  contractor is involved in business transactions.  That

23  was the ruling.  You know, knowing your Honor is familiar

24  with *Memry*, there's a Lexus cite, even though it's an

48

1    unpublished or not-for-citation case, but that case again

2    goes through and talks about the detailed factual

3    showing.  And again, your Honor, what you heard today was

4    generic.  What you heard today was generic.  Generic

5    statements don't do it.  And it's for good reason.  And

6    one of the reasons for this is because essentially what

7    we want to do with this concept is to essentially say

8    whatever Mr. Lei -- one consequence of this is, whatever

9    Mr. Lei says is an admission.  So if we are going to say

10    that it is an admission against party, then we have this

11    heightened standard, because that is a -- could be a

12    death nail to someone's case.  And that's why we have

13    these rather rigid requirements for client

14    representatives.  They have consequences.  And one of the

15    most significant evidentiary consequences, as I

16    mentioned, is the fact that it works as an admission.

17    And that's why this is not some sort of game over

18    documents.  It's not.  It has far more important

19    implications.  I summarize by saying that today on this

20    record they have not met their burden of proof, and they

21    haven't met their burden of proof because they have not

22    squarely -- and again -- they did it again today -- they

23    have not squarely come out and embraced the concept of

24    "functional employee."  They have not come out and

49

1   squarely embraced or addressed the question of

2   compensation.  In fact really the driver in the *Merriman*

3   case was a finding that the independent contractor there

4   -- or the party involved had a financial interest.  That

5   was what was the deciding and driving force in that

6   decision.  That was what drove that case.  And here the

7   only evidence, your Honor, that you have -- the only

8   evidence -- is Mr. Lei's assertion that he only gets a

9   commission.  So we're led to believe that there's this

10  gentleman out there who works for the Alcon Group, he

11  gets paid a commission, but yet at all times he is acting

12  as an extension of Sabella and Dynamic.  And that may be,

13  but the evidence doesn't say that.  And they need to take

14  the next step if that's what they want -- if that's the

15  position they want to take.  They've had an ample

16  opportunity to, as your Honor has observed.  They do want

17  to walk this tightrope.  But they just can't have it both

18  ways.  THE COURT:  I frankly haven't been aided by the

19  argument.  I'm where I was at the beginning; and that is,

20  I think, what we need to do is have Mr. Kahn's favorite

21  event, an evidentiary hearing, because Mr. Kahn

22  references that the testimony I've heard from Mr. Lei

23  previously -- and I did in fact hear it, but it was in a

24  totally different context.  We were in the context of the

50

1    issue of broker and the question surrounding that and his

2    role there, and it was focused on that.  It was not

3    focused on this question.  And my sensitivity to this

4    question is because, once the cat's out of the bag, the

5    cat's out of the bag, which is always the problem of

6    privilege.  I happen to be of a view similar to that

7    espoused by Mr. Mojdehi, and that is that privilege in

8    the abstract is generally disfavored because it prevents

9    people from getting at the evidence, yet when there is a

10   legitimate privilege to be preserved, then the privilege

11   ought to be invoked and it ought to be sustained.  But in

12   order to do that, I need more facts.  I need more facts

13   that would allow me to conclude whether -- and here's

14   part of my problem that I'm wrestling with, and that is

15   this notion that if Mr. Lei is a functional equivalent of

16   an employee under the *Bieter* rationale for some purposes,

17   is he one for all purposes; and if he's not, then as to

18   each of the documents we have to have an independent

19   determination about whether there's a factual basis to

20   support it, because it's got to show that the context in

21   which it arose was a context that supports those facts

22   that says at that point in time he was acting as an

23   functional equivalent of an employee.  It's not an

24   absolute.  It's not, gee whiz, if you're a functional

51

1    equivalent for some purposes, at all times you then

2    become an employee for purposes of privilege. So we're

3    just going to have to take it step by step. And the

4    question I have is how quickly you can be ready to go,

5    because I'm ready. MR. KAHN: I think I'm ready also.

6    I'm not sure of Ms. Sabella -- I know Ms. Sabella's

7    currently in China. Mr. Lei is obviously here. I have a

8    deposition tomorrow. Next week I have to be in Delaware

9    for a trial Tuesday, Wednesday, Thursday. The following

10   week I have depositions which must go in North Carolina,

11   which will have me out of the office Monday through

12   Thursday. If I can grab my calendar, your Honor. I am

13   free the week of August 13 and August 20 and through the

14   29th. I then have a series of other depositions. So

15   it's pretty much the month of August beginning on the

16   week of August 13. If I may confer with counsel. MR.

17   MOJDEHI: Your Honor, one point. THE COURT: You're on

18   vacation? MR. MOJDEHI: No, no, no. Work always comes

19   first. THE COURT: Boy, there's a mistake. MR. MOJDEHI:

20   Well, made many mistakes, your Honor, along those lines.

21   Continue to do so. We need to take Mr. Lei's deposition

22   and perhaps Ms. Sabella's, and that's why -- before we

23   put him on the witness stand. We don't want to -- we're

24   entitled -- THE COURT: You don't want to fly blind. MR.

52

```
 1    MOJDEHI:  We don't want to fly blind.  And the fact is,

 2    your Honor, I take your ruling today is that they have

 3    not met their evidentiary burden.  And I'm not here

 4    insisting that you rule against them, but the fact is

 5    they haven't met it; and hence, in light of their

 6    failure, they're the ones who need to accommodate the

 7    trustee, not the other way around.  They've had three

 8    months to come up with evidence, and they're come up with

 9    conclusory stuff.  So in light of their failure, we would

10    like to take their depositions and then we can have the

11    hearing.  And we're prepared to take his deposition as

12    soon as we get the documents that we're entitled it to.

13    Ms. Gertz will get into the other documents.  But as soon

14    as we get those, we just need what, three, four days,

15    five days to review them, digest them dissect them, and

16    then we're ready for the interrogation. THE COURT:  Well,

17    I can tell you that I would be inclined to allow a depo

18    of Mr. Lei.  I don't think a depo of Ms. Sabella is going

19    to be that important for purposes of the hearing.  It's

20    really where he is and who he is. MR. KAHN:  I have no

21    problem with that.  What documents does counsel want

22    produced?  MR. MOJDEHI:  I guess, your Honor, may I

23    suggest that we deal with the other issues, the

24    documents, and then come back to the calendar at the end
```

53

1  of this? THE COURT:  We can do that.  But right now I'm

2  going to take about ten minutes, give my staff a chance

3  to stretch and all that kind of stuff, and then we'll

4  come back.  (Brief recess.)MR. KAHN:  If I may, your

5  Honor, before me move on to the next topic.  I've been

6  attempting to meet and confer in this matter, and I think

7  that as to -- and as I said to the Court and said to the

8  counsel and the trustee -- as to the vast majority of the

9  documents -- and we're talking thousands of documents

10  that are presently on the privileged logs -- that we

11  think are inconsequential.  And this is not a cherry-

12  picking situation where I'm precluding them and saying

13  the documents are withheld, we cannot attack the validity

14  of, that we give those up.  This has become a horribly

15  expensive process and a horribly burdensome process.  And

16  I still don't have an answer on that.  Because I think

17  what we're going to be left with is maybe a couple of

18  hundred documents.  And let me point out to the Court

19  that when we spoke yesterday in the meet and confer, Ms.

20  Gertz said, Well, it looks like we solved a lot of the

21  problems on the privileged logs but we still have some

22  problems on them and descriptions, and asked, Well, give

23  me an example.  The response is, Well, if you look at

24  page 5, there's a discussion between two attorneys

54

1   internally at Pachulski Stang re litigation, we need more

2   of a description.  I mean, what more of a description is

3   necessary than two attorneys -- we're not even talking

4   about did somebody break the privilege.  Why do you need

5   more than that?  And there are a number of things on the

6   privilege log which are like that.  There are detailed

7   billings which reflect work product.  I think that once

8   we get rid of a lot of the documents which are truly

9   inconsequentual but truly cost a lot of money to fight

10  over, we're going to be left with much narrower issues.

11  Those documents can then be reviewed by -- not the

12  ultimate decision maker in this case -- somebody

13  appointed by the Court to determine whether there is

14  attorney-client matter we should not have to be produced.

15  And we're solving the problem rather than incurring a lot

16  more expense.  And I think if we go through that process

17  first, we can then determine whether an evidentiary

18  hearing is even necessary as to the documents that

19  remain.  I really think that's the most cost-effective

20  and efficient way of going forward.  THE COURT:  Ms.

21  Gertz or Mr. Mojdehi?  MR. MOJDEHI:  Your Honor, would

22  you like to me address that point or go back to the

23  motion?  THE COURT:  Well, I think we're back to the

24  motion. MS. GERTZ:  Yes, your Honor.  The issue of the

55

1   client representative, although it is quite significant

2   to the determination of whether the balance of the

3   documents on the privilege log would or would not be

4   subject to any claim of privilege, assuming that we would

5   get beyond that threshold determination and assuming that

6   we would determine that either Mr. Lei could not be

7   deemed to be a client representive or there were

8   majority -- certain documents that prove that he was not

9   acting in that role, there are other issues that we have

10  also briefed with respect to privileges.  We have broken

11  it down essentially into three categories.  Number one,

12  determination of the attorney-client privilege; number

13  two, determination of whether there is a, quote unquote,

14  confidential settlement communication, or it appears also

15  that has also been labeled as attorney-client and work

16  product, parenthesis, joint representation privilege --

17  whether that exists; and thirdly, the work product, which

18  I suppose is more a doctrine than privilege, but I will

19  categorize it in as a third category.  With respect to

20  attorney-client privilege, the case law in the ninth

21  circuit is quite clear that there's an eight-factor test

22  that is used, stated most simply, the attorney-client

23  privilege applies where legal advice of any kind is

24  sought from a legal advisor acting in that capacity with

56

1    respect to communications relating to that purpose made

2    in confidence by the client, and these are at the

3    client's instance permanently protected from disclosure

4    by himself or by the legal advisor unless the privilege

5    is waived.  And courts have broken that down into eight

6    independent factors.  We would suggest as another

7    threshold matter that there is serious question as to

8    whether a subject matter -- or as Mr. Kahn has described

9    it, an issue waiver -- has already occurred.  We have, to

10   a certain extent, suggested in our briefings that there

11   have been problems with the production.  I won't go into

12   that in detail now, but I certainly can attest to the

13   fact that there have been serious problems.  Part of the

14   problems surrounding the production has been that there

15   have been multiple recalls of CDs, production sets, so-

16   called technical difficulties which apparently caused

17   misnumbering, caused redactions not to stick.  There were

18   a large amount of documents that were requested to be

19   sequestered, and the examinees indicated that these

20   documents had been inadvertently disclosed.  There is law

21   in the ninth circuit, and we don't intend to argue it

22   now, but it is relevant to the issue of whether there

23   could already be an issue waiver.  With respect to the

24   inadvertent disclosure courts look at the invert

57

1    disclosure, they see if it was due to undue carelessness,

2    they see if there was any gamesmanship involved, and

3    courts have in certain cases in the ninth circuit imposed

4    an issue waiver where there has been inadvertent

5    disclosure.  That issue has not been determined, and for

6    that reason we were uncertain as to whether it would be

7    wise to accept Mr. Kahn's offer that they would produce

8    selected documents, that they would choose the documents

9    that they would produce, and that the trustee in

10   connection with that by agreement would agree not to

11   assert that there had been an issue waiver.  The trustee

12   was also concerned about this offer because of the case

13   law in the ninth circuit that has indicated that,

14   although certainly parties can agree to almost anything

15   by contract, courts as a general rule do not approve of

16   the idea of selective disclosure of privileged

17   information.  The reason for this is it can be used as

18   both a sword and shield.  It would have opened us up to

19   the possibility of examinees cherry picking.  And we are

20   not asserting the fact that this was the intent.  All we

21   are saying is this was our concern, that there could be

22   the fact that favorable documents could be produced

23   whereas the so-called smoking guns would be in those

24   hundred that were not produced.  The trustee would be

58

1   forever barred from saying there had been a subject

2   matter waiver.  For that reason we ask for more time to

3   think about this issue.  But I will say that the concern

4   over an issue or subject matter waiver is present in this

5   case, and I believe it's something that needs to be --

6   with full facts briefed to the court -- needs to be

7   looked at.  There is also a second issue with respect to

8   waiver, and that is the fact that we have reviewed the

9   privilege logs in detail, and apart from the fact that

10  obviously all the communications that are on these

11  privilege logs are communications that went through Mr.

12  Lei's hands, and of course if Mr. Lei is not a client

13  representation, they are ipso facto waived because it

14  went through a third party.  There were other third

15  parties involved in some of these communications.  Mr.

16  Phillips was copied on some of these communications.

17  There were other attorneys at the Gibson Dunn & Crutcher

18  firm that were copied on some of these communications.

19  We presently do not have information in our hands and

20  there hasn't been -- the burden has not been met to show

21  that these were not waivers by disclosure to these

22  particular individuals.  There's another concern that we

23  have, and that is the fact that the case law is very

24  clear that a client cannot simply forward a nonprivileged

59

1    document to an attorney and say, Oh, an attorney client

2    communication, this is now privileged.  The courts simply

3    don't allow that.  We have reviewed the privilege log.

4    We have seen what appears to be fax cover sheets that are

5    forwarding an invoice from Isaac Lei.  I'm not talking

6    about attorney invoices.  I'm talking about invoices

7    being forwarded by Isaac Lei to the attorneys.  These are

8    the sort of documents -- numerous examples of these are

9    showing up on the privilege log.  I harken back to the

10   Court's own words.  I know that it is history, it is a

11   year ago, but when this Court did an in camera review of

12   a substantial portion of the documents which were

13   produced earlier with respect to the earlier evidentiary

14   hearing -- and I will comment by a parenthesis that the

15   so-called production sets volumes I and II, which is

16   approximately 18,000 pages of documents, is jot for jot

17   identical to what was produced -- at least that's our

18   understanding -- with the exception that the privilege

19   logs had been updated subsequently -- with what was

20   produced to the Bree parties in the evidentiary hearing.

21   So a lot of the documents that we are talking about,

22   obviously the ones the Court -- the limited subset that

23   the Court did in camera review, were contained in these

24   initial Document Productions I and II.  But the Court

60

```
 1   took a sampling at that time.  And the Court's words, as
 2   were quoted earlier and have been quoted in our
 3   pleadings, is that the Court could not determine from the
 4   face of the documents that there was a colorable claim of
 5   privilege of the majority of the documents, I believe are
 6   the words that the Court used.  Now, obviously a broader
 7   in camera review would be a very burdensome process, but
 8   I would just comment that, from a sampling that the Court
 9   took earlier, the Court was not finding that a lot of
10   these privilege claims were valid, and we are finding the
11   same thing when we're reviewing even just the privilege
12   logs.  These are questions that arise.  Another thing
13   that we are seeing and that courts have said quite
14   clearly, and it is in the test under United States v.
15   Chevron, that had has to be legal advice, and the way
16   courts have discussed this is you can't make an invoice,
17   you can't make generally a contract, you can't even --
18   courts have even indicated you can't even necessarily
19   make drafts of contracts, you can't cloak those with the
20   attorney-client privilege.  Now, work product may be a
21   different issue, but certainly not the attorney/client
22   privilege, because it has to relate to legal advice, and
23   courts have deemed that to be business advice in most
24   cases.  Secondly, I will turn to the issue of the work
```

61

1    product doctrine.  The test is really quite simple under

2    the federal rules.  To be eligible for the work product

3    doctrine, materials must be prepared -- and here are the

4    key words -- in anticipation of litigation or for trial

5    by or for a party, and courts in the ninth circuit have

6    been quite clear that it has to be a party in that same

7    action -- materials that -- courts have held that

8    materials that merely prove to be of value later to

9    litigation do not qualify.  As such we cannot see that

10   there is any valid claim for work product protection,

11   because quite frankly we can't see that they were

12   prepared for litigation.  It looks, when you see the

13   descriptions, as though these were materials that were

14   prepared with respect to transactions that were occurring

15   at that time.  Furthermore, even assuming that the work

16   product doctrine could be demonstrated to apply in this

17   case, where it's not a party to this action, there is

18   this case -- let's say that way -- nor were they prepared

19   in anticipation of litigation, it's also a very limited

20   doctrine.  The federal rules provide that if the party

21   that is requiring production has a, quote, substantial

22   need that the work product privilege will yield -- and I

23   would suggest that Mr. Lei's role in this case is so

24   substantial and the documents that he has are so key to

62

1    the trustee's understanding of the assets of the estate,

2    that I would suggest that even if the work product

3    doctrine were to be demonstrated, that this is a primary

4    case where that should be found to yield.  The third

5    category, confidential settlement communications with

6    Phillips.  In our view this is -- it's the law of the

7    case that there is no such privilege.  And we do not see

8    that there is any distinction that has been drawn between

9    what was previously labeled as a confidential settlement

10   communication and for now the same communications now

11   being labeled attorney/client and work product, paren,

12   joint representation.  It appears as though what they're

13   trying to assert is the joint representation common

14   interest doctrine, but the courts are clear that there

15   has to be a burden met in order to demonstrate this would

16   apply as well.  This burden has not been met.  There has

17   been no evidence of an agreement.  There has been no

18   evidence that the parties understood that they were

19   operating under a joint representation doctrine and no

20   waiver would apply.  And I would suggest that, until the

21   examinees are able to put on that sort of evidence, that

22   there is no question that this would not apply.  I will

23   now turn to the separate issue of relevancy.  Relevancy

24   generally can be separated out into two major categories.

63

1    Number one, what was referred to as Exhibit 53 at the

2    time of the evidentiary hearing.  Exhibit 53 was

3    essentially a listing of Alcon Group's what I'm not going

4    to call income I'm going to call receipts, or maybe even

5    a better word for it is transactions, because if you look

6    at Exhibit 53, the trustee's counsel is unable to

7    determine as to whether these were actual receipts,

8    whether they were pass-through payments or exactly what

9    was going on from the evidence that's been produced.  But

10   the question with respect to this is that whether the

11   evidence that was produced at the time of the evidentiary

12   hearing in 2006 as Exhibit 53 is sufficient or whether

13   that should be updated.  We strongly argue that it does

14   need to be updated, particularly not only with respect to

15   the general substantive merit of the claims that the

16   trustee is investigating with respect to the property of

17   the estate, but it also is of direct substantive and

18   factual value with respect to the client representative

19   concept, because indeed this information is directly

20   relevant to what Mr. Lei was doing for Dynamic versus

21   what he was doing for other entities, also what he was

22   doing for Dynamic with respect to the other entities

23   outside of North Plaza.  So it gives a very good picture

24   of who Mr. Lei is, who Alcon Group is, what kind of

64

1    compensation they are receiving, from whom, and under

2    what circumstances.  We are certainly not asking Mr. Lei

3    or Alcon Group to produce confidential financially

4    private information, and certainly information of that

5    sort we can either arrange to have a protective order

6    drawn up or there can be some agreed form of redaction.

7    We're not asking to invade his privacy.  On the other

8    hand, the information is relevant to both the substantive

9    issue of usury as well as to the issue of whether Mr. Lei

10   in fact can demonstrate the client representative theory,

11   because it appears as though Mr. Lei and Alcon Group

12   again seem to be a gestalt concept, may it be, because it

13   appears as though the income was generally routed through

14   Alcon Group and not through Mr. Lei.  At least that is

15   our understanding from the evidence.  There is a second

16   category, and that is the category of the post-2002 Vail

17   Lake, quote unquote, membership buyout.  And we would

18   simply submit on our papers with this respect.  It is

19   well detailed in our reply with respect to the motion to

20   compel, pages 7 thru 12, where we bring forth just the

21   very foundational issues that we are coming up with with

22   respect to the theory that the Vail Lake asset was indeed

23   sold.  We believe there's serious question about that,

24   and as a result the logical inference is this may still

65

1  be property of the estate.  What we need to know is what

2  is going on with that property of the estate -- or

3  probable property of the estate.  We believe it's also

4  relevant what the communications are currently now with

5  respect to what we understand are proposed settlements

6  between Mr. Johnson and Sabella and Dynamic with respect

7  to this transaction.  We are still sorting out the

8  details of this transaction.  We're still sorting out Mr.

9  Johnson's role in this transaction and the issues with

10  respect to the other Vail Lake entities.  I think that

11  our papers have detailed it in a fair amount of depth

12  that North Plaza was not hermetically sealed from the

13  rest of the entities.  It's quite clear from the evidence

14  that North Plaza was not hermetically sealed.  In fact to

15  certain extent, one could say that the entities were

16  looked at as one entity.  For that reason we believe that

17  it is extraordinarily relevant that the trustee be

18  permitted to receive this discovery, number one, with

19  respect to the Vail Lake entity itself after the

20  purported buyout, and number two, also with respect to

21  the other Vail Lake entities with which North Plaza was

22  substantially intertangled.  Thank you, your Honor. THE

23  COURT:  Mr. Kahn. MR. KAHN:  Thank you, your Honor.

24  Turning first to the attorney/client privilege and the

66

1    explication by Ms. Gertz as to why they have concerns

2    regarding the offer that I made.  Now that I have a

3    better concept of what their concern is, I think that I

4    can meet that.  As I understand it the concern is that if

5    I produce documents which we believe to be privileged,

6    just to move this process along, and want as the sole

7    condition being that that production itself will not

8    constitute or be argued to be a subject matter or issue

9    waiver, I understand the trustee's concern to be that,

10   because of some inadvertent disclosers which occurred

11   during the discovery process, that entering into that

12   agreement would somehow wave their right to raise that

13   issue as to the inadvertent disclosers, and I can say

14   that we will carve that out. THE COURT:    That's a

15   separate ballpark, separate arena. MR. KAHN:    Right.  And

16   they can still take that position.  But I have something

17   to say about that, and it's something that caused me

18   grave concern.  One of the first set of documents that we

19   did produce -- and this goes back to March -- was in fact

20   what we call the Bree production, which included

21   documents from a variety of sources.  There was Dynamic,

22   there was Alcon, there was our firm.  There were certain

23   in number of documents that were on the privileged log

24   and -- coming from the Dynamic database as it were, and

67

1    those were, including the very first documents on the

2    privilege log would be D-Y-N, for Dynamic, 001 to 004 are

3    on the privilege log.  And this goes back to March of

4    this year.  Inadvertently those same documents were

5    produced.  We did not discover it until May.  And we've

6    heard about all of the diligence that counsel for the

7    trustee has undertaken going through the privilege logs,

8    comparing them to the documents.  They had known since

9    March that we claim something as being privileged on the

10   privilege log and also inadvertently produced it, and

11   they said nothing and in fact said nothing to this day.

12   But we can't agree that we -- that it will carve out that

13   issue for the trustee and that if they want to assert the

14   waiver of privilege on the grounds of inadvertent

15   production, then so be it, and we'll address that issue

16   when it arises.  Now, they also state that on the

17   privileged log there are items that show that not only

18   were communications shared with Mr. Lei, but they were

19   also shared with Gibson Dunn, which counsel knows was

20   also an attorney for Dynamic and Mr. Phillips.  As those

21   assertion of privilege relate to Mr. Phillips, it is

22   undisputed that at certain points in time Mr. Phillips

23   represented both entities that Mr. Johnson was involved

24   in and also Dynamic in litigation.  One had to do with

68

1    what was called the Orchard property.  There was some

2    environmental group that sued everybody, and Mr. Phillips

3    represented both of them.  Another one is called the

4    Sundance litigation.  It has to do with water rights on

5    one of the Vail Lake properties.  He represented both of

6    them.  And we spoke with Mr. Phillips and asked him what

7    were the time periods of that representation.  He

8    provided us with those time periods.  I owe those dates

9    to counsel.  We discussed that yesterday, and I will get

10   it to counsel.  But those are the documents that we

11   marked as attorney/client privilege as to him.  The other

12   issues Ms. Gertz raised, which is the mere forwarding of

13   documents of what would be business advice, again my

14   offer is to produce all of that stuff that they have

15   those concerns on that are not otherwise so clearly and

16   unequivocally within the rendering of exactly advice.  I

17   have no problem with that on the condition that I provide

18   it.  Turning to work product, the question is, you know,

19   certainly that there are materials prepared in

20   anticipation of litigation.  Trustee's position been,

21   Well, there is no litigation going on, but, you know,

22   there was.  There was a lost litigation going on with the

23   Brees.  There was a lot of preparation of exhibits,

24   honing exhibits down, making sure that the information

69

1    being present to the Court would be accurate, and those

2    are within the attorney client or -- and work product

3    privileges, and that's why there is the assertion of that

4    exclusion from discovery as to that.  Turning to what is

5    now a moribund classification of confidential settlement

6    negotiations.  I am very well aware that the Court ruled

7    that there was no such carve-out from discovery, and we

8    removed that designation.  Unfortunately in the very

9    first privilege log there's a vestige, as we have tales

10   when we're embryos, and when it was called to our

11   attention, we removed them.  However, contrary to what

12   Ms. Gertz has said, those settlement negotiations are the

13   ones that have to do with the disputes between Dynamic

14   and Sabella and Johnson over what we've called the

15   membership interest that have not resulted in the

16   settlement as of this date, and so we moved those out of

17   the category of confidential settlement negotiations into

18   what we call the irrelevant matter or beyond-the-scope

19   matter having to do with North Plaza post January 2001,

20   which is something that I'll address momentarily.  When

21   we turn to relevancy, the first issue that Ms. Gertz

22   raises is that there should be an update to Exhibit 53.

23   And if the Court does not recall, Exhibit 53 is the list

24   by the year and a list by client of Alcon of what was

70

1   earned by Alcon for services rendered to Dynamic,

2   Sabella, and various other entities for which Alcon has

3   done work, going back from 1989 through the then current

4   date of the Bree litigation in April of 2006.  And we did

5   update that through this year.  It was a easy process to

6   do.  It's just putting in what did you earn in the last

7   year, where did it come from, and we added that on in.

8   That apparently is not good enough for counsel, but we

9   can try and work on that meet and confer.  But what we're

10  looking at now in terms of relevancy and as I set forth

11  in my opposition is this, is that the Court ordered that

12  we produce all documents in the context of the Bree

13  litigation, showing Mr. Lei's activities with Dynamic and

14  Sabella, going back from the very first transaction in

15  the late nineties through what was then the present in

16  2006.  And the Court heard substantial testimony, as the

17  Court again noted today, as to what those activities

18  were, how involved was he, what did he do and that sort

19  of thing.  What they now want is, okay, update that from

20  the beginning of 2006 to the present.  We're talking

21  about, your Honor, a large volume of documents; it's over

22  10,000.  I can't give you better number than that.  But

23  these would also be documents which would have to be

24  heavily redacted because they would deal with

71

1    transactions both on behalf -- by Alcon on behalf of

2    Dynamic and Sabella on behalf of other entities which

3    would contain personal financial information regarding

4    the buyers, their identities, and by law we have to

5    redact that information.  Redaction is extremely

6    expensive.  And we have offered -- again, we made an

7    offer to the trustee that we will stipulate that Mr.

8    Lei's activities over the last year are the same types of

9    activities for all the eight years that there's already

10   been a substantial amount of evidence.  We're now getting

11   four or five years remote from the last transaction

12   that's at issue here, and the probative value of an

13   additional year's information we believe is outweighed by

14   the burden of producing that.  Finally, there's the issue

15   of Vail Lake after the date that the -- that North

16   Plaza's interest from all of the documents that are

17   available are shown to have terminated.  And what

18   counsel's looking for is any piece of paper that has

19   anything to do with that entity from the termination of

20   that interest to the present.  All documents up to that

21   date have been produced.  It's just after that date.  And

22   so that's why we made a point of it, because the

23   assertion that North Plaza still holds an interest in any

24   of the Vail Lake entities was first raised by the trustee

72

1    two months after they served the subpoenas and said,

2    Well, what we meant by produce documents while North

3    Plaza had an interest -- what we really meant is through

4    today, and you should have known that.  Well, I didn't

5    know that.  Nobody knew that until the trustee raised it.

6    And the trustee, you know, has these theories, and the

7    trustee cites a need for the documents so as to promote

8    and prosecute those theories, but I think we have to look

9    at the reply brief of the trustee where he states what it

10   is that he needs to prove or wants information on to

11   prove up his case.  And that's contained in the reply

12   brief at pages 10 thru 15.  One is that the calculation

13   of North Plaza's membership interest in Vail Lake may

14   have been greater than 20 percent.  Okay.  Maybe it's in

15   a different amount.  But those documents that would

16   reflect why or if it should be in a different amount

17   would be prior to the date that North Plaza's interest

18   appears to have been relinquished.  Second, there are

19   disputed facts regarding the transaction whereby it

20   terminated its interest, whether it's approved by the

21   various members of North Plaza, whether it was actually

22   completed, and whether it was a fraudulent transfer.

23   Again, those facts would be in documents that go through

24   the date of that termination, not a document regarding a

73

1    conversation last week.  Next is that there may have been

2    breaches of fiduciary duty with respect to the

3    transaction which would form the basis for a cause of

4    action I imagine against Mr. Johnson or one his other

5    entities.  If there was a breach of fiduciary duty, it

6    occurred at the time of that transaction, not in 2004,

7    2006 or 2007.  And the final claim that the trustee wants

8    to investigate for possible prosecution is whether there

9    is a right to rescission.  Again, if there's a right to

10   rescission, it is something that occurred at the time of

11   the transaction, not something that's occurring in 2002,

12   2004 or today.  Thank you, your Honor. THE COURT:  Ms.

13   Gertz, MS. GERTZ:  Yes, your Honor.  Actually I'd like to

14   take this in reverse order.  I think I'd like to address

15   the Vail Lake question first.  Mr. Kahn suggests that

16   this was raised, quote unquote, late, that they had no

17   way of knowing that we would ever suggest that the Vail

18   Lake USA interest could be still retained by the estate.

19   The exact language of the Request For Production No. 41,

20   which is the request for production that relates to Vail

21   Lake, says as follows.  Quote, documents that refer or

22   relate to any property or other membership or financial

23   interest, whether past, present, or future, by North

24   Plaza in or to Vail Lake USA or of the property of Vail

74

1    Lake USA.  Now, granted we didn't put it in flashing red

2    letters, we didn't bold face it, but it was there.  And

3    we would expect counsel in representing their client to

4    read a request for production thoroughly, look at all the

5    requests, and to see what's being asked.  Clearly we were

6    suggesting that there could be a present interest by the

7    estate in Vail Lake USA.  Furthermore, the so-called

8    membership interest settlement that Mr. Kahn alludes to,

9    we're informed and believe that that relates to the same

10   series of transactions that occurred in 2002 with respect

11   to the buyout of the membership interest in Vail Lake

12   USA, whether it be by, Suprunuk, whether it be by the

13   purported buyout of North Plaza or whether it be by

14   anyone else.  Furthermore, the buyout itself was supposed

15   to have been by Shining City.  Shining City of course is

16   one of the controlling members of North Plaza, LLC.

17   Shining City was the one theoretically using other

18   people's money, that, quote unquote, bought out the

19   interests of North Plaza, LLC.  That itself raises a lot

20   of issues.  To borrow from evidentiary law, if there is

21   an accident that occurs, yes, maybe there are facts

22   preceding the accident and immediately following the

23   accident, but under evidentiary principles one is able to

24   obtain discovery with respect to remediation efforts.

75

1    This can be analogized to that.  Frankly the trustee

2    would like to have discovery of some of the current

3    discussions between Shining City and Ms. Sabella with

4    respect to the circumstances of this membership buyout

5    which are occurring today.  To turn back to the issue of

6    the Exhibit 53, and actually this point is equally

7    applicable to the Vail Lake post-2002 information.  I

8    normally don't like to try to bring procedural issues as

9    the major focus, and that is why I mention it only as a

10   secondary issue, but frankly the only two timely

11   objections that were received -- and of course Mr. Kahn

12   can say that he was surprised at the fact that we would

13   be asking for information with respect to Vail Lake USA.

14   Well, I think that's a question of fact.  But the only

15   specific objections that were made within the time frame

16   of rule 45 were two.  Number one, they indicated that our

17   request for information and documents that refer or

18   relate to any office where your -- "your" is defined as

19   both Isaac Lei and Alcon Group -- real estate license is

20   displayed and where personal consultations where held.

21   They objected on the basis that this request was, quote,

22   vague and ambiguous and unintelligible.  The trustee

23   responded that this was a direct quote from division 4,

24   part 1, chapter 3, article 2 of the California Business

76

1 and Professions Code regulating the conduct of licensed

2 real estate brokers and such should not be vague,

3 ambiguous or unintelligible to Mr. Lei.  Secondly, the

4 other objection was with respect to Request For

5 Production No. 35 for information and documents that

6 refer or relate to your -- as in Isaac Lei or Alcon

7 Group's -- employment on behalf of Dynamic or on behalf

8 of Sabella, which was contained in Request For Production

9 No. 36.  After having an opportunity -- and it took us a

10 couple weeks to review the voluminous privilege logs --

11 we responded to the effect that the word "employee"

12 should be deemed to include the concept of, quote

13 unquote, functional equivalent of an employee, and we

14 indicated that the term "functional equivalent" was a

15 direct quote from the applicable case law construing the

16 client representative theory which Lei had already

17 asserted.  Nonetheless, the objection indicated that none

18 -- quote -- none of the examinees were employees of

19 Dynamic and would therefore have nothing to produce, also

20 that the request was over-broad, burdensome and

21 oppressive as not reasonably calculated to lead to the

22 discovery of relevant matter, assuming that it was deemed

23 to include any and all actions ever undertaken on behalf

24 of Dynamic beyond those actions subject to the categories

77

1   in the request for production related to North Plaza.

2   Those were the only objections.          It wasn't until we

3   actually received later correspondence -- and it was then

4   of course officially asserted in the objection to the

5   motion to compel -- that these two other issues came up

6   with respect to Exhibit 53 and with respect to the post-

7   2002 Vail Lake transaction.  I would suggest that these

8   objections are simply not timely, even getting past the

9   fact that we quite frankly feel that they're not valid.

10  Turning to the issue of the attorney/client privilege,

11  the privilege logs that Mr. Kahn refers to that we should

12  have, quote unquote, known that documents were produced

13  that had been privileged.  Mr. Kahn knows that the

14  privilege logs have been inaccurate.  He has -- the

15  examinees have admitted that they were inaccurate.  Quite

16  frankly they have been incomprehensible, because many of

17  the documents that were produced by this Court's order

18  were still contained on that privilege log.  We were the

19  ones pointed that out to them.  It has not only been

20  until very, very recently that those privilege logs have

21  been updated.  So for Mr. Kahn to suggest that we should

22  have known that there was something out there -- quite

23  frankly in the documents that we have reviewed, we have

24  not been able to discern anything that would have been

78

1   subject to a form of privilege, assuming that it had been

2   inadvertently produced.  For Mr. Kahn to suggest that we

3   withheld -- that we knew that this information was

4   privileged and we withheld this information to them, it

5   simply is not true.  Now, for Mr. Kahn to suggest that

6   Mr. Phillips was a subject to the joint defense

7   privilege, it raises an interesting point because of the

8   fact that the joint defense privilege relies on an

9   agreement and it relies on knowledge by these parties

10  that they are subject to this joint defense privilege.

11  We'd like to know then why -- originally this was

12  asserted as a confidential settlement communication

13  privilege, and it wasn't until -- oh, excuse me -- months

14  later that suddenly then this was changed when it was

15  realized that the confidential settlement communications

16  would not exist.  Then suddenly the joint defense common

17  interest privilege is asserted.  If indeed there was such

18  an agreement, why wasn't it asserted at the very

19  beginning?  With respect to work product, Mr. Kahn does

20  not suggest -- I did not hear him state -- that any of

21  the information on the privilege logs that is branded as

22  work product, particularly those documents which are on

23  the -- are branded as work product which predate even the

24  filing of this case -- how those could be subject to the

79
1   work product privilege when it has to be prepared in
2   anticipation of litigation.  What I actually heard from
3   Mr. Kahn with respect to his offer is in truth 90 percent
4   of the documents that are on that privilege log frankly
5   aren't privileged.  They're happy to give that up because
6   it's inconsequential.  As the cost of that they want the
7   trustee to prospectively -- and we understand that there
8   could be a carve-out for retroactive waiver concerns, but
9   the trustee's also concerned about prospective --
10  prospectively abandoning the right to assert an issue
11  waiver.  The reason is the very fact that courts state,
12  and that is the fact that documents are selectively
13  disclosed, the so-called smoking guns are not disclosed,
14  the best evidence is presented, and then the party who is
15  attempting to discover this information -- usually their
16  ability then is to go in and say, Wait a minute.  I need
17  everything.  I don't want you to just show me the best
18  stuff.  I need everything.  And we want to be able to
19  preserve that right in case the need arises, and that is
20  why we did not decline Mr. Kahn's offer, but we did not
21  want to be pushed into it in a manner where we would not
22  have sufficient time to consider all the angles and
23  whether it really was wise and whether it really would be
24  of benefit to the estate to agree to such a thing.  We

80

1    understand that it is burdensome to have an in camera

2    review of documents.  We are hopeful that we will be able

3    to go through the privilege log and be able to resolve in

4    a meet and confer with Mr. Kahn and with respect to

5    examinees that in truth most of these documents are not

6    subject to any form of privilege.  That being said, we

7    are not, at least at this time, comfortable with

8    abandoning our right to -- and have them disclose

9    selected documents and then not be able to assert the

10   fact that the rest of them, even the smoking guns, should

11   be disclosed based on an issue waiver.  Thank you.THE

12   COURT:  All right.  Well, first off, I may be missing

13   something, but I don't frankly see the concern -- in

14   terms of how Mr. Kahn's proposal has been made, the

15   concerns that a trustee should have in that context.  It

16   seems to me that what he's saying -- and I disagree with

17   your characterization, Ms. Gertz.  He did not say they

18   weren't privileged.  What he said was, We think they're

19   totally irrelevant, nonconsequential to this, and rather

20   than fight over the privilege for these 90 percent or

21   however many documents it is, he's saying, We're so

22   confident that you'll take a look at them and realize

23   that they're irrelevant and  nonconsequential that

24   neither of us will have to fight over them, but if you

81

1    see one that's consequential and you want to fight over

2    it, we'll fight over it; and for the ones where we think

3    it really is consequential, all we want is for you to say

4    is that, as to these documents we produced to allow you

5    to look at, without having gone through the time and

6    expense of fighting over, you won't come back and say we

7    therefore waive the whole issue because we've produced

8    this document.  You know, you want to fight -- and

9    therefore we have to turn over the 10 percent because

10   we've done this issue waiver or something like that.  All

11   he's saying.  And I frankly -- as I say, maybe I'm

12   missing something, but I don't see why that's a trap of

13   some kind for the trustee.  It seems it me it's a way to

14   expedite the process of reducing the number of documents

15   that wind up being the focus of dispute.  We'll get

16   there.  Okay.  But the trustee has to decide what to do

17   in that regard, but it seems to me that that seems like a

18   proposal that -- and again I may be missing something,

19   but --MR. MOJDEHI:  Could I just, your Honor --THE COURT:

20   No, no.  MR. MOJDEHI:  I just had a question. THE COURT:

21   No.  You can talk to him afterwards about your question.

22   Second, the Alcon work list, Exhibit 53, has, according

23   to Mr. Kahn, been updated in a summary portion form.  The

24   trustee wants more particulars as to that.  I am

82

1   concerned given where we are -- and I'm talking '06 to

2   now, the last year -- I really question the relevance of

3   that in this context given the amount there is.  I have

4   no problem with going back for other events and saying,

5   Give us more information with respect to this transaction

6   or that transaction, but I don't think the last year is

7   going to be probative for whether Mr. Lei's role was

8   broker.  It's an event that could easily have changed in

9   the meantime, and I'm not going to require at this time

10  the production of the backup documents, if you will, for

11  the entries made on the update to 53 for 2006 forward to

12  be produced at this time because I do think that the

13  burden of particularly redacting those is -- does

14  outweigh the benefits to the discovery.  Vail Lake since

15  2002 -- I think that information does need to be

16  produced.  I am concerned about what if anything is

17  there, and the trustee's entitled to find that out, and I

18  do think that it's quite possible that if there's some

19  residual interest that in fact North Plaza has in Vail

20  Lake, or if there's something else, I do think that the

21  breach of fiduciary duty issue is associated with

22  documents that would have been up to the 2002.  But in

23  terms of whether North Plaza has some kind of interest

24  that exists after the supposed events in 2002, whether it

83

1    was actually terminated, whether it was only partially

2    terminated or whether it wasn't terminated at all is

3    something that's likely to appear in documents that come

4    up after that.  The right to rescission might be for some

5    window of time after 2002 based upon whatever

6    representations were made that resulted in the

7    transaction in 2002, I don't see how it's likely to occur

8    after 2004, so I would put a cap on the discovery as to

9    that up to January 1 of 2004 at this point in time.  I

10   recognize that Request No. 41 did ask for past, present

11   and future, and it was there.  It was always there,

12   unlike 26 and 27, which was specifically time dated.  The

13   general scope of discovery -- I've alluded to it already

14   earlier this morning, but I'll repeat.  The discovery in

15   the Bree litigation that I allowed and undertook was

16   targeted; it was to try and give us a zone of information

17   that would, while not exhaustive, give me enough

18   confidence perhaps that we were in a position to approve

19   the proposed settlements.  That was the context in which

20   that came up.  There was not a full-blown 2004

21   investigation by a trustee or some other party in

22   interest to the proceeding.  My view is -- and I realize

23   and am concerned about both time and cost associated with

24   the discovery in this case, but at the same time, as I

84

1   have indicated in writing as well as orally, I had some

2   real concerns about what was really happening with

3   Dynamic, Ms. Sabella, the relationship with Mr. Johnson,

4   and why things were happening as they were happening, why

5   proposals were being made to settle on the terms on which

6   they were being made to settle, and I don't know whether

7   that is some kind of collusion with Johnson, Sabella and

8   Dynamic or it's Johnson because of his interest in other

9   things and Sabella and Dynamic are innocent, but we've

10  got to find out.  I've got to find out.  To the extent

11  the trustee thinks he has to know and to the extent he

12  can show me in the face of an objection how it appears to

13  be relevant, I'm inclined to allow that discovery subject

14  to any appropriate protective orders either limiting

15  range, scope, et cetera.  So that's the general context.

16  I think you need to get together and figure out how to

17  deal with the 90 percent of the documents, whatever that

18  is, and see if we can get some of those out of the way.

19  I see more clearly now than I did just from reading the

20  papers the functional equivalent employee status of Lei

21  in terms of its impact on a range, and I think we really

22  have to get that resolved.  You guys will agree on a date

23  for doing Mr. Lei's depo, and once that's done, let us

24  know and we'll set it for hearing as quickly as we can,

85

1    because I want to get us past that point so we're there.

2    Does that give you any guidance?  MR. MOJDEHI:  Yes, your

3    Honor.  That's helpful.  Forgive me for asking this, but

4    I just want to get clarity.  With respect to their offer

5    to produce what they characterize as inconsequential

6    documents, are they also suggesting they will not

7    themselves rely on those documents since they are

8    inconsequential?  Is that part of the package too?  THE

9    COURT:  Well, you can work that out with whatever terms

10   of any stip you want.  What they're saying is, You've

11   asked for these documents, we've identified them out of

12   abundance of caution on the privilege log, et cetera, but

13   we believe that they're of no moment of consequence to

14   anything you're looking at with respect to North Plaza;

15   and moreover we're willing to allow you to take a look at

16   them to see whether that's so.  That's what they're

17   saying.  And you can look at them, and that's it. MR.

18   KAHN:  And they can use it for any purpose as long as

19   there's no issue waiver asserted by reason of that

20   production. THE COURT:  And, you know, with this

21   explication on the record, I think I'm in a position to

22   protect both of you if you decide to enter into this kind

23   of an agreement, you know, when it came time for a

24   hearing or some kind of argument or whatever.  It's your

86

1    decision to make as between the two of you, but unless

2    I'm missing something, it looks like a good approach for

3    part of it and just narrows the fight. MR. MOJDEHI:

4    Thank you very much.  I appreciate the Court's time. MR.

5    KAHN:  Thank you, your Honor. THE COURT:  All right.

6    Anything else we need to talk about this afternoon now?

7    Mr. Kahn, I shouldn't have asked. MR. KAHN:  I know how

8    much the reporter and the clerk would like a break.  Just

9    a clarification. THE COURT:  Ah, that euphemism. MR.

10   KAHN:  It's that as to what we call Vail Lake post the

11   termination of -- or the apparent termination of the

12   interest that documents could be produced through January

13   1, 2004? THE COURT:  Up to January 1. MR. KAHN:  Thank

14   you.  See, that didn't take very long.  MR. MOJDEHI:  And

15   I, your Honor, listened to your words carefully, and

16   obviously we'll get the transcript but, you know, you

17   indicated that "at this time."          THE COURT:  Oh,

18   yeah.  If I can be shown something where there looks like

19   there's something that will take us somewhere, but at

20   this point in time I don't see a reason to go past that

21   point.  It's based on what I have in front of me at this

22   time.  If you come up with some other information, we can

23   certainly revisit the issue.  We're in recess.  Let us

87

1    know as soon as you need a hearing, and we'll be

2    available.

3                          --- oOo ---

4    STATE OF CALIFORNIA

5    COUNTY OF SAN DIEGO

6

7                    I, PATRICIA A. CALLIHAN, COURT

8    REPORTER, DO HEREBY CERTIFY:

9                        THAT I REPORTED IN SHORTHAND THE

10   PROCEEDINGS HELD IN THE FOREGOING CAUSE ON THE 25TH DAY OF

11   JULY, 2007; THAT MY NOTES WERE LATER TRANSCRIBED INTO

12   TYPEWRITING UNDER MY DIRECTION; AND THAT THE FOREGOING

13   TRANSCRIPT CONTAINS A CORRECT STATEMENT OF THE

14   PROCEEDINGS.

15                           .

16                      DATED THIS 28TH DAY OF AUGUST, 2007.

17

18                    _____

19                      PATRICIA A. CALLIHAN

20                      COURT REPORTER

21

22

23

24

88

1

EXHIBIT 8

1   Richard M. Pachulski, Esq. (CA Bar No. 90073)
    Stanley E. Goldich (CA Bar No. 92659)
2   Steven J. Kahn (CA Bar No. 76933)
    Pachulski Stang Ziehl Young Jones
3   & Weintraub LLP
    10100 Santa Monica Blvd., 11th Floor
4   Los Angeles, California 90067-4100
    Telephone: 310/277-6910
5   Fax: 310/201-0760

6   Attorneys for Examinee Isaac Lei and
    The Alcon Group, and Privilege Holders Angela C. Sabella
7   and Dynamic Finance Corporation

FILED KD

07 AUG 23 PM 3: 28

CLERK
U S BANKRUPTCY CT.
SO. DIST OF CALIF

8

9           UNITED STATES BANKRUPTCY COURT

10          SOUTHERN DISTRICT OF CALIFORNIA     VIA FAX

11   In Re:                              Case No.: 04-00769-PB11

12   NORTH PLAZA LLC,

13                                     Chapter 11

14                                     **OBJECTION TO [PROPOSED]**
                                       **ORDER REGARDING MOTION OF**
15                              Debtor.    **RICHARD M. KIPPERMAN,**
                                       **CHAPTER 11 TRUSTEE TO COMPEL**
16                                     **RESPONSES TO SUBPOENAS FOR**
                                       **DOCUMENTS AND TESTIMONY TO**
17                                     **ISAAC LEI, THE ALCON GROUP**
                                       **AND CUSTODIAN OF RECORDS OF**
18                                     **THE ALCON GROUP UNDER**
                                       **FRCP 45 AND FRBP 9016**
19

20                                     Place:        Courtroom 4
                                    Judge:      Chief Judge, Peter W. Bowie
21

22

23     **TO ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

24        Examinee Isaac Lei objects to a portion of the [Proposed] Order Regarding Motion of

25   Richard M. Kipperman, Chapter 11 Trustee to Compel Responses to Subpoenas for Documents and

26   Testimony to Isaac Lei, The Alcon Group and Custodian of Records of The Alcon Group Under

27   FRCP 45 and FRBP 9016 (the "Proposed Order").

28        In particular, Examinee expressly objects to that portion of Section (i) of the Proposed Order

    which provides,

20298-005\DOCS_LA:171300.1

At least three (3) business days prior to the date of the Deposition, Mr. Isaac Lei shall produce to the Trustee at the offices of Baker & McKenzie LLP, 101 W. Broadway, San Diego, California 92101, all non-privileged documents that are intended to be used by him at the Deposition and would refer or relate to whether he may qualify as a "client representative" of Dynamic Finance Corporation and/or Angela C. Sabella.

This objection is based on the following grounds:

1.      The Court was not requested to order, nor did it order *sua sponte* the production of any documents by Mr. Lei at the taking of his deposition, much less specifically on the issue of whether he qualifies as a client representative for the purposes of the attorney/client privilege.[1] The inclusion of such a provision in the Proposed Order is therefore improper.

2.      The provision is nonsensical. By its very nature, the deposition of Mr. Lei requested by the Trustee at the hearing on July 25, 2007, will not constitute an affirmative presentation by Mr. Lei of his "case in chief" on the issue of whether or not he qualifies as a client representative of Dynamic Finance Corporation and/or Angela Sabella. Nor will Mr. Lei be "using" any documents brought by him to his deposition as Mr. Lei has not been requested, much less ordered, to produce, and will not be producing, any documents thereat. Rather, to the extent the Trustee asks Mr. Lei non-objectionable questions about whichever documents the Trustee decides to introduce as exhibits at the deposition, Mr. Lei will respond to those questions. Until specific questions are asked of him at Deposition, there can be no intent formed as to what documents would "used" by him in response to presently unknown questions. It is not Mr. Lei's duty or obligation as a deponent to review, organize and produce documents in anticipation of what may be asked of him at his deposition.

3.      Counsel for Examinee has advised Trustee's counsel that there are no specific documents which state, in effect, "Isaac Lei, you are our client representative for communications with our counsel."

In point of fact, and as counsel for the Trustee is well aware, prevailing case law on this issue requires a viewing of the "totality of the relationship" between the representative and the client. See

---

[1] Although Mr. Mojdehi stated that he would be prepared to take Mr. Lei's deposition, "as soon as we get the documents that we're entitled to. Ms. Gertz will get into the other documents," he was clearly referring to the categories of documents which were otherwise sought in the Motion (i.e., documents such as those relating to Vail lake USA LLC after 2000 and Mr. Lei's business activities over the last year).

1   *Memry Corp. v. KY. Oil Tech, NV*, 2007 U.S. Dist. LEXIS 3094 (N.D. Cal. Jan. 4, 2007) and *In re*

2   *Bieter, Co.*, 16 F.3d 929, 937 (8th Cir. 1994). Hence, to the extent there is reliance on any documents

3   to establish Mr. Lei's role as a "client representative," such documents would include the totality of

4   the documents produced, and to be produced, relating to his relationship with the clients, consisting

5   of approximately 20,000 pages to date. Since the Trustee is already in possession of those

6   documents, and may utilize them at will, to require Examinee to incur the expense to copy, transport

7   and produce a duplicate set of documents is not warranted.

8       For the reasons set forth hereinabove, it is respectfully requested that the portion of the

9   Proposed Order subject to this objection be stricken prior to the entry of same.

10

11

                              Respectfully submitted,

12

13   Dated:    August 23, 2007            PACHULSKI STANG ZIEHL YOUNG JONES

14                                 & WEINTRAUB LLP

15                             By

16                                 Richard M. Pachulski, Esq. (CA Bar No.

17                                 90073)
                                Stanley E. Goldich (CA Bar No. 92659)

18                                 Steven J. Kahn (CA Bar No. 76933)
                                Attorneys for Isaac Lei, TheAlcon Group,

19                                 Dynamic Finance Corporation and Angela
                                Sabella

20

21

22

23

24

25

26

27

28

# PROOF OF SERVICE

1

2    STATE OF CALIFORNIA )

3    CITY OF LOS ANGELES )

4

5    I, Sherry Ploussard, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa

6    Monica Blvd., 11th Floor, Los Angeles, California 90067-4100.

7    On August 23, 2007, I caused to be served the **OBJECTION TO ORDER REGARDING MOTION OF RICHARD M. KIPPERMAN, CHAPTER 11 TRUSTEE TO COMPEL**

8    **RESPONSES TO SUBPOENAS FOR DOCUMENTS AND TESTIMONY TO ISAAC LEI, THE ALCON GROUP AND CUSTODIAN OF RECORDS OF THE ALCON GROUP**

9    **UNDER FRCP 45 AND FRBP 9016** in this action by placing a true and correct copy of said document(s) in sealed envelopes addressed as follows:

10    *Please see attached Service List*

11

12    ☐ (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S.

13    Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party

14    served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

15    ☐ (BY NOTICE OF ELECTRONIC FILING) I caused to be served the above-described document by means of electronic transmission of the Notice of Electronic Filing through

16    the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

17

18    ☐ (BY FAX) I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and

19    without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

20    ☐ (BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s).

21

22    ☑ (BY OVERNIGHT DELIVERY) By sending by Federal Express to the addressee(s) as indicated on the attached list.

23    I declare that I am employed in the office of a member of the bar of this Court at whose direction was made.

24

25    Executed on August 23, 2007, at Los Angeles, California.

26

27                                        *Sherry Ploussard*
                                          Sherry Ploussard

28

20298-005\DOCS_LA:171300.1                    1

IN HOUSE ATTORNEY SERV.  ☑007

## SERVICE LIST

Tiffany L. Carroll
Office of the United States Trustee
402 West Broadway, Suite 600
San Diego, CA 92101

Counsel for Richard Kipperman
Ali M.M. Mojdehi
Baker & McKenzie LLP
101 West Broadway, 12th Floor
San Diego, CA 92101

20298-005\DOCS_LA:171300.1

1

EXHIBIT 9

1   JEFFER, MANGELS, BUTLER & MARMARO LLP
    John A. Graham (Bar No. 71017), jag@jmbm.com
2   John L. Hosack (Bar No. 42876), jhosack@jmbm.com
    Dan P. Sedor, P.C. (Bar No. 139091), DSedor@jmbm.com
3   1900 Avenue of the Stars, Seventh Floor
    Los Angeles, California 90067-4308
4   Telephone:    (310) 203-8080
    Facsimile:    (310) 203-0567
5
    Attorneys for Secured Creditor DORENE MAE BREE AND
6   SOUTH TEMECULA GATEWAY, LLC

7

8                      UNITED STATES BANKRUPTCY COURT

9                     SOUTHERN DISTRICT OF CALIFORNIA

10

11  In Re                                    CASE NO.    04-00769-PB11

12  NORTH PLAZA, LLC                         Chapter 11

13          Debtor.
                                             NOTICE OF MOTION AND MOTION TO
14                                           COMPEL PRODUCTION OF
                                             DOCUMENTS; MEMORANDUM OF
15                                           POINTS AND AUTHORITIES;
                                             DECLARATION OF ALEXANDER A.
16                                           MYERS

17                                           Date:       [To Be Set]
                                             Time:       [To Be Set]
18                                           Dept.:      Four
                                             Judge:      Honorable Peter W. Bowie
19

20          PLEASE TAKE NOTICE that Secured Creditors Dorene Mae Bree and South

21  Temecula Gateway, LLC (collectively, "Bree") will and hereby do move the Court for an order

22  pursuant to Fed. R. Civ. P. 37(a) compelling Dynamic Finance Corporation ("Dynamic") and

23  Angela C. Sabella ("Sabella") (collectively, "Dynamic/Sabella") to produce documents (1) authored

24  by or disclosed to Isaac Lei, (2) reflecting settlement negotiations, and (3) authored by or disclosed

25  by counsel for Debtor or William Johnson.

26          This Motion is made on the grounds that the documents in question are not subject to

27  any existing privilege and are relevant to these proceedings, and is based upon the attached

28

1    Memorandum of Points and Authorities and Declaration of Alexander A. Myers in support thereof,

2    and such other and further written or oral evidence as may be appropriately before the Court at the

3    time of the hearing on the motion.

4              Bree reserves the right to seek an award of reasonable expenses incurred in the

5    making of this Motion, including attorneys fees, pursuant to Fed. R. Civ. P. 37(a)(4)(A).

6              Counsel have met and conferred telephonically regarding the subject of this Motion

7    pursuant to L.B.R. 7026-2.

8

9    DATED: March 16, 2006            JEFFER, MANGELS, BUTLER & MARMARO LLP
                                      JOHN A. GRAHAM
10                                    JOHN L. HOSACK
                                      DAN P. SEDOR, P.C.
11

12                                    By: _____
13                                         JOHN A. GRAHAM
                                      Attorneys for Secured Creditor DORENE MAE BREE
14                                    AND SOUTH TEMECULA GATEWAY, LLC

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PRINTED ON
RECYCLED PAPER

5882319v1                         - 2 -    Motion to Compel Production of Documents

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2    I.    **INTRODUCTION**

3              On March 3, 2006, and March 6, 2006, respectively, Dynamic/Sabella produced two

4    volumes of privilege logs.  The two volumes contain over 9,000 entries for documents which

5    Dynamic/Sabella withheld as privileged.  Declaration of Alexander A. Myers Exs. ("Myers Decl.")

6    ¶¶ 2-3 & Exhibits A and B.  Many of these documents have been withheld improperly, either

7    because no privilege applies or the privilege has been waived.  Counsel met and conferred on March

8    13, 2006 regarding the entries on the Dynamic/Sabella logs.  Myers Decl. ¶ 7.

9              Dynamic/Sabella withheld 591 documents which were disclosed to or authored by

10    Isaac Lei.  Throughout these proceedings, Dynamic/Sabella have held Lei out to be an independent

11    third party, who maintains a separate business office and acts as an independent broker assisting

12    Sabella and Dynamic in the arranging of loans secured by real property.  For this reason, the

13    disclosure of any privileged material to Lei waives the privilege.  Dynamic/Sabella cannot claim

14    that Lei is an independent party and yet he also belongs within the inner sanctum of confidential

15    communications between Dynamic/Sabella and their counsel.  Accordingly, all documents which

16    were disclosed to Lei must be produced.

17              Dynamic/Sabella have also withheld 785 documents on the sole ground that they are

18    "confidential settlement communications."  No such privilege has been recognized by the Ninth

19    Circuit.  In fact, evidence of the settlement negotiations are particularly relevant to Debtor's motion

20    to approve its settlement with Dynamic/Sabella because the Court must determine whether the

21    settlement was reached through good faith, arm's-length negotiations and not as the product of any

22    favoritism or collusion.  The communications between the parties during the negotiation process are

23    direct evidence, and may be the only evidence, of whether the compromise was reached in good

24    faith and without favoritism.  Although Dynamic/Sabella indicated during the meet and confer

25    process that they were relying on a Sixth Circuit case[1] holding that settlement-related documents are

26    privileged, that case does not apply for two reasons: (1) it is Sixth Circuit law and not controlling;

27    ---
    [1] Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc., 332 F.3d 976 (6th Cir. 2003)

28
PRINTED ON
RECYCLED PAPER

3882499.1                                        - 3 -        Motion to Compel Production of Documents

1  and (2) even if the holding was accepted by this Court, the circumstances and holding of the Sixth

2  Circuit case are totally inapposite to the facts and issues in this proceeding. In this case, the issue to

3  be decided is whether the settlement is fair and in the best interests of the estate, hence the parties

4  conduct in reaching the settlement is critical, relevant evidence. In the Sixth Circuit case, a party to

5  a separate lawsuit sought to depose a party in another lawsuit as to what that party said at a private,

6  confidential court-sanctioned settlement conference. The party seeking the deposition wanted to

7  use the statements made at the settlement conference in the other case to show witness bias and

8  possible inconsistent positions in the other, separate litigation. In this case, the settlement

9  communications bear directly on a factor the Court must consider in determining whether to

10  approve the settlement. Therefore, all documents withheld as "confidential settlement

11  communications" must be produced.

12  Additionally, Dynamic/Sabella withheld 312 documents on attorney-client privilege

13  and work product grounds despite the fact that these documents were disclosed to or authored by

14  Todd Curry, Debtor's attorney, or Fred Phillips, William Johnson's attorney. Debtor and Johnson

15  are third parties and therefore any privileged material shared with them has waived the privilege.

16  Dynamic/Sabella's attorney-client or work product privileges cannot be extended through the "joint

17  defense" or "common interest" to the other lawyers in this proceeding because the Debtor and

18  Dynamic/Sabella are supposed to be at odds with each other, and supposedly reached their

19  settlement by arms-length negotiations. These documents must also be produced.

20  Bree respectfully requests that the Court order Dynamic/Sabella to produce these

21  three categories of documents.

22  **II.    DISCUSSION**

23  **A.    Burden of Proof**

24  Dynamic/Sabella has the burden of proving that a privilege applies to documents

25  they have withheld. See In re Grand Jury Investigation, 974 F.2d 1068, 1070 (9th Cir. 1992) (party

26  asserting privilege has burden of proving that privilege applies to documents or communications).

27  To meet this burden as to the attorney-client privilege, a party must demonstrate that the documents

28  adhere to the essential elements of the privilege: "(1) Where legal advice of any kind is sought (2)

1  from a professional legal adviser in his capacity as such, (3) the communications relating to that

2  purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7)

3  from disclosure by himself or by the legal adviser, (8) unless the protection be waived." Id. at

4  1070-71 & n.2. A party claiming the work-product privilege bears the burden of establishing that

5  documents claimed were prepared in anticipation of litigation. See Kintera, Inc. v. Convio, Inc.,

6  219 F.R.D. 503, 507 (S.D. Cal. 2003). Dynamic/Sabella cannot meet their burden as to the

7  documents which are the subject of this Motion

8       **B.    Dynamic/Sabella Waived Any Privilege as to Documents Disclosed to Isaac Lei**

9            591 entries on Dynamic/Sabella's privilege logs list Isaac Lei as either an author or a

10 recipient. Lei attested that he is "an independent real estate broker employed by The Alcon Group,

11 Inc." Declaration of Isaac Lei in Support of Motion and Motion [sic] for Order: (1) Approving

12 Settlements with Secured Creditors; and (2) Authorizing Payment of Secured Claims [Docket No.

13 310] ("Lei Decl."), ¶ 2. He further stated: "I am not now, nor have I ever been, an employee of

14 Dynamic. . . . [A]ll of my income is generated through Alcon, and neither Angela Sabella (who is

15 the president of Dynamic) nor anyone else associated with her, owns any interest in Alcon." Lei.

16 Decl. ¶ 6. Lei has been very specific about his assertion that he is an independent party, wholly

17 unaffiliated with either Dynamic or Sabella.

18            Voluntary disclosure of privileged attorney-client communications to a third party

19 constitutes waiver. See Clady v. Los Angeles County, 770 F.2d 1421, 1433 (9th Cir. 1985); Weil v.

20 Investment/Indicators, Research and Mgmt., Inc., 647 F.2d 18, 24 (9th Cir. 1981) ("it has been

21 widely held that voluntary disclosure of the content of a privileged attorney communication

22 constitutes waiver of the privilege as to all other such communications on the same subject");

23 Newport Pacific Inc. v. County of San Diego, 200 F.R.D. 628, 633 (S.D. Cal. 2001) (party waives

24 attorney-client privilege by voluntarily disclosing content of communication to third party).

25 Because Lei is an independent third party, any privileged communications disclosed to him by

26 Dynamic/Sabella has waived the privilege. Therefore, the documents must be produced.

27            To the extent that Dynamic/Sabella claim that these documents may be withheld on

28 work product grounds, they have not demonstrated that the documents were prepared in anticipation

1   of litigation. See Fed. R. Civ. P. 26(b)(3). Additionally, communications with Lei is not within the

2   traditional work product privilege which protects an attorney's thought process and strategic

3   preparation from being disclosed to his adversary in litigation. Moreover, the Court has ruled that

4   discovery may be had concerning the nature of Lei's representation of Dynamic/Sabella. Bree has

5   substantial need of this discovery, among other reasons, in order to ascertain whether loans

6   purportedly arranged by Lei were usurious. Although these communications are not really work

7   product, if so, Bree's substantial need of the materials overcomes Dynamic/Sabella's work product

8   claims, if such work product claims can be proven by Dynamic/Sabella's counsel. See id.

9       C.      **Dynamic/Sabella May Not Withhold Documents Reflecting Settlement**

10              **Negotiations Because Those Negotiations Are at Issue in the Settlement Motion**

11              Dynamic/Sabella listed 785 documents in their privilege logs which were withheld

12  on the grounds that they were "confidential settlement negotiations." Parties are entitled to

13  discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party.

14  See Fed. R. Civ. P. 26(b)(1). The Ninth Circuit has not recognized a privilege under Fed. R. Evid.

15  501 regarding "confidential settlement negotiations."

16              The Court has scheduled a three day full evidentiary hearing (April 4-6) for the

17  taking of testimony from witnesses to determine if the Debtor's motion to approve its settlement

18  with Dynamic/Sabella should be approved under the standards applicable to Bankruptcy Rule 9019.

19  The law applicable to approval of settlements pursuant to Fed. R. Bankr. P. 9019, requires to the

20  Court to consider all facts necessary to determine whether the settlement was negotiated in good

21  faith. See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390

22  U.S. 414, 424 (1968); In re A & C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986); In re Pacific

23  Gas & Elec. Co., 304 B.R. 395, 417 (N.D. Cal. 2004) (to approve settlement, court must find that

24  "settlement was negotiated in good faith and is reasonable, fair and equitable"). As the Second

25  Circuit has observed:

26          However, "all" [facts] cannot really mean "all". The Supreme Court could not have

27          intended that, in order to avoid a trial, the judge must in effect conduct one. In order

28          to supplement the thus necessarily limited examination of the settlement's

PRINTED ON
RECYCLED PAPER

388231961

1    substantive terms, attention also has been paid to the negotiating process by which

2    the settlement was reached, and courts have demanded that the compromise be the

3    result of arm's-length negotiations and that plaintiffs' counsel have possessed the

4    experience and ability, and have engaged in the discovery, necessary to effective

5    representation of the class's interests.

6    Weinberger v. Kendrick, 698 F.2d 61, 74 (2d Cir. 1982) (citations omitted).

7    Whether a settlement was the result of arm's-length negotiations and not favoritism

8    or collusion between the parties is a critical factor to be considered by a court faced with a Rule

9    9019 motion. See Matter of Foster Mortgage Corp., 68 F.3d 914, 918 (5th Cir. 1996) ("Another

10   factor bearing on the wisdom of the compromise at hand is the extent to which the settlement is

11   truly the product of arms-length bargaining, and not of fraud or collusion."); Matter of Cajun Elec.

12   Power Coop., Inc., 119 F.3d 349,356 (5th Cir. 1997) (same); In re Drexel Burnham Lambert Group,

13   Inc., 134 B.R. 493, 497 (S.D.N.Y. 1991) (considering "the extent to which settlement is the product

14   of arm's length bargaining"); In re Del Grosso, 106 B.R. 165, 168 (N.D. Ill. 1989) (proponents of

15   settlement must show, inter alia, that settlement was not collusive, but was arrived at after arms-

16   length negotiations, and that there has been sufficient discovery of underlying claims to enable

17   counsel to act intelligently).

18   The documents evidencing the interchange and settlement process between the

19   Debtor and Dynamic/Sabella will bear directly on the Court's consideration of whether the

20   agreement was reached in good faith. Bree has opposed the settlements on the basis that substantial

21   mistakes were made in reaching the settlement between Debtor and Dynamic/Sabella. One of the

22   contributing causes of the unfair settlement is because Mr. Johnson has a conflict of interest vis-à-

23   vis Sabella and he can not afford to anger or upset Dynamic/Sabella, who hold $80,000,000.00 of

24   liens against Mr. Johnson's Vail Lake Project, and also share an equity interest with Mr. Johnson in

25   the Vail Lake Project.[2] The Court must have access to the interchange and communications

26

27   [2] The facts relating to Mr. Johnson's conflict of interest relationship to Dynamic/Sabella and
     his conflict of interest are confirmed in ¶ 3 of the Declaration of Frederick C. Phillips in Support of
28   Motion For Order Approving Settlements With Secured Creditors, etc. [Docket No. 344]. See also

38823191

1  between all the parties to the settlement in order to properly gauge whether the settlements provide

2  what amounts to an unfair windfall to Dynamic/Sabella. See In re Woodson, 839 F.2d 610, 620-21

3  (9th Cir. 1988) (overturning approval of settlement where debtor's own interest was served at

4  expense of creditors). In order for the Court to consider "all facts necessary" to make its

5  determination, Dynamic/Sabella should be ordered to produce the withheld settlement documents.

6        There is no special privilege protecting the communications between the settling

7  parties. Indeed, the parties motivations, analysis and reasons for reaching the settlement is highly

8  probative on the central issues to be decided by this court. The Goodyear Tire & Rubber Co. v.

9  Chiles Power Supply, Inc., 332 F.3d 976 (6th Cir. 2003) case, relied upon by Dynamic/Sabella

10  during the meet and confer process, is completely inapplicable in this case. In Goodyear, the Sixth

11  Circuit held that information disclosed during a private, confidential court-sanctioned settlement

12  conference was privileged under Fed. R. Evid. 501. However, in Goodyear, another party, entirely

13  unrelated to the litigation wherein the settlement negotiations were conducted, sought to depose one

14  of the participants as to his oral statements made during the negotiations in order to show bias and

15  impeach witnesses in a separate litigation. The Sixth Circuit held that such discovery was improper

16  because of the exaggerations and puffery inherent in the settlement process, and the need to protect

17  the participants in settlement to undue burdens and breach of confidentiality. No legal approval of

18  the settlement itself was at issue in the Sixth Circuit case. Conversely, Bree seeks documentary

19  evidence related to settlement negotiations within the same litigation, not to attack the credibility of

20  witnesses, but because the negotiations themselves must be evaluated for reasonableness, good

21  faith, and absence of favoritism and collusion. Debtor and Dynamic/Sabella cannot conceal the

22  facts regarding their purported arms-length negotiations behind the assertion of a different type of

23  privilege unrecognized in the Ninth Circuit, while at the same time asking this Court to find that

24  their settlement was negotiated at arm's length.

27  Supplemental Declaration of Angela Sabella in Support of Motion For Order Approving
Settlements With Secured Creditors, etc. [Docket No. 341], ¶ 9.

- 8 -   Motion to Compel Production of Documents

**D.**    **Dynamic/Sabella Waived Any Privilege as to Documents Disclosed to or Authored by Opposing Counsel**

In addition to the documents withheld as settlement-related, Dynamic/Sabella withheld 312 additional documents as either attorney-client privileged or work product, despite the fact that counsel for Debtor or Debtor's trustee William Johnson were listed as authors or recipients. Because Debtor and Johnson are third parties, disclosure of any privileged material to them waives the privilege. See supra Part II.B. The same is true for any work product. See In re Syncor Erisa Litigation, 229 F.R.D. 636, 645 (C.D. Cal. 2005) (work product protection is waived when document is disclosed to adverse party).

The "common interest" or "joint defense" exception to the waiver of privileges, relied upon by Dynamic/Sabella during the meet and confer process, cannot apply in this case. Debtor and Dynamic/Sabella are opposing parties in this litigation, presumably attempting to maximize the outcome for themselves at the expense of the other. Bree has found no authority to support any contention by Dynamic/Sabella that settlement negotiations or a motion for approval of a settlement constitute the type of joint legal enterprise contemplated by the common interest exception. See United States v. Bergonzi, 216 F.R.D. 487, 496 (N.D. Cal. 2003) (common interest applies to "allied lawyers and clients who are working together in prosecuting or defending a lawsuit"). The mere fact that two adverse parties in a multiparty litigation are both in favor of a particular motion does not suddenly render their legal interests common, such that their communications are privileged. Such an interpretation of the doctrine would lead to absurd results.

In addition, the communications between Debtor and Dynamic/Sabella are of particular importance to the Court, which must determine whether their settlement was reached as the result of arm's-length negotiations and not collusion. See supra Part II.C. Under these circumstances, Dynamic/Sabella should not be permitted to hide behind an overly expansive interpretation of the attorney-client or work product privileges.

III.    **CONCLUSION**

For the foregoing reasons, Bree respectfully requests that the Court enter an Order compelling Dynamic/Sabella to produce forthwith documents (1) authored by or disclosed to Isaac Lei, (2) reflecting settlement negotiations, and (3) authored by or disclosed by counsel for Debtor or William Johnson.

DATED:  March 16, 2006

JEFFER, MANGELS, BUTLER & MARMARO LLP
JOHN A. GRAHAM
JOHN L. HOSACK
DAN P. SEDOR, P.C.

By: _John A. Graham_____
       JOHN A. GRAHAM
Attorneys for Secured Creditor DORENE MAE BREE
AND SOUTH TEMECULA GATEWAY, LLC

PRINTED ON
RECYCLED PAPER

3882319v1